UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
Miami Division

CASE NO.: 09-20915-CIV-GOLD/McALILEY

| | |
|---|---|
| EXIM BRICKELL, LLC, a Florida limited liability company, | ) ) ) ) |
| Plaintiff, | ) ) ) |
| v. | ) ) ) |
| PDVSA SERVICES, INC., a Delaware corporation, and BARIVEN, S.A., a Venezuelan business entity | ) ) ) ) |
| Defendants. | ) ) ) |

**ANSWER, AFFIRMATIVE DEFENSES AND
COUNTERCLAIM ON BEHALF OF BARIVEN, S.A.**

Defendant Bariven, S.A. ("Bariven") answers as follows in response to the numbered allegations set forth in Plaintiff Exim Brickell, LLC's ("Exim Brickell") Amended Complaint:

**JURISDICTION AND VENUE**

1.      Bariven lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in this paragraph.

2.      Bariven admits that PDVSA Services Inc. ("PSI") is a corporation organized and existing under the laws of the State of Delaware which maintains its principal place of business at 1293 Eldridge Parkway, Houston, Texas 77077.

3.      Admitted, except that it denies the allegation to the extent that Plaintiff alleges that PSI was or is anything other than Bariven's purchasing agent.

4.      This paragraph states a legal conclusion to which no response is required.  Further

answering, Bariven admits that the amount in controversy exceeds $75,000, exclusive of interest and costs.

5.      This paragraph states a legal conclusion to which no response is required.

6.      This paragraph states a legal conclusion to which no response is required.  To the extent that this paragraph alleges that Bariven breached any contract with Plaintiff, Bariven denies such allegations.

7.      This paragraph states a legal conclusion to which no response is required.

8.      This paragraph states a legal conclusion to which no response is required.

<u>**FACTS COMMON TO ALL CLAIMS**</u>

<u>The Parties</u>

9.      Admitted.

10.      Bariven admits the allegations of this paragraph, except that it denies that it is "the commercial procuring arm of the Venezuelan government."

11.      Admitted.

12.      Bariven admits that PSI is its international purchasing agent and further admits that PSI is owned by Bariven.  Bariven denies that PSI is "controlled" by Bariven except to the extent that PSI, like any corporate subsidiary, is controlled by PSI's Board of Directors, shareholders, officers and executives.

13.      Admitted.

<u>The Agreement</u>

14.      Bariven admits that it, through its purchasing agent PSI, placed a Purchase Order with Plaintiff on or about March 26, 2008 (the "Purchase Order").  Further answering, Bariven admits that a partial copy (because a portion of the text is cut off on the copy) of this Purchase Order is

- 2 -

attached to the Complaint as Exhibit A, and a complete copy of the Purchase Order is attached to this Answer and Counterclaim as Exhibit A.  To the extent that Plaintiffs allegations are inconsistent with the Purchase Order, Bariven denies them.

15.     Bariven admits that the purchase order provided for CFR delivery of cargo to Puerto Cabello/La Guaira, Venezuela.  Bariven denies that the purchase order provided that payment to Plaintiff was immediately due or that it was required to remit payments to Plaintiff immediately upon receipt of any shipments.  Further answering, Bariven states that the Agreement provided that payment would be "100% net 30 days after receipt and approval of your invoice."  Further answering, to the extent that Plaintiffs allegations are inconsistent with the Purchase Order, Bariven denies them.

16.     Bariven admits that a copy of a letter of credit issued by Girobank is attached to the Complaint as Exhibit B.  To the extent that Plaintiffs allegations are inconsistent with the document, Bariven denies them.

<u>The Parties' Dealings</u>

17.     Bariven admits the allegations of the first sentence of this paragraph, except Bariven denies the allegation to the extent that Plaintiff alleges that powdered milk contaminated with toxic substances (melamine and cyanuric acid) has any "value."  As to the second sentence, Bariven denies that Plaintiff had the seventeen (17) shipments of powdered milk inspected "by the same highly-regarded, international inspection company that Defendants use to inspect products worldwide," and Bariven lacks knowledge or information sufficient to form a belief as to the truth of the allegation that the shipments of powdered milk were actually inspected by the inspection company referenced in the paragraph.  As to the third sentence, Bariven admits that Exim Brickell submitted invoices to PSI, Bariven admits that it approved payment on those invoices to Plaintiff based on representations and warranties of Plaintiff, and Bariven otherwise

denies the allegations in this paragraph.

18.     Bariven admits the allegations of the first sentence of this paragraph, except Bariven denies the allegation to the extent that Plaintiff alleges that powdered milk contaminated with toxic substances (melamine and cyanuric acid) has any "value."  As to the second sentence, Bariven lacks knowledge or information sufficient to form a belief as to the truth of the allegation that the shipments of powdered milk were actually inspected by the inspection company referenced in the paragraph.  As to the third sentence, Bariven admits that it refused to pay Plaintiff for the six (6) shipments referenced in this paragraph because, among other things, of Defendants' concern (since confirmed by laboratory testing) that powdered milk shipped by Plaintiff pursuant to the Purchase Order was contaminated with melamine, and otherwise denies the allegations of this sentence.

19.     Bariven denies the allegations of this paragraph, and, further answering, states that it has refused to accept any further shipments from Plaintiff after laboratory tests confirmed that shipments of powdered milk from Plaintiff were contaminated with melamine.

20.     Bariven denies the allegations contained in the first sentence of this paragraph.  As to the remaining allegations in this paragraph, Bariven admits that copies of certain letters referred to in this paragraph are attached to the Complaint as Exhibit C, and, to the extent that Plaintiff's allegations are inconsistent with those documents, Bariven denies such allegations.

21.     Bariven admits that copies of certain letters referred to in this paragraph are attached to the Complaint as Exhibit C, and, to the extent that Plaintiff's allegations are inconsistent with those documents, Bariven denies such allegations.  Answering further, Bariven denies that PSI "consistently refers to itself synonymously with Bariven" in the letter.

22.     This paragraph contains conclusions of law to which no response is required.  To the

- 4 -

extent a response is required, Bariven denies the allegations in this paragraph.

## COUNT I
### (Breach of Contract)

23.     This paragraph contains no allegations requiring a response.  To the extent a response is required, Bariven incorporates its responses to paragraphs 1-22 as if fully set forth herein.

24.     This paragraph contains conclusions of law to which no response is required.  To the extent a response is required, Bariven denies the allegations in this paragraph.

25.     This paragraph contains conclusions of law to which no response is required.  To the extent a response is required, Bariven denies the allegations in this paragraph.

26.     This paragraph contains conclusions of law to which no response is required.  To the extent a response is required, Bariven denies the allegations in this paragraph.

27.     This paragraph contains conclusions of law to which no response is required.  To the extent a response is required, Bariven denies the allegations in this paragraph.

## COUNT II
### (Goods Sold and Delivered)

28.     This paragraph contains no allegations requiring a response.  To the extent a response is required, Bariven incorporates its responses to paragraphs 1-22 as if fully set forth herein.

29.     This paragraph contains conclusions of law to which no response is required.  To the extent a response is required, Bariven denies the allegations in this paragraph.

## COUNT III
### (Open Account)

30.     This paragraph contains no allegations requiring a response.  To the extent a response is required, Bariven incorporates its responses to paragraphs 1-22 as if fully set forth herein.

 31.     This paragraph contains conclusions of law to which no response is required.  To the extent a response is required, Bariven denies the allegations in this paragraph.

## COUNT IV
### (Account Stated)

32.     This paragraph contains no allegations requiring a response.  To the extent a response is required, Bariven incorporates its responses to paragraphs 1-22 as if fully set forth herein.

33.     Bariven denies that Defendants "agreed to the resulting balance" on May 26, 2008.

34.     Denied.

35.     This paragraph contains conclusions of law to which no response is required.  To the extent a response is required, Bariven denies the allegations in this paragraph.

## COUNT V
### (Unjust Enrichment)

36.     This paragraph contains no allegations requiring a response.  To the extent a response is required, Bariven incorporates its responses to paragraphs 1-22 as if fully set forth herein.

37.     This paragraph contains conclusions of law to which no response is required.  To the extent a response is required, Bariven denies the allegations in this paragraph.

38.     This paragraph contains conclusions of law to which no response is required.  To the extent a response is required, Bariven denies the allegations in this paragraph.

39.     This paragraph contains conclusions of law to which no response is required.  To the extent a response is required, Bariven denies the allegations in this paragraph.

## COUNT VI
### (Tortious Interference With a Business Relationship Against PDVSA Services)

40.     This paragraph contains no allegations requiring a response.  To the extent a response is required, Bariven incorporates its responses to paragraphs 1-21 as if fully set forth herein.

41.     Bariven admits that Girobank issued a letter of credit, a copy of which is attached to the Complaint as Exhibit B, in favor of Exim Brickell, and lacks knowledge or information sufficient

to form a belief as to the full nature or scope of the business relationship between Exim Brickell and Girobank.

42.     Bariven admits that its agent, PSI, was aware of the letter of credit issued by Girobank, but lacks knowledge or information sufficient to form a belief as to the full nature or scope of the relationship between Exim Brickell and Girobank.

43.     This paragraph contains conclusions of law to which no response is required.  To the extent a response is required, Bariven denies the allegations in this paragraph.

44.     This paragraph contains conclusions of law to which no response is required.  To the extent a response is required, Bariven denies the allegations in this paragraph.  Bariven denies an action for tortious interference with a business relationship is properly brought against PSI, as PSI was at all times acting as Bariven's agent, and an agent cannot tortiously interfere with a business relationship to which its own principal is a party.

45.     This paragraph contains conclusions of law to which no response is required.  To the extent a response is required, Bariven denies the allegations in this paragraph.

<u>FIRST AFFIRMATIVE DEFENSE</u>

Plaintiff's Amended Complaint fails to state a claim upon which relief can be granted against PSI because PSI acted at all times as an agent of Bariven and did not express an intention to be bound by the terms of the Agreement between Bariven and Plaintiff, as discussed in further detail in PSI's Motion to Dismiss (*see* D.E. ## 10, 12).

<u>SECOND AFFIRMATIVE DEFENSE</u>

Plaintiff's Complaint fails to state a claim upon which relief can be granted because the Complaint does not contain any allegation that Plaintiff has requested adequate assurances, and because of Plaintiff's own material breach as set forth in more detail in Bariven's Counterclaim.

<u>THIRD AFFIRMATIVE DEFENSE</u>

As set forth in more detail in Bariven's Counterclaim, Plaintiff has breached the contract by providing shipments of powdered milk that did not meet the quality specifications of the contract, and/or contained "toxic substances" or "strage matter," in that they were contaminated with melamine and/or cyanuric acid.  Bariven was therefore entitled to revoke acceptance of any milk already accepted, to reject milk it had not yet accepted and to cancel the contract.

<u>FOURTH AFFIRMATIVE DEFENSE</u>

As set forth in more detail in Bariven's Counterclaim, any alleged damages suffered by Plaintiff were the direct and proximate result of Plaintiff's own conduct, including without limitation its breaches of contract.

<u>FIFTH AFFIRMATIVE DEFENSE</u>

Plaintiff's claims are barred by the doctrine of unclean hands due to Plaintiff's conduct set forth in more detail in Bariven's Counterclaim.

<u>SIXTH AFFIRMATIVE DEFENSE</u>

Plaintiff's claims are barred by the doctrines of estoppel and/or waiver due to Plaintiff's conduct set forth in more detail in Bariven's Counterclaim.

<u>SEVENTH AFFIRMATIVE DEFENSE</u>

In light of Plaintiff's conduct as set forth in more detail in Bariven's Counterclaim, and because, on information and belief, Plaintiff has failed to attempt to sell any undelivered quantity of powdered milk on the open market, Plaintiff has failed to mitigate any damages it claims to have suffered .

EIGHTH AFFIRMATIVE DEFENSE

Plaintiff's claims are barred due to a failure of consideration due to the contamination as described in more detail in Bariven's Counterclaim.

RESERVATION

Defendant/Counterclaimant reserves the right to assert such other defenses as may be discovered, disclosed, or may become available or apparent during discovery and other proceedings in this action.

## COUNTERCLAIMS OF BARIVEN, S.A.

*The Parties*

46.     Counterclaim Plaintiff Bariven, S.A. ("Bariven") was and is an agency or instrumentality of a foreign state as defined in 28 U.S.C. §1603(b).  Bariven is a subsidiary of Petróleos de Venezuela, S.A., the state-owned oil company of the Bolivarian Republic of Venezuela. Beginning in November 2007, Bariven began purchasing food commodities in the international markets to alleviate the emergency food shortage then plaguing Venezuela.

47.     On information and belief, counterclaim Defendant Exim Brickell, LLC ("Exim Brickell") was and is a limited liability company organized and existing under the laws of the State of Florida that maintains its principal place of business at 13728 SW 84th Street, Miami, Florida 33183.  On information and belief, Exim Brickell's sole member and principal is Rogelio Salges.  Exim Brickell is an international commodities trader with which Bariven entered into a contracts for the purchase and delivery of powdered milk and for the purchase and delivery of rice.

*Jurisdiction and Venue*

48.     This Counterclaim is within the subject matter jurisdiction of this Court in accordance with 28 U.S.C. § 1367(a), 28 U.S.C. § 1332(a)(4) and Fed. R. Civ. P. 13 in that the claims asserted herein: (a) arise out of the same transaction or occurrence that is the subject matter of Exim Brickell's claim and do not require adding another party over whom the court cannot acquire jurisdiction, (b) are so related to Exim Brickell's claims (of which this Court has original jurisdiction) that they form part of the same case or controversy under Article III of the United States Constitution, or (c) this is an action between a foreign state, as defined in 28 U.S.C. s. 1603(a)-(b), as counterclaim plaintiff and a citizen of a State, where the amount in controversy exceeds the sum or value of $75,000, exclusive of interests and costs.

49.     This Court has personal jurisdiction over Exim Brickell pursuant to Sections 48.193(1)(a) and (2), Florida Statutes.  In particular, Counterclaim Plaintiff's claims arise out of: (a) Exim Brickell's operating, conducting, engaging in, or carrying on a business or business venture in Florida and (b) Exim Brickell's engaging in substantial and not isolated activities in Florida.

50.     Venue is appropriate in this Court pursuant to 28 U.S.C. § 1391(b) and (c).

*Factual Allegations: Contract 62310*

51.     Bariven, through its purchasing agent PSI, submitted Purchase Order No. 5100062310 ("P.O. 62310") to Exim Brickell on or about March 26, 2008.  (A true copy of P.O. 62310 is attached as Exhibit A to Defendants' Answer, Affirmative Defenses and Counterclaim)

52.     Exim Brickell accepted P.O. 62310, thereby creating a valid and enforceable agreement between itself and Bariven ("Contract 62310").

53.     In Contract 62310, Exim Brickell agreed to provide 26,000 metric tons of powdered milk at a unit price of $4,785.00 per metric ton, for a total price of $124,410,000.  Exim Brickell

further agreed that the milk "must be free of preservatives, neutralizers, toxic substances or any strange matter." In connection with Contract 62310, Bariven caused a letter of credit in an amount exceeding $9.5 million, to be issued in favor of Exim Brickell from Girobank in Curacao.

54.     In Contract 62310, Exim Brickell agreed to make eight shipments of 3,250 metric tons of powdered milk, one shipment per month beginning in May 2008 and concluding in December 2008. Exim Brickell further agreed to ship the powdered milk CFR to Puerto Cabello or La Guaira, Venezuela.

55.     In Contract 62310, Exim Brickell also agreed that its powdered milk "[p]roduct . . . must not leave [its] facilities until the assigned inspector of designated inspection agency has issued a release authorizing shipping of the product or equipment."

56.     Exim Brickell began making deliveries and submitting invoices, bills of lading ("B/L") and other shipping documents to PSI for payment by Bariven in June 2008.

57.     Included among the documents provided by Exim Brickell in connection with various shipments of powdered milk pursuant to Contract 62310 were certain reports from a company named SGS CSTC Standards Technical Services Co., Ltd. ("SGS China"). On information and belief, SGS China is an inspection, testing and certification company based in and operating in China. On information and belief, SGS China is an affiliate of the SGS Group, a Swiss holding company which owns a number of other subsidiaries or affiliates in various locations throughout the world which also provide inspection, testing and certification services under the SGS name. On information and belief, Exim Brickell contracted directly with SGS China to perform certain services, as directed by Exim Brickell, for Exim Brickell in China. Bariven and PSI played no role in Exim Brickell's selection of SGS China, did not assign or designate SGS China to perform

inspections of the powdered milk under Contract 62310, and had no involvement in determining the scope or methodology of the services SGS China provided to Exim Brickell.

58.     Between June and mid-September of 2008, Exim Brickell delivered sixteen shipments of powdered milk from China to Bariven in Venezuela, totaling 9,480 metric tons of powdered milk, and submitted invoices in connection with those shipments.  Bariven, through PSI, paid those invoices in an amount totaling approximately $45,361,800.

59.     In connection with each of these shipments, Exim Brickell provided, among other things, documents from SGS China, including Load Supervision Reports, Sampling Reports, and Testing Reports, although not all three types of documents were provided in connection with each shipment.  Exim Brickell represented that the SGS China documents provided in connection with a given shipment were in fact associated with the specific powdered milk in that shipment and constituted reports regarding the loading, sampling and testing of the powdered milk in that shipment.  These SGS China Test Reports indicated that a given powdered milk sample was tested for certain specific things such as the vitamin protein and fat content of the milk, and the presence of mold, salmonella, listeria, and other specific bacteria.  However, these SGS China Test Reports did not indicate that the powdered milk sample had been tested for the presence of melamine.  As of this time period, there had not yet been any public disclosure of the possible presence of melamine contamination in powdered milk from China.

60.     Melamine is a chemical used to create certain resins and plastics.  Over time, melamine can break down into the related compound, cyanuric acid.  With regard to food, melamine and cyanuric acid are chemical contaminants.  Neither chemical should be present in powdered milk in any amount.  In order to understand the true level of contamination, both melamine and cyanuric acid must be taken into account.  These substances are toxic to humans and animals.

For example, in 2007 widespread pet illness and death was attributed to melamine contamination of pet food causing melamine-cyanurate crystals in the kidneys of these animals.  In 2008, illness and death of children was linked to the contamination in China of milk and infant formula with melamine and cyanuric acid.

61.    In mid-September 2008, news outlets began reporting that milk from certain Chinese milk manufacturers was contaminated with melamine.  Shortly thereafter, the Chinese government suspended all shipments of milk from China and commenced an investigation.

62.    On September 19, 2008, a Bariven employee emailed Rogelio Salges, the principal of Exim Brickell, and requested information on the plants that supplied Exim Brickell with milk.

63.    On September 23, 2008, Mr. Salges provided assurances to the Bariven employee that, among other things, Exim Brickell did not use the plants or the company publicly implicated in the melamine scandal.  Mr. Salges also stated that Exim Brickell would test for the presence of melamine in future shipments of powdered milk.

64.    On or about October 1, 2008, Exim Brickell represented that SGS China conducted tests on retained samples of powdered milk from the sixteen shipments of powdered milk that had already been delivered by Exim Brickell, and for which Bariven had already paid Exim Brickell. Exim Brickell sent Bariven and PSI copies of four SGS China Test Reports which indicated that the samples tested, which Exim Brickell represented had come from the prior shipments, were not contaminated with melamine.  On information and belief, the four SGS China Test Reports were associated with the following four prior shipments:

    a.    Invoice Date July 18, 2008; B/L No. PBN000716;

    b.    Invoice Date August 20, 2008; B/L No. COSU6018549050;

    c.    Invoice Date September 8, 2008; B/L No. PBN001762;

- 13 -

      d.      Invoice Date September 12, 2008; B/L No. PBN001852.

65.     In December 2008, Exim Brickell resumed shipments of powdered milk pursuant to Contract 62310.  Exim Brickell delivered the first of these resumed shipments, B/L No. PBN003576, involving 300 metric tons of powdered milk with an invoice date of December 9, 2008.  In connection with this shipment, Exim Brickell provided to Bariven and PSI an SGS China Test Report, which Exim Brickell represented was a test of a sample from this particular shipment, which indicated that the sample was not contaminated with melamine.  Bariven, through PSI, paid the invoice for this shipment in the amount of $1,435,500.00.

66.     As a precaution, Bariven decided to conduct independent tests for melamine contamination.  Bariven caused samples to be taken from two of the prior Exim Brickell powdered milk shipments (the seventh and eighth of the shipments received).  The shipments sampled and tested were:

      a.      Invoice Date August 1, 2008; B/L No. PBN001138; and

      b.      Invoice Date August 5, 2008; B/L No. PBN001149.

67.     Silliker, Inc. ("Silliker") is a leading internationally accredited food testing and consulting network with laboratories located throughout the world, including in the United States.  Certified Laboratories, Inc. ("Certified Laboratories") is a private, independent group of laboratories located in the United States with accreditations and certifications from the U.S. Department of Agriculture and other federal, state and private organizations and with over 75 years of experience in the dairy industry.  Silliker tested six samples from the shipment with B/L No. PBN001138, and two samples from the shipment with B/L No. PBN001149.  Certified Laboratories tested twelve samples from the shipment with B/L No. PBN001138, and four samples from the shipment with B/L No. PBN001149.

68.     Silliker tested all eight samples for the presence of melamine, but did not test for cyanuric acid.  Silliker's tests showed that all six samples taken from the shipment with B/L No. PBN001138 contained melamine, with four of the samples containing melamine in amounts greater than 1 part-per million ("ppm") including one with melamine contamination as high has 83 ppm.  Silliker's tests on the two samples from the shipment with B/L No. PBN001149 showed that both contained melamine in amounts greater than 1 ppm including one sample as high as 2480 ppm.  The average level of contamination in these eight samples (without accounting for cyanuric acid) was nearly 325 ppm.  Exim Brickell was provided with copies of these test results months ago.

69.     Certified Laboratories tested its sixteen samples for both melamine and cyanuric acid. Certified Laboratories' tests on all twelve samples from the shipment with B/L No. PBN001138 and all four samples from the shipment with B/L No. PBN001138 contained melamine and/or cyanuric acid in excess of 1 ppm including one sample showing melamine contamination as high as 1274 ppm.  The average level of melamine and/or cyanuric acid contamination in these sixteen samples was nearly 140 ppm.  Exim Brickell was provided with copies of these test results months ago.

70.     From mid-December to January 2009, Exim Brickell submitted invoices for five additional shipments, totaling 2,000 metric tons of powdered milk.  Exim Brickell also submitted melamine test results that it represented were from samples from these five shipments.  In connection with these shipments, Exim Brickell provided to Bariven and PSI certain SGS China Test Reports, which Exim Brickell represented were reports of tests of samples from these particular shipments, and which indicated that the samples were not contaminated with melamine.

- 15 -

71.     Bariven refused to pay Plaintiff for these five shipments because, among other things, of Bariven's concern that the powdered milk shipped by Exim Brickell from China was contaminated with melamine.  Exim Brickell has made a claim on the Girobank letter of credit in Curacao in the amount of approximately $9.5 million and, as of the date of this Counterclaim, and even though Exim Brickell is aware of the Silliker and Certified Laboratories test results described above, Exim Brickell continues to seek payment on the letter of credit from Girobank and has failed to take any further action with regard to the melamine and cyanuric acid contamination detected.

72.     As of the filing of this counterclaim, Bariven has had samples from three additional Exim Brickell shipments tested by Certified Laboratories for the presence of melamine and cyanuric acid.  These shipments were the third, fourth, and fifteenth of the shipments received from Exim Brickell.  Two of these shipments (the fourth and sixteenth) were, on information and belief, included in the group that Exim Brickell represented (in October 2008) had been tested for the presence of melamine by SGS China at Exim Brickell's direction and for which Exim Brickell had provided SGS China Test Reports stating that there was no melamine contamination.  The shipments that Bariven caused to be tested were:

      a.      Invoice Date July 11, 2008; B/L No. PBN000494;

      b.      Invoice Date July 18, 2008; B/L No. PBN000716; and

      c.      Invoice Date September 8, 2008; B/L No. PBN001762.

73.     The results of Certified Laboratories' test of one sample from the shipment with B/L No. PBN000494 revealed the presence of melamine and cyanuric acid contamination of 8.48 ppm. Results from tests on additional samples are expected.

74.     The results of Certified Laboratories' tests of twenty-nine samples from the shipment with B/L No. PBN000716 revealed the presence of measurable levels (for these tests, the measurable level is an amount above .25 ppm) of melamine and cyanuric acid in twenty-seven samples.  At least nine of these samples contained melamine and/or cyanuric acid levels above 1 ppm, with one sample as high as 19.7 ppm.  Results from tests on additional samples are expected.

75.     The results of Certified Laboratories' tests of ten samples from the shipment with B/L No. PBN001762 revealed the presence of measurable levels (for these tests, the measurable level is an amount above .25 ppm) of melamine and cyanuric acid in each sample.  Seven of these samples contained melamine and/or cyanuric acid levels above 1 ppm, with one sample as high as 353.3 ppm.  Results from tests on additional samples are expected.

76.     In sum, Bariven has had independent laboratories test samples from Exim Brickell's third, fourth, seventh, eighth and fifteenth powdered milk shipments for the presence of melamine and/or cyanuric acid, and significant melamine and/or cyanuric acid contamination has been found in each shipment tested.  The average level of melamine and/or cyanuric acid in the test results from the sixty-four samples described above from these five shipments is nearly 85 ppm.

77.     To date, all of the powdered milk supplied by Exim Brickell has been held in storage at the Venezuelan ports.  It is worthless to Bariven.  It has not been and will not be distributed to the people of Venezuela.

*Factual Allegations: Contract 65038*

78.     Bariven, through its purchasing agent PSI, submitted Purchase Order No. 5100065038 ("P.O. 65038") to Exim Brickell on or about June 12, 2008.  (A true copy of P.O. 65038 is attached hereto as Exhibit B.)

79.     Exim Brickell accepted P.O. 65038, thereby creating a valid and enforceable agreement between itself and Bariven ("Contract 65038").

80.     In Contract 65038, Exim Brickell agreed to provide 19,200 metric tons of white rice at a unit price of $1,021.00 per metric ton, for a total price of $19,603,200.

81.     In Contract 65038, Exim Brickell agreed to make deliveries of 4,000 metric tons per month beginning in July 2008 and ending in November 2008.  Exim Brickell also agreed to provide all original export documentation to Bariven at least seven working days prior to the arrival of a given shipment in Venezuela.  Specifically, in Contract 65038 Exim Brickell agreed to provide originals of the following documents to Bariven: (1) Bill of Lading, (2) Commercial Invoice; (3) Inspection Certificates; (4) Phytosanitary Certificate; and (5) Certificate of Origin. (Exhibit B, pp. 6-7)  The presentation of original documentation is an important part in the process of bringing food products such as the rice at issue in Contract 65038 into Venezuela.

82.     Exim Brickell failed to provide original documentation, including without limitation original bills of lading, for certain shipments under Contract 65038, including but not limited to a shipment of 250 tons of rice that arrived in Venezuela in early January 2009.

83.     Not withstanding Exim Brickell's failure to provide the necessary original export documentation, and acting in good faith, Bariven, though PSI, promptly paid for all shipments of rice pursuant to Contract 65038, including $255,250 for the shipment of 250 tons that arrived in early January 2009 but for which Exim Brickell had not provided original documentation.

84.     Exim Brickell's failure to provide original export documents has prevented Venezuelan customs agents from nationalizing some of its shipments of rice, including without limitation the shipment of 250 tons that arrived in early January 2009, and has necessitated the storage of many containers of rice at ports in Venezuela.

- 18 -

85.     Bariven, through PSI, requested on numerous occasions that Exim Brickell provide the required original export documentation, including, for example, written requests in January, February and March of 2009 that Exim Brickell provide the necessary original documents for the January shipment of 250 tons.  Exim Brickell did not provide the requested original documentation.  Instead, Exim Brickell either claimed that its rice supplier was to blame or ignored Bariven's requests altogether.

86.     On information and belief, Exim Brickell's Brazilian rice supplier, Zaeli Alimentos Ltda. ("Zaeli"), has instructed the company that transported the rice not to release the original export documents to Bariven because Exim Brickell has not yet paid Zaeli for certain shipments of rice, including the January shipment of 250 tons.

87.     Substantial storage charges and other related expenses associated with the ongoing storage of the containers of rice continue to accrue, and Bariven has been denied for many months the ability to distribute rice for which it has paid Exim Brickell.

**COUNT I**
**Breach of Contract 62310**

88.     Bariven repeats and re-alleges ¶¶ 46 through 87.

89.     Exim Brickell and Bariven are parties to Contract 62310, a valid and enforceable agreement for the purchase and delivery of 26,000 metric tons of powdered milk at a unit price of $4,785.00 per metric ton, for a total price of $124,410,000.

90.     In Contract 62310, Exim Brickell agreed to provide powdered milk that was free from toxic substances and fit for human consumption.

91.     Pursuant to Contract 62310, to-date Bariven has paid to Exim Brickell approximately $46,797,300.  In addition, Exim Brickell has asserted a claim under a letter of credit issued by Girobank seeking additional payment in the amount of approximately $9.5 million.

92.     Exim Brickell breached Contract 62310 by providing powdered milk that is contaminated with melamine and/or cyanuric acid, which are toxic substances and/or strange matter (as those terms are used in Contract 62310), and which render the milk unfit for human consumption.

93.     Bariven did not discover the non-conformity when it received the powdered milk.  When Bariven became concerned about the possible presence of melamine, Exim Brickell assured Bariven that the milk was not contaminated and provided reports purporting to show the same.

94.     Bariven is thus entitled to revoke acceptance of any milk it accepted, and to reject any other shipments of milk.

95.     The presence of melamine and/or cyanuric acid contamination in multiple shipments has substantially impaired the value of the whole contract, and therefore represents a breach of the whole contract.

96.     Exim Brickell's breach of Contract 62310 caused Bariven to suffer damages in an amount to be determined at trial, but including at least the $46,797,300 previously paid to Exim Brickell pursuant to Contract 62310, together with pre- and post-judgment interest, costs, incidental and consequential damages and any other relief this court deems equitable, just and proper.  In addition Exim Brickell should be precluded from continuing to pursue any claim on the Girobank letter of credit, and, in the event that Exim Brickell receives any proceeds from the letter of credit, Bariven will have suffered that amount as additional damages.

**COUNT II**
**Breach of Contract (65038)**

97.     Bariven repeats and re-alleges ¶¶ 46 through 87.

98.     Exim Brickell and Bariven are parties to Contract 65038, a valid and enforceable agreement for the purchase and delivery of 19,200 metric tons of white rice at a unit price of $1,021.00 per metric ton, for a total price of $19,603,200.

- 20 -

99.     In Contract 65038, Exim Brickell agreed to provide all original export documentation to Bariven at least seven working days prior to the arrival of a given shipment in Venezuela. Specifically, Contract 65038 required that Exim Brickell provide originals of the following documents to Bariven: (1) Bill of Lading, (2) Commercial Invoice; (3) Inspection Certificates; (4) Phytosanitary Certificate; and (5) Certificate of Origin.

100.    Exim Brickell has breached Contract 65038 by failing to provide the required original export documentation.

101.    On information and belief, the reason for Exim Brickell's breach is that it has failed to make payments to its rice supplier, which has caused the supplier to not release the export documentation.

102.    As a result of Exim Brickell's breach, Bariven has suffered damages in an amount to be determined at trial, but including at least any storage charges and other related expenses associated with the ongoing storage of the containers of rice which Bariven incurs, costs associated with efforts by Bariven to obtain nationalization and posession of the rice, and damages associated with the denial of Bariven's ability to distribute rice for which it has paid Exim Brickell for many months, together with pre- and post-judgment interest, costs, incidental and consequential damages and any other relief this court deems equitable, just and proper.

**Breach of Implied Warranty of Merchantability (Contract 62310)**

103.    Bariven repeats and re-alleges ¶¶ 46 through 87.

104.    Exim Brickell's shipments of powdered milk to Bariven included an implied warranty that the goods would be merchantable.

105.    As detailed above, Exim Brickell failed to deliver merchantable goods to Bariven because the powdered milk is contaminated with melamine and/or cyanuric acid.

106.     Because of the contamination, the powdered milk delivered by Exim Brickell was not fit for the ordinary purpose for which powdered milk is used.

107.     Exim Brickell's actions, as detailed above, constitute a breach of the implied warranty of merchantability.

108.     As a result of Exim Brickell's breach, Bariven has suffered damages in an amount to be determined at trial, but including at least the $46,797,300 previously paid to Exim Brickell pursuant to Contract 62310, together with pre- and post-judgment interest, costs, incidental and consequential damages and any other relief this court deems equitable, just and proper.  In addition Exim Brickell should be precluded from continuing to pursue any claim on the Girobank letter of credit, and, in the event that Exim Brickell receives any proceeds from the letter of credit, Bariven will have suffered that amount as additional damages.

## COUNT III
### Breach of Implied Warranty of Fitness for Particular Purpose (Contract 62310)

109.     Bariven repeats and re-alleges ¶¶ 46 through 87.

110.     Exim Brickell knew and/or had reason to know the particular purpose for which the powdered milk was to be used by Bariven, that is, as milk for human consumption by the people of Venezuela.

111.     Bariven reasonably relied on Exim Brickell's skill and judgment to deliver suitable powdered milk.

112.     Exim Brickell knew and/or had reason to know of Bariven's reliance.

113.     Exim Brickell's actions, in providing milk contaminated with melamine and/or cyanuric acid, constitute a breach of the implied warranty of fitness for a particular purpose.

114.     As a result of Exim Brickell's breach, Bariven has suffered damages in an amount to be determined at trial, but including at least the $46,797,300 previously paid to Exim Brickell

pursuant to Contract 62310, together with pre- and post-judgment interest, costs, incidental and consequential damages and any other relief this court deems equitable, just and proper.  In addition Exim Brickell should be precluded from continuing to pursue any claim on the Girobank letter of credit, and, in the event that Exim Brickell receives any proceeds from the letter of credit, Bariven will have suffered that amount as additional damages.

**COUNT IV**
**Unjust Enrichment (Contract 62310)**

115.    Bariven repeats and re-alleges ¶¶ 46 through 87.

116.    Bariven conferred a benefit upon Exim Brickell by paying approximately $46,797,300 for powdered milk delivered by Exim Brickell, and by causing a letter of credit to be issued by Girobank in favor of Exim Brickell.

117.    Bariven made the payments with the expectation that Exim Brickell had performed and would perform its obligations under Contract 62310.

118.    Exim Brickell accepted Bariven's payments but failed to perform its obligations under Contract 62310 by providing shipments of powdered milk contaminated with melamine and/or cyanuric acid.

119.    Exim Brickell has received the benefit of Bariven's payments and is seeking to obtain a benefit by claiming approximately $9.5 million under the Girobank letter of credit.

120.    In light of Exim Brickell's failure to perform its obligations under Contract 62310, its retention of the $46,797,300 benefit conferred upon it would be inequitable and unjust.  In addition, it would be inequitable and unjust for Exim Brickell to be permitted to pursue any claim on the Girobank letter of credit, and, in the event that Exim Brickell receives any proceeds from

the letter of credit, it would be inequitable and unjust for Exim Brickell to be permitted to retain any of those proceeds.

### COUNT V
### Breach of Implied Covenant of Good Faith, Fair Dealing, and
### Commercial Reasonableness (Contract 62310)

121.    Bariven repeats and re-alleges ¶¶ 46 through 87.

122.    Exim Brickell and Bariven are parties to Contract 62310, a valid and enforceable agreement for the purchase and shipment of 26,000 metric tons of powdered milk at a unit price of $4,785.00 per metric ton, for a total price of $124,410,000.

123.    Bariven made payments in excess of $46,797,300, with the reasonable expectation that Exim Brickell was complying with its contractual obligations to deliver powdered milk free from toxic substances and strange matter, and fit for human consumption.

124.    Following media reports about the presence of melamine contamination in certain Chinese milk, Exim Brickell repeatedly assured Bariven that the milk Exim Brickell was providing was not contaminated with melamine.  Exim Brickell also provided Bariven with test reports that it represented were from samples of milk it had shipped to Bariven, and represented that the test reports demonstrated that the powdered milk was not contaminated with melamine.

125.    In light of the Silliker and Certified Laboratories test results showing pervasive melamine and cyanuric acid contamination, Exim Brickell was not complying with its contractual obligations to deliver powdered milk free from toxic substances and strange matter, and fit for human consumption, and Exim Brickell's repeated representations that the powdered milk was not contaminated with melamine were false.

126.     Exim Brickell's actions and omissions constitute a breach of the covenant of good faith and fair dealing implied in its contract with Bariven.

127.     As a result of Exim Brickell's breach, Bariven has suffered damages in an amount to be determined at trial, but including at least the $46,797,300 previously paid to Exim Brickell pursuant to Contract 62310, together with pre- and post-judgment interest, costs, incidental and consequential damages and any other relief this court deems equitable, just and proper.  In addition Exim Brickell should be precluded from continuing to pursue any claim on the Girobank letter of credit, and, in the event that Exim Brickell receives any proceeds from the letter of credit, Bariven will have suffered that amount as additional damages.

### COUNT VI
### Negligent Misrepresentation (Contract 62310)

128.     Bariven repeats and re-alleges ¶¶ 46 through 87.

129.     In connection with each shipment of powdered milk, Exim Brickell represented that the shipment complied with contractual specifications, contained no toxic substances or strange matter, and was fit for human consumption.  Following media reports about the presence of melamine contamination in certain Chinese milk, Exim Brickell repeatedly represented to Bariven that the powdered milk Exim Brickell had provided and was providing was not contaminated with melamine.  Exim Brickell also provided Bariven with test reports that it represented were from samples of milk it had shipped to Bariven, and represented that the test reports demonstrated that its powdered milk was not contaminated with melamine.

130.     These representations were material, and Exim Brickell made the representations with the intent to induce Bariven to rely on them.

131.     Bariven reasonably relied on the misrepresentations.

- 25 -

132.    These representations were false, as the Silliker and Certified Laboratories test results described above demonstrate pervasive melamine and cyanuric acid contamination in the powdered milk supplied by Exim Brickell.

133.    Exim Brickell reasonably should have known that its representations were false.

134.    As a result of Exim Brickell's misrepresentations, Bariven has suffered damages in an amount to be determined at trial, but including at least the $46,797,300 previously paid to Exim Brickell pursuant to Contract 62310, together with pre- and post-judgment interest, costs, incidental and consequential damages and any other relief this court deems equitable, just and proper.  In addition Exim Brickell should be precluded from continuing to pursue any claim on the Girobank letter of credit, and, in the event that Exim Brickell receives any proceeds from the letter of credit, Bariven will have suffered that amount as additional damages.

**COUNT VII**
**Deceptive and Unfair Trade Practices - FDUPTA (Contract 62310)**

135.    Bariven repeats and re-alleges ¶¶ 46 through 87.

136.    Bariven is a consumer within the meaning of Florida's Deceptive and Unfair Trade Practices Act ("FDUPTA").

137.    Exim Brickell's (a) false representations (as more fully described above) that the powdered milk it supplied to Bariven met the contractual specifications, was free from toxic substances and strange matter, was fit for human consumption, and was not contaminated with melamine, (b) breaches (as more fully described above) of express and implied warranties, (c) failures to address Bariven's discovery of the presence of significant contamination of the powdered milk in any meaningful way, and (d) continued pursuit of payment on the Girobank letter of credit after being informed of Bariven's discovery of the presence of significant

contamination, all constitute unfair and/or deceptive acts or practices in the conduct of trade or commerce.

138.     As a result of Exim Brickell's unfair and/or deceptive acts or practices described above, Bariven has suffered damages in an amount to be determined at trial, but including at least the $46,797,300 previously paid to Exim Brickell pursuant to Contract 62310, together with pre- and post-judgment interest, costs, incidental and consequential damages and any other relief this court deems equitable, just and proper.  In addition Exim Brickell should be precluded from continuing to pursue any claim on the Girobank letter of credit, and, in the event that Exim Brickell receives any proceeds from the letter of credit, Bariven will have suffered that amount as additional damages.

WHEREFORE, Bariven requests that this Court grant the following relief:

    a.      Enter judgment in favor of Bariven and against Exim Brickell;

    b.      Award compensatory damages in favor of Bariven for all such damages sustained by Bariven as a result of Exim Brickell's breaches of contract, including any breaches of the implied covenant of good faith, fair dealing, and commercial reasonableness;

    c.      Order the disgorgement and return of any benefits conferred by Bariven upon Exim Brickell and unjustly retained by Exim Brickell;

    d.      Preliminarily and permanently enjoin Exim Brickell from continuing to pursue any claim on the Girobank letter of credit, and, in the event that Exim Brickell receives any proceeds from the letter of credit, order the disgorgement and return of such proceeds.

e.     Award incidental and consequential damages in favor of Bariven for all such damages sustained by Bariven as a result of Exim Brickell's breaches of contract, including any breaches of the implied covenant of good faith, fair dealing, and commercial reasonableness;

f.     Award Bariven its attorneys' fees, costs, and other expenses incurred in this action; and

g.     Grant Bariven such other relief as the Court considers appropriate.


Dated:  July 6, 2009                                    Respectfully submitted,

                                                        BARIVEN, S.A.

                                                        By its attorneys,

                                                          /s/ Brian Silverio
                                                        Brian Silverio, *Florida Bar No. 0183301*
                                                        SILVERIO & HALL, P.A.
                                                        150 West Flagler St., PH 2850
                                                        Miami, FL 33130
                                                        Telephone:  (305) 371-2756
                                                        Facsimile:  (305) 371-2744

                                                        Ronald E.M. Goodman, *pro hac vice*
                                                        Anthony D. Mirenda, *pro hac vice*
                                                        K. Neil Austin, *pro hac vice*
                                                        Thomas J. Bone, *pro hac vice*
                                                        Thomas R. Ayres, *pro hac vice*
                                                        FOLEY HOAG LLP
                                                        1875 K Street, N.W., Suite 800
                                                        Washington, D.C. 20006-1238
                                                        Telephone:  (202) 232-1200
                                                        Facsimile:  (202) 785-6687

<u>CERTIFICATE OF SERVICE</u>

WE HEREBY CERTIFY that, on this 6th day of July 2009, we electronically filed the foregoing document with the Clerk of the Court using CM/ECF.  We also certify that the foregoing document is being served this day on all counsel of record identified on the attached

Service List in the manner specified, either via transmission of Notice of Electronic Filing generated by CD/ECF or in some other authorized manner to those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

/s/ Brian Silverio
Brian Silverio