# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF FLORIDA
## MIAMI DIVISION

CASE NO.: 09-20915-CIV-GOLD/McALILEY

|  |  |
|---|---|
| Exim Brickell LLC, | ) |
| Plaintiff/Counterclaim-Defendant, | ) |
|  | ) |
| v. | ) |
|  | ) |
| Bariven, S.A., | ) |
| Defendant/Counterclaim-Plaintiff | ) |
|  | ) |

## DEFENDANT/COUNTERCLAIM-PLAINTIFF BARIVEN S.A.'S MOTION FOR PARTIAL SUMMARY JUDGMENT

Defendant/Counterclaim-Plaintiff Bariven, S.A. ("Bariven"), pursuant to Federal Rule of Civil Procedure 56 and Local Rule 7.5, moves this Court for Partial Summary Judgment against Exim Brickell, LLC ("Exim") on Counts I and II of Bariven's Counterclaim (D.E. #33) and on all remaining counts of Exim's Second Amended Complaint (D.E. #24).[1]  As grounds for this Motion, Bariven states as follows.

## I. BACKGROUND

This case involves two contracts for large quantities of basic food commodities:  (1) a contract for 26,000 tons of powdered milk (the "Milk Contract") and (2) a contract for 19,200 tons of white rice (the "Rice Contract").  The undisputed facts demonstrate that the seller, Exim, materially breached both contracts, thereby causing Bariven, the buyer, to suffer tens of millions of dollars in damages.

---

[1] Accompanying this Memorandum, pursuant to L.R. 7.5, is Bariven's Concise Statement of Undisputed Material Facts.  The Statement of Facts is cited as "SOF at ¶ __."  Spanish-language documents cited in the Statement of Facts are accompanied by certified translations bearing the designation "-TR."

The undisputed facts show that Exim shipped Bariven thousands of tons of powdered milk contaminated with the toxic substance melamine and its analogs, including cyanuric acid. This powdered milk was intended for distribution through government-subsidized grocery stores and consumption by the people of Venezuela. Viewed narrowly through the lens of the Florida Uniform Commercial Code ("UCC"), which governs the contract-based claims involved in this dispute, Exim's breaches were that it provided nonconforming goods (in the case of the Milk Contract) and failed to provide required export documents (in the case of the Rice Contract). Viewed in its full context, however, Exim's Milk Contract breach was much more than that. It was a matter of providing toxic milk to its unsuspecting buyer, Bariven, disregarding information that one of its suppliers had been implicated in the Chinese scandal, falsely assuring Bariven of the quality and safety of the milk, and refusing to work with Bariven to correct the nonconformity.

Bariven seeks summary judgment that Exim materially breached the Milk and Rice Contracts as a matter of law and is liable to Bariven for the damages that Bariven has incurred as a result of those breaches. Bariven also seeks summary judgment as to all remaining counts of Exim's Complaint, on which Exim cannot prevail as a matter of law. Bariven reserves its remaining claims for the bench trial in this matter, if necessary.[2]

---

[2] In addition to the breach of contract claims, Bariven has the following additional claims against Exim arising out of the Milk Contract: (1) breach of the implied warranty of merchantability, (2) breach of the implied warranty of fitness for a particular purpose, (3) unjust enrichment, (4) breach of the implied covenant of good faith, fair dealing, and commercial reasonableness, and (5) deceptive and unfair trade practices. If the Court finds Exim liable for breach of the Milk Contract, each additional claim other than the deceptive and unfair trade practices claim would be rendered moot as a practical matter, since the damages to be recovered by Bariven under these other claims would be duplicative of the damages under the breach of contract claims. Thus, only Exim's liability and additional damages on the unfair/deceptive practices claim would remain for trial.

# II. <u>FACTS</u>

Bariven is a wholly-owned subsidiary of Petróleos de Venezuela, S.A. and is located in Caracas, Venezuela.  SOF at ¶1.  In 2007, Bariven was tasked with purchasing substantial quantities of basic food commodities on the international market.  *Id.*  Bariven undertook this task with the assistance of its purchasing agent, PDVSA Services, Inc. ("PSI"), a wholly-owned subsidiary of Bariven located in Houston, Texas.  SOF at ¶2.  Exim is a Florida corporation that buys and sells food commodities.  SOF at ¶3.  Exim and Bariven were parties to several food contracts, including the two at issue in this case.  SOF at ¶4.

## 1.      **The Milk Contract**

The Milk Contract is set out in a March 26, 2008 purchase order issued to Exim for 26,000 tons of milk powder, to be delivered at a rate of 3,250 tons per month over eight months.  SOF at ¶5.  The Milk Contract contained detailed technical specifications regarding the composition and quality of the milk.  SOF at ¶6.  For example, the Milk Contract specified minimum (and in some cases maximum) levels of fat, protein, chlorides, lactose, and Vitamin A required to be in the powdered milk.  *Id.*  In addition, the Milk Contract specified that the milk "must be free of preservatives, neutralizers, toxic substances or any strange matter."  *Id*.

On March 31, 2008, Patricia Montenegro, an Exim employee, transmitted a request to PSI containing technical specifications for the milk that were different in certain respects from those in the Milk Contract.  SOF at ¶7.  Among other differences, Exim's proposal included a minimum protein level of 15%, considerably lower than the 24.5% stated in the Milk Contract.  SOF at ¶¶7, 8.  Ms. Montenegro also asked PSI to identify specifically by name the preservatives, neutralizers, and toxic substances prohibited by the purchase order.  SOF at ¶7.  PSI rejected Exim's proposal and forwarded Ms. Montenegro a response from Bariven

reaffirming that "no type" of preservatives, neutralizers or toxic substances were permitted. SOF at ¶8.

Exim understood and accepted Bariven's commitment to the specifications stated in the Milk Contract. SOF at ¶8. After PSI rejected the proposed substitute specifications, Exim's president, Rogelio Salges, informed PSI that Exim's new supplier, Qingdao Dairygold Industry Co., Ltd., ("Dairygold") provided milk that fully abided by the specifications in the Milk Contract. SOF at ¶9. Mr. Salges wrote, "please have no doubt that we will only supply products under the contracted quality." *Id*. Antonio Rivero, Exim's former director and the person primarily responsible for the Milk Contract, testified that Exim understood as of early April 2008 that no type of preservatives, neutralizers, or toxic substances would be permitted in the powdered milk. SOF at ¶8.

Exim began shipping milk from China to Venezuela in late June 2008. SOF at ¶10. Exim's first shipment, supplied by a Chinese company called Qingdao Suncare Nutritional Technology Co. ("Suncare"), consisted of 500 tons of milk powder transported in 30 shipping containers. *Id*. After a lengthy sea voyage, the milk arrived in Venezuela in August 2008. *Id*. Exim followed up this shipment with fifteen additional shipments dispatched over the months of July, August, and September. SOF at ¶11. The milk contained in these sixteen shipments was manufactured predominantly by Suncare (*i.e.*, 7,450 of 9,480 tons), with the remainder manufactured by Dairygold. *Id*.

Shortly after Exim sent its sixteenth shipment, the Chinese government announced that thousands of children in China had become ill as a result of ingesting milk contaminated with melamine. SOF at ¶13. Melamine is a synthetic substance that does not occur naturally in milk but that, when added to milk, artificially boosts the apparent level of protein above the actual

protein content.  SOF at ¶14.  Melamine is a toxic substance that has been known to cause death

and serious injury when consumed in milk.  SOF at ¶15.  Human ingestion of melamine is

associated with a number of harmful health effects, including the formation of kidney stones,

urinary tract abnormalities, and acute kidney injury.  *Id*.  In China, where the melamine

contamination was most widespread, hundreds of thousands of children were harmed.  *Id*.  More

than 50,000 children were hospitalized, and at least six children died.  *Id*.

The Chinese government halted exports of milk products in mid-September 2008.  SOF

at ¶24.  By that time, Exim had shipped over 9,000 tons of Chinese powdered milk to Venezuela,

all of which had been paid for by Bariven prior to its arrival.[3]  *Id*.

In light of the alarming news regarding the Chinese melamine scandal, Bariven sought

assurances from Exim that its powdered milk was free of melamine.  On September 19, 2008,

Jorge Parra, a Bariven employee, emailed Mr. Salges of Exim requesting information in light of

the scandal.  SOF at ¶17.  On September 23, Mr. Salges replied to Mr. Parra's email, indicating

that the melamine scandal was limited to one type of milk product (infant formula) produced by

one company (Mengniu Dairy) in one month (January 2008).  SOF at ¶19.  Mr. Salges assured

PSI that Mengniu Dairy "is 'NOT' our provider and [Exim] has been supplying powdered milk

for industrial use since July of 2008, and no problems of any kind have arisen."  SOF at ¶19.  In

addition, Mr. Salges indicated that the Quality Control Institute for Imports and Exports ("CIQ")

had become involved in testing Chinese powdered milk in light of the scandal.  *Id*.

Mr. Salges' assurances were not consistent with information known to Exim at the time.

One week before Mr. Salges' response, Tracy Gao of Dairygold informed Exim, in response to a

request for information about the melamine scandal, that melamine was added to milk "on

---

[3]  Bariven paid Exim a total of $45,361,800 for the first sixteen shipments of milk.  SOF at ¶12.

purpose." SOF at ¶16. In addition, Ms. Gao informed Exim that, due to melamine contamination, Suncare, Exim's other supplier at the time, was "forced to stop production to reorganize, reform." *Id.* At the time of Ms. Gao's email, Exim had already delivered 7,450 tons of Suncare powdered milk to Bariven. *Id.*

Moreover, just one day before Mr. Salges' response to Mr. Parra, Exim employee Dialys Guevara emailed Mr. Salges, along with two other Exim representatives, an article from *USA Today*, entitled "Tainted Milk Scandal Spreads, 3rd Baby Dies," which stated that "Qingdao-based Suncare" and three other companies "were recalling their products after melamine was found in their milk powder." SOF at ¶18.

The very same day that Mr. Salges emailed his assurances to Bariven, September 23, 2008, Ms. Li of Suncare emailed Exim representatives, including Mr. Salges, a summary report prepared by Suncare of its involvement in the melamine scandal. SOF at ¶20. Suncare's report acknowledged that a Chinese state inspection agency found melamine in certain milk products manufactured by Suncare. *Id.* Despite the confirmed deaths of several infants related to melamine ingestion, Suncare's report stated that the melamine incident had been exaggerated by the Chinese and foreign media and was, in fact, "far from such a serious matter." *Id.*

Exim never notified Bariven that Suncare's own representative had acknowledged that melamine had been found in Suncare's milk. Instead, on October 1, 2008, Exim provided Bariven with copies of four negative melamine tests that Exim asserted were from powdered milk samples retained by SGS, the inspection company that conducted physiochemical tests of Exim's milk. SOF at ¶22. This assertion was false. In an email dated September 25, 2008, Ms. Yao summarized for Ms. Guevara, Mr. Rivero, and Mr. Salges her meeting with Suncare the previous day and informed them that the four samples in question had been selected *by Suncare*

and sent to SGS *by Suncare*. SOF at ¶21. A close inspection of the test results raises serious concerns regarding their reliability. For example, the melamine test report that Exim associated with its fifth shipment contains a batch number of 22072008, which corresponds with a production date of July 22, 2008. SOF at ¶23. However, the loading supervision report that Exim associated with this same shipment indicates that the milk was loaded into containers and all the containers were sealed by July 17. *Id*. Given this discrepancy, Exim's representation that the test result corresponds to milk from this fifth shipment could not possibly have been true.

In the weeks following its assurances to PSI, Exim made numerous inquires of its contacts in China regarding when it could resume milk shipments. SOF at ¶25. In email correspondence dated October 21, 2008 between Mr. Rivero and Exim's China-based consultant, Zhang Zhihua, Mr. Zhang wrote that the CIQ officers responsible for inspecting Chinese milk "would need some bribery, I would negotiate to reduce your cost." *Id*. In response, Mr. Rivero stated that "any idea to solve the problem ASAP is welcome" and instructed Ms. Guevara, to wire Mr. Zhang $3,000 to pay him as Exim's "consultant." *Id*. Exim did not inform Bariven of this communication, even though it had previously assured PSI of the safety of its milk based on the fact that officers from CIQ were conducting melamine tests. However, Exim did send a letter from Mr. Salges dated October 27, 2008, in which Mr. Salges again represented that the melamine scandal had affected only infant formula, not industrial milk powder. *Id.*

Bariven began taking steps to conduct its own sampling and testing of Chinese powdered milk.[4] SOF at ¶27. According to Sulfani Azocar, the coordinator of Bariven's food program, even though Bariven expected that the milk would "be clean and that it would comply with all of

_____

[4] Exim dispatched at least five more shipments with a total of 2,000 tons of powdered milk in December 2008 and January 2009. SOF at ¶26.

the standards and requirements," it "had to clarify any possible doubt because it was quite a sensitive situation." *Id.*

Tests conducted on samples of Exim milk taken in January 2009 showed the widespread presence of melamine and its analog, cyanuric acid. SOF at ¶28. Bariven followed up this testing with additional sampling in late April and early May 2009 and February 2010.[5] *Id.* Tests conducted on these samples likewise showed the widespread presence of melamine and cyanuric acid. SOF at ¶¶29, 31. In total, Bariven has taken 142 samples from fifteen shipments sent by Exim. SOF at ¶28. Each of those fifteen shipments tested positive for the presence of melamine and cyanuric acid. SOF at ¶33.

Bariven has paid Exim at total of $56,367,300 for the powdered milk received from Exim. SOF at ¶34. In addition, Bariven has incurred $23,104,923 in storage and demurrage costs (*i.e.*, charges imposed by shippers for use of their containers) to hold the nonconforming powdered milk supplied by Exim since its arrival. SOF at ¶35.

## 2.    The Rice Contract

The Rice Contract is set out in a June 12, 2008 purchase order issued to Exim for 19,200 tons of white rice to be delivered in installments. SOF at ¶36. The Rice Contract required Exim to provide original export documentation to Bariven so that the rice could clear customs in Venezuela. SOF at ¶37.

In or about January 2009, three shipments of Exim's rice with the following bill of lading numbers arrived in Venezuela without original export documentation: SEA5551323 (1,325 tons);

---

[5] From the outset of this litigation, Bariven invited Exim on numerous occasions to participate in a joint exercise to sample and test the milk. SOF at ¶30. Exim repeatedly declined to participate. In the end, Exim opted, instead, to send observers to view the February 2010 sampling process and the integrity of the samples shipped to the United States, and to receive split samples when the samples were opened for analysis at Certified Labs in New York. SOF at ¶31.

SUDU687002388020 (125 tons); and SUDU68700238802 (250 tons).  SOF at ¶39.  Without original export documentation, Bariven was unable to clear the rice through customs.  SOF at ¶40.  Bariven asked Exim numerous times for the original export documentation, but Exim failed to provide such documentation in response to any of Bariven's requests.  SOF at ¶¶ 41, 42.

Although Bariven paid for each of the rice shipments in December 2008, Exim did not pay its supplier, Zaeli Alimentos, Ltda. ("Zaeli") for the rice until October 2009.  SOF at ¶¶ 43, 44.  Exim was only able to direct the original export documents to Bariven after it had paid Zaeli.  SOF at ¶44.

Exim never tendered delivery of the final 3,000 tons of rice under the Rice Contract.  PSI sought to inspect the final shipment of 3,000 tons of rice at Zaeli's warehouse, but Zaeli did not permit PSI to inspect the goods because Exim had not yet paid Zaeli.  SOF at ¶45.

As a consequence of Exim's admitted failure to provide original export documents, Bariven was unable to clear the rice through customs and incurred storage and demurrage charges of $3,657,314.  SOF at ¶46.

### III. <u>ARGUMENT</u>

Summary judgment is appropriate where the pleadings and supporting materials show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.  *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).  Issues of fact are genuine only if a reasonable factfinder, considering the evidence presented, could find for the nonmoving party.  *See Anderson*, 477 U.S. at 247-51.  "[A]n adverse party may not rest upon the mere allegations or denials of the adverse party's pleadings, but ... must set forth specific facts showing that there is a genuine issue for trial."  Fed.R.Civ.P. 56(e).

1. **Bariven Is Entitled To Summary Judgment On Count I Of Its Counterclaim Because The Undisputed Material Facts Demonstrate That Exim Materially Breached The Milk Contract.**

To prevail on a claim of breach of contract under Florida law, a claimant must prove (1) a valid contract, (2) breach, and (3) damages. *J.J. Gumberg Co. v. Janis Servs., Inc.*, 847 So. 2d 1048, 1049 (Fla. App. 2003). The undisputed facts establish each of these elements with respect to Exim's performance of its obligations under the Milk Contract, and Bariven is therefore entitled to judgment as a matter of law on Count I of its Counterclaim.

   a. **Exim Breached The Milk Contract By Providing At Least Fifteen Installments of Nonconforming, Toxic Milk.**

The Milk Contract was an installment contract and is therefore governed by Fla. Stat. §672.612, which provides that "[w]henever nonconformity or default with respect to one or more installments substantially impairs the value of the whole contract there is a breach of the whole." The undisputed facts demonstrate that Exim breached numerous installments of the Milk Contract by providing at least fifteen shipments of powdered milk contaminated with melamine. Given the serious health risks posed by melamine, including death, the nonconforming nature of the goods provided by Bariven substantially impaired the value of the Milk Contract as a whole, and Bariven is entitled to judgment as a matter of law.

   (i) **The Milk Contract Plainly Prohibited "Toxic Substances."**

The existence and terms of the Milk Contract are not in dispute. SOF at ¶5. If the terms of a contract are clear and undisputed, the construction of the contract is a question of law that can be resolved by summary judgment. *General Tool Indus., Inc. v. Premier Machinery, Inc.*, 790 So.2d 449, 451 (Fla. 3d. DCA 2001). Here, the language of the Milk Contract is clear: powdered milk supplied pursuant to its terms "must be free of … toxic substances."

There is nothing ambiguous about the phrase "toxic substances." Language in a document is legally ambiguous only when it is uncertain in meaning and may be fairly understood in more ways than one and is susceptible of interpretation in opposite ways. *Barnett v. Destiny Owners Ass'n, Inc.*, 856 So. 2d 1090, 1092 (Fla. 1st DCA 2003) (relying on *Friedman v. Virginia Metal Prods. Corp.*, 56 So. 2d 515, 517 (Fla. 1952)). The requirement that the powdered milk must be "free" of "toxic substances" is neither uncertain in meaning nor susceptible of interpretation in opposite ways. To the contrary, there is only one interpretation of the language that makes sense – *i.e.*, that *no amount* of any toxic substance is permitted. This interpretation not only conforms to the words on the page, but more importantly conforms to common sense. If a product is intended for consumption by humans, including children, it only makes sense that *no amount* of toxic substance should be contained in the product. Accordingly, there is little here for the Court to construe. The Milk Contract means what it says.

Further support that the Milk Contract prohibits any amount of a toxic substance is found in the structure of the contract. Whereas certain physiochemical requirements are stated in terms of the maximum amount of a particular substance that is tolerated (*e.g.*, 5.9% "ash"), the toxic substances provision is stated in absolute terms: the product must be "free" of toxic substances. The toxic substances provision is rendered meaningless if the Milk Contract is construed as allowing *some* amount of a toxic substance. Exim is not entitled to read language into a contract that does not exist for the purpose of making the contract more advantageous to it. *Burger King Corp. v. Ashland Equities, Inc.*, 217 F.Supp.2d 1266, 1273 (S.D. Fla. 2002) (noting that, when the terms of a contract are clear and unambiguous, the contracting parties are bound to those terms and may not rewrite the contract to make it more advantageous or reasonable for one of the contracting parties). That is particularly true where, as here, Exim specifically asked for

clarification of this specification, and was told that *no type* of preservatives, neutralizers or toxic substances would be permitted. SOF at ¶¶7, 8.

> **(ii) Each Of The Fifteen Shipments Sampled Were Nonconforming Because They Were Contaminated With Melamine, A Toxic Substance.**

The Milk Contract provided that *no amount* of toxic substances was allowed. Under the Florida UCC, goods conform to the contract when they are in accordance with the obligations under the contract. Fla. Stat. § 672.106(2) (2010). Accordingly, the presence of any amount of a toxic substance in the milk means that the milk is nonconforming.

Melamine is a toxic substance that has been known to cause death and serious injury when consumed in milk. SOF at ¶15. Exim has offered no competent evidence to the contrary.[6] Each of the fifteen shipments (*i.e.*, installments) sampled in Venezuela tested positive for melamine.[7] Accordingly, it is undisputed that Exim delivered at least fifteen installments of nonconforming (*i.e.*, toxic) milk, and thus Bariven is entitled to judgment as a matter of law.

Even assuming that the plain language of the Milk Contract were not controlling (and there is no reason to conclude that it is not), Dr. Michael Somers, the only competent witness to

---

[6] The only evidence submitted by Exim regarding the health effects of melamine was proffered by Professor Robert Bradley, its sampling expert. Bariven has filed a Daubert motion contemporaneously with this motion in which it seeks to exclude certain of Professor Bradley's opinion testimony, including his opinions regarding the health effects of melamine. Professor Bradley admits that he is not an expert on the health effects of melamine and, thus, is not qualified to render an opinion on the toxicity of melamine. *See* Bariven's Daubert Motion, p. 6.

[7] The findings of these test results are undisputed. Although Professor Bradley contends that the results are not "reliable" because the samples were taken using a scoop rather than a coring device, and were therefore in his opinion not "representative," he does not dispute that the samples were in fact taken from bags of milk supplied by Exim, and that the results indicate the presence of melamine in the samples. *See* Bariven's Daubert Motion, pp. 16-18. Moreover, Professor Bradley admits that the use of a scoop (as opposed to a coring device) would not cause the milk powder sampled to test positive for the presence of melamine in the absence of melamine. *Id.*

address the health effects of melamine,[8] has opined that even small amounts of melamine can be injurious to health. SOF ¶32. For example, Dr. Somers has explained that recent studies in China have shown that among a group of 7,000 children screened for melamine associated kidney injury, the patient group with the lowest melamine intake (less than 0.2 mg/kg body weight/day) was 1.7 times more likely to have kidney stones than Chinese children with no exposure. *Id*. Moreover, Dr. Somers has explained that the most recent research to examine all the toxicological factors and data about melamine exposure set a "tolerable daily intake" ("TDI")[9] of 0.00809 mg/kg body weight/day and a tolerable concentration of melamine in dairy products to be ingested by humans lower than 0.324 parts per million ("ppm"). *Id*. Exim milk showed melamine levels above—and in many cases well above—0.324 ppm. SOF at ¶33.

Of the fifteen shipments of powdered milk sampled and tested by Bariven, all fifteen tested positive for the presence of melamine. SOF at ¶33. The amount of melamine found varied from sample to sample, but, on the whole, demonstrated that Exim's powdered milk suffered from systematic melamine adulteration. Many of the samples tested showed melamine concentration at extremely high levels. SOF at ¶¶28, 31. Several samples showed melamine concentration of over 1,000 ppm, and one sample was as high as 2,800 ppm. *Id*. Powdered milk contaminated at this level is highly dangerous, regardless of the age of the consumer. For example, Dr. Somers opined that a 50-pound child would surpass the level of melamine deemed "tolerable" on a daily basis based on the most recent research (*i.e.*, 0.00809 mg/kg/day) by consuming as little as 0.06 ounces of milk contaminated at 100 ppm. SOF ¶32. That same child

---

[8] In recognition of his expertise in the field of pediatric nephrology, Dr. Somers was asked by the American Society of Pediatric Nephrology to help coordinate the development of a guideline to assist pediatric clinicians in assessing children exposed to melamine-contaminated milk powder.

[9] TDI is defined as an estimated maximal amount of a substance that an individual can be exposed to on a daily basis without suffering adverse health consequences. SOF at ¶32.

would surpass the same threshold for daily tolerable melamine consumption by consuming 0.6 ounces of milk contaminated at 10 ppm or 6.1 ounces of milk contaminated at 1 ppm. *Id.* These levels are in line with the actual test results of Exim milk. More than half of the shipments tested for melamine contained samples that showed melamine levels greater than 100 ppm, and 14 of 15 shipments contained samples that showed melamine levels greater than 1 ppm. SOF at ¶33. Every one of the 15 shipments showed melamine levels greater than the 0.324 ppm deemed "tolerable" based on the most recent research. *Id.*

### (iii) The Presence Of Melamine In All Fifteen Of The Installments Tested Substantially Impaired The Value Of The Milk Contract As A Whole.

Pursuant to Fla. Stat. §672.612, "[w]henever nonconformity or default with respect to one or more installments substantially impairs the value of the whole contract there is a breach of the whole." The purpose of the "substantial impairment" requirement is "to preclude a party from canceling a contract for trivial defects." *Hubbard v. Utz Quality Food, Inc.*, 903 F.Supp. 444, 450 (W.D.N.Y. 1995) (applying identical provision of New York UCC).[10] Although determining whether a nonconformity amounts to a "substantial impairment" is generally a question of fact, summary judgment is nevertheless appropriate where, as here, no reasonable fact-finder could find that a particular nonconformity was other than a substantial impairment. *See Anderson*, 477 U.S. at 247-51 (noting that issues of fact are genuine only if a reasonable factfinder, considering the evidence presented, could find for the nonmoving party). *See also L&M Enters., Inc. v. BEI Sensors & Sys. Co.*, 231 F.3d 1284, 1288 (10th Cir. 2000) (holding as a matter of law that repeated failure to pay for shipments substantially impairs the value of the whole contract).

---

[10] Bariven has been unable to find any cases interpreting Fla. Stat. §267.612. Accordingly, Bariven has cited in this brief to cases from other jurisdictions with an identical UCC provision.

The notes to Fla. Stat. §672.612 provide that "[w]hether the nonconformity in any given installment justifies cancellation as to the future depends, not on whether such nonconformity indicates an intent or likelihood that the future deliveries will also be defective, but whether the nonconformity substantially impairs the value of the whole contract." Fla. Stat. §672.612, n.6. As for what constitutes "substantial impairment," the notes provide that substantial impairment of an installment "can turn not only on the quality of the goods but also on such factors as time, quantity, assortment, and the like. It must be judged in terms of the normal or specifically known purposes of the contract." *Id.* at n.4.

There is no dispute that each of the fifteen shipments sampled in Venezuela tested positive for the presence of melamine and, therefore, was nonconforming. The only question is whether the nonconformity substantially impaired the value of the whole contract. Here, no reasonable factfinder could determine that the nonconformity did not substantially impair the value of the Milk Contract as a whole. Given the serious health risks posed by melamine, and the widespread contamination of the fifteen shipments tested, the sampling and testing efforts that would be required to ensure the safety of the milk going forward would be prohibitive. Put bluntly, Bariven does not and cannot trust Exim, which falsely assured it of the quality of its milk even in the face of information that one of its dairies was implicated in the Chinese melamine scandal. Bariven simply could not, in good conscience, distribute milk supplied by Exim without testing virtually 100% of the product.

Moreover, there is no dispute that Bariven paid for each of the nonconforming installments. Pursuant to the standard expressed in Fla. Stat. §672.612, the nonconformity of the fifteen tainted shipments substantially impaired the value of the Milk Contract as a whole because, even assuming that every other shipment was clean, and that every future delivery

would have been clean, the fifteen tainted shipments, for which Bariven paid over $43 million, were worthless.  In other words, regardless of the quality of the other shipments, Bariven would have suffered a loss of over $43 million dollars.  This fact makes this case similar to those in which courts have found substantial impairment as a matter of law where a buyer repeatedly fails to pay for shipments.  *See L&M Enters., Inc.* 231 F.3d at 1288.

This is not a case where Bariven is seeking to cancel the Milk Contract because of trivial defects.  This is a case where, had Bariven not sought to confirm the assurances it was getting from Exim, tens of thousands of tons of Exim's toxic milk would have been distributed, potentially causing a massive public health disaster in Venezuela.  Accordingly, Exim's fifteen shipments of tainted milk constitutes substantial impairment as a matter of law.

    **b.**    **Damages**

Bariven's damages are the amounts it paid for worthless milk, and the costs incurred to store the milk while it confirmed what turned out to be false assurances of the milk's quality.  The amount that Bariven paid for the milk, $56,367,300, is undisputed and recoverable pursuant to Fla. Stat. §672.711.[11]  SOF at ¶34.  The amount incurred by Bariven in storage and demurrage costs, $23,104,923, is undisputed and recoverable pursuant to Fla. Stat. §672.713.[12]  SOF at ¶35.

---

[11] "Where the seller fails to make delivery or repudiates or the buyer rightfully rejects or justifiably revokes acceptance then with respect to any goods involved, and with respect to the whole if the breach goes to the whole contract (s. 672.612), the buyer may cancel and whether or not he or she has done so may *in addition to recovering so much of the price as has been paid*:  . . .  (b) Recover damages for nondelivery as provided in this chapter (s. 672.713)."  Fla. Stat. §672.711 (Emphasis added.)

[12] Fla. Stat. §672.713 provides for an aggrieved buyer's recovery of "incidental" damages.  Pursuant to Fla. Stat. §672.715, "[i]ncidental damages resulting from the seller's breach include expenses reasonably incurred in inspection, receipt, transportation and care and custody of goods rightfully rejected … and any other reasonable expense incident to the delay or other breach."

2. **Bariven Is Entitled To Summary Judgment On Count II Of Its Counterclaim Because The Undisputed Material Facts Demonstrate That Exim Materially Breached The Rice Contract.**

The undisputed facts establish each element of a claim for breach of contract with respect to Exim's performance of its obligations under the Rice Contract, and Bariven is therefore entitled to judgment as a matter of law on Count II of its Counterclaim.

a. **Exim Breached The Rice Contract By Failing To Provide Original Export Documents In A Commercially Prompt Manner.**

Exim's undisputed failure to provide original export documents for the last three rice shipments to arrive caused Bariven to be unable to take possession of over one thousand tons of rice for a period of approximately ten months. The Rice Contract, the delivery term for which was "CIF Puerto Cabello / La Guaira, VE," plainly required Exim to provide Bariven with original export documents. SOF at ¶36. Original export documents were required in order to permit food imported into Venezuela to make it through the customs process and be delivered to the end user. SOF at ¶40.

The Florida UCC contains a provision that deals with this scenario. Specifically, Fla. Stat. §372.320(2) provides that "[u]nless otherwise agreed … the term C.I.F. destination or its equivalent requires the seller at his or her own expense and risk to … [p]repare an invoice of the goods and procure any other documents required to effect shipment or to comply with the contract; and [f]orward and tender with commercial promptness all the documents in due form and with any indorsement necessary to perfect the buyer's rights."

The notes to Fla. Stat. §372.320 make clear that a seller's obligations to deliver goods are not met until required documentation is in the possession of the buyer:

> The buyer needs all of the documents required under a C.I.F. contract, in due form and with necessary endorsements, so that before the goods arrive he may deal with them by negotiating the documents or may obtain prompt possession of the goods after their arrival…  The seller is therefore obligated to do what is

mercantilely reasonable in the circumstances and should make every reasonable exertion to send forward the documents as soon as possible after the shipment. The requirement that the documents be forwarded with "commercial promptness" expresses a more urgent need for action than that suggested by the phrase "reasonable time".

It is undisputed that Bariven paid Exim for the following three shipments of rice in December 2008: (1) 1,325 tons identified on bill of lading number SEA5551323; (2) 125 tons of rice identified on bill of lading number SUDU687002388020; and (3) 250 tons of rice identified on bill of lading number SUDU687002388002. SOF at ¶43. It is likewise undisputed that each of these shipments arrived in Venezuela in January 2009. SOF at ¶39. Finally, Mr. Salges admitted at his deposition that Exim failed to cause original export documents to be delivered to Bariven until October 2009, more than ten months after the goods arrived in Venezuela. SOF at ¶44.

Under the applicable UCC provisions, no reasonable fact-finder could determine that a ten-month delay in the tender of original export documents was reasonable, let alone "commercially prompt." This is particularly true where, as here, the Rice Contract required that original export documents be provided to Bariven at least seven working days before the arrival of the rice. Accordingly, Exim breached the contract as a matter of law.

**b.     Damages**

It is undisputed that Bariven has suffered damages in the form of the $3,657,314 in storage and demurrage charges that it incurred as it waited for original export documents. SOF at ¶46. Bariven is entitled to recover these amounts as incidental and/or consequential damages pursuant to Fla. Stat. §§ 672.714 and 672.715.

**3.     Each of Exim's Remaining Claims Fails As A Matter Of Law**

Counts I through V of Exim's Complaint state claims related to Bariven's alleged breach of the Milk Contract. Specifically, Exim alleges that Bariven anticipatorily breached the Milk

Contract by refusing to accept approximately 13,000 tons of milk remaining under the contract (Count I) and by refusing to pay for a shipment of 3,000 tons (Counts I through V). Each of these claims fails as a matter of law because, as discussed above, the undisputed evidence shows that Exim breached the Milk Contract as a whole. Accordingly, the Court should enter judgment in favor of Bariven with respect to these claims.

As for the final claim, Count VII, Exim alleges that Bariven anticipatorily breached the Rice Contract by failing to proceed with the purchase of the final 3,000 tons under the contract. As demonstrated above, however, the undisputed evidence show that Exim's own conduct caused Bariven to be unable to take possession of approximately 1,700 tons of rice—for which Bariven had already paid in full—for more than ten months, while that same rice sat generating storage and demurrage charges. Moreover, putting aside the evidence of Exim's own obstructionist conduct, Exim never tendered the final 3,000 tons of rice for Bariven's acceptance, so Bariven cannot be liable as a matter of law. To the contrary, the undisputed evidence shows that Bariven was unable even to inspect the goods at the supplier's facility in Brazil because of Exim's failure to pay its supplier's invoices. SOF at ¶45.

## III. CONCLUSION

For all of the reasons stated above, the Court should grant partial summary judgment in Bariven's favor on Counts I and II of its Counterclaim and on all remaining counts of Exim's Complaint.

Respectfully submitted,

BARIVEN, S.A.

By its attorneys,

/s/ *Brian Silverio*

Brian Silverio, *Florida Bar No. 0183301*
SILVERIO & HALL, P.A.
150 West Flagler St., PH 2850
Miami, FL 33130
phone: (305) 371-2756
fax:    (305) 371-2744

Ronald E.M. Goodman, *pro hac vice*
FOLEY HOAG LLP
1875 K Street, N.W., Suite 800
Washington, D.C. 20006-1238
Telephone:  (202) 223-1200
Facsimile:  (202) 785-6687

Anthony Mirenda, *pro hac vice*
K. Neil Austin, *pro hac vice*
Jeff Bone, *pro hac vice*
Thomas Ayres, *pro hac vice*
FOLEY HOAG LLP
155 Seaport Blvd.
Boston, MA 02210
Telephone:  (617) 832-1000
Facsimile:  (617) 832-7000

Dated July 9, 2010

## CERTIFICATE OF SERVICE

WE HEREBY CERTIFY that, on this 9th day of July, 2010, we electronically filed the foregoing document with the Clerk of the Court using CM/ECF.  We also certify that the foregoing document is being served this day on opposing counsel of record, either via transmission of Notice of Electronic Filing generated by CD/ECF or in some other authorized manner to those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

*/s/ Brian Silverio*
Brian Silverio