**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
Miami Division**

CASE NO.: 09-20915-CIV-GOLD/McALILEY

EXIM BRICKELL, LLC,

     Plaintiff,

vs.

BARIVEN, S.A.,

     Defendant.

_____/

**EXIM BRICKELL'S MOTION FOR SUMMARY JUDGMENT
AND INCORPORATED MEMORANDUM ON COUNT I
OF ITS COMPLAINT AND ON CERTAIN OF BARIVEN'S COUNTERCLAIMS**

George Volsky
Luis M. O'Naghten
Michael A. Sayre
Attorneys for Exim Brickell, LLC
One Southeast Third Avenue, 25th Floor
Miami, Florida  33131-1714
Phone:  (305) 374-5600
Fax:  (305) 374-5095
Email: george.volsky@akerman.com
      luis.onaghten@akerman.com
      michael.sayre@akerman.com

July 9, 2010

# TABLE OF CONTENTS

I.   INTRODUCTION ............................................................................................... 1

II.  FACTUAL BACKGROUND ............................................................................. 3

    (a)   The Powdered Milk Contract ................................................................... 3
    (b)   Performance Under The Powdered Milk Contract ................................... 4
    (c)   The Chinese Melamine Alert And Subsequent Actions .......................... 5
    (d)   Bariven's Attempted Rejection Of Shipments 1-22 ............................... 6
    (e)   Bariven Delays Testing For Melamine ..................................................... 6

III. ARGUMENT .................................................................................................... 7

   A.   BARIVEN'S REJECTION OF THE POWDERED MILK CONTRACT WAS
       IMPROPER AND INEFFECTIVE ............................................................... 7

    (a)   The Powdered Milk Contract Is Governed By Florida's UCC ................. 7

    (b)   Bariven Accepted Shipments 1-16 And Never Cancelled The
         Powdered Milk Contract ....................................................................... 8

       (1)   Bariven accepted the powdered milk Shipments 1-16 ............. 8
       (2)   Rejection not made timely ........................................................ 9
       (3)   Upon acceptance, Bariven obligated to pay contractual rate ... 10
       (4)   Bariven did not cancel the powdered milk contract but refused
           to provide adequate assurance ............................................... 10

    (c)   Bariven Did Not Reject Based On Alleged Melamine Contamination ..... 12

       (1)   Bariven did not state melamine contamination as a basis for
           rejection................................................................................... 13
       (2)   Bariven did not seasonably notify Exim of any melamine
           contamination.......................................................................... 13
       (3)   Any melamine contamination was ascertainable by reasonable
           inspection ................................................................................ 15
       (4)   Exim could have cured any defect related to melamine
           contaminated milk if Bariven had   stated such a defect
           seasonably .............................................................................. 16
       (5)   Bariven's wrongful rejection of Shipments 17-22 based on
           alleged melamine contamination ............................................ 17

    (d)   Bariven's Rejection Based On The Lack Of PSI Supervised Document
         Inspection Is Insufficient ....................................................................... 19

       (1)   Bariven failed to reserve its rights to allege breach for lack of
           PSI  supervised document inspection...................................... 19
       (2)   Bariven's  course  of  performance  modified/waived  the
           document inspection requirement............................................ 20
       (3)   Bariven's wrongful rejection based on lack of PSI supervision
           of document inspection............................................................ 21

    (e)   Bariven's Unjust Enrichment Claim Is Legally Insufficient .................... 23

(f)    Exim Is Entitled To Summary Judgment On All Claims Related To The Powdered Milk Contract ......................................................................... 24

B.   BARIVEN IS NOT ENTITLED TO RECOVER ON THE RICE CONTRACT ......... 24

(a)    Bariven Waived The Contractual Provision Requiring Delivery Of Shipping Documents Seven Days In Advance Of The Shipment's Arrival ..................................................................................................... 25

(b)    Bariven Suffered No Damages As A Result Of Exim's Delay In Providing Original Shipping Documents ..................................................... 25

CONCLUSION.................................................................................................................. 26

CERTIFICATE OF SERVICE ............................................................................................ 26

Plaintiff, Exim Brickell, LLC ("Exim"), pursuant to Rule 56 of the Federal Rules of Civil Procedure and Local Rule 7.5, moves for entry of an order granting summary judgment as to liability in its favor on Count I and certain of Bariven's counterclaims.[1]

## I.    INTRODUCTION

Exim filed its complaint seeking payments owed to it by Bariven under two food supply contracts (actually purchase orders) — one for powdered milk (which was for over $124 million) and one for rice.  Exim performed approximately half of the powdered milk contract before Bariven stopped paying for the powdered milk product and then refused to provide Exim adequate assurance that it would pay for any powdered milk delivered in the future under the contract.  Bariven has denied Exim's allegations and counterclaimed.

At bottom, Bariven defends against Exim's claims and counterclaims as to the powdered milk contract principally arguing that the powdered milk supplied by Exim was contaminated with melamine, and, alternatively, that Exim did not comply with the powdered milk contract's requirement that Bariven's agent, PDVSA Services, Inc. ("PSI") supervise inspections of documents related to the powdered milk.  Exim contests the methodology employed by Bariven when it conducted its sampling and testing for melamine and asserts there is no competent evidence of toxic levels of melamine in the powdered milk it supplied. However, for purposes of this motion only, Exim will assume that some powdered milk it supplied contained

---

[1]    Exim specifically seeks summary judgment on the following Bariven counterclaim counts: Breach of Milk Contract (Count I), Breach of Implied Warranty of Merchantability (Count A), Breach of Implied Warranty of Fitness for Particular Purpose (Count III), Unjust Enrichment (Count IV), and Breach of Implied Covenant of Good Faith, Fair Dealing and Commercial Reasonableness (Count V), and Breach of Rice Contract (Count II).

toxic amounts of melamine. Nonetheless, Bariven's defenses and counterclaims all fail because Bariven completely ignored its obligations and Exim's rights under the UCC as enacted in Florida.   Such willful disregard for the UCC bars Bariven's defenses and counterclaims and mandates a judgment in favor of Exim.

Bariven's ignored several fundamental principles of the UCC: (1) prior to the filing of its answer and counterclaims in this action, Bariven <u>never</u> notified Exim that it was rejecting the powdered milk based on suspected melamine contamination; (2) because Bariven failed to notify Exim that it was rejecting the powdered milk based on melamine, it foreclosed any ability on Exim's part to cure the alleged defect, as is its right; (3) despite ample notice of possible melamine contamination, Bariven failed to timely inspect the powdered milk for melamine and instead waited until after the powdered milk's viable shelf life to inspect the powdered milk which delay precludes its right to reject the product[2]; (4) Bariven waived all claims based on the document inspection provision of the powdered milk contract due to its course of performance of the contract; and (5) Bariven <u>never</u> cancelled the powdered milk contract.  This last element is critical in understanding why Bariven remains liable on the remaining balance of the powdered milk contract that was not fulfilled.

Likewise, Bariven's counterclaim related to the rice contract also fails. Simply put, its sole argument that Exim's failure to timely deliver certain original shipping documents excuses its performance ignores two facts: (1) that Bariven's course of performance modified the contract (much the same way it did related to

---

[2]    This point is especially relevant in light of a recent Venezuelan government investigation into corruption at Bariven, in which Bariven's officers, including its president, Luis Pulido, profited by intentionally allowing food products, including powdered milk and rice, to surpass their official expiration date. SOF ¶42  [DE77, Ex.A].

the document inspection provision of the powdered milk contract) and (2) Bariven was able to nationalize the subject shipment without the original documents, thus it suffered absolutely no damage based on the alleged failure to deliver timely certain documents.

## II.   FACTUAL BACKGROUND[3]

**(a)   The Powdered Milk Contract**

On March 26, 2008, Bariven issued a purchase order to Exim for 26,000 metric tons of industrial powdered milk for a total price of approximately $124 million (the "powdered milk contract"). (SOF ¶¶3 and 4).  Pursuant to the powdered milk contract, Exim was to supply the powdered milk from either China or India. (SOF ¶ 5).

The contract also provided that prior to delivery of the powdered milk, Bariven was to conduct certain document inspections related to the powdered milk. (SOF ¶7). To this end, Bariven's US agent, PSI, entered into a contract with SGS North America ("SGS-NA") to conduct these document inspections. (SOF ¶7).  SGS-NA personnel would not perform the actual document inspection, but an SGS affiliate in China was expected to perform the inspections. (SOF ¶8). These were document inspections intended to insure that the documents supplied by the Chinese suppliers indicated that the powdered milk conformed to the requirements in the contract. (SOF ¶8). These inspections did not involve any laboratory inspections of the milk itself that would reveal any possible non-conformity with the powdered milk. (SOF ¶8).

---

[3]     Exim's Statement of Undisputed Material Facts (the "Statement of Facts") has been filed contemporaneously with this motion and memorandum.  The facts set forth in this section are derived from the Statement of Facts, which shall be cited as "SOF ¶____."

Exim entered into supply contracts with three Chinese powdered milk manufacturers to supply the entirety of the powdered milk contract. (SOF ¶5).  In order to assure compliance with the contract, Exim also entered into a contract with an SGS affiliate in China (SGS-China) to perform both the document inspections required under the powdered milk contract <u>and</u> laboratory tests to determine that the powdered milk provided by its suppliers met the contract specifications. (SOF ¶11).

**(b)   Performance Under The Powdered Milk Contract**

It is undisputed that Exim made 22 shipments of powdered milk to Bariven totaling 11,780 metric tons of powdered milk.  (SOF ¶¶25, 26 and 36).  With respect to the first 16 shipments("Shipments 1-16"), Bariven issued e-mails stating that all documents related to the shipments had been "received, reviewed, confirmed and accepted."  (SOF ¶27).  The documents referred to in the Bariven e-mails included the inspection reports from SGS-China contracted by Exim. (SOF ¶13).  The documents <u>did not</u> include the document inspection reports required to be provided by SGS-NA as contracted by PSI.  (SOF ¶9).  SGS-NA provided regular reports to PSI that it was not performing the document inspections. (SOF ¶10). Nonetheless, Bariven paid Exim approximately $45 million for the powdered milk. (SOF ¶28).

With respect to Shipments 17-22 ("Shipments 17-22") Exim followed the same procedure as with Shipments 1-16. Bariven, however, refused to pay for Shipments 17-22.  (SOF ¶45).  Exim ultimately was paid approximately $9.5 million for Shipments 17-22 by drawing on its letter of credit with Girobank in Curacao. (SOF ¶ 49).

Because Bariven had refused to pay for Shipments 17-22, Exim demanded assurance from Bariven that it intended to perform under the powdered milk contract, including payment for the powdered milk provided. (SOF ¶52). Bariven refused to provide such adequate assurance. (SOF ¶53).  Nevertheless, Bariven never cancelled the powdered milk contract. (SOF ¶53).

**(c)    The Chinese Melamine Alert And Subsequent Actions**

In September 2008, there were widely published news accounts regarding melamine having been improperly added to Chinese infant powdered milk (not industrial milk). (SOF ¶29). In response, the Chinese government immediately stopped any further export of powdered milk (of any variety).  (SOF ¶29).  China then inspected each and every Chinese factory of powdered milk to ensure that any and all melamine tainted milk was destroyed and imposed new requirements in which no powdered milk could be exported without the Chinese government first testing the milk for melamine. (SOF ¶29). Only if the powdered milk tested melamine free would China permit its exportation. (SOF ¶29). In addition to the new Chinese government inspections, Exim ordered SGS-China to conduct an additional laboratory tests to ensure that all new shipments of powdered milk tested melamine free. (SOF ¶39).

Despite the new procedures put in place to ensure the quality of the powdered milk emanating from China, Exim offered to provide powdered milk from other countries that did not have a melamine issue. (SOF ¶38).  Bariven did not accept this offer from Exim. (SOF ¶38).

In October 2008, Bariven made the internal decision to test all powdered milk supplied by Exim (both past and future) for melamine. (SOF ¶31).

Shipments 17-22 were all shipped <u>after</u> the Chinese government allowed the resumption of exports of powdered milk and after the new procedures related to melamine had been instituted. (SOF ¶¶36 and 43).

**(d)    Bariven's Attempted Rejection Of Shipments 1-22**

On January 19, 2009, Bariven issued a Claim Form pursuant to which it stated that Exim's powdered milk was rejected.  Specifically the Claim Form provided that there was a "Technical Non-Conformity," specifically, "Rejection of product sent to Venezuela due to lack of inspection under PSI Supervision as requested and described in the PO." (SOF ¶47).  Nowhere did the Claim Form refer to melamine. (SOF ¶50). By the time the Claim Form was issued, Shipments 1-22 had either arrived in Venezuela or had already left China for Venezuela.  (SOF ¶47). Thus, the Claim Form rejection pertained to all Shipments 1-22.

Prior to the filing of Bariven's answer and counterclaim in the instant action, Bariven never rejected any shipments based on melamine contamination. (SOF ¶50).

**(e)    Bariven delays testing for melamine**

Although Bariven knew of the melamine alert in September 2008 and in October 2008 decided to test all of  Exim supplied powdered milk, Bariven failed to do so in a timely manner and, in the case of Shipments 17-22, failed to test them whatsoever. (SOF ¶36). The failure to test Shipments 17-22 is particularly egregious as these shipments were sent after the newly imposed Chinese government procedures intended to ensure that no melamine tainted powdered milk would be exported from China. The following chart shows the delay on

Bariven's part in sampling and testing powdered milk on Shipments 2-16[4] (SOF ¶33):

| Shipment(s) | Delay in Sampling from arrival | Delay in Obtaining Test Results |
|---|---|---|
| 7 & 8 | 3.9 months | 4.9 months |
| 16 | 6.3 months | 7.2 months |
| 3 and 5 | 7.5-7.9 months | 8.6-8.8 months |
| 2, 4, 6, 9, 10-15 | more than 15 months | more than 16 months |
| 1 and 17-22 | never sampled | never tested |

## III.   ARGUMENT

### A.   BARIVEN'S REJECTION OF THE POWDERED MILK CONTRACT WAS IMPROPER AND INEFFECTIVE

**(a)   The Powdered Milk Contract Is Governed By Florida's UCC**

"In Florida, a sale of goods is governed by the UCC." *See Validsa, Inc. v. PDVSA Serv., Inc.*, 632 F. Supp. 2d 1219, 1228 (S.D. Fla. 2009); *Birwelco-Montenay, Inc. v. Infilco Degremont*, Inc. 827 So.2d 255, 257 (Fla.App. 3 Dist. 2001). The powdered milk contract constitutes an "installment contract" in that it is a contract "which requires or authorizes the delivery of goods in separate lots to be separately accepted ... ." Fla. Stat. § 672.612(1). The UCC goes on to provide that

> (2) The buyer may reject any installment which is nonconforming if the nonconformity substantially impairs the value of that installment and cannot be cured or if the nonconformity is a defect in the required documents; but if the nonconformity does not fall within subsection (3) and the seller gives adequate assurance of its cure the buyer must accept that installment.
>
> (3) Whenever the nonconformity or default with respect to one or more installments substantially impairs the value of the whole

---

[4]      Shipment 1 was apparently nationalized and utilized by Bariven and was never sampled or tested. (SOF ¶25).

> contract there is a breach of the whole.  <u>But the aggrieved party</u>
> <u>reinstates the contract if she or he accepts a nonconforming</u>
> <u>installment without seasonably notifying of cancellation</u> … .

Fla. Stat. § 672.612(2) and (3) (emphasis
added.)

Bariven's attempted rejection of Shipments 1-22 fails to satisfy the requirements of § 672.612.[5]

**(b)    Bariven Accepted Shipments 1-16 And Never Cancelled The Powdered Milk Contract**

**(1)    Bariven accepted the powdered milk Shipments 1-16**

The undisputed facts establish that Bariven, at a minimum, accepted Shipments 1-16. As to Shipments 1-16, PSI sent emails to Girobank authorizing payment to Exim for the powdered milk explicitly stating that it had accepted the shipment: "we have received, reviewed, confirmed and <u>accepted</u> the invoice [for the milk shipment]." (emphasis added.) (SOF ¶27).  Bariven's acceptance is further evidenced by the fact that Bariven paid for each of the first sixteen shipments. *Hoover v. Osley & Whitney, Inc.*, 915 F.2d 1556 (1st Cir. 1990)( "[a] payment made after tender, although not conclusive, is always a relevant factor to determine the acceptance, particularly in view of inconsistent actions.").   Also, because "[Bariven] admits it retained the milk shipments and benefited by selling some of [the milk]," (Shipment 1) Bariven is deemed to have accepted the milk pursuant to 672.606(1)(c).   *Golden Needles Knitting v. Dynamic Marketing Enterprises, Inc.*,

---

[5]      In its counterclaim and response to interrogatories, Bariven has refused to specify whether it rejected Shipments 1-22 or revoked its prior acceptance.  *See* Bariven Counterclaim ¶94 (Bariven is "entitled to revoke acceptance of any milk accepted, and to reject any other shipments of milk."); Response to Second Set of Interrogatories at 5 ("Bariven rejected or revoked its acceptance of shipments 1 through 22").  However, the Claim Form is unequivocal in that Bariven purported to "reject" Shipments 1-22. (SOF ¶50).

766 F. Supp. 421, 426 (W.D.N.C. 1991) (applying Florida law to find that buyer had accepted goods).

### (2)   Rejection not made timely

Bariven accepted the first sixteen shipments, because it did not timely reject the powdered milk. Fla. Stat. § 672.606(1)(b) provides that: "[a]cceptance of goods occurs when the buyer . . . [f]ails to make an effective rejection." *See Validsa*, 632 F. Supp. 2d  at 1228; *In re Holistic Serv. Corp.*, 29 B.R. 509, 512 (S.D.Fla. Bkrtcy. 1983). Fla. Stat. § 672.602(1) goes on to provide that rejection is ineffective if not made "within a reasonable time after . . . delivery or tender." *In re Holistic Serv. Corp.*, 29 B.R. at 512  (Under Florida law, debtor accepted goods shipped by creditor where evidence established that goods were delivered, debtor had opportunity to inspect and debtor failed to notify creditor of any defect within reasonable time.)

As set forth in greater detail below, Bariven did not reject Exim's powdered milk on a timely basis because: (i) it <u>never</u> rejected based on melamine contamination (thus denying Exim the opportunity to cure any such nonconformity), (ii) Bariven delayed in sampling and testing the powdered milk supplied by Exim, and (iii) Bariven waited over eight months after it had knowledge that SGS-NA was not conducting document inspections to reject on this basis. Briven's failure to make a timely rejection means that it accepted Shipments 1-16.

Further, Bariven's failure to provide timely notice of a breach to Exim precludes it from obtaining any remedy.  Fla. Stat. § 672.607(3)(a) ("[t]he buyer must within a reasonable time after he or she discovers or should have discovered any breach notify the seller of the breach or be barred from any remedy.") *See also*

*In re Holistic Serv. Corp.*, 29 B.R. at 512; *Hawke Distributing, Inc. v. Nuevo Sol Partners, Inc.*, 689 So.2d 1202, 1202 (Fla. 3d DCA 1997).

    **(3)   Upon acceptance, Bariven obligated to pay contractual rate**

    Fla. Stat. § 672.607(1) states unequivocally, that "[t]he buyer must pay at the contract rate for any goods accepted."  Further, upon acceptance the buyer (Bariven) losses its right to reject. § 672.607(2).  Thus, Bariven's acceptance of Shipments 1-16 requires it to pay for Shipments 1-16. *See Hawke Distributing*, 689 So.2d at 1202 ("Having thus accepted merchandise from [the seller], [the buyer] was obligated to pay the contract."); *see also Validsa, Inc.*, 632 F. Supp. 2d at 1228 ("[t]he buyer must pay at the contract rate for any goods accepted.")

    **(4)   Bariven did not cancel the powdered milk contract but refused to provide adequate assurance**

    Bariven refused to pay for Shipments 17-22, but never provided a notice of cancellation of the powdered milk contract as required if it intended to cancel the contract.  Fla. Stat. § 672.612(3) ("[b]ut the aggrieved party reinstates the contract if she or he accepts a nonconforming installment without seasonably notifying of cancellation … ."); *20 Atlantic Ave. Corp. v. Allied Waste Industries, Inc.*, 482 F.Supp.2d 60, 84 (D.Mass. 2007) (holding that where the buyer did not notify the seller of the cancellation as required by Section 612(3) and did not give the seller an opportunity to cure, the buyer could not cancel the contract); *Mextel, Inc. v. Air-Shields, Inc.*, 2005 WL 226112, *25  (E.D.Pa. 2005) (buyer not entitled to cancel where it accepted non-conforming tender without notice of cancellation). In addition to not paying for Shipments 17-22, Bariven refused to inspect powdered milk awaiting shipment. (SOF ¶49). Between its refusal to inspect and to pay for shipments, Exim had reasonable grounds for insecurity regarding Bariven's future

performance.    Under  such  circumstances  an  "aggrieved  party  may  treat  the

contract as broken if [the party's] reasonable grounds for insecurity are not cleared

up."  *See* §672.609, Comments ¶2.  Section 672.609 provides that:

> (1) A contract for sale imposes an obligation on each party that the
> other's expectation of receiving due performance will not be impaired.
> When reasonable grounds for insecurity arise with respect to the
> performance of either party the other may in writing demand adequate
> assurance of due performance and until he or she receives such
> assurance may if commercially reasonable suspend any performance
> for which he or she has not already received the agreed return.
>
> (4) After receipt of a justified demand failure to provide within a
> reasonable time not exceeding 30 days such assurance of due
> performance as is adequate under the circumstances of the particular
> case is **a repudiation of the contract**.

672.609 (1) & (4) (emphasis added).

On  March  19,  2009,  Exim  sent  a  letter  to  Bariven,  identifying  that  Bariven

had not paid for several shipments and was not cooperating with inspections.  (SOF

¶52).  Exim requested that Bariven honor its contractual obligations.  *Id.*  Bariven

did  not  respond  to  this  communication  at  all,  let  alone  respond  with  the  requested

assurance.  Indeed, when asked whether, in response to the letter, Bariven assured

Exim that it would honor it obligations as to the remainder of the milk contract, Mr.

Kabboul  responded  sarcastically,  stating:  "[t]o  send  product  with  melamine."

Kabboul Depo, pg. 76.  It is undisputed that Bariven did not provide the requested

assurance  within  30  days  of  the  letter.    Accordingly,  pursuant  to  §  672.609(4),

Bariven  repudiated  the  milk  contract.    "Where  the  buyer  .  .  .  repudiates  with

respect to . . . the whole . . . [then] with respect to the whole undelivered balance,

the  aggrieved  seller  may  .  .  .  recover  damages  for  nonacceptance  (s.  672.708)  or  in

a proper case the price (s. 672.709)."  *See* § 672.703.

**(c)      Bariven Did Not Reject Based On Alleged Melamine Contamination**

Florida's UCC provides that "rejection of goods must be within a reasonable time after their delivery or tender.  It is ineffective unless the buyer seasonably notifies the seller."  Fla. Stat. § 672.602(1). *In re Dorado Marine, Inc.*, 321 B.R. 581, 585 (Bkrtcy.M.D.Fla. 2005); *Phone Card America, Inc. v. Quality Discount Equip. Sellers, LLC*, 2010 WL 1576833, *3 (N.Y.Sup. 2010); *Wells Fargo Fin. Leasing, Inc. v. Piggie Park Enterp., Inc.*, 2010 WL 500454, *2 (D.S.C. 2010); *Dur-O-Wal, Inc. v. Alfa Installations Corp.*, 1989 WL 103361, 2 (N.D.Ill. 1989).

In addition, if a buyer fails to state a particular reason for rejection, it will have been deemed to have waived such an objection. Fla. Stat. § 672.605;[6] *In Re Mystic Tank Lines, Corp.*, 354 B.R. 694, 699 -700 (Bkrtcy.D.N.J. 2006) (construing UCC provision identical to Fla. Stat. §672.605) ("Where a buyer rejects the goods delivered by the seller, the buyer must identify the particular defect. If the buyer fails to identify the defect, it is precluded from relying on the unstated defect to justify rejection or breach where the seller could have seasonably cured the defect."); *see also Pennfield Precision, Inc. v. Atlantic Castings and Engineering Corp.*, 1990 WL 158193, *9 (E.D.Pa. 1990) (same); *Dur-O-Wal, Inc.*, 1989 WL 103361, *2  (same). Bariven fails to meet each and every requirement for a proper rejection as it relates to the alleged melamine contamination.  Most fundamentally, any claimed rejection based on melamine contamination fails because Bariven <u>never</u> rejected Exim's shipments based on melamine and only raised the issue in litigation proceedings.

---

[6]      The statute provides that: "(1) the buyer's failure to state in connection with rejection a particular defect which is ascertainable by reasonable inspection precludes the buyer from relying on the unstated defect to justify rejection or to establish breach: (a) where the seller could have cured it if stated seasonably ... ." Fla. Stat. § 672.605(1)(a).

**(1)    Bariven did not state melamine contamination as a basis for rejection**

Bariven failed to properly reject any shipments based on melamine contamination because it failed to comply with Fla. Stat. § 672.605(1)'s requirement that it specify the "particular defect", i.e. melamine contamination.  As previously stated, Bariven never formally rejected shipments based on melamine contamination.  The Claim Form was explicit with respect the basis of rejection: "Rejection of product sent to Venezuela due to lack of inspection under PSI Supervision as requested and described in the PO." (SOF ¶47).  Nowhere did the Claim Form mention melamine.  Bariven never provided another formal rejection of Shipments 1-22 based on melamine or otherwise.

It is not surprising that the Claim Form did not mention melamine as a basis for rejection: on January 19, 2009 when the Claim Form was sent to Exim, Bariven had not even sampled, much less tested, any of Exim's supplied powdered milk for melamine. In this regard, it had absolutely no basis to assert such contamination as a basis for rejection.

**(2)    Bariven did not seasonably notify Exim of any melamine contamination**

Both Fla. Stat. §§ 672.602 and 672.605 require that Bariven notify Exim of its rejection "seasonably." *See In re Dorado Marine, Inc.*, 321 B.R. at 585; *Phone Card America, Inc.*, 2010 WL 1576833 at *3; *Wells Fargo*, 2010 WL 500454 at *2; *Dur-O-Wal*, 1989 WL 103361, at *2.  As stated above, prior to filing their answer and counterclaim in this action (on July 6, 2009), Bariven never stated that it had

13

<u>rejected Shipments 1-22 based on melamine contamination</u>.[7]   This fact alone precludes rejection based on melamine contamination.

However, if Bariven asserts that it notified Exim of its rejection in its answer and counterclaim, such notice is clearly not timely. Between the time when Bariven should have discovered the alleged melamine breach (late October 2008) and when it notified Exim through a counterclaim of the rejection based on melamine (July 6, 2009), close to nine months had elapsed.  This nine month delay is not reasonable under UCC standards.

"Under the U.C.C., a reasonable time for any action 'depends on the nature, purpose and circumstances' of that action." *Arnold, Matheny and Eagan, P.A. v. First American Holdings, Inc.*, 982 So.2d 628, 635 n.3 (Fla. 2008).  "'What is a reasonable opportunity varies, depending upon the type of goods involved.'" *Rafter Seven Ranches L.P. v. C.H. Brown Company*, 546 F.3d 1194 (10 Cir. 2008).  If the goods are perishable, the notification period is shorter. *Levin v. Gallery 63 Antiques Corp.*, Case No. 04-CV-1504 (S.D.N.Y. 2006) (recognizing that timeliness of notification is an issue as to  "'perishable goods [or] goods which fluctuated rapidly in price.'").

The powdered milk was perishable.  Indeed, given the conditions in which Bariven stored the milk, the shelf life of the milk was six months – but certainly not more than one year. (SOF ¶4). Shipments 1-16 were shipped between June 22, 2008 and September 10, 2008. (SOF ¶23).  As such, even assuming that the milk was produced the day it was shipped, the shelf life of the powdered milk expired by

---

[7]      As also noted in footnote 5 above, Bariven has refused to characterize whether it rejected Shipments 1-22 or revoked a prior acceptance.  However, because the only formal notice provided to Exim was of a "rejection," i.e., the Claim Form, Bariven's actions are here analyzed as a purported rejection.

March 10, 2009.   Similarly, Shipments 17-22 were shipped between December 2008 and January 2009. Thus, the shelf life for all of these shipments expired close to the date of Bariven's "notice" of breach. Thus, by the time Bariven notified Exim of the rejection based on melamine, the powdered milk's shelf life had expired. Delay of rejection until after the product expired is clearly unreasonable and the UCC drafters recognized as much, providing that the rejection must occur "before any substantial change in condition of the goods." *In re Dorado Marine, Inc.*, 321 B.R. at 585; *Phone Card America, Inc.*, 2010 WL 1576833 at *3; *Wells Fargo*, 2010 WL 500454 at *2; *Dur-O-Wal* , 1989 WL 103361, at *2); *see also* White & Summers, *Uniform Commercial Code* § 11-10 at 772-3 (5d ed. 1996) (citing *A.C. Carpenter, Inc. v. Boyer Potato Chips,* 7 UCCRS 493 (1969) (twelve day delay after delivery of potatoes is unreasonable), and citing *Mazur Brothers v. Jaffe Fish Co., Inc.,* 3 UCCRS 419 (1965) (five day delay after delivery of shrimp is unreasonable)).

**(3)   Any melamine contamination was ascertainable by reasonable inspection**

Bariven could, and should have, discovered any melamine contamination by the end of October 2008 or beginning of November 2008 at the latest.  Bariven was aware of the melamine alert at the latest by September 19, 2008 — the date Bariven's Jorge Parra e-mailed Exim's president regarding the alert.  As of that moment Bariven should have sampled and tested the Exim supplied powdered milk. Indeed, Bariven recognized as much, ordering on October 2, 2008 that Exim-supplied powdered milk be sampled and tested. (SOF ¶3).  Upon receiving samples, a laboratory can provide test results for melamine within two weeks.  (SOF ¶33). Thus, Bariven should have discovered the alleged melamine contamination by the

end of October 2008, but certainly before the January 19, 2009 Claim Form rejection for "technical non-conformity". Its failure to ascertain the melamine contamination in this period prevents it from now asserting melamine contamination as a basis for rejection. Fla. Stat. § 672.605(1). *See In Re Mystic*, 354 B.R. at 699 -700; *see also Pennfield Precision* , 1990 WL 158193 at *9; *Dur-O-Wal*, 1989 WL 103361 at *2.

### (4) Exim could have cured any defect related to melamine contaminated milk if Bariven had  stated such a defect seasonably

Both Fla. Stat. §§ 672.605 and 672.508 provide the seller the opportunity to cure any nonconforming product. *See In re Holistic Services Corp.*, 29 B.R. at 512 ("Obviously, the purpose and effect of this Commercial Code provision requiring notice is to require that the parties act in a commercially reasonable manner and to make it possible for the seller to exercise his rights under Section 672.508, Florida Statutes, which provides for the seller's right to cure any defect and thereby mitigate damages.") Indeed, the right to cure provided in § 672.508 limits Bariven's right to reject. White & Summers, *Uniform Commercial Code* § 8-5 at p. 577 (5d ed. 1996). But Bariven never provided Exim the opportunity to cure any nonconformity of its powdered milk because Bariven never notified Exim that it was rejecting based on melamine contamination. Without such notification, Exim's ability to cure was not even triggered. *Nebula Glass Intern., Inc. v. Reichhold, Inc.*, 2004 WL 4946483, *5  (S.D.Fla. 2004) ("notice of breach is a valid precondition of imposing liability on a seller of goods.")

Moreover, there is no doubt that Exim could have cured any problem related to melamine contaminated milk had it been notified seasonably regarding such

16

contamination.  First, Exim offered to provide Bariven powdered milk from countries other than China which were unaffected by the melamine situation.  (SOF ¶38). Bariven ignored such offers.  Second, by the time the Claim Form rejection was made on January 19, 2009, China had already restructured the powdered milk export requirements to ensure that no melamine contaminated milk was exported. (SOF ¶29).  In addition, Exim's suppliers were willing to provide new batches of powdered milk if they had been seasonably notified that the powdered milk they manufactured and supplied had been contaminated by melamine. (SOF ¶51).

### (5)   Bariven's wrongful rejection of Shipments 17-22 based on alleged melamine contamination

With respect to any rejection, Bariven must establish that it "rightfully reject[ed]" the powdered milk. Fla. Stat. § 672.711. *See also Fanok v. Carver Boat Corp., LLC*, 576 F.Supp.2d 404, 66 (E.D.N.Y. 2008); *Bandeis Machinery & Supply Co., LLC v. Capitol Crane Rental, Inc.*, 765 N.E.2d 173, 47 (Ind. Ct. App. 2002); *Sanders v. Robertson-American Corp.*, 698 S.W.2d 480, 485 (Tex. App. Ct. 1985). Of course rejection is proper only to the extent that the goods fail "to conform to the contract." Fla. Stat. § 672.601. *see also Frank Griffin Volkswagen, Inc. v. Smith*, 610 So.2d 597, 599 (Fla. 1st DCA.,1992) ("Goods are conforming [and thus cannot be rejected] when they are in accordance with the obligations under the contract."); *McCormick Machinery, Inc. v. Julian E. Johnson & Sons, Inc.* 523 So.2d 651, 654 (Fla. 1st DCA  1988) (same ); *Sanders*, 698 S.W.2d at 485 ("In order for a buyer to reject, there must be a failure of the goods or the tender of delivery to conform to the contract.")  To the extent that Bariven argues that the powdered milk supplied in Shipments 17-22 failed to conform because it contained melamine, such argument must fail, <u>because Bariven has never sampled or tested Shipments</u>

<u>17-22</u>.  In February 2010, as part of this litigation, Bariven decided to test various shipments that had not been previously tested.  However, for tactical reasons, it decided not to sample or test a single container from Shipments 17-22.  This fact is noteworthy because these shipments all occurred after the changes enforced by the Chinese government related to the testing of melamine in all powdered milk to be exported from China. Therefore, Bariven can not establish a genuine issue of material fact as to Shipments 17-22's alleged non-conformity.

Bariven's actions in wrongfully rejecting Shipments 17-22 rise to the level of bad faith.  A buyer may reject goods tendered by the seller as long as the buyer has a good faith belief that the goods are non-conforming.  *Matrix Int'l Textiles, Inc. v. Jolie Intimates Inc.*, No. 316107/03, 2005 WL 1074774, at *6 (N.Y. Civ. Ct. May 5, 2005); *Y & N Furniture, Inc. v. Nwabuoku,* 190 Misc.2d 402, 404, 734 N.Y.S.2d 382 (N.Y.City Civ.Ct. 2001).  *GE Packaged Power, Inc. v. Readiness Management Support, L.C.,* 510 F.Supp.2d 1124 (N.D. Ga. 2007).  In the instant action, when Bariven rejected Shipments 17-22 on January 19, 2010, Bariven had not yet *sampled*, much less obtained test results *from any* of Exim's powdered milk shipments.[8]  Its bad faith continues to this day by virtue of its decision not to test Shipments 17-22 as a litigation tactic.  Simply put, at the time Bariven rejected these shipments it had no basis to reject them based on melamine – and it still has no such basis today.

---

[8]     When the first test results were returned some of these showed no melamine contamination and resulted in Mr. Luis Pulido, at that time head of PDVAL and subsequently President of Bariven, to publicly declare the powdered milk supplied to Venezuela from China was melamine free.  (SOF ¶50).

**(d)   Bariven's Rejection Based On The Lack Of PSI Supervised Document Inspection Is Insufficient**

Bariven's "rejection" of Shipments 1-22 was pretextual as is evidenced by the facts.   Nonetheless, Bariven's attempted rejection on this basis was ineffective too.

**(1)   Bariven failed to reserve its rights to allege breach for lack of PSI  supervised document inspection.**

Fla. Stat. § 672.605(2) provides that a buyer's "[p]ayment against documents made without reservation of rights <u>precludes recovery of the payment for defects apparent on the face of the documents</u>." (emphasis added.) *See Canada Steamship Lines, Inc. v. Warner Petroleum Corp.*, 2009 WL 3294872, *4 (N.D.Ind. 2009); *Bogien v. Amistadi*, 1996 WL 189442, *3  (Mass.App.Div. 1996).

As previously noted, the only ground asserted in the Claim Form supporting Bariven's rejection is that Exim did not comply with the "document inspection requirement."   In order to receive payment on a shipment, Exim sent Bariven multiple documents, including sampling reports, loading supervision reports and test reports prepared by SGS-China.   (SOF ¶13).   Upon receiving Exim's documents, Bariven authorized the payment to Exim and issued e-mails stating that all documents related to the shipments had been "<u>received, reviewed, confirmed and accepted</u>." (emphasis added.)  (SOF ¶27).  Absolutely no reservation of rights language was contained in these e-mails.

No document inspection report from SGS-NA was included among the documents provided by Exim.   Indeed, Bariven was aware that SGS-NA was not conducting the document inspection as regular reports were being sent to PSI stating this fact.  (SOF ¶10).  Further, the documents explicitly stated that Exim

selected the inspection company (SGS-China), as Exim Brickell is listed as the client. (SOF ¶12). Finally, the inspection reports submitted by SGS-China were in a different format than used by SGS-NA.   (SOF ¶12). As such, the alleged non-conformity was apparent from the face of the documents.   Nonetheless, Bariven proceeded to pay Exim for Shipments 1-16 without a reservation of rights.  For this reason, Bariven cannot seek recovery for payments made on Shipments 1-16 based on Bariven not selecting the inspection agency.

### (2) Bariven's course of performance modified/waived the document inspection requirement

Bariven's contention that Exim's contracting of SGS-China to inspect the milk constitutes a material breach of contract is unsustainable, as that provision in the contract was modified or waived by the parties' course of performance.  Fla. Stat. § 672.208 provides that "course of performance shall be relevant to show a waiver or modification of any term inconsistent with such course of performance."  See also *T.J. Stevenson & Co., Inc. v. 81,193 Bags of Flour*, 629 F.2d 338 (5th Cir. 1980)(express notice provisions waived by course of performance); *In re McClamrock*, 51 UCC2d 683 (Bankr. M.D.N.C. 2003) (high car payment waived by course of performance).

The contractual inspection requirement was modified or waived by Bariven's course of conduct. Since as early as May 29, 2008, Bariven was aware that the inspections being conducted were not under SGS-NA supervision. (SOF ¶10). Further, each of the SGS-China reports that Bariven received from Exim clearly listed "Exim Brickell" as the client, not "Bariven –PDVSA," as was typical of SGS-NA reports delivered to Bariven. (SOF ¶12). An additional difference in the reports is that the SGS-NA did not appear at the top of each page of the report.  (SOF ¶12).

Moreover, on September 22, 2008, SGS-NA explicitly informed Bariven that it had not been coordinating the inspection. (SOF ¶10). Notwithstanding this notification, Bariven did not promptly raise the "inspector selection" as an issue. In short, by repeatedly accepting shipments based on reports issued by SGS China, Bariven modified or waived the inspection requirement.   Indeed, Mr. Alfonso Gravina, PSI's International Purchasing Manager, recognized this very point, stating: "with this case we should be careful, because for this order we have already accepted the first shipments without a PSI inspection." (SOF ¶47). Accordingly, to the extent that Bariven seeks to recover for breach of the inspection provision as to Shipments 1-16, such argument fails.

### (3)   Bariven's wrongful rejection based on lack of PSI supervision of document inspection.

Bariven's rejection based on lack of inspection was improper for two additional reasons (1) the rejection was untimely and (2) the rejection based on lack of document inspection was made in bad faith and does not substantially impair the contract as a whole.

Bariven did not reject acceptance based on lack of inspection until January 19, 2009. However, Bariven was aware of the alleged breach eight months earlier— on about May 29, 2008. By that date, Bariven's inspection agency (SGS-NA) informed Bariven that it was unable to inspect the milk, as it had been unable to contact the manufacturer. (SOF ¶10). Notwithstanding, on May 20, 2008, Exim informed Bariven that the first milk shipment was ready to be inspected by it. (SOF ¶23).   Given its awareness that SGS-NA had not inspected the goods, it should have known that the inspection had not been conducted by its selected agency (SGS-NA).   Accordingly, about eight months elapsed between the date Bariven

21

should have been aware of the breach and when it actually revoked acceptance on that ground. Such a delay is not reasonable. *See  Canada Steamship Lines, Inc. v. Warner Petroleum Corp.*, 2009 WL 3294872, *4 (N.D.Ind. 2009); *Bogien v. Amistadi*, 1996 WL 189442, *3  (Mass.App.Div. 1996).

Bariven's rejection based on lack of document inspection was also improper because it was done in bad faith. *Matrix Int'l Textiles, Inc. v. Jolie Intimates Inc.*, No. 316107/03, 2005 WL 1074774, at *6 (N.Y. Civ. Ct. May 5, 2005); *Clark v. Zaid, Inc.*, 282 A.2d 483, 484-85 n.1 (Md. 1971); *Y & N Furniture, Inc. v. Nwabuoku,* 190 Misc.2d 402, 404, 734 N.Y.S.2d 382 (N.Y.City Civ.Ct.2001). *GE Packaged Power, Inc. v. Readiness Management Support, L.C.*, 510 F.Supp.2d 1124 (N.D. Ga. 2007).   Further, pursuant to Fla. Sta.  § 672.612 (2), an installment of the contract can only be rejected if the non-conformity substantially impairs the value of the installment.[9] § 672.612 (2) ("The buyer may reject any installment which is nonconforming if the nonconformity substantially impairs the value of that installment and cannot be cured or if the nonconformity is a defect in the required documents"); see also *Design Plus Store Fixtures, Inc. v. Citro Corp.*, 508 S.E.2d 825, 827 (N.C. Ct. App. 1998) ("Rejection of an installment  is appropriate only if "the nonconformity substantially impairs the value of that installment ...."); *Midwest Mobile Diagnostic Imaging, L.L.C. v. Dynamics Corp. of America*, 965 F.Supp. 1003, 1011 (W.D.Mich. 1997) ("Under subsection (2), a buyer may not reject nonconforming tender unless the defect substantially impairs the value of the

---

[9]    Comment 4 to § 672.612 specifies that "[t]he defect in required documents refers to such matters as the absence of insurance documents under a C.I.F. contract, falsity of a bill of lading, or one failing to show shipment within the contract period or to the contract destination.   Even in such cases, however, the provisions on cure of tender apply if appropriate documents are readily procurable."

installment."); *Hubbard v. UTZ Quality Foods, Inc.*, 903 F.Supp. 444, 450 (W.D.N.Y. 1995).

It must be emphasized that the document inspections mandated by the powdered milk contract <u>did not</u> call for actual inspections of the powdered milk (laboratory tests) that may have determined any possible non-conformity of the product.   Instead, the document inspections were just that: inspections of documents to make sure all documents were in order.

Further, the inspection agency contracted by Exim was the same agency contracted by PSI – SGS.[10] (SOF ¶11). Moreover, the SGS-China reports generated on Exim's behalf contained all the material information required by PSI of SGS-NA and more (the SGS-China reports contracted by Exim contained actual laboratory tests of the powdered milk). (SOF ¶12). Exim's use of SGS-China to inspect and generate the necessary reports, rather than PSI coordinating with SGS-NA to review documents prepared by SGS-NA, did not constitute a substantial impairment of the milk shipped.  Consequently, Bariven's rejection based on lack of inspection was in bad faith and improper.

**(e)   Bariven's Unjust Enrichment Claim Is Legally Insufficient**

Bariven's unjust enrichment claim fails because the powdered milk contract forecloses a quasi-contractual theory.   "It is well-settled in Florida that unjust enrichment is an equitable remedy and is, therefore, not available where there is an adequate legal remedy."  *American Honda Motor Co. v. Motorcycle Info. Network*, 390 F. Supp. 2d 1170, 1178 (M.D. Fla. 2005).  Where (as here) the plaintiff admits to the existence of a contract, "claims arising out of that contractual relationship

---

[10]    Exim contracted with a SGS Chinese affiliate, which is exactly what SGS-NA intended to do.

will not support a claim for unjust enrichment." *Moynet v. Courtois, 8 So. 3d 377, 379 (Fla. 3d DCA 2009); Validsa, Inc. v. PDVSA Serv., Inc.*, 632 F. Supp. 2d 1219, 1243 (S.D. Fla. 2009) (no unjust enrichment claim where parties "admitted to the existence of express contracts").

**(f)     Exim Is Entitled To Summary Judgment On All Claims Related To The Powdered Milk Contract**

As set forth above, Bariven did not reject Shipments 1-22 based on the alleged melamine contamination; its rejection based on the lack of a supervised document inspection was ineffective because it paid for the goods without a reservation of rights, it waived the inspection requirement, and this rejection was otherwise untimely and done in bad faith; finally, Bariven did not cancel the milk contract. For these reasons, Exim requests that this Court grant summary judgment in its favor as to liability, reserving jurisdiction to determine the amount of Exim's damages. Similarly, summary judgment should be granted in favor of Exim on Bariven's counterclaims for Breach of Milk Contract (Count I), Breach of Implied Warranty of Merchantability (Count A), Breach of Implied Warranty of Fitness for Particular Purpose (Count III), Unjust Enrichment (Count IV), and Breach of Implied Covenant of Good Faith, Fair Dealing and Commercial Reasonableness (Count V).

**B.   BARIVEN IS NOT ENTITLED TO RECOVER ON THE RICE CONTRACT**

Bariven alleges that Exim breached the rice contract because it failed "to provide all original documentation to Bariven at least seven working days prior to the arrival of a given shipment in Venezuela" as required under the rice contract. Bariven claim fails because (1) Bariven waived the seven day delivery requirement and (2) Bariven has not been damaged.

**(a)** **Bariven Waived The Contractual Provision Requiring Delivery Of Shipping Documents Seven Days In Advance Of The Shipment's Arrival**

As previously noted, the UCC provides that a contractual provision can be modified or waived by the parties' course of performance.  Fla. Stat. § 672.208. That is exactly what occurred in this instance.  Bariven routinely permitted Exim to provide the original shipping documentation after that shipment had arrived. This course of performance resulted in a waiver or modification of the requirement that Exim provide the original documentation seven days in advance.  Accordingly, as the provision has been waived, Bariven is precluded from claiming a breach of the provision.  *T. J. Stevenson & Co., Inc. v. 81,193 Bags of Flour*, 629 F.2d 338, 365 (5th Cir. 1980) (applying UCC waiver provision to hold that notice requirement  in parties' agreement was waived by the parties' course of performance); *Midwest Builder Distributing, Inc. v. Lord and Essex, Inc.*, 891 N.E.2d 1, 28, 322  (Ill. Ct. App. 2007)("under the UCC, the course of performance is more than an interpretive tool; it may also give rise to waiver of express contractual terms if those terms are not strictly adhered to.")

**(b)** **Bariven Suffered No Damages As A Result Of Exim's Delay In Providing Original Shipping Documents**

To establish a breach of contract, the plaintiff must prove:  (1) a valid contract;  (2) a material breach and (3) damages resulting from the breach. *Murciano v. Garcia*, 958 So. 2d 423, 423 (Fla. 3d DCA 2007). Bariven claims that Exim's failure to deliver the original documents resulted in storage charges and other related expenses stemming from its inability to nationalize and distribute the product.  However, it is undisputed that Bariven was able to nationalize the product without the original documents through the issuance of carta de compromiso. (SOF

¶20).   Once nationalized, Bariven was free to distribute the rice.   Consequently, because Bariven was able to nationalized the rice, none of the purported damages suffered resulted from Exim's actions.

## CONCLUSION

Based on the foregoing argument and authority, summary judgment on liability should be entered in Exim's favor.

Respectfully submitted,

Attorneys for Plaintiff
One Southeast Third Avenue, 25th Floor
Miami, Florida  33131-1714
Phone:  (305) 374-5600
Fax:  (305) 374-5095
Email:  george.volsky@akerman.com
        luis.onaghten@akerman.com
        michael.sayre@akerman.com

By: s/Luis M. O'Naghten
        George Volsky, Esq.
        Fla. Bar No. 203092
        email: george.volsky@akerman.com
        Luis M. O'Naghten, Esq.
        Fla. Bar No. 622435
        email: luis.onaghten@akerman.com
        Michael A. Sayre, Esq.
        Fla. Bar No. 17607
        email: michael.sayre@akerman.com

## **CERTIFICATE OF SERVICE**

*I hereby certify* that on July 9, 2010, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF.  I also certify that the foregoing document is being served this day on all counsel of record or pro se parties identified on the attached Service List in the manner specified, either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

By:  /s/Michael A. Sayre

## SERVICE LIST

**Exim Brickell, LLC v. PDVSA Services, Inc. and Bariven S.A.**
**CASE NO.: 09-20915-CIV-GOLD/McALILEY**
**United States District Court, Southern District of Florida**

Anthony D. Mirenda, Esq.
K. Neil Austin, Esq.
Thomas J. Bone, Esq.
Thomas R. Ayres, Esq.
Foley Hoag LLP
155 Seaport Boulevard
World Trade Center West
Boston, MA  02210-2170
Tel: (617) 832-1000
Email: amirenda@foleyhoag.com
Email: naustin@foleyhoag.com
Email: jbone@foleyhoag.com
Email: tayres@foleyhoag.com

Ronald E.M. Goodman, Esq.
Foley Hoag LLP
1875 K. Street, N.W., Suite 800
Washington, DC  20006
Tel: (202) 223-1200
Email: rgoodman@foleyhoag.com

Brian Silverio, Esq.
Silverio & Hall, P.A.
150 West Flagler Street, PH. 2850
Miami, FL  33130-1557
Tel: (305) 371-2756
Email: bsilverio@silveriohall.com