UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

CASE NO.: 09-20915-CIV-GOLD/McALILEY

| | |
|---|---|
| Exim Brickell LLC,<br>      Plaintiff/Counterclaim-Defendant,<br><br>v.<br><br>Bariven, S.A.,<br>      Defendant/Counterclaim-Plaintiff | ) ) ) ) ) ) ) ) ) ) |

**BARIVEN'S REPLY MEMORANDUM IN SUPPORT OF ITS
MOTION FOR PARTIAL SUMMARY JUDGMENT**

Pursuant to Federal Rule of Civil Procedure 56 and Local Rule 7.5, Bariven, S.A. ("Bariven") submits this reply in support of its Motion for Partial Summary Judgment (D.E. #84) against Exim Brickell LLC ("Exim") on Counts I and II of Bariven's Counterclaim (D.E. #33) and on all remaining counts of Exim's Second Amended Complaint (D.E. #24).[1]  In reply, Bariven states as follows.

## I.   INTRODUCTION

The Court should grant Bariven's Motion for Partial Summary Judgment because there is no genuine issue of material fact as to Exim's breaches of the Milk and Rice Contracts.  Exim misrepresents or ignores testimony and documents in an attempt to muddle the record; however, Exim has not set forth specific facts showing that there is a genuine issue for trial.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

---

[1] Accompanying this Memorandum is Bariven's Concise Statement of Contested Material Facts in Support of its Reply, which is cited as "Reply SOF at ¶ __."  Bariven's Concise Statement of Material Facts filed with its Motion for Summary Judgment (D.E. #84.1) will be cited as "SOF at ¶ __."  Bariven's Concise Statement of Material Facts in Opposition to Plaintiff's Motion for Summary Judgment will be cited as "Opposition SOF at ¶ __."

## II.     ARGUMENT

1.   **It Is Undisputed That Exim's Milk Shipments Are Substantially Impaired As A Result of Pervasive Melamine and Cyanuric Acid Contamination.**

There is no genuine dispute of material fact that each of the fifteen milk shipments Bariven sampled contain a number of samples which tested positive for the presence of melamine and cyanuric acid and thus did not conform to the Milk Contract's express prohibition of toxic substances.  In addition, there is no dispute that each shipment contained a number of samples with melamine present at levels that are undisputably harmful to humans if ingested. Pursuant to Fla. Stat. §672.612, this egregious and pervasive nonconformity substantially impairs the value of the Milk Contract as a whole.  Accordingly, Bariven is entitled to judgment as a matter of law on Count I of its Counterclaim.

   a.   *It Is Undisputed That Exim's Milk Contains Melamine And Cyanuric Acid.*

There can be no dispute that the Milk Contract plainly stated that the powdered milk "must be free of … toxic substances."  SOF at ¶ 6.  It is also undisputed that extensive sampling and testing have established the presence of melamine and cyanuric acid in Exim's milk.  Reply SOF at ¶ 33.  Indeed, Exim's own sampling expert, Professor Robert L. Bradley, Jr., conceded that the milk contained melamine and cyanuric acid.  Reply SOF at ¶ 47.

   b.   *Exim Presents No Expert Testimony To Dispute That Melamine Concentration Above .324 PPM Is Unsafe For Human Consumption.*

Exim seeks to create confusion by asserting that "there is conflict between Exim's and Bariven's experts regarding permissible levels of melamine."  D.E. #110 at 8.  First, no amount of melamine is "permissible" under the express terms of the Milk Contract.  SOF at ¶ 6.  Second, Bariven's expert, Dr. Michael Somers, the only competent witness to address the health effects of melamine and cyanuric acid, has opined that the most recent research indicates that melamine

and cyanuric acid pose an unacceptable risk to human health at levels above .324 parts per million ("ppm").  Reply SOF at ¶ 32, 48-50.  Exim's proffered sampling expert, Professor Bradley, repeatedly acknowledged that he is not an expert on the health effects on humans of melamine and cyanuric acid, Reply SOF at ¶ 32, and so Exim cannot rely on Professor Bradley or his report to manufacture any dispute on this issue.  And, finally, it is undisputed that fourteen of the fifteen shipments sampled contained milk with melamine in concentrations significantly higher than even the 2.5 ppm urged by Exim[2] as the "unsafe" threshold, as shown below:

| Shipment No. | Highest result | Shipment No. | Highest result |
|---|---|---|---|
| 2 | 80 ppm | 9 | 315 ppm |
| 3 | 18.1 ppm | 10 | 2800 ppm |
| 4 | 117 ppm | 12 | 9.56 ppm |
| 5 | 39.2 ppm | 13 | 43 ppm |
| 6 | 692 ppm | 14 | 1600 ppm |
| 7 | 88 ppm | 15 | 2400 ppm |
| 8 | 1274 ppm | 16 | 352 ppm |

        *c.*     *Exim Criticism of Bariven's Sampling and Testing for Melamine and Cyanuric Acid Does Not Create a Material Factual Dispute.*

Exim's criticisms of Bariven's sampling and testing for melamine and cyanuric acid do not create a material factual dispute.  First, Exim argues that Bariven's test results are "unreliable" merely because Bariven sampled the bags with a scoop instead of a coring device.  However, Exim's own sampling expert, Professor Bradley, acknowledged that using a scoop is permitted when sampling milk powder from stitched bags, the type Exim used in supplying the milk to Bariven.  Reply SOF at ¶ 47.  Moreover, Professor Bradley admitted that his own

---

[2] Exim's source for the 2.5 ppm figure is a two-year-old FDA interim report; however, Dr. Somers testified that the most recent research sets a tolerable daily intake ("TDI") of 0.00809 milligram per kilogram of body weight per day. SOF at ¶ 32; Reply SOF at ¶ 49.  As an example, Dr. Somers opined that a 50-pound child would surpass the level of melamine deemed "tolerable" on a daily basis based on the most recent research (*i.e.*, 0.00809 mg/kg/day) by consuming as little as 0.06 ounces of milk contaminated at 100 ppm. *Id.*  That same child would surpass the same threshold for daily tolerable melamine consumption by consuming 0.6 ounces of milk contaminated at 10 ppm or 6.1 ounces of milk contaminated at 1 ppm.  *Id.*  Exim has offered no contrary expert testimony.

criticisms of Bariven's sampling methodology were unfounded because he had no knowledge of the details of the milk production in China or what the tolerance range for divergent results should be. *Id.*

Second, Exim misrepresents the true toxicity of the milk it shipped by omitting test results demonstrating the presence of cyanuric acid, an analog of melamine into which melamine breaks down over time. Reply SOF at ¶ 33 & 51. Detection of cyanuric acid is an indication that melamine was once present in greater quantities, even when melamine itself has not been detected. *Id.* Without accounting for the undisputed presence of cyanuric acid, Exim's assertions about the absence of melamine are neither accurate nor complete.

Third, Exim has offered no credible evidence to contradict the results of Bariven's sampling and testing for melamine and cyanuric acid. Exim's attempt to present SGS-China test results to show the absence of melamine fails because Exim's own sampling expert, Professor Bradley, admitted that he could not link the SGS-China melamine test reports with any of the other SGS-China sampling reports, much less with the milk powder actually sent to Bariven. *Id.* at ¶ 57. The documents in Exim's "Composite Exhibit 19" themselves do not link to the milk shipped to Bariven—for example, an SGS-China melamine test report that Exim represented was associated with Shipment 5 contained batch number "22072008", which corresponds with a milk production date of July 22, 2008. *Id.* However, the loading supervision report that Exim represented was associated with this same Shipment 5 indicated that the milk was loaded into containers and sealed by July 17, 2008, *id.*, so this melamine test could not possibly have been done on the milk actually shipped to Bariven. Exim has offered no other evidence to link these reports to the milk actually supplied, and therefore has no basis for relying on the SGS-China reports.

### 2. The Milk Damages Bariven Incurred Are Undisputed and Reasonably Ascertainable.

As an aggrieved buyer, the Florida UCC clearly permits Bariven to recover the amounts it paid to Exim for its worthless milk as well as the reasonable costs Bariven incurred to store the milk as a result of Exim's breach. See Fla. Stat. §§672.711, 713 & 715; Miles v. Cavanaugh, 350 So. 2d 1090, 1093 (Fla. 3d DCA 1977) (expense in transporting and overhauling defective plane and damages from loss of its use proximately caused by breach of warranty recoverable).

#### *a.   The Amount Bariven Paid For All The Milk Shipments Is Undisputed.*

The $56,367,300 Bariven paid to Exim for 22 shipments of powdered milk is undisputed. SOF at ¶¶ 12 & 26. Exim makes the completely unsupported—and irresponsible—assertion that the first shipment was "sold". There is absolutely no evidence of that. To the contrary, the undisputed evidence shows that milk from the first shipment is being securely stored in Jose, Venezuela, along with milk from Exim's other shipments. Opposition SOF at ¶ 25.

#### *b.   It Is Undisputed That Payments For Storage and Demurrage Costs Were Made From PDVSA Corporate Funds.*

It is undisputed that the approximately $23 million in demurrage and warehousing costs are directly related to the containers storing Exim's milk. Reply SOF at ¶ 35. It is also undisputed that Bariven is a wholly-owned subsidiary of Petroleos de Venezuela, S.A. ("PDVSA"). SOF at ¶ 1. It is also undisputed that invoices for the demurrage and storage charges for milk were reviewed and approved by Bariven and paid from PDVSA's corporate treasury. Reply SOF at ¶ 35. Similarly, invoices for the demurrage and storage charges for rice were reviewed and approved by Bariven and sent to PDVSA Petróleos, S.A. for payment out of funds from PDVSA's corporate treasury. Reply SOF at ¶ 35. Exim's only point is that the funds used to pay the invoices were not issued directly from a Bariven corporate account, but

rather from its parent PDVSA's corporate treasury. This does not create a material factual dispute or render the amounts unrecoverable.

### c. *Bariven's Storage and Demurrage Costs Are Reasonably Ascertainable.*

Finally, Exim has offered nothing to contradict the amount of Bariven's storage and demurrage costs; such costs are reasonably ascertainable through undisputed rate schedules and arrival dates, which form the basis for invoices and pre-liquidation statements. Reply SOF at ¶ 53. The Florida UCC is clear that a buyer does not have to prove its loss with "mathematical precision"; rather, "[l]oss may be determined in any manner which is reasonable under the circumstances." Fla. Stat. §672.715, n.4. Here, Bariven has provided evidence of the milk storage and demurrage charges with as close to mathematical precision as possible. The undisputed facts show that all $2,480,447 of the milk storage costs and $6,025,682 of the milk demurrage costs are based on actual invoices. Reply SOF at ¶ 53. The calculation of the remaining milk demurrage charges is hardly speculative: for each container in each shipment, established rates are multiplied by the number of days of storage. Shippers' pre-liquidation statements simply reflect this calculation as of a certain point in time, and are by no means speculative because, like invoices, they are based on established rates times a given number of days. *Id.* Bariven's customs employee, Judith Bello, confirmed that pre-liquidation estimates, like invoices, were based on "the same rate statements. What varies is the date." *Id.*

### 3. Exim's Breach Of The Rice Contract And Bariven's Resulting Damages Are Undisputed.

It is undisputed that Bariven paid Exim for three rice shipments that arrived in January 2009. SOF at ¶¶ 39 & 43. It is likewise undisputed that Exim failed to cause the necessary export documents to be delivered to Bariven until October 2009 because Exim had not paid its supplier. SOF at ¶ 44. In an attempt to hide its breach, Exim now seeks to create factual

6

disputes where none exist by misrepresenting documents and testimony of Bariven employees. Given that no reasonable factfinder could determine that a ten-month delay in the tender of original expert documents was reasonable—much less commercially prompt—Bariven is entitled to judgment as a matter of law on Count II of its Counterclaim. *See* Fla. Stat. §§672.320.

### a. *Bariven Could Not Timely Nationalize Rice Shipments And Incurred Costs As A Direct Result of Exim's Breach.*

The causal chain of events with respect to the rice shipments flows naturally: (1) Exim did not provide original export documents to Bariven because Exim failed to pay its supplier; which (2) prevented Bariven from timely removing the rice shipments from customs; which, in turn, (3) caused Bariven to incur storage and demurrage costs. SOF at ¶¶ 39-44. Venezuelan law requires original export documentation, as does the express language of Rice Contract. Reply SOF at ¶ 40. Bariven's customs employee, Judith Bello, testified that while Venezuelan law may permit nationalization in extraordinary circumstances without original export documents, Bariven could only proceed in this manner if it provided an explicit written commitment (*i.e.*, "carta de compromiso") to customs authorities to provide original export documents within a matter of days. Bariven asked Exim repeatedly for three months for the original export documents, but Exim repeatedly failed to provide such documents. SOF at ¶ 41.

Through reasonable efforts, Bariven eventually was able to transfer two rice shipments to PDVAL (Bariven's corporate affiliate and the end-user) on August 12, 2009 through a process called "legal abandonment," which took months to accomplish. Reply SOF at ¶ 40. Exim has presented no evidence that Bariven's nationalization of the two rice shipments through legal abandonment was unreasonable under the circumstances.

### b. The Dates of Storage and Demurrage Charges For Rice Shipments Are Undisputed.

As discussed above, Exim's disingenuous factual assertions about invoices directed to Bariven's corporate affiliate, PDVSA Petroleos, and the nature of pre-liquidation statements are not sufficient to defeat summary judgment. In addition, Exim purposefully ignores the fact that all four invoices for the two legally abandoned rice shipments are dated in July 16 and August 13, 2009, which is approximately when Bariven transferred the shipments to PDVAL. Reply SOF at ¶ 54. The pre-liquidation statement for demurrage costs for the third shipment, which was not declared in legal abandonment, is dated July 28, 2009—months before October 2009 when Exim finally turned over the original export documents.

### 4. Bariven Did Not Anticipatorily Repudiate The Rice Contract.

Finally, Exim is not entitled to summary judgment on Count VII of its Second Amended Complaint because the undisputed evidence shows that Exim never demanded adequate assurances that Bariven perform on the Rice Contract; and, even if it did, Exim had already breached the Rice Contract. *See* Fla. Stat. §672.609.

The April 8, 2009 letter Exim cites to show a demand of adequate assurances under the Rice Contract does not even mention the Rice Contract. Reply SOF at ¶ 55. Instead, it requests "payment for invoices past over due." *Id.* The undisputed evidence shows that Bariven had already paid Exim in full for all the rice shipped to Venezuela, so this letter could not possibly be referring to the Rice Contract. SOF at ¶ 43. Given that Exim had filed suit under the Milk Contract the day *before* this letter—April 7, 2009—Exim's use of this letter is nothing more than a *post hoc* attempt to attach legal significance to an otherwise irrelevant communication.

Even if the April 8, 2009 letter demanded adequate assurances, the Florida UCC is clear that a party in breach cannot invoke Fla. Stat. §672.09. *See Café Cola, Inc. v. Somojo, Inc.*, No.

8

96-562, 1996 U.S. Dist. LEXIS 3207, at *19 (E.D. La. Mar. 14 1996).  The undisputed evidence shows that as of April 8, 2009, despite Bariven's payment for rice in full, Exim had failed to provide Bariven with the required original export documentation for approximately *four months* because Exim did not pay its supplier.  SOF at ¶¶ 39-44.  Furthermore, even if the April 8, 2009 letter demanded adequate assurances, because Exim sent it the day after filing suit, Exim did not allow Bariven a reasonable time to respond as Fla. Stat. §672.609 requires.  Exim's claim fails as a matter of law and, accordingly, the Court should enter summary judgment on this count in Bariven's favor.

### III.   CONCLUSION

For all these reasons, the Court should grant Bariven's Partial Motion for Summary Judgment.

Respectfully submitted,

BARIVEN, S.A.
By its attorneys,

/s/ *Brian Silverio*
Brian Silverio, *Florida Bar No. 0183301*
SILVERIO & HALL, P.A.
150 West Flagler St., PH 2850
Miami, FL 33130
phone: (305) 371-2756
fax:     (305) 371-2744

Ronald E.M. Goodman, *pro hac vice*
FOLEY HOAG LLP
1875 K Street, N.W., Suite 800
Washington, D.C. 20006-1238
Telephone:  (202) 223-1200
Facsimile:  (202) 785-6687

                                        Anthony Mirenda, *pro hac vice*
                                        K. Neil Austin, *pro hac vice*
                                        Jeff Bone, *pro hac vice*
                                        Thomas Ayres, *pro hac vice*
                                        FOLEY HOAG LLP
                                        155 Seaport Blvd., Boston, MA 02210
                                        Telephone:  (617) 832-1000
                                        Facsimile:  (617) 832-7000

Dated August 27, 2010

## CERTIFICATE OF SERVICE

       WE HEREBY CERTIFY that, on this 27th day of August, 2010, we electronically filed the foregoing document with the Clerk of the Court using CM/ECF.  We also certify that the foregoing document is being served this day on opposing counsel of record, either via transmission of Notice of Electronic Filing generated by CD/ECF or in some other authorized manner to those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

                                        */s/ Brian Silverio*
                                        Brian Silverio