IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

CASE NO.: 09-20915-CIV-GOLD/McALILEY

EXIM BRICKELL, LLC

        Plaintiff/Counterclaim-Defendant,

v.

BARIVEN, S.A.,

        Defendant/Counterclaim-Plaintiff.

_____/

**DEFENDANT/COUNTERCLAIM-PLAINTIFF BARIVEN S.A.'S
UPDATED PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW**

Brian M. Silverio (FBN 183301)
**SILVERIO & HALL, P.A.**
Museum Tower
150 West Flagler Street, Penthouse
Miami, FL 33130
Telephone:  (305) 371-2756
Facsimile:  (305) 372-2744
Email:  bsilverio@silveriohall.com


Anthony Mirenda, Esq. (*pro hac vice*)
Neil Austin, Esq. (*pro hac vice*)
Thomas J. Bone, Esq. (*pro hac vice*)
Thomas R. Ayres, Esq. (*pro hac vice*)
**FOLEY HOAG LLP**
Seaport World Trade Center West
155 Seaport Boulevard
Boston, MA  02210-2600
Telephone:  (617) 832-1000
Facsimile:  (617) 832-7000

May 6, 2011

## Table of Contents

I.     FINDINGS OF FACT ........................................................................................ 1

       A.     The Parties ........................................................................................... 1

       B.     Formation and Performance of the Milk Contract Prior to the Melamine
              Alert .................................................................................................... 2

       C.     The Melamine Alert and Health Consequences of Melamine/Cyanuric
              Acid ..................................................................................................... 6

       D.     Exim's Initial Response to the Melamine Alert .................................... 8

       E.     Exim's Offers to Use Other Suppliers ................................................. 14

       F.     PSI-Supervised Inspections ................................................................ 16

       G.     The January 21st Meeting and Subsequent Communications ............... 21

       H.     Bariven's Sampling and Testing and Exim's Filing of Suit. ............... 23

       I.     Reliability of Sampling and Testing ................................................... 28

       J.     The Rice Contract .............................................................................. 32

II.    CONCLUSIONS OF LAW ........................................................................... 36

       A.     Jurisdiction and Venue ....................................................................... 36

       B.     Governing Law and Overview of the Parties' Claims ......................... 36

       C.     Resolution of Pending Motion in Limine ........................................... 38

       D.     Milk Contract Claims: Shipments 1-16 .............................................. 40

              i.      Bariven's Claim for Breach of the Milk Contract's Implied
                      Warranty of Merchantability ................................................... 40

              ii.     Bariven's Claim for Breach of the Milk Contract: Substantial
                      Impairment of the Whole ........................................................ 50

              iii.    Revocation of Acceptance (Shipments 1-16) ........................... 57

       E.     Milk Contract Claims: Shipments 17-22 ............................................ 60

              i.      Rejection (Shipments 17-22) ................................................... 60

F.      Exim's Claim for Anticipatory Repudiation of the Milk Contract......................... 64

G.      Bariven's Claim for Breach of the Milk Contract's Implied Covenant of
        Good Faith and Fair Dealing.................................................................................. 74

H.      Bariven's Claim for Violation of FDUTPA............................................................ 76

I.      Bariven's Claim for Breach of the Rice Contract.................................................. 77

J.      Exim's Claim for Anticipatory Repudiation of the Rice Contract ....................... 81

K.      Damages.................................................................................................................. 83

III.    CONCLUSION................................................................................................................. 90

Pursuant to the Court's April 20, 2011 Order (D.E. #171), Defendant/Counterclaim-Plaintiff Bariven, S.A. ("Bariven") hereby submits the following Updated Proposed Findings of Fact and Conclusions of Law.

I.      **FINDINGS OF FACT**[1]

    A.      **The Parties**

1.      Exim Brickell, LLC ("Exim") is a Florida corporation engaged in, among other things, the business of buying and selling food commodities.  Joint Pretrial Stipulation ("PT Stip."), V(1) (D.E. #139).

2.      Bariven, located in Caracas, Venezuela, is an agency or instrumentality of the Government of Venezuela and a wholly-owned subsidiary of Petróleos de Venezuela, S.A. ("PDVSA").  In 2007, Bariven was tasked with purchasing substantial quantities of food commodities on the international market.  Bariven carried out the food purchases through its international purchasing agent, PDVSA Services, Inc. ("PSI"), a wholly-owned subsidiary of Bariven located in Houston, Texas.  PT Stip., V(2).

3.      Exim and Bariven were parties to several food contracts, including the Milk Contract and the Rice Contract at issue in this case.  PT Stip., V(3).  Prior to this lawsuit, Bariven and Exim had a good commercial relationship going back many years.  Salges Testimony, March 14, 112:11-14, 115:6-116:6; Azocar Testimony, March 16, 157:7-25; March 17, 14:15-15:3.

---

[1] The parties submitted a group of Joint Trial Exhibits ("JTX") which were admitted in evidence by the Court at the commencement of trial.  As trial progressed, each party offered certain other exhibits that the Court admitted; Plaintiff's Trial Exhibits will be cited "PTX _" and Defendant's Trial Exhibits will be cited "DTX _".

**B.      Formation and Performance of the Milk Contract Prior to the Melamine Alert**

4.      On March 26, 2008, Bariven, through its purchasing agent PSI, issued a purchase order to Exim for 26,000 metric tons of powdered milk (the "Milk Contract") to be delivered to Venezuela in eight monthly installments of 3,250 metric tons per month from May 2008 to December 2008 for a total price of $124,410,000.  JTX 5.

5.      The Milk Contract contains several provisions that are pertinent to the Court's findings and conclusion, including the following:

- A provision specifying that the milk "must be free of preservatives, neutralizers, toxic substances or any strange matter."  JTX 5, p. 3.

- A provision setting forth physiochemical requirements for the milk, including a minimum protein level of 24.5%.  JTX 5, p. 3.

- A provision containing the following "field inspection requirement":

    1. This purchase order … has been coded for field inspection prior to shipment. This means a qualified inspector will inspect the equipment for compliance to quote, purchase order, and any other industry standard or specification.

    2. Product, equipment, or material inspection must be performed before packing for shipment. The purchaser's inspection does not relieve the manufacturer or the seller from compliance to all purchase order requirements.

    3. Product, equipment or material must not leave your facilities until the assigned inspector or designated inspection agency has issued a release authorizing shipping of the product.

    4. The vendor is required to provide the following information:

        4.1 Location of where inspection can be performed.

        4.2 Contact name, telephone, and email address of the project mgr.

    JTX 5, p 11.

- 2 -

- A provision specifying that the "supplier must send the delivery schedule and plant locations by email" to certain specified PSI employees in order for PSI to "know the logistics and coordinate the inspections."  JTX 5, p. 2.

- A provision specifying China or India as the origin of the milk.  JTX 5, p. 4.

6.      Although the Milk Contract initially provided for an advance payment of 10% of the total contract value, Bariven and Exim modified the contract such that Bariven's payments were to be secured by a letter of credit in lieu of an advance payment.  Salges Testimony, March 14, 146:15-147:3.  Bariven's payments under the Milk Contract were secured by a $12.4 million irrevocable standby letter of credit obtained by another PDVSA subsidiary and issued in favor of Exim by Girobank, B.V., a Curaçao bank.  PT Stip. V(5).

7.      Several days after Bariven issued the Milk Contract, Exim asked in writing whether Bariven would accept milk meeting a set of alternative specifications, including a minimum protein level of 15% (rather than the 24.5% specified in the Milk Contract).  JTX 6 at EX003305.  Exim also specifically inquired about the types of preservatives, neutralizers and/or toxic substances permitted.  *Id.* at EX003306.  Bariven responded in writing that **no** preservatives, neutralizers or toxic substances were permitted and reiterated that the milk must contain a minimum protein level of 24.5%.  *Id.* at EX003303-04 (emphasis added); Salges Testimony, March 15, 58:3-64:1; Rodriguez Testimony, March 29, 88:13-90:4.

8.      To assist in identifying suitable Chinese or Indian dairies to supply milk, Exim hired SGS-China to conduct audits of certain pre-selected Chinese dairies, Salges Testimony, March 14, 133:22-135:2, and also had audits conducted of Indian suppliers.  Rivero Deposition, 47:8-14.  Exim's President, Mr. Salges, traveled to China to visit the dairies.  *Id.* at 135:22-136:3.  Exim selected and thereafter entered into written supply contracts with two Chinese

- 3 -

dairies to supply milk to Bariven: Qingdao Suncare Nutritional Technology Co., Ltd. ("Suncare") and Qingdao Dairygold Industry Co., Ltd. ("Dairygold").

9.      On May 20, 2008, Exim assured PSI that milk from Dairygold would meet the physiochemical requirements of the Milk Contract.  JTX 6 at EX3300-01.  However, on May 16 Exim's China-based employee (June Yao) sent an email to the Director of Exim's milk project (Antonio Rivero), and Exim's Administrative Manager (Dialys Guevara), and Mr. Salges alerting them that a test report on a sample of Dairygold's milk showed it to have a protein level of only 22.8% and so would not meet the Contract specification.  JTX 14 at EX004533, EX004542.  In response to this, Exim was told by Dairygold that it would "**reformulate**" its milk in order to meet the protein specifications under the Milk Contract, but Exim never informed Bariven of this.  Salges Testimony, March 15, 64:2-67:7; Rodriguez Testimony, March 29, 90:8-11.

10.      In addition, a factory audit conducted on the Dairygold factory in May 2008 revealed eight critical violations and fifteen major violations.  JTX 15 at EX004745-46.  The audit report defined a critical violation as an "observation of conditions and/or practices that could constitute a health hazard or food safety risk; imminent health hazard."  *Id.* at EX004746. Exim did not disclose this audit report to Bariven, indicating that "[l]ike any corporation," it had "internal matters" that it did not share with Bariven.  Salges Testimony, March 15, 72:4-77:6.

11.      Moreover, on May 22, 2008, in an internal Exim email about PSI-supervised inspection in China, Ms. Yao informed Mr. Salges and Mr. Rivero that Dairygold "does not agree our client [PSI] arrange inspection, he think that must delay shipment.  He insisted on contact SGS himself and through SGS depart [sic] in Qingdao…." JTX 20 at EX004547.  Exim

did not disclose that Dairygold insisted on controlling its own inspections to Bariven.  Salges

Testimony, March 15, 77:18-78:16.

      12.     On June 22, 2008, Exim shipped its first installment under the Milk Contract: 500

tons of milk manufactured by Suncare.  That first shipment arrived in Venezuela on August 3,

2008.  *See* JTX 194.  Exim shipped fifteen additional installments between July 3 and September

10, 2008:  Of the first sixteen shipments, Suncare manufactured 7,450 tons, and Dairygold

manufactured 2,030 tons.  *Id.*

| Shipment No. | Shipment Date | Arrival Date | Manufacturer | Tons |
|---|---|---|---|---|
| 2 | 7/3/2008 | 9/7/2008 | Suncare | 300 |
| 3 | 7/14/2008 | 9/7/2008 | Suncare | 700 |
| 4 | 7/17/2008 | 9/7/2008 | Dairygold | 510 |
| 5 | 7/19/2008 | 9/12/2008 | Suncare | 700 |
| 6 | 7/25/2008 | 9/24/2008 | Suncare | 650 |
| 7 | 8/6/2008 | 10/2/2008 | Suncare | 800 |
| 8 | 8/7/2008 | 10/2/2008 | Suncare | 500 |
| 9 | 8/15/2008 | 11/6/2008 | Suncare | 800 |
| 10 | 8/22/2008 | 10/20/2008 | Suncare | 700 |
| 11 | 8/29/2008 | 11/6/2008 | Dairygold | 510 |
| 12 | 8/22/2008 | 11/10/2008 | Dairygold | 510 |
| 13 | 8/29/2008 | 11/6/2008 | Dairygold | 500 |
| 14 | 8/29/2008 | 11/6/2008 | Suncare | 800 |
| 15 | 9/10/2008 | 10/26/2008 | Suncare | 500 |
| 16 | 9/10/2008 | 10/26/2008 | Suncare | 500 |

13.      Bariven paid Exim a total of $45,361,800 by wire transfer for these first sixteen shipments of milk. Each payment was made while the associated shipment was in transit and before it reached Venezuela. *See* JTX 194.[2]

C.      **The Melamine Alert and Health Consequences of Melamine/Cyanuric Acid**

14.      In mid-September 2008, after the first sixteen milk shipments had left China, the Chinese government announced that melamine contamination in powdered milk had caused thousands of children to become ill.  This led the Chinese government to halt exports of dairy products.  PT Stip., V(7).

15.      Melamine (also known as cyanuramide) is a synthetic substance that does not occur naturally in milk or any other food.  Stip. of Counsel, March 16, 120:10-121:24.  Adding melamine to milk powder artificially boosts the apparent level of protein in the milk powder.  *Id.*

16.      Melamine is a toxic substance.  Somers Testimony, March 16, 119:5-7.[3]  When consumed by humans, melamine can be dangerous or even lethal.  Stip. of Counsel, March 16, 120:10-121:24.  Common medical problems associated with melamine consumption include kidney stones and other forms of acute kidney injury, as well as urinary tract injury.  *Id.*

17.      Even small amounts of melamine and cyanuric acid can be injurious to human health.  The most recent research to examine all the toxicological factors and data about

---

[2] The Court's Summary Judgment Order states that these payments were made by the Girobank letter of credit.  Summary Judgment Order, p. 5.  However, as the parties clarify in their Joint Pretrial Stipulation, the letter of credit was issued as security for the Milk Contract.  PT Stip., V(5).  Payment for the first sixteen shipments was made by wire transfer directly from Bariven accounts to Exim accounts.  *Id.* at V(18).

[3] Bariven relies on the testimony of Dr. Michael Somers, an internationally-recognized pediatric nephrologist, who the Court finds qualified to testify as to the health effects of melamine.  Exim has admitted that its expert, Professor Robert Bradley, is not an expert on the human health effects and health risks of melamine.  D.E. #83-3, pp. 188:6-189:8; D.E. #103, p. 7.

melamine exposure set a "tolerable daily intake" ("TDI") of 0.00809 mg/kg body weight/day and a tolerable concentration of melamine in dairy products to be ingested by humans at or below 0.324 ppm.[4]  Somers Testimony, March 16, 122:17-123:22.

18.     A typical 18-month old child would surpass the level of melamine deemed "tolerable" on a daily basis (i.e., 0.00809 mg/kg/day) by consuming approximately three ounces of milk contaminated at 1 ppm.  Somers Testimony, March 16, 126:1-127:8.  This amount is well below the twenty to thirty ounces of milk that a typical 18-month-old would consume on a daily basis.  *Id.*  That same child would surpass the threshold for daily tolerable melamine consumption by consuming as little as 0.3 ounces of milk contaminated at 10 ppm.  *Id.* at 126:9-13.

19.     Cyanuric acid is an analog of melamine that is also a toxic substance.  Somers Testimony, March 16, 119:5-9.  The presence of cyanuric acid in milk that also contains melamine is a factor that increases the toxicity of melamine and leads to increased risk of injury.  Somers Testimony, March 16, 135:17-20 (testifying that cyanuric acid can combine with melamine to cause injury "at lower concentrations than what one would expect with melamine alone").

20.     In China, over 300,000 cases of children affected by melamine contamination were confirmed, but the extent of the impact and injury on children there is likely

---

[4] The Court is not persuaded by Exim's argument that it should adopt 2.5 ppm as the appropriate standard in this case.  The 2.5 ppm level published by the FDA in November 2008 was based on a 13-week study in rats using arbitrary safety factors to determine tolerable human intake levels. Somers Testimony, March 16, 127:17-129:21.  Furthermore, it was published as part of an "interim" report (not a final report) based on preliminary data and analysis, and did not take into account the more recent research conducted in light of the Chinese melamine scandal.  *Id.* at 129:7-131:1; 141:18-142:6.  The Court is persuaded that the 0.324 ppm level identified by Dr. Somers reflects the actual risk to human health presented by melamine.

underestimated.  Stip. of Counsel, March 16, 120:10-121:24.  A proportion of those children affected by the Chinese melamine scandal continue to manifest urinary tract and kidney abnormalities.  *Id.*  Several children died as a result of consuming melamine-contaminated milk powder.  Somers Testimony, March 16, 116:3-18.

        **D.**      **Exim's Initial Response to the Melamine Alert**

21.      Following the melamine alert, Exim had numerous internal and external communications regarding the Chinese melamine scandal and its potential impact on the Milk Contract.  These communications are reflected in trial exhibits and are the subject of extensive trial testimony.

22.      On or about September 16, 2008, Exim sent an email to Dairygold asking "what will be the impact for the recent news about the milk powder about … how the banned chemical melamine was added to milk sold to Sanlu Group Co., China's biggest milk powder producer."  JTX 34 at EX005083-84.  In response, Dairygold made clear that the contamination was not accidental ("Sanlu issue was caused by some illegitimacy who added the banned chemicals to the milk on purpose….") and, more importantly, told Exim that "your partner suncare has been forced to stop production to reorganize, reform."  *Id.*

23.      On September 22, 2008, Ms. Guevara read a press report stating that "Qingdao-based Suncare" was among several companies who were "recalling their products after melamine was found in their milk powder."  JTX 35.  Upon reading this report, Ms. Guevara internally circulated the information via email to Mr. Salges, Mr. Rivero, and Ms. Yao.  JTX 37; Salges Testimony, March 15, 82:5-83:19.

24.      At the time of Dairygold's email implicating Suncare, Exim had already shipped 7,450 metric tons of Suncare-manufactured milk to Bariven.  JTX 192 and 194.  Exim did not inform Bariven, either at the time it received this information or at any later date, that its supplier

Suncare had been forced to stop production to "reorganize [and] reform" as a result of melamine contamination, nor did it inform Bariven that, back in May, Dairygold had informed Exim that Dairygold would "reformulate" its milk in response to a low protein test result.  JTX 34 at EX005083; Salges Testimony, March 15, 78:17-81:16.

25.     Meanwhile, upon learning about the melamine scandal, Bariven began to seek information from its suppliers regarding the melamine contaminated milk originating from China and took certain preventative measures, including placing the milk under observation and halting its distribution, to avoid the risk that any contaminated milk might be distributed.  Rodriguez Testimony, March 29, 91:21-93:16; Azocar Testimony, March 16, 154:7-13.

26.     On September 19, 2008, Bariven wrote to Exim to inquire about the "quality and reliability" of Exim's milk shipments in light of the Chinese melamine announcement.  JTX 36 at EX001364; Salges Testimony, March 15, 78:17-81:16.

27.     Mr. Salges responded to Bariven's email on September 23, assuring Bariven that its milk was safe.  Mr. Salges stated, among other things, that the melamine scandal was limited to infant formula milk[5] produced by a single company called Mengniu Dairy at a single point in time, in January 2008, and that officers from China's Inspection and Quarantine office ("CIQ") would begin performing "obligatory exams for the removal of chemical components like melamine."  Mr. Salges further stated that no problems had arisen with Exim's milk, that Mengniu Dairy was not its provider, and that Exim had only been supplying industrial powdered

---

[5] Although Exim argues that the contamination of infant formula did not indicate a problem with the industrial milk being supplied to Bariven, the trial evidence is to the contrary.  Professor Bradley, testified that powdered whole milk, the key ingredient of industrial milk, is "more than likely" a component of infant formula.  Bradley Testimony, March 15, 100:20-24.  Moreover, Dr. Somers testified as to the harmful effects of melamine in *whole milk*, including that an 18-month-old child could readily exceed the toxic level of melamine by regularly consuming milk with concentrations as low as 1 ppm.  Somers Testimony, March 16, 126:17-127:8; 131:14-17.

milk, not infant formula.  JTX 36; Salges Testimony, March 15, 78:17-81:16.  Bariven interpreted Exim's response as "very good news."  Azocar Testimony, March 16, 161:1-18.

28.     On the same day that Mr. Salges sent his September 23 email, Exim received a written response from Suncare that admitted that a Chinese state inspection agency found melamine in Suncare's infant formula milk powder.  JTX 43; Salges Testimony, March 14, 188:11-24; Guevara Testimony, March 15, 146:7-15.  Suncare's response was highly defensive in tone and content—so much so that a reasonable seller would not have relied on Suncare's statements minimizing the import of the agency's finding (*e.g.*, arguing that the melamine incident had been exaggerated by the Chinese and foreign media and was "far from such a serious matter").  JTX 43.  Exim did not inform Bariven, either at the time it received this information or at any later date, of Suncare's admission, which demonstrated the falsity of Mr. Salges' previous representation to Bariven that the melamine problem was limited to one manufacturer that Exim did not use.

29.     Two days later, on September 25, 2008, Ms. Yao sent an email to Mr. Salges and others at Exim summarizing a meeting she had the previous day with Suncare.  JTX 37; Salges Testimony, March 15, 82:5-14.  Ms. Yao began the summary by noting the topics discussed at the meeting, including, among others, "why one of Suncare's lot been inspected having melamine" and "what will Suncare do to avoid alike problem happen again."  Ms. Yao stated that, to confirm the quality of milk previously shipped, Suncare agreed to send to SGS-China (an inspection company previously hired by Exim) samples that "had been chosen from the kept samples and **sent to SGS Qingdao Lab yesterday**."  (Emphasis added.)  Ms. Yao also stated that Suncare wanted to know if Exim would continue to buy Suncare milk powder and asked, "How is our client's attitude to this accident?"  JTX 37 at EX002099.  Although Mr. Salges

understood that the "client" referred to was Bariven, and testified that he discussed this email with Suncare, no one at Exim ever informed Bariven of Suncare's melamine contamination, let alone asked Bariven whether it wished to continue receiving Suncare's milk in light of its admitted contamination issues.  Salges Testimony, March 15, 81:3-7; 82:12-83:14.

30.     On October 1, 2008, Ms. Guevara emailed four negative melamine test reports to Bariven and stated that the reports were on samples from milk previously shipped by Exim to Venezuela that SGS-China "**still has in its records**."  JTX 46 (Emphasis added).  Ms. Guevara's statement, written under Mr. Salges' instructions, was false.  Salges Testimony, March 15, 83:15-85:1.  Just one week before, Ms. Yao notified her colleagues at Exim that the Suncare samples had been selected by Suncare and sent to SGS-China the previous day—not maintained by SGS-China in its records.[6]

31.     At trial, Mr. Salges testified that he made a "mistake" when he told Ms. Guevara to write in the October 1 email that the samples tested for melamine had been retained by SGS-China.  Salges Testimony, March 15, 83:20-84:14.  Although he testified that he realized the mistake in 2008, Mr. Salges "didn't do anything" to correct it.  *Id.* at 84:19-85:1.  Moreover, at his deposition, taken on June 8, 2010, Mr. Salges *twice* attributed the statement that the samples had been retained by SGS-China not to a "mistake", but instead claimed that SGS-China *specifically told him* that it still had these samples in its records.  When confronted with this inconsistent testimony at trial, Mr. Salges claimed that this too was a "mistake."  *Id.* at 85:22-88:25.  For these reasons, the Court does not find the testimony of Mr. Salges on this subject to

---

[6] The falsity of Mr. Salges' statement was further demonstrated in an email from SGS-China sent months later, on February 23, 2009.  In that email, SGS-China confirmed that the samples were supplied to it by Suncare on or about September 25 (*see* JTX 146-147).  They were not samples that had been retained by SGS-China from its previous inspections.  *See* JTX 37 at EX002099.

be credible.  Regardless, there can be no mistake about one key fact:  Exim *never* informed

Bariven that its representations about the custody of the Suncare samples were false—that the

samples had been provided by Suncare after the fact, not retained by SGS-China from its

previous inspections.

32.     In its October 1 email to Bariven, Exim did not associate the four melamine test

reports with any specific shipments.  JTX 46.  Therefore, at the time there was no way for

Bariven to discuss the discrepancies identified below.  At trial, however, Exim associated each of

the four test reports with a specific shipment (Shipments 5, 10, 15 and 16).  PTX 18, 23, 28, 29;

Guevera Testimony, March 16, 9:3-11:18.  An examination and comparison of those test reports

together with the other SGS-China documents associated by Exim with those shipments reveals

the following:

- The SGS-China Melamine Test Report attributed by Exim to Shipment 5 (PTX 18 at EX005107) shows that the sample was received by SGS-China on September 26, 2008 and that the manufacture date of the milk being tested was July 22, 2008. However, the SGS-China Loading Report associated with Shipment 5 (PTX 18 at EX004123-24) shows that loading into sealed containers occurred on July 14— meaning that the milk purportedly being tested for melamine (made on July 22), could not have been from the milk sent to Bariven (loaded on July 14).

- The SGS-China Melamine Test Report attributed by Exim to Shipment 10 (PTX 23 at EX005105) shows that the sample was received by SGS-China on September 25 and that the manufacture date of the milk being tested was August 14, 2008.  However, the SGS-China Sampling Report for Shipment 10 (PTX 23 at EX003046-47) shows that sampling occurred on August 2, 2008 and that the samples were taken from a batch manufactured on July 31—meaning that the milk being tested (made August 14) did not come from the milk actually sent to Bariven (made July 31).

- The SGS-China Melamine Test Report attributed by Exim to Shipment 15 (PTX 28 at EX002119) shows that the sample was received by SGS-China on September 25 and that the manufacture date of the milk being tested was September 9, 2008.  However, the SGS-China Sampling Report for Shipment 15 (PTX 28 at EX003129-30) shows that sampling occurred on August 16, 2008 and that the samples were taken from a batch manufactured on August 15, 2008—

meaning that the milk being tested (made September 9) did not come from the milk actually sent to Bariven (made August 15).

- The SGS-China Melamine Test Report attributed by Exim to Shipment 16 (PTX 29 at EX005106) shows that the sample was received by SGS-China on September 25 and that the manufacture date of the milk being tested was September 6, 2008.  However, the SGS-China Loading Supervision Report for Shipment 16 (PTX 29 at EX003106) shows that the loading into sealed containers was completed by September 2, 2008—meaning that the milk being tested (made September 6) could not have come from the milk actually sent to Bariven (loaded by September 2).

33.     At some point in October 2008, Exim hired Zhang Zhihua of the Chinese Chamber of International Commerce to be its consultant in China to assist its current suppliers to get shipments restarted, and to identify other possible Chinese suppliers.  Rivero Deposition, 138:17-141:25.[7]  On October 21, 2008, Mr. Zhang emailed Mr. Rivero that the CIQ officers responsible for inspecting Chinese milk "would need some bribery, I would negotiate to reduce your costs."  JTX 53; Guevara Testimony, March 15, 174:13-22 (acknowledging that Mr. Zhang told Mr. Rivero that Chinese officials would require bribery); Rivero Deposition, 142:18-147:7.  In response, Mr. Rivero wrote, "any idea to solve the problem ASAP is welcome" and instructed Ms. Guevara to wire $3,000 to Mr. Zhang.  JTX 53 at EX002140.  Exim did not inform Bariven of these communications, even though it had previously assured Bariven of the safety of the milk based, in part, on the fact that officers from CIQ were conducting "obligatory exams" to inspect for the presence of melamine.  JTX 36.

34.     On October 27, 2008, Mr. Salges again wrote to Bariven assuring it that milk previously shipped by Exim to Venezuela was not affected by melamine contamination.  JTX 59.

---

[7] The Court notes that at trial Ms. Guevara attempted to minimize the scope of Mr. Zhang's services, testifying that Exim hired Mr. Zhang solely to look for new suppliers in China. Guevara Testimony, March 15, 171:24-172:15.  On cross-examination, however, she was confronted with emails that clearly showed that Mr. Zhang's duties included helping Exim's current suppliers get export authorization. *Id.* at 173:18-174:12, JTX 56, 73.

Mr. Salges did not inform Bariven in this communication (or any others) about any of the information Exim had learned.

###### E.      Exim's Offers to Use Other Suppliers

35.      In his October 27 letter, Mr. Salges indicated that in order "to fully comply with the contracts … under the agreed conditions of quality, quantity and time" Exim would "submit for [Bariven's] consideration and approval" a proposal "to divide the export of milk between suppliers in China and other countries…." JTX 59.  He indicated that Exim could begin to negotiate with milk suppliers from four other countries, namely Argentina, New Zealand, Brazil and Uruguay, to supply milk.  *Id.*

36.      On October 29, 2008, PSI responded to Exim's October 27 email requesting further information from Exim, including milk brands and technical specifications, in order for its request to use other suppliers to be considered.  JTX 60 at EX004779-80.

37.      Separately, Bariven inquired whether it would be possible for Exim to substitute milk from India, the other country of origin specifically identified in the Milk Contract.  Salges Testimony, March 14, 207:24.

38.      The Milk Contract was issued through a closed-bid system.  To preserve the integrity and transparency of the system, Bariven maintains internal procedures limiting the ability of vendors to modify certain key terms of contracts (*e.g.*, country of origin for imported foodstuffs) after those contracts have been awarded based on an accepted bid.  Azocar Testimony, March 16, 168:8-169:7.  Based on these procedures, Bariven did not accept Exim's proposal to begin negotiating with alternative suppliers in the countries identified in Mr. Salges' October 27 correspondence: Argentina, New Zealand, Brazil, and Uruguay.  *Id.* at 168:21-25.  However, the evidence shows that Bariven did ask Exim whether it could substitute milk from

India, a country specifically identified in the Milk Contract as an alternative country of origin. Salges Testimony, March 14, 207:24; JTX 5, p. 4.

39.    On November 13, 2008, Exim wrote to Bariven stating that in light of the delay caused by the Chinese government's export ban, "we [Exim] shall be shipping a supply of milk from our supplier in India within the next three weeks."  JTX 69.

40.    There is no evidence that Exim actually shipped any substitute milk from India.[8] Instead, Exim learned that the Chinese milk embargo would be lifted shortly thereafter, meaning that Exim would be able to ship milk from China.  JTX 194; Salges Testimony, March 14, 211:19-23.  This development obviated the need to locate an alternative supplier, a fact which is evident from the lack of additional correspondence between the parties on the subject.

41.    At trial, Mr. Salges testified that he again raised the proposal to source the milk from other countries (besides China or India) at a meeting with Bariven officials on January 21, 2009.  Salges Testimony, March 14, 210:10-211:6.  Mr. Salges testified that Bariven's response was that it had to leave the contract as it was, with product sourced from China or India, because changing the terms might violate Venezuelan law and would be unfair to other suppliers who participated in the bid process.  *Id.*

42.    No other witness provided testimony at trial to corroborate whether this occurred at the January 2009 meeting, and it does not appear in the draft meeting minutes.  JTX 117. Regardless, such a response would have been consistent with the testimony of Ms. Azocar, who

---

[8] Exim did not disclose to Bariven that it had previously conducted factory audits of Indian milk suppliers in the spring of 2008, had found those suppliers to be unsanitary, and had not conducted any further examinations.  *See* Guevara Testimony, March 16, 5:15-8:8. Notwithstanding Exim's November 13 email, Mr. Salges testified at trial that Exim never inquired of suppliers in India whether Exim could fulfill the contract requirements from India. Salges Testimony, March 14, 207:22-208:2.

testified that Bariven was concerned that changing the source of the milk to a country other than China or India would violate Venezuelan government regulations.  Azocar Testimony, March 16, 169:1-7.  Whatever the advisability of such regulations or procedures in the face of an emergency such as that presented by the Chinese melamine alert, in light of all of the circumstances (*e.g.*, Bariven's suggestion of India as an alternative source; Bariven's willingness to wait for clarification of the China situation without seeking to terminate Exim's contract due to delayed deliveries and to proceed under the contract; and Bariven's extension of the letter of credit), *see* ¶¶ 57, 72, the Court finds that Bariven's response was based on its good-faith understanding of Venezuelan laws and regulations.

43.     In light of the lifting of the Chinese export ban in December 2008, the Court finds that the compelling grounds for alternative suppliers that may have existed in October and November 2008 no longer existed in January 2009.  Considering the lack of compelling grounds for modification along with Bariven's previous suggestion to use suppliers from India, the Court finds that any reluctance on Bariven's part in January 2009 to switch to milk suppliers from Argentina, New Zealand, Brazil, or Uruguay was reasonable.

## F.     PSI-Supervised Inspections

44.     Although the Milk Contract contained provisions giving Bariven the right to inspect the milk in China prior to shipment, it is undisputed that prior to the melamine alert in the summer of 2008 neither Bariven nor its designated inspection agency, SGS North America ("SGS-NA"), performed any inspections on Shipments 1-16.  Salges Testimony, March 14, 167:14-16; Azocar Testimony, March 16, 177:16-20.  As a separate matter, Exim hired SGS-China to inspect the milk and Exim subsequently provided Bariven with copies of various reports issued by SGS-China.  Salges Testimony, March 14, 133:19-25.

45.     After the melamine alert, PSI asked SGS-NA to review certain SGS-China test reports to determine if they comported with the Milk Contract's inspection requirements.  JTX 67.  On Thursday, November 13, 2008, Carlos Cisneros, an SGS-NA representative, informed PSI that "this document is NOT an inspection report and in NO way satisfies the inspection requirements set forth by PDVSA to SGS for INSPECTION."  *Id.*; Cisneros Dep. 105:15-110:18.

46.     On Monday, November 17, 2008, the second business day after receipt of Mr. Cisneros' November 13 email, and prior to the resumption of any milk shipments from China, PSI inspections analyst Jose Herrera sent Exim an email notifying it that future milk shipments would not be accepted unless there was "an inspection release document issued by inspector or inspection agency assigned by PSI and under its supervision."  JTX 72.  Mr. Herrera specifically requested that Exim "cooperate with the inspection agencies and comply with all the requirements mentioned in the purchase orders and avoid any shipment of products without the 'mandatory inspection release form' and/or PO compliance."  *Id.*

47.     Mr. Salges testified at trial that he specifically spoke to two PSI employees, Juan Jose Bastardo (logistics) and Alfonzo Gravina (purchasing), claiming that they told him that the November 17 email did not apply to Exim or that "[i]t's not for you."  Salges Testimony, March 14, 199:22-203:24.  However, the Court finds that Mr. Salges' testimony is not credible.  First, Mr. Bastardo's testimony squarely contradicts that of Mr. Salges.  Bastardo Testimony, March 17, 48:20-49:1 (Q: "Did you ever tell Mr. Salges that this [November 17] email did not apply to Exim Brickell and that his company didn't need to worry about it?  A: No.  Q: More generally, have you ever had any conversations with Mr. Salges about the milk contract?  A. No.").  Second, although Mr. Gravina's deposition was taken in this litigation, at no point did he testify

about this alleged conversation with Mr. Salges.  Third, and perhaps most importantly, Mr. Salges' actions in January 2009 do not corroborate this testimony—in January 2009, in response to an email from PSI reminding him about the Milk Contract's inspection requirements, Mr. Salges wrote a lengthy email defending Exim's actions.  JTX 108.  Nowhere in that email did Mr. Salges even *hint* that PSI employees had told him that the November 17 email did not apply to Exim, even though logically such a contention would have been the very first thing he would have written.  *Id.*  Given these discrepancies, along with other inconsistencies in Mr. Salges' testimony (*e.g.*, concerning his alleged visual inspections of the milk containers at Puerto La Guaira, a port that received *none* of the subject milk shipments), the Court finds Mr. Salges not credible on this issue.  Accordingly, the Court finds that the November 17 email and inspection requirements contained therein, indeed applied to Exim.

48.     In light of the melamine scandal, PSI-supervised inspections of the milk in China were of critical importance to Bariven because an inspection at the point of origin would provide verification that the milk complied with the technical specifications under the Milk Contract. Rodriguez Testimony, March 29, 114:18-115:4.  Further, the on-site inspector would report and answer to PSI (and not Exim), which was also significant in light of the melamine alert.  *Id.*  The significance of to whom the inspector would report and answer is illustrated by the fact that, in September 2009, in light of an impending visit by Bariven representatives to China to discuss the melamine issue with Chinese government representatives, the Chinese milk suppliers, and SGS-China, Mr. Salges spoke with SGS-China (and Exim's milk suppliers) and instructed them to not give any information to the Bariven representatives.  JTX 169-70; Salges Testimony, March 15, 116:1-117:11.  This demonstrates the main problem—had SGS-China been working for PSI, Mr. Salges would not have been able to block its cooperation.

49.    Exim dispatched six more shipments (Shipments 17-22) between December 11, 2008 and January 16, 2009.  PT Stip., V(9); JTX 194.

| Shipment No. | Shipment Date | Arrival Date | Manufacturer | Tons |
|---|---|---|---|---|
| 17 | 12/11/2008 | 1/25/2009 | Suncare | 300 |
| 18 | 12/13/2008 | 1/22/2009 | Dairygold | 500 |
| 19 | 12/23/2008 | 2/11/2009 | Suncare | 500 |
| 20 | 1/8/2009 | 2/20/2009 | Suncare | 500 |
| 21 | 1/10/2009 | 2/20/2009 | Beijing Reward | 200 |
| 22 | 1/16/2009 | 2/25/2009 | Beijing Reward | 300 |

50.    Despite the November 17 email, Exim did not allow PSI to coordinate inspections in China for any of these six shipments.  Salges Testimony, March 14, 213:5-23.  There is no evidence that Exim provided Bariven or PSI with the plant locations or any schedule of manufacturing and loading such that PSI could arrange to have inspections conducted in China before the goods were loaded, and no evidence that any designated inspector from PSI or Bariven issued inspection releases for any of these shipments.  *Id.*

51.    Instead, Exim allegedly arranged for SGS-China to inspect Shipments 17-22.  *Id.* However, the SGS-China reports associated by Exim with these shipments were not adequate substitutes for PSI-supervised inspections.  Exim offered no evidence of when the vast majority of these reports (*i.e.*, 18-22) were sent to Bariven, Guevara Testimony, March 15:156:24-159-23, and Exim's cover letter associated with the report allegedly tied to Shipment 17 was dated March 2009, after the shipments were shipped or received.  PTX 31-35 (none with cover transmittal letter).  More significantly, an examination of the documents provided by Exim reveal serious

inconsistencies, and based on the SGS-China identification numbers on the documents (Job No., Food File No., Test Report No., SGS Ref. No.) the key reports do not link up with each other, making it impossible to tie the melamine test results to the milk actually shipped to Bariven in each shipment:

- Shipment 17:  The SGS-China Test Report of the physiochemical testing for Shipment 17 (PTX 30 at EX003148-49) shows that the milk was manufactured prior to August 21, well before the melamine alert.  The separate SGS-China Melamine Test Report (PTX 30 at EX003150) does not link up to the SGS-China Loading Supervision Report (PTX 30 at EX003146-47) which means it cannot be connected to the milk actually sent to Bariven.

- Shipment 18:  The SGS-China Loading Supervision Report (PTX 31 at EX003154) shows that the milk was loaded into sealed containers on September 9, 2008, just before the melamine alert.  The SGS-China Melamine Test Report (PTX 31 at EX006062) indicates that the sample received by it for testing was received on December 5, almost two months after the material was supposedly loaded into sealed containers.

- Shipments 19-20:  There is no way to link the SGS-China Melamine Test Reports to the milk actually sent to Bariven.  (PTX 32 at EX002390 does not link to EX002388-89 or 3162-65); (PTX 33 at EX002302 does not link to EX003170-73).

- Shipments 21-22:  The SGS-China reports show that the milk came from Beijing Reward, a new supplier never disclosed to Bariven.  There were no SGS-China Sampling Reports, and no way to know whether the samples tested came from the milk actually sent to Bariven.  PTX 34, 35.

52.   On January 7, 2009, Mr. Herrera from PSI again wrote to Exim (1) restating that Exim must comply with the Milk Contract's requirement that PSI coordinate inspections by a PSI-designated inspection agency of the milk before it was loaded to leave China; (2) instructing Exim not to dispatch more shipments "until you have read and understood our packing, marking, invoicing, and shipping instructions for sellers"; and (3) attaching portions of the Milk Contract inspection requirements.  JTX 89.

53.     On January 9, Mr. Herrera wrote to Exim that "the product has been rejected for not having been inspected under PSI supervision."  JTX 99.

54.     On January 20, Mr. Herrera sent Exim a formal claim notice, stating that "any *recent sending* of this product without PSI's supervision is rejected because it is in violation to what is established in the purchase order under the inspection terms supervised/coordinated by PSI.  For the inspections they also require a release generated at the time of the actual inspection effective as of November 17, 2008."  JTX 114 (emphasis added).

### G.     The January 21st Meeting and Subsequent Communications

55.     Shortly after learning that the Chinese government was lifting the export ban, Bariven sought to meet with Exim to discuss the Milk Contract in light of the melamine scandal.  *See* JTX 69.  Bariven sent an email to Exim on December 2, 2008 proposing to meet with Mr. Salges immediately.  *Id.* at EX003893.  Mr. Salges replied that he could not meet until December 17.  *Id.* at EX003892.  The next day, Bariven confirmed the meeting for December 17.  *Id.*  However, on December 15, Mr. Salges emailed Bariven to say that he would not be able to meet on December 17 and requested that the meeting be postponed by a month, until the second week of January 2009.  *Id.* at EX003890-91.  Ultimately, this meeting occurred on January 21, about seven weeks after Bariven's request.  Azocar Testimony, March 17, 7:18-8:1.

56.     On January 21, 2009, Exim's president Mr. Salges met with Bariven representatives, including Bariven President Georges Kabboul, Ms. Sulfani Azocar, and Ms. Dubraska Rodriguez, in Caracas.  Joint Pretrial Stipulation, V(10); JTX 117.

57.     Multiple witnesses testified about what occurred at the January 21 meeting.  Although their testimony at times differed on the details, there is no dispute about the general subjects that were discussed either at the meeting or the day after the meeting:

- Bariven's president, Mr. Kabboul, asked for Exim's assistance in resolving the problems posed with respect to the Milk Contract by the Chinese melamine scandal.  The Venezuelan Health Ministry had not issued the permits necessary to import Exim's milk, and the milk was therefore sitting at the ports under observation.  Salges Testimony, March 15, 26:7-12; Azocar Testimony, March 17, 8:19-23; Rodriguez Testimony, March 29, 111:14-21.  Exim agreed to collaborate with Bariven by presenting the Health Ministry with original testing reports certifying that the milk was melamine-free and by bringing the Chinese suppliers to meet with the Health Ministry.  Salges Testimony, March 15, 26:13-16; 95:3-23; JTX 117 at 4027-28.

- Bariven informed Exim that its milk would be tested for melamine and discussed the return of milk shipments in the event the milk was found to be contaminated with melamine.  Specifically, Bariven told Exim that if the milk was contaminated, it would seek to return it to China and get replacement milk.  Azocar Testimony, March 17, 9:3-11; Salges Testimony, March 15, 50:11-51:7 (Bariven "wanted [Exim] to take the merchandise that was in Venezuela, return it to China and get new product that was free of melamine"); JTX 117 at 4028; JTX 116 (January 21 Exim email to its milk supplier confirms Exim's understanding that Bariven expressed concerns about melamine contamination) and Salges Testimony, March 15, 100:10-101:3.

- Bariven asked Exim to suspend future shipments while the Venezuelan authorities decided whether the milk would be nationalized.  JTX 117 at 4028; Salges Testimony, March 15, 28:9-18.  Mr. Kabboul asked for 30 days in which to sort out the issues, which Mr. Salges agreed to.  Salges Testimony, March 15, 103:4-17.[9]

- Finally, Bariven and Mr. Salges discussed the issue of PSI-supervised inspections.  Specifically, Bariven discussed Exim's failure to comply with the Milk Contract's provision for PSI-coordinated inspections of the milk.  Rodriguez Testimony, March 29, 114:3-17; Azocar Testimony, March 17, 8:24-9:2.  At the meeting, Bariven did not agree to pay for these shipments, Azocar Testimony, March 17, 9:5-7, but it did agree to extend the Girobank letter of credit for sixty days as a sign of good faith, which Bariven did on January 27, 2009.  JTX 122 at 15349; JTX 126; Azocar Testimony, March 17, 13:9-13.

58.    The following day, Mr. Salges sent an email to Bariven in which he thanked

Bariven for the meeting and wrote, "It is our RULE to meet our clients' needs and to develop the

---

[9] Mr. Salges initially testified that Mr. Kabboul asked for only "two or three weeks."  Salges Testimony, March 15, 28:25-29:2.  After being confronted with contrary deposition testimony on cross-examination, Mr. Salges admitted that Mr. Kabboul had in fact requested 30 days and that Mr. Salges said "okay."  *Id.* at 102:19-103:17.

best communication with them to resolve problems as they arise, aiming at the best future for our commercial relations."  JTX 117.

59.      A few hours later, without notifying Bariven, Exim made a claim to Girobank under the letter of credit for payment of $9,570,000 for Shipments 18-22.  JTX 118; Salges Testimony, March 14, 36:14-37:6; Azocar Testimony, March 17, 12:21-13:8.[10]

60.      Meanwhile, Bariven technical services manager Eusebio Zavatti began making arrangements to conduct inspections on Exim's milk in China.  Azocar Testimony, March 17, 34:20-35:8.  Mr. Salges admitted during his testimony that Bariven and PSI were in fact trying to coordinate inspections for future shipments.  Salges Testimony, March 15, 36:1-3 ("They were trying but never occur").

**H.      Bariven's Sampling and Testing and Exim's Filing of Suit.**

61.      In late September and early October of 2008, Bariven, at the direction of the Venezuelan Ministry of Health, had taken samples of milk for testing from another of its milk suppliers, Absolute Trading.  Rodriguez Testimony, March 29, 93:17-95:2.  The Ministry instructed Bariven to sample milk from Absolute Trading in particular because the milk from its shipments had been produced closest in time to January 2008—the earliest date which was known at that time to have melamine-contaminated production lots from China.  Azocar Testimony, March 16, 164:14-165:11.

62.      As of October and November 2008, knowledge about melamine in general, and knowledge about how to best test for the presence of melamine in particular, was still evolving.  Mitchell Testimony, March 30, 95:19-96:13.  Bariven sought to contact qualified laboratories in

---

[10] The Court's Summary Judgment Order states that Exim made a claim to Girobank for payment for Shipments 17-22.  *See* Summary Judgment Order, p. 9.  As Joint Exhibit 194 clarifies, Bariven had already paid for Shipment 17 on December 11, 2008.

Venezuela to perform the required testing, but none existed.  Rodriguez Testimony, March 29, 101:4-102:4; *see* Azocar Testimony, March 16, 166:7-11.

63.     Bariven attempted to ship the Absolute Trading samples to qualified labs in the U.S. in October, November and December 2008, but encountered multiple obstacles and delays, including those caused by U.S. regulatory requirements applicable to the handling of the volume milk powder to be tested (*e.g.*, obtaining necessary permits from the U.S. Department of Agriculture and the FDA to bring such material into the U.S. lawfully).  Rodriguez Testimony, March 29, 105:7-107:17, 108:10-23; DTX V.  After several failed attempts to send the samples, and after consulting with a number of resources, including international courier services and external and internal customs specialists, Bariven was ultimately able to transmit the samples to the U.S. for analysis.  *Id.*  These efforts took approximately 16 weeks from start to finish.  *Id.*, Rodriguez Deposition, 33:24-35:15; 39:1-20.

64.     The creation of a laboratory in Venezuela to perform these tests was not a feasible alternative.  Mitchell Testimony, March 30, 90:12-93:20.  Martin Mitchell, President of Certified Laboratories ("Certified Labs"), estimated that it would take approximately three months "assuming everything went well" for an experienced lab to acquire, ship, set up, and calibrate the equipment needed to test for the presence of melamine.  *Id.*  Mr. Mitchell's estimate was based on a similar project conducted by Certified Labs on behalf of a client in India to conduct a less complicated test for the presence of pesticides.  *Id.*  Even assuming that Bariven immediately engaged a qualified lab to create an on-site testing center the very day in September that it learned of the Chinese melamine alert, it would not be able to begin testing for at least three months, meaning that the earliest it possibly could have had melamine test results would have been late December 2008 or early January 2009.  Of course, it is unreasonable to assume that

Bariven should have decided on the first day of the alert to request a lab to set up a testing center on-site, particularly in light of its plan to send samples to labs in the U.S.  Moreover, had Bariven responded to the obstacles it encountered in transmitting samples to U.S. labs in October or November by switching strategies and beginning to set up a testing center in Venezuela, the delays of which Exim now complains would have been even longer.  Accordingly, the Court finds that Exim's response to dealing with the lack of qualified labs in Venezuela to be reasonable under the circumstances.

65.     While Bariven intended to take and test samples of Exim's milk, it did not physically take the samples until it had worked through the process described above and was sure of the methodology to get the samples out of the country and to an appropriate laboratory in the U.S.  Rodriguez Testimony, March 29, 107:19-108:1. Given the unprecedented nature of the melamine contamination in milk, the uncertainties surrounding the most appropriate methodologies to be used in testing, the multiple government ministries involved, the serious consequences that could have followed from a mistake in either direction (either mistakenly allowing milk later determined to be dangerous out to the public, or mistakenly concluding that $45 million in milk could not be used if it really was safe), and the fact that the milk had a one-year expiration date, it was not unreasonable for Bariven to take the time that it did to work through all of these matters.  *See* Azocar Testimony, March 16, 162:8-164:13; Rodriguez Testimony, March 29, 101:4-105:6; Mitchell Testimony, March 30, 106:23-107:12; DTX D at EX-VS00020.  If the samples of powdered milk taken by Bariven showed no contamination, Bariven could have distributed the milk well within the product's one-year expiration date.  Rodriguez Testimony, March 29, 110:23-111:21.  Moreover, Exim's expected cooperation in getting original test certificates from Chinese laboratories for all the shipments, which Mr.

Salges had promised on January 21, would have helped demonstrate that the milk was not dangerous and helped persuade the Minister of Health to release the shipments from observation. Salges Testimony, March 15, 26:13-16; 95:3-23; Azocar Testimony, March 17, 9:16-10:2; Rodriguez Testimony, March 29, 111:22-113:17.

66.    There is no evidence that Exim requested that Bariven sample or test the milk more quickly, or that Exim gave any indication that the passage of time was causing it any prejudice—to the contrary, it was Exim which repeatedly delayed meeting with Bariven from December 2 until January 21. Exim's suggestion at trial that had Bariven moved more quickly it would have been able to take advantage of the return policy of its Chinese suppliers is not supported by the evidence. First, there is no evidence that Exim ever made Bariven aware of any such return policies. Second, the only evidence of any supplier return policy comes from Suncare—its representative testified at deposition that it would accept returns up to at most one month after manufacture. Chen Deposition, 11:3-14. It is undisputed that the shipments at issue here took between 6-8 weeks or more to be loaded and shipped and to reach Venezuela from China, JTX 194, and so nothing Bariven did could have satisfied such a policy.

67.    In any event, a week after the January 21 meeting, Bariven took sixteen samples of Exim's milk from Shipments 7 and 8. JTX 130; PT Stip., V(11). Bariven sent portions of those samples to two U.S. laboratories for testing: SGS-NA and Silliker Labs. *See* JTX 130; Rodriguez Testimony, March 29, 115:12-117:3.

68.    Bariven received test results from SGS-NA and Silliker Labs in late February; however, the test results were mixed. *See* Rodriguez Testimony, March 29, 117:4-11; DTX W; PTX 52. Results of SGS-NA's testing indicated the presence of melamine at levels below 1 ppm, while the results of Silliker's testing indicated the presence of melamine at much higher

levels.  *See* JTX 192.  After further investigation, Bariven learned that the laboratories used different testing methodologies.  Rodriguez Testimony, March 29, 117:18-118:2 and March 30, 38:9-39:6.

69.     In light of the mixed nature of these results, Bariven sent retained portions from all sixteen samples to two additional U.S. laboratories, Certified Labs and Midwest Labs, for confirmatory testing.  Rodriguez Testimony, March 29, 117:18-118:11.  Results from both Certified Labs (received on March 20, 2009) and Midwest Labs indicated the widespread presence of melamine and/or cyanuric acid.  *See* JTX 156, 192.

70.     On March 19, 2009, Exim's attorney sent a letter to PSI, making various demands.  *See* JTX 155.

71.     Bariven responded by letter dated March 27, 2009.  JTX 157.  In that letter, Bariven's president Mr. Kabboul requested an urgent meeting at Bariven's offices to discuss the status of the Milk Contract in light of the melamine alert.  *Id.*; Azocar Testimony, March 17, 13:14-18.  Mr. Kabboul wrote that "[w]e are sure that in this meeting we will be able to establish the mechanisms that will make the nationalization possible, as well as the subsequent payment of all shipments that are fit for human consumption."  JTX 157.  Mr. Kabboul's statement reflects an ongoing commitment to the Milk Contract and, in light of the facts and circumstances existing at the time, constituted adequate assurances of performance.

72.     As a further demonstration of good faith and its commitment to the Milk Contract, Bariven agreed to a second extension of the Girobank letter of credit on or around the date of Mr. Kabboul's letter.  Salges Testimony, March 15, 103:18-104:21.

73.     On April 2, 2009, Mr. Kabboul followed up his March 27 letter with another letter requesting a meeting at Bariven's offices to discuss the situation with the milk and the letter of

credit.  JTX 160; Azocar Testimony, 13:19-14:5.  This letter specifically mentioned wanting to discuss the melamine test results.  JTX 160.

74.      Mr. Salges responded on April 3 that he intended to travel to Caracas for the meeting, although he indicated that due to a shortage of flights because of the holidays the meeting would have to take place after April 16.  JTX 161; Salges Testimony, March 15, 114:17-115:10.  There is no indication in Mr. Salges' email of any dissatisfaction with Bariven's response, or of any need for further information prior to the meeting to occur after April 16.  JTX 161.

75.      Notwithstanding Mr. Salges' April 3 response, Exim filed the instant lawsuit on April 7, 2009.  D.E. #1; PT Stip. V(12).

76.      Between April 30, 2009 and May 5, 2009, Bariven sampled and had Certified Labs test Exim's milk from Shipments 3, 5, and 16.  PT Stip., V(13); JTX 164; Rodriguez Testimony, March 29, 119:2-120:21.  These tests showed widespread contamination of melamine and/or cyanuric acid.  JTX 166; Rodriguez Testimony, March 29, 120:22-121:2.

77.      In February 2010, Bariven had Certified Labs sample and test Exim's milk from Shipments 2, 4, 6, 9, 10, 11, 12, 13, 14 and 15 (ten in total).  DTX D & G; Rodriguez Testimony, March 29, 121:18-131:25.  These tests also showed widespread contamination of melamine and/or cyanuric acid.  DTX F; Rodriguez Testimony, March 29, 132:1-7.

**I.      Reliability of Sampling and Testing**

78.      At trial, Bariven relied on tests conducted by Certified Labs to demonstrate melamine/cyanuric acid contamination.

79.      Certified Labs is a private independent laboratory involved in the field of food safety and analysis.  Certified Labs is accredited to ISO Standard 17025, which is the international standard attesting to the laboratory's quality systems and competency, and, in

particular, to the laboratory's competency to perform sampling and testing for melamine in food products.  *See* Cusack Testimony, March 30, 47:6-13; Mitchell Testimony, March 30, 77:3-24. The U.S. FDA, as well as thousands of private companies, have utilized Certified Labs to sample and analyze a wide range of food products, including meats, seafood, spices, powders, and liquids for compliance with food safety and quality standards, drawing upon its expertise in the areas of food Chemistry and Microbiology.  Certified Labs conducted the laboratory testing of the samples of Exim milk taken in the three rounds of sampling described above.  In addition, Certified Labs designed and executed Bariven's February 2010 sampling plan.

80.     The Court finds that the sampling methodology used by Bariven to obtain samples of Exim's milk was reasonable and produced representative, reliable samples of Exim's milk. The first two rounds of sampling of Exim's milk were conducted in accordance with Venezuelan regulations governing the selection of samples, specifically COVENIN 3133.  *See* Rodriguez Testimony, March 29, 115:12-22; 119:2-120:12.  For the third round of sampling, given the large number of containers and volume of milk at issue, Certified Labs devised a random sample selection plan in which it sampled, at random, a number of containers from each shipment equal to the square root of the number of containers plus 1—a standard which is generally accepted in the field as reasonable and appropriate.  Cusack Testimony, March 30, 48:19-49:11.  Certified Labs then proceeded to sample from suitable powdered milk bags from each container, using a metal scoop to retrieve the individual samples.  The individual bags contained 25 kilograms of powdered milk, sealed in an inner plastic liner, enclosed in a heavy kraft paper outer bag, stitched shut.  *See* Cusack Testimony, March 30, 56: 12-22.  During all three sampling exercises, samples were taken from unopened, intact bags.  Rodriguez Testimony, March 29, 120:15-21, 129:1-4; Cusack Testimony, March 30, 56:2-7.

81.    The Court further finds that the use of a metal "scoop" (*i.e.*, a small shovel) to take powder from each of ten sealed bags from a given shipping container and compositing that material into a single sample, produced representative samples of the milk.  When taking samples from multiple bags to make a composite, and in the context of testing for the presence of a chemical substance or contaminant, the use of a metal scoop is accepted as general practice in retrieving representative samples.  *See* Cusack Testimony, March 30, 58:21-59:3; 60:18-61:9; Mitchell Testimony, March 30, 79:7-24 ("in the [FDA's] Inspector's Operation Manual, they do talk about using the scoop and, in fact, the FDA currently today, all sampling that they do for melamine is either by taking intact packages of it or things like that or by use of scoop if it is a powder…").  The Court is not persuaded by Exim's expert's testimony that the use of a "coring device" or a "thief" is the only way to have produced a representative sample.[11]  Exim's expert has acknowledged that the use of a scoop when sampling dry product from stitched bags (which includes the powdered milk at issue here) was permissible.  *See* Bradley Testimony, March 16, 104:2-106:5 (acknowledging, among other things, that authoritative treatises permit the use of a scoop for sampling powdered milk).  Further, as the metal scoops were used in the context of testing for chemical contamination, and not microbiological contamination, the cleaning process

---

[11] In essence, Exim is asking the Court to find that the use of a scoop to sample the milk powder was inappropriate based solely on the *ipse dixit* of Professor Bradley, as Professor Bradley's opinion that the use of a scoop was improper when taking samples for purposes of testing for the presence of melamine and cyanuric acid was not supported by any reasons, and was contradicted by authoritative treatises.  Bradley Testimony, March 16, 104:2-106:5.  Professor Bradley's opinion was further called into question by his own admission that he was not particularly familiar with the characteristics of melamine, and by his inability to articulate to the Court why the use of a scoop has any bearing on the detection of melamine.  *Id.* at 88:2-93:16.  It is well-settled, however, that a Court should not rely on an expert's *ipse dixit*.  *See Southern Grouts & Mortars, Inc. v. 3M Co.*, 575 F.3d 1235 (11th Cir. 2009); *see also Allapattah Svcs., Inc. v. Exxon Corp.*, 61 F.Supp.2d 1335, 1340 (S.D. Fla. 1999) ("The expert's 'self-proclaimed' accuracy is insufficient").

utilized here (before a scoop was used on another production lot, washing it in water and drying it with disposable, sanitary paper towels so that no powder remained, *see* Rodriguez Testimony, March 29, 129:19-130:13), was sufficient to prevent any cross-contamination; sterilization in between sampling was not required.  *See* Cusack Testimony, March 30, 59:4-23.  The other points offered by Professor Bradley (regarding particle shifting, selection of bags, etc.) were not shown to have any bearing on the question of whether or not the powdered milk was contaminated with melamine.  *See* Bradley Testimony, March 16, 88:2-93:16; 106:17-110:20. As such, the Court finds that the testimony of Professor Bradley on this matter should be given no weight.

82.      In addition, the Court finds that the melamine and cyanuric acid test results obtained by Bariven are accurate and reliable.  Certified Labs employed FDA Laboratory Information Bulletin ("LIB") 4122, a testing method developed by the FDA for detecting melamine and cyanuric acid generally considered to provide more effective sensitivity and selectivity than other testing methods.  LIB 4122 is considered superior to other testing methods employed by other laboratories to test samples of Exim's milk for melamine and cyanuric acid.[12] Mitchell Testimony, March 30, 96:10-13 (LIB 4122 has "become accepted as the gold standard…").  Certified Labs used the LIB 4122 testing method to test all samples of Exim's milk from each of the three rounds of sampling.  *Id.* at 96:10-16.

83.      Each of the fifteen shipments of Exim's milk that Bariven sampled and tested contained milk that was contaminated by melamine and/or cyanuric acid.  JTX 192; Mitchell Testimony, March 30, 105:15-106:19.  These fifteen shipments consisted of 8,980 metric tons of

---

[12] For example, the "Elisa" testing method used by SGS-NA to test several of the milk samples has not been validated by any organization to date and has not undergone any collaborative study.  Mitchell Testimony, March 30, 107:16-108:9.

milk, or roughly 95% of the milk delivered and accepted, 76% of the milk delivered (whether accepted or not), and 35% of the total quantity to be supplied under the Milk Contract.  JTX 192, 194.

84.     Eleven of these 15 shipments (6,950 out of a total of 8,980 metric tons) contained melamine-contaminated milk from Exim's provider Suncare, with milk production dates ranging from between June 2008 and September 2008.  JTX 192.  This was the same milk provider as provided the milk in shipment 1.  *Id.*  Shipment 2 (also provided by Suncare) included contaminated production lots with manufacturing dates as early as June 17.  *Id.*  Shipment 1 was dispatched on June 22.  JTX 194.  There is no evidence to suggest that Suncare employed any different manufacturing methodology as between Shipment 1 and the other shipments manufactured prior to the melamine alert in September.  For these reasons, the Court finds that it is more likely than not that the milk in Shipment 1 was similarly contaminated with melamine and cyanuric acid, even without specific laboratory testing of milk from this particular shipment.

### J.     The Rice Contract

85.     On June 12, 2008, Bariven, through its purchasing agent PSI, issued a purchase order to Exim for 19,200 metric tons of white rice (the "Rice Contract").  The total purchase price for this purchase order was $19,603,200.  JTX 24 (Rice Contract).

86.     Exim contracted with a rice supplier located in Brazil, Zaeli Alimentos, Ltda. ("Zaeli"), to supply the rice under the Rice Contract.  PT Stip., V(17).

87.     The Rice Contract provided for rice to be delivered to Bariven in four monthly installments of 4,000 metric tons and a fifth installment of 3,200 metric tons, starting in July 2008.  JTX 24, p. 5 of 12.

88.     The Rice Contract contained the delivery terms "CIF Puerto Cabello / La Guaira, VE," and provided that "Original Export documentation…for all ocean shipments are required to

be in possession of Bariven-Aduanas seven (07) working days prior to the arrival of the freight at the first Venezuelan Port." JTX 24, pp. 1, 7.

89.     Original export documents are necessary to allow imported goods to clear Venezuelan customs and be received by Bariven in Venezuela.  Bello Testimony, March 29, 26:24-27:12; Bastardo Testimony, March 17, 43:3-13.

90.     From August to December 2008, Exim dispatched a total of 26 shipments of rice totaling 16,200 metric tons.  Bariven paid Exim in full (a total of $16,540,200) for these shipments.  Each payment was made while the corresponding shipment was in transit and before it reached Venezuela.[13]  PT Stip., V(18); JTX 195; Salges Testimony, March 15, 107:9-13.

91.     In January 2009, three shipments (21, 23 and 24) of Exim's rice with the following bill of lading numbers arrived in Venezuela: SEA5551323 (1,325 metric tons); SUDU687002388020 (125 metric tons); and SUDU68700238802 (250 metric tons).  JTX 195. All three of these shipments arrived without original export documentation.  Salges Testimony, March 15, 107:23-108:2; 110:23-111:17; Guevara Testimony, March 17, 17:5-20; Bastardo Testimony, March 17, 43:17-44:1; Bello Testimony, March 29, 29:17-31:3;

92.     With respect to these three shipments, which arrived in Venezuela in January 2009, Exim did not provide Bariven with original export documents.  *See id.*  Bariven repeatedly asked Exim for original export documents beginning in January 2009.  JTX 104; Bastardo Testimony, March 17, 44:18-46:20.[14]  Exim was unable to provide Bariven with these original

---

[13] The Court's Summary Judgment Order states that Exim made 23 separate shipments of rice to Venezuela, totaling 16,200 tons.  *See* Summary Judgment Order, p. 10.  However, as the parties have clarified in their Joint Pretrial Stipulation, Exim provided the 16,200 tons in 26 shipments of rice to Venezuela; Bariven paid for all 26 shipments.  *See* PT Stip., V(18).

[14] Although Bariven's emails only referenced the bill of lading for one of the shipments in its requests, *see* JTX 102-105, 143-144, Exim understood that Bariven was requesting documentation for all three shipments.  *See* Guevara Testimony, March 16, 13:24-14:3.

export documents in January 2009 because it had not paid its Brazilian supplier, Zaeli, for the rice. Salges Testimony, March 15, 107:9-108:4; Guevara Testimony, March 16, 17:5-20; JTX 151 (March 6, 2009 letter from Zaeli to Exim demanding payment).

93.     At trial, Mr. Salges claimed that Exim's failure to pay Zaeli for Shipments 21, 23, and 24 was caused by Bariven's failure to pay Exim for Shipments 18-22 under the *Milk Contract*. Salges Testimony, March 15, 109:7-110:1. However, this testimony does not match up with the chronology and Exim's own financial records: (1) Rice Shipments 21, 23 and 24 were dispatched in late November and Bariven paid Exim for them in December, so Exim should have paid Zaeli in December; (2) as of January 8, 2009, Exim had a $3.6 million surplus in payments from Bariven on the Rice Contract and (3) as of December 31, 2009, Exim had a $3.7 million surplus in payments from Bariven on the Milk Contract. JTX 181, 194. In light of this discrepancy, and the lack of any written communication from Exim explaining this basis for non-payment, the Court puts little weight on Mr. Salges' testimony as to the reason for Exim's failure to pay Zaeli.

94.     Bariven repeatedly requested that Exim provide original shipping documents beginning in January, and informed Exim that Bariven was incurring costs due to the delay of receipt of these documents. JTX 102-105; 143-144; Bastardo Testimony, March 17, 44:18-46:20; Bello Testimony, March 29, 33:1-8; Guevara Testimony, March 16, 13:24-17:20. Bariven was initially told by Exim that it would contact the supplier and request the documents "that have apparently not been sent." JTX 104. On February 20, 2009, Bariven informed Exim that the delay in providing original export documentation "could lead to additional costs for delays." JTX 105. On February 25, 2009, Exim told Bariven that it had contacted Zaeli but because Brazil was "practically paralyzed by the Carnival season, there was a delay in receiving

the documents." JTX 104.  These excuses offered by Exim were misleading, at best.  At no time did Exim inform Bariven that the reason it was unable to provide the original shipping documents was because Exim had not paid Zaeli for the rice, despite having already been paid by Bariven.

95.     Exim finally paid its supplier, Zaeli, for these three shipments of rice in October 2009, some ten months after the rice arrived in Venezuela.  Only after Exim paid Zaeli was Exim able to cause the original export documents to be delivered to Bariven.  Guevara Testimony, March 17, 17:5-20.

96.     Bariven was unable to clear the rice from these three shipments through Venezuelan customs without the original export documents and incurred storage and demurrage costs for this rice.  DTX I; Bello Testimony, March 29, 26:24-29:16; 33:1-35:8.

97.     The evidence shows that, although the Rice Contract required original export documents to be transmitted to Bariven's customs agents seven days prior to the goods' arrival, Bariven did not refuse shipments in instances when Exim failed to satisfy this condition, but rather gave Exim a reasonable period of time (*i.e.*, one to two weeks after arrival) to transmit original documents.  Bello Testimony, March 29, 29:9-30:2.  There is no evidence in the record that Bariven waived the requirement for original export documents.

98.     With respect to the last 3,000 metric tons of rice (with a contract price of $3,063,000) remaining under the Rice Contract, PSI sought to inspect the product at Exim's supplier in Brazil before shipment, but the supplier did not permit PSI's inspection because Exim had not yet paid the supplier for this rice.  JTX 196; Bastardo Testimony, March 17, 46:21-48:5.

II.    **CONCLUSIONS OF LAW**

A.    **Jurisdiction and Venue**

99.    As Bariven is an agency or instrumentality of the government of Venezuela, a foreign state as defined in 28 U.S.C. § 1603(b), this Court has original jurisdiction under 28 U.S.C. § 1330.  PT Stip., p. 5.

100.    Personal jurisdiction over the Parties is not contested.

101.    Venue in this Court is appropriate under 28 U.S.C. § 1391(b), (c), (f)(1), and (3).

B.    **Governing Law and Overview of the Parties' Claims**

102.    Both parties agree that this dispute is governed by Florida law, and the Court likewise understands that Florida law applies.

103.    The Milk Contract and Rice Contract are valid and enforceable agreements for the purchase of goods between Bariven, the buyer, and Exim, the seller.  Accordingly, the Contracts are governed by the provisions of the Uniform Commercial Code (the "UCC") as codified in Florida law at Fla. Stat. § 672.101 *et seq.* (PT Stip., VII(2, 5)).

104.    While the Court's findings are based on specific provisions of the UCC, the Court recognizes that these specific provisions are animated by the principles of commercial reasonableness and good faith, which run throughout the UCC.  *See* Fla. Stat. § 671.203 n.1. The UCC does not require parties to be perfect, nor does it intend that parties cancel contracts and initiate litigation at the first hint of contractual problems.  Instead, the UCC envisions that parties behave in a commercially reasonable manner and attempt to act in good faith to resolve issues between them.  Thus, for example, the UCC's notice provisions are intended to "defeat commercial bad faith, not to deprive a good faith consumer of his remedy," Fla. Stat. § 672.607 n.4, and the UCC provides that "[a] reasonable time for notifying of cancellation … extends of

course to include the time covered by any reasonable negotiation in good faith," Fla. Stat. §672.612, n.7.

105.    Each party to this suit has proceeded to trial on claims for affirmative relief under both the Milk Contract and the Rice Contract.  In total, there are seven claims pending before this Court—five relating to the Milk Contract and two relating to the Rice Contract.   Exim seeks relief on two counts: (1) anticipatory repudiation of the Milk Contract (Count I of its Second Amended Complaint) and (2) anticipatory repudiation of the Rice Contract (Count VII).  Bariven seeks relief on five counts: (1) breach of the Milk Contract's implied warranty of merchantability (Count A), (2) breach of the Milk Contract (Count I of its Counterclaim), (3) breach of the Milk Contract's implied covenant of good faith and fair dealing (Count V), (4) violation of the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA") (Count VII), and (5) breach of the Rice Contract (Count II).

106.    The claims arising out of the Milk Contract divide into three groups: (1) claims related to Shipments 1-16, which arrived prior to the Chinese melamine alert; (2) claims related to Shipments 17-22, which were shipped after Bariven's November 17 email reinstating the contract inspection requirement; and (3) claims related to the 14,220 tons remaining to be shipped (but never shipped) after the arrival of Shipment 22.[15]

107.    The claims arising out of the Rice Contract will be dealt with in Section II.I. and II.J. below.

---

[15] Earlier in this case, Exim alleged that it sent a 23rd shipment to Bariven for which Bariven never paid.  Salges Testimony, March 15, 39:23-40:8.  In preparing for trial, however, Exim realized that, although the supplier delivered the goods to the port, they were never loaded on the ship and, therefore, never delivered to Bariven.  *Id.*  Accordingly, the Court includes the 23rd shipment among the 14,220 tons that were never delivered.

### C.     Resolution of Pending Motion in Limine

108.    Before addressing the merits of the parties' claims, the Court pauses briefly to address Exim's outstanding Motion in Limine to Exclude Evidence of 2010 Sampling and Testing, D.E. #150.  The Court reserved on the motion, allowed the evidence to be admitted conditionally at trial, and indicated that it would rule on the motion in its final order.  Trial Transcript, March 29, 5:8-12.

109.    Having carefully considered the issue, the Court now denies Exim's motion.  The results of the February 2010 sampling and testing demonstrate that ten shipments of milk provided by Exim contained toxic levels of melamine and cyanuric acid, which rendered them unfit for human consumption.  This evidence is relevant not only to Bariven's affirmative claims for breach of contract, breach of warranty, breach of the covenant of good faith and fair dealing, and violation of FDUTPA, but also to Bariven's defenses to Exim's claim for anticipatory repudiation of the Milk Contract.

110.    The February 2010 test results are relevant to Bariven's affirmative claims because each claim is based upon an alleged material difference between the goods described in the Milk Contract (*i.e.*, powdered milk free of toxic substances) and the goods delivered to Bariven (*i.e.*, powdered milk adulterated with melamine).  Because the presence of melamine is not discernable without laboratory testing, such testing is necessary to demonstrate this difference in quality and therefore relevant.

111.    At the same time, the February 2010 test results are relevant to Bariven's defenses to Exim's claim of anticipatory repudiation of the Milk Contract.  A party in breach is not entitled to rely on the anticipatory repudiation doctrine to cancel a contract and sue the other party for breach.  *See Advanced Bodycare Solutions v. Thione Int'l, Inc.*, 615 F.3d 1352, 1361 (11th Cir. 2010) (noting that a breaching party cannot invoke the UCC's anticipatory repudiation

doctrine at Section 2-609 by requesting assurances of the other party because to do so would "allow a party to avoid liability for breaching its contracts"); *See Gibbs, Nathaniel (Canada) Ltd., v. International Multifoods Corp.*, 804 F.2d 450, 452–53 (8th Cir. 1986) (holding that a party may not claim damages for anticipatory repudiation when the party's own conduct substantially impaired the value of the contract).  Because the February 2010 test results indicate that ten shipments were contaminated with melamine and cyanuric acid, they are relevant to whether Exim was in breach at the time it canceled the Milk Contract and brought suit.

112.    The Court is not persuaded by Exim's argument that when Bariven filed its counterclaims in July 2009 it lacked a good faith basis to revoke acceptance of the ten shipments not yet tested.  As of July 2009, Bariven had test results showing melamine contamination in 5 of the 16 shipments sent by Exim before the melamine alert, comprising 3,200 of the 9,480 metric tons of milk these shipments contained.  *See* JTX 192, 194.

113.    The test results demonstrating that at least one-third of Exim's Chinese milk powder was contaminated provided Bariven with a good faith basis to believe that all sixteen shipments sent before the melamine alert were contaminated, thus permitting it to assert a claim for revocation, particularly as the standard under Fla. Stat. § 672.608 calls for notice to be given when a buyer knows or has reason to know of the basis. Test results later obtained by Bariven to confirm its legal claim are relevant and not unduly prejudicial as they merely demonstrate what Bariven originally contended: that the milk provided by Exim was contaminated with melamine. The Court also notes that the February 2010 sampling and testing was carried out during the course of discovery in this litigation, and that Bariven demonstrated extensive good faith efforts (see JTX 171, 173, 174 & 179) to engage Exim in a cooperative effort to sample and test the

milk as part of the discovery process; it would be inequitable to penalize Bariven for such
efforts.

### D.   Milk Contract Claims: Shipments 1-16

#### i.   *Bariven's Claim for Breach of the Milk Contract's Implied Warranty of Merchantability*

114.    Under the UCC, goods sold by a merchant such as Exim contain an implied
warranty of merchantability.  Fla. Stat. § 672.314.  To satisfied this implied warranty, a merchant
seller must provide goods "fit for the ordinary purposes for which [they] are used."  Fla. Stat. §
672.314(2)(c).

115.    To prevail on a claim of breach of an implied warranty, a claimant must show "(1)
facts in respect to the sale of the goods; (2) type of warranty created; (3) facts in respect to the
creation of that particular type of warranty; (4) facts of the breach of warranty; (5) notice to
seller of breach; and (6) injuries sustained by the buyer as a result of the breach of warranty."
*Pegasus Imaging Corp. v. Allscripts Healthcare Solutions, Inc.*, 2009 U.S. Dist. Lexis 57519, at
*4 (M.D. Fla. 2009) (citing *Dunham-Bush, Inc. v. Thermo-Air Service, Inc.*, 351 So.2d 351 (Fla.
4th DCA 1977)).

116.    Bariven has satisfied the first three elements of its claim for breach of implied
warranty, and other than a citation to the trial record or applicable legal authority, those elements
require no elaboration by the Court: (1) Exim sold milk, *a good*, to Bariven (JTX 5, 194); (2) A
warranty of merchantability is implied in the Milk Contract by operation of Florida law (Fla.
Stat. § 672.314); and (3) Exim is a merchant in the kind of goods provided in the Milk Contract.
(PT Stip. V(1), D.E. #139).

117.    The final three elements merit further elaboration, beginning with Element 4:  *the*
*facts of the breach of warranty*.  Based on the evidence adduced at trial, the Court finds that

Bariven has carried its burden of proving by a preponderance that Exim breached the implied

warranty of merchantability by providing sixteen shipments of milk unfit for human

consumption.  Food products that are unfit for human consumption are not fit for their usual

purpose and, accordingly, constitute a breach of the implied warranty of merchantability.  *See,*

*e.g., T.J. Stevenson & Co. v. 81,193 Bags of Flour*, 629 F.2d 338, 353 (5th Cir. 1980) (flour

containing weevil infestation not merchantable); *Willmar Cookie Co. v. Pippin Pecan Co.*, 357

N.W.2d 111, 114 (Minn. Ct. App. 1984) (moldy and rancid pecans not fit for human

consumption not merchantable).

118.    Shipments 2 through 16 were tested for the presence of melamine and cyanuric

acid, and the test results showed that each of those shipments contained widespread

contamination.  *See* ¶¶ 83-84 above.  Based on the evidence submitted at trial, the Court finds

that: (1) the samples tested were taken from Shipments 2-16 of Exim's milk; (2) that the

sampling was reasonable and representative; (3) that the test results accurately reflect the

concentrations of melamine and/or cyanuric acid contained in the samples.  As such, the Court

finds that Shipments 2 through 16 were contaminated with melamine and cyanuric acid in the

amounts reflected in Joint Exhibit 192.

119.    Shipments 2-16 each contained combined melamine/cyanuric acid values greater

than 0.324 ppm, representing melamine/cyanuric acid contamination at a level that is unsafe for

human consumption.  Somers Testimony, March 16, 122:17-23; 123:14-22; 130:13-131:1;

133:23-136:12.  Although Exim sought to rely on a different standard for defining unsafe levels

of melamine (2.5 ppm), the Court excluded the interim FDA report containing that standard on

the basis of the Eleventh Circuit's holding in *Toole v. McClintock*, 999 F.2d 1430 (11th Cir.

1993), and for the reasons explained in footnote 4 above, the Court concludes that the 2.5 ppm

level identified in the interim FDA report does not outweigh the testimony put forward by Dr.

Somers, the only witness competent to address the health effects of melamine on humans.

Somers Testimony, March 16, 127:17-128:3; 129:1-6.

120.     Although Shipment 1 was not tested, the circumstantial evidence proves by a

preponderance that it, too, was contaminated with melamine and/or cyanuric acid.  *See* ¶ 84.

121.     As for the fifth element—*notice of breach*—the Court finds by a preponderance

that Bariven provided seasonable notice of breach in connection with its breach of warranty

claim.  Given the attention devoted by the parties to the issues of notice under the UCC, the

Court pauses to explain in detail its findings and conclusions as to this element.

122.     The notice standard for breach of warranty claims is governed by Fla. Stat. §

672.607(3).  *See Royal Typewriter Co. v. Xerographic Supplies Corp.,* 719 F.2d 1092, 1102

(11th Cir. 1983).  Section 607(3) provides that "[w]here a tender has been accepted … the buyer

must within a reasonable time after he or she discovers or should have discovered any breach

notify the seller of breach or be barred from any remedy."  A buyer "notifies" a seller of breach

by "by taking such steps as may be reasonably required to inform the other person in ordinary

course" of the breach.  Fla. Stat. §671.201(26).

123.     The notice requirement for Bariven's breach of warranty claim under §

672.607(3) is independent of the notice requirements under the UCC provisions governing

rejection (§ 672.605(1)) and revocation of acceptance (§ 672.608(2)).  Bariven, as a buyer, is

permitted to pursue a claim for breach of warranty, regardless of the sufficiency or timeliness of

its notice of rejection and/or revocation.[16]  *See, e.g., Central Florida Antenna Svc.*, 503 So.2d

---

[16] As explained in further detail below, that the Court does not find Bariven's notice of rejection
or notice of revocation to be insufficient or untimely.

1351, 1353 (Fla. Dist. Ct. App. 1987) (buyer's year-and-a-half delay in giving notice may

preclude revocation of acceptance, but did "not preclude him from making a claim for breach of

warranty"); *Cliffstar Corp. v. Elmar Indus. Inc.*, 254 A.D.2d 723, 724 (NY App. Div. 4th Dep't

1998) (holding that even where buyer failed seasonably to reject or revoke acceptance, buyer

was permitted to pursue an action for breach of warranty).[17]

124.    Surprisingly, there are few decisions of the courts of Florida elaborating on the

notice standard laid out in Fla. Stat. §672.607(3).  However, the Eleventh Circuit interpreted the

provision in a similar case involving a merchant buyer's breach of warranty claim under the

Florida UCC.  *Royal Typewriter Co.*, 719 F.2d at 1102.  In *Royal Typewriter*, the Eleventh

Circuit held that notice under Fla. Stat. §672.607 must be both *timely* and *sufficient under the*

*circumstances* and is governed by the buyer's obligation to act in good faith.  *Id.* (emphasis

added.)  The Eleventh Circuit held that the issues of timeliness and sufficiency are questions of

fact.  *Id.*  (citing *Eastern Air Lines, Inc. v. McDonnell Douglas Corp.,* 532 F.2d 957, 970-71,

976-79 (5th Cir. 1976) *and  T.J. Stevenson & Co. v. 81,193 Bags of Flour*, 629 F.2d 338, 359

(5th Cir. 1980)).

125.    Because of its factual and legal similarities, the *Royal Typewriter* case merits

some extended discussion.  There, a seller of photocopiers sued its buyer for failing to pay the

full purchase price for 190 copiers.  The buyer contended that there were defects in the machines

---

[17] Further, even apart from the issue of notice, Bariven's failure to inspect at a particular location
prescribed in a contract (China, in the case of the Milk Contract) does not estop it from bringing
a claim for damages under a warranty theory which is supported by evidence garnered from
subsequent inspections at another location.  *See HCI Chemicals, Inc. v. Henkel KGaA*, 966 F.2d
1018, 1022-24 (5th Cir. 1992) (permitting buyer to recover under warranty damages for non-
conforming goods which were inspected at point of arrival rather than point of delivery as
prescribed by sales contract).  Additionally, as Exim did not plead this theory of estoppel as an
affirmative defense in its answers to Bariven's Counterclaims (D.E. #25 & #52), the Court finds
it has waived this affirmative defense.  Fed.R.Civ.P. 8(c).

and asserted counterclaims including for breach of warranty and revocation of acceptance—the latter claim based upon notice of revocation that post-dated the commencement of litigation. Both parties' claims were tried to a jury, and the jury returned a general verdict awarding the buyer $5 million in damages and denying the seller's claims.  The seller argued a number of points on appeal, including that: (1) the district court erred in permitting the revocation of acceptance claim to reach the jury and (2) that the buyer's breach of warranty claims were precluded by its failure to give timely and "unequivocal" notice of breach.  Although the Eleventh Circuit agreed that the revocation claim should not have been presented to the jury, it found that the buyer presented sufficient evidence from which a jury could reasonably infer that notice was sufficient and timely.  In particular, the court pointed to evidence that the buyer brought problems to the seller's attention and that the seller met with the buyer regarding the concerns.  Quoting from the Florida UCC, the Eleventh Circuit observed that these exchanges could reasonably be found to constituted proper notice because they were "sufficient to let the seller know that the transaction [was] still troublesome and [needed to] be watched."  *Id.* (quoting Fla. Stat. §672.607, Official Comment 4).

126.    This Court notes that the Eleventh Circuit's reliance on Official Comment 4 in the *Royal Typewriter* case may appear to be not entirely consistent with two earlier decisions of the Fifth Circuit (both of which are cited in *Royal Typewriter*).[18]  In *Eastern Air Lines*, a case

---

[18] To the extent that there is, in fact, tension between the *Royal Typewriter* case and the Fifth Circuit's prior rulings in *Eastern Air Lines* and *Stevenson & Co.*, this Court must confront the Eleventh Circuit's prior panel precedent rule, which holds that courts in this circuit are bound by earlier panel holdings unless and until they are overruled en banc or by the Supreme Court.  *See, e.g., United States v. Smith*, 122 F.3d 1355, 1359 (11th Cir. 1997).  The application of that rule is complicated somewhat under these circumstances because the prior rulings are on matters of state law.  Were it squarely to apply to this case, the issue would be whether earlier, binding Fifth Circuit precedent relating to the application of the UCC's notice provisions under California law (*Eastern Air Lines*) and Illinois law (*Stevenson & Co.*) preclude this Court from

involving a breach of contract under *California* law, and *Stevenson & Co.*, involving a breach of

warranty claim under *Illinois* law, the Fifth Circuit criticized certain decisions of other courts

which relied on the portion of Comment 4 that the seller "need only be informed that 'the

transaction is still troublesome and must be watched'" as justification for the extreme conclusion

that "any expression of discontent by a buyer always satisfies section 2-607." *Eastern Air Lines,*

532 F.2d at 976. Both *Eastern Air Lines* and *Stevenson* reject that extreme conclusion, indicating

that §2-607(3)(a) requires something more than the "minimal notification endorsed by these

courts," and they both go on to embrace the full text of Official Comment 4—explaining that

what is required is that the notice inform the seller that the transaction is still troublesome and

must be watched, and  indicate that the transaction is claimed to involve a breach so as to "open[]

the way for normal settlement through negotiation." *Id.*

127.    Bariven has carried its burden of showing notice sufficient to meet the *Royal*

*Typewriter, Eastern Air Lines* and *Stevenson & Co.* cases—*i.e.*, that its notice was sufficient,

timely, and made in the exercise of commercial good faith.  As the *Stevenson* court recognized,

"notice must be evaluated from the perspective of the policies which it seeks to encourage:

compromise by the parties; and conduct within the bounds of commercial good faith." *Stevenson*

*& Co.*, 629 F.2d at 361.

128.    <u>Sufficiency</u>.  Notification of breach of warranty need not be in any particular

words and need not be written.  *Stevenson & Co.*, 629 F.2d at 359.  It may be given in a single

---

relying on a more recent decision of the Eleventh Circuit applying the UCC's notice provisions
under Florida law, the law at issue in this case.  While the Court is doubtful that the prior panel
precedent rule would preclude it from relying on the only Eleventh Circuit decision to address
the notice issue under Florida law, it need not rely on those doubts here because it finds that the
sufficiency and timeliness of Bariven's notice does not depend upon judging it solely under the
"troublesome and must be watched" aspect of Official Comment 4.

communication or derived from several.  *Id.  See also Eastern Air Lines*, 532 F.2d at 978 ("The

buyer's conduct, then, taken as a whole, must constitute timely notification that the transaction is

claimed to involve a breach.")  As for the particular words used, notice under UCC Section 2-

607 "need not be a specific claim for damages or an assertion of legal rights."  *Eastern Air Lines*

532 F.2d at 976.

129.   <u>Timeliness</u>.  The issue of timeliness is judge according to a standard of

reasonableness:  "The buyer must within a reasonable time after he or she discovers or should

have discovered any breach notify the seller of breach."  Fla. Stat. §672.607(3)(a).  The UCC

specifies that "the time of notification is to be determined by applying commercial standards to a

merchant buyer."  *Id.*, Official Comment 4.

130.   <u>Good Faith</u>.  In *Eastern Air Lines*, the Eleventh Circuit observed that "it is

particularly important in continuing contractual relationships … that all of a buyer's dealings

with a seller be evaluated under the good faith standard."  *Eastern Air Lines* 532 F.2d at 978.

The court added that "an overly mechanical application of the notice requirement to complex or

ongoing agreements would frequently frustrate the section 2-607 design of defeating commercial

bad faith."  *Id.*  The *Stephenson & Co.* court echoed these points, noting that "§ 2-607(3)(a)

notice must be evaluated from the perspective of the policies which it seeks to encourage:

compromise by the parties; and conduct with the bounds of commercial good faith."  *Stevenson

& Co.*, 629 F.2d at 361.

131.   Applying the sufficiency, timeliness, and good faith elements of the notice

analysis, Bariven has carried its burden of proof.  The evidence demonstrates that Bariven's

notice was both sufficient and timely; that it encouraged compromise by the parties; and that

Bariven's actions were animated by commercial good faith.

132.     To put Bariven's notice and good faith into context, it is important to understand the timing of shipments in Venezuela relative to the melamine announcement in China.  As of September 19, 2008, the date on which Bariven learned of the Chinese melamine scandal, five shipments of Exim milk had arrived in Venezuela, one in August and four in September.  JTX 194.  Eleven other shipments had already been dispatched from China but had yet to arrive in Venezuela.  The last of those shipments arrived by November 10, 2008.  *Id.*  Thus, when Bariven learned that Chinese milk manufacturers had been furtively adding melamine to milk products, 9,480 tons of Exim milk powder had already been dispatched from China to Venezuela, and over $45 million had already been paid for that milk.

133.     After securing the milk so it would not be distributed and seeking assurances from Exim that its powdered milk was not affected by the scandal, Bariven sought to hold a high-level meeting with the president of Exim to discuss issues raised by the melamine incident.  JTX 69.  Bariven requested this meeting on December 2, 2008 and, after delays requested by Exim, finally met with Exim's president on January 21, 2009.  JTX 69.  At the January 21 meeting and in subsequent discussions, Bariven informed Exim that it "wanted [Exim] to take the merchandise that was in Venezuela, return it to China and get new product that was free of melamine." Salges Testimony, March 15, 50:11-51:7; Azocar Testimony, March 17, 9:3-9:11; JTX 117; JTX 116 (January 21 Exim email confirms its understanding that Bariven expressed concerns about possible melamine contamination) and Salges Testimony, March 15, 100:10-101:3.

134.     Bariven's statements provided sufficient and timely notice under Fla. Stat. § 672.607(3)(a).  They were not mere "expressions of discontent" but rather communications that informed Exim that "the transaction [was] claimed to involve a breach, and thus open[ed] the way for normal settlement through negotiation."  *See Eastern Air Lines* 532 F.2d at 976.  That

these communications opened the door to settlement discussions is amply supported by the evidence introduced at trial.  It is quite clear that the tenor of the January 21 meeting was one of a buyer and seller coming together to resolve problems posed by the melamine scandal.  Mr. Salges testified that Exim agreed to suspend future shipments for thirty days to allow Bariven to work through its issues with the Ministry of Health.  Salges Testimony, March 15, 103:4-17.  Meanwhile, Bariven agreed to extend the Girobank letter of credit for 60 days as a sign of good faith.  JTX 122; Azocar Testimony, March 17, 13:9-13.  Moreover, the day after the meeting, Mr. Salges emailed Bariven, thanking it for the meeting and writing, "It is our RULE to meet our clients' needs and to develop the best communication with them to resolve problems as they arise, aiming at the best future for our commercial relations."  JTX 117.  This is exactly the type of communication that the UCC drafters sought to encourage through notification of breach, and to find that Bariven's notice was insufficient on these facts would be inequitable.

135.    Moreover, as Florida courts have stated, once of the important purposes of Section 672.607(3)'s notice provisions is to "protect[] the seller's right to inspect the goods." *General Matters, Inc. v. Paramount Canning Co.*, 382 So.2d 1262, 1264 (Fla. DCA 2d 1980) (citing J. White & R. Summers, *Uniform Commercial Code* § 11-9 at 344 (1972)).  As the *Paramount* court noted, "Section 672.515, Florida Statutes (1979) (U.C.C. s 2-515 (1972 version)), which codifies the inspection rationale, provides that either party may inspect, test and sample the goods including those in the possession or control of the other for the purpose of ascertaining the facts and preserving the evidence."  *Id.*  By providing Exim notice that it was testing the goods for melamine and would seek to return them if they were contaminated, then retaining the goods, Bariven protected Exim's right to conduct its own tests (a right that Exim chose not to exercise).

136.    Bariven continued to act in good faith following the January 21 meeting. Specifically, on January 29, it took samples of Exim's milk for testing and, in the face of conflicting results received in late February, rather than jump to a conclusion based on the higher test results, sent the same samples to additional laboratories for additional testing.  JTX 130, 156; PTX 52; DTX W.  After this confirmatory testing showed that the samples were definitely contaminated, Bariven continued to act in good faith.  Still hopeful that it could work out a business resolution, it requested a meeting to discuss the Milk Contract in light of the March 20th test results, and specifically indicated that it wanted to work with Exim to nationalize any milk that was suitable for human consumption.  JTX 157.

137.    In contrast to Bariven's good faith, the Court finds that Exim was engaged in bad faith conduct during this same time period.  In particular, after Bariven notified Exim that it had received test results and wanted to discuss them, and after Exim agreed to meet to discuss the results, Exim pushed the date of the meeting back by a matter of weeks only to file suit in the intervening time period.  Adding insult to injury, Exim has consistently made the argument that Bariven's failure to cancel the Milk Contract prior to Exim's commencement of the lawsuit should be held against Bariven.

138.    As for the final element—*injuries as a result of the breach*—the Court finds that the presence of melamine in Shipments 1-16 of Exim's milk rendered the milk worthless and unmerchantable such that Bariven has sustained damages as a result of Exim's breach of the implied warranty of merchantability.  Additional, specific findings as to Bariven's damages are dealt with separately in paragraphs 244-253.

139.    Accordingly, the Court finds that Bariven has carried its burden of proof with respect to its implied warranty claim and shall enter judgment in Bariven's favor to that effect.

ii.  *Bariven's Claim for Breach of the Milk Contract: Substantial Impairment of the Whole*

140.  Fla. Stat. §672.612(3) provides that "[w]henever nonconformity or default with respect to one or more installments substantially impairs the value of the whole contract there is a breach of the whole."

141.  Bariven contends that each of the fifteen shipments of Exim milk that it tested was nonconforming because of the presence of melamine and cyanuric acid and that, given the large volume of contaminated milk and the grave health consequences associated with ingestion of these substances, the nonconformity substantially impaired the value of the Milk Contract as a whole.  Accordingly, Bariven argues that Exim breached the Milk Contract as a whole.

142.  The question of "substantial impairment" generally presents a question of fact. *See Bill's Coal Co. v. Board of Pub. Utils.*, 887 F.2d 242, 247 (10th Cir. 1989); *Barrington Homes of Florida, Inc. v. Kelley*, 320 So. 2d 841, 843 (Fla. Dist. Ct. App. 1975) (substantial impairment "must be subjectively measured from the standpoint of the purchaser"); *see also Winterbotham v. Computer Corps, Inc.*, 490 So. 2d 1282, 1283 (Fla. Dist. Ct. App. 1986).  As for whether a nonconformity constitutes substantial impairment, the notes to Fla. Stat. §672.612 provide that substantial impairment of an installment "can turn not only on the quality of the goods but also on such factors as time, quantity, assortment, and the like.  It must be judged in terms of the normal or specifically known purposes of the contract."  Fla. Stat. §672.612, n.6. Here, the purpose of the contract from Bariven's perspective was to obtain milk to distribute to the Venezuelan public.

143.  The Court finds that Shipments 2-16 of powdered milk were substantially impaired because laboratory tests confirmed the widespread presence of melamine in each of

these shipments.  The Court also finds that the first shipment[19] of powdered milk was

substantially impaired, even in the absence of melamine testing of this shipment, because of the

confirmed presence of melamine in each of the other fifteen shipments that departed China prior

to the Chinese melamine alert.  *See* ¶¶ 83-84.

144.    The Court finds that the confirmed presence of melamine in at least fifteen

shipments substantially impaired the value of the Milk Contract as a whole.  Those fifteen

shipments consisted of 8,980 metric tons of milk, or roughly 95% of the milk delivered and

accepted, 76% of the milk shipped (whether accepted or not), and 35% of the total contract

volume.  (Including Shipment 1, this raises the percentages to 100%, 80%, 36%, respectively).

In light of the grave health consequences associated with the ingestion of melamine, Bariven

could not in good conscience distribute the milk in those fifteen shipments for human

consumption.  The milk contained in these shipments was worthless to Bariven (and to any other

potential buyer).  Accordingly, unless Exim was willing to replace these fifteen shipments (and

there is no evidence that Exim would have done so), the amount paid by Bariven for these

shipments was a total loss.

145.    Bariven paid $45,361,800 for milk Shipments 1-16, which represented 9,480

metric tons of milk, or over a third of the total payment and tonnage required by the contract.

JTX 194.  This substantially impaired the value of the contract as a whole.  *See* Fla. Stat. §

672.612.  By way of contrast, impairment to a fraction of one installment (20% of one order,

where the order "covered only $41,250 of the nearly $9 million contract"—in other words, only

---

[19] The Court is mindful of Exim's assertion that Bariven distributed the first shipment of milk
through PDVAL.  Exim has offered no evidence to support this assertion, and the evidence
submitted by Bariven is to the contrary.  *See* JTX 191 at No. 8; Rodriguez Testimony, March 29,
132:25-134:16.  Therefore, the Court finds to a preponderance of the evidence that Bariven did
not distribute the milk from Shipment 1.

0.458% of the total contract value) was not a substantial impairment. *See Advanced BodyCare Solutions, LLC v. Thione Int'l, Inc.*, 615 F.3d 1352, 1361 (11th Cir. 2010).  Similarly, it did not substantially impair the value of the contract as a whole when a single shipment in a year-long installment contract was not made. *See Kirkwood Agri-Trade v. Frosty Land Foods Int'l, Inc.*, 650 F.2d 602, 604 (5th Cir. 1981).  Unlike the impairment to a small portion of a single installment in *Advanced BodyCare Solutions*, or the modest missing shipment in *Kirkwood Agri-Trade*, here the first $45,000,000 in milk shipments, representing thirty-five percent of the total contract value, was a total loss.

146.    The Court is not persuaded by Exim's argument that the presence of melamine and cyanuric acid do not necessarily render these shipments nonconforming.  To the contrary, the Court interprets the contract language as Bariven urges—*i.e.*, that no amount of any toxic substance is permitted since the product was ultimately intended for human consumption—and finds that melamine and cyanuric acid are toxic substances.  moreover, each of these fifteen shipments tested positive for melamine and cyanuric acid at levels that pose an unacceptable risk to human health (*i.e.*, 0.324 ppm).  Even assuming that melamine and cyanuric acid should be deemed  toxic only at levels above 2.5 ppm, as Exim contends, numerous samples of Exim's milk exceeded even that level.  Fourteen of the fifteen shipments contained combined melamine/cyanuric acid readings above 2.5 ppm, with some samples showing melamine levels of over 1,000 ppm.

147.    Exim defends Bariven's claim for substantial impairment of the Milk Contract by raising the following defenses: (1) that Bariven's tests were unreliable and, therefore, Bariven has failed to prove nonconformity and (2) that Bariven failed to give Exim proper notice of

rejection or revocation of any nonconforming installments and that Bariven furthermore failed to notify Exim of cancellation of the Milk Contract.

148.     Having carefully reviewed the evidence and the law, the Court concludes that Bariven has carried its burden of proving a nonconformity that substantially impaired the value of the Milk Contract as a whole and has met its notification obligations.  The Court previously found, as a factual matter, that the test results are reliable and the milk is demonstrably contaminated (*see* ¶¶ 82-84), and so Exim's first argument is rejected.

149.     Mindful of the important role of notice under the UCC, the Court concludes that Bariven met the applicable requirements under the UCC for notifying a seller of a nonconformity that substantially impairs the value of an installment contract.  The Court is equally satisfied that, under the facts and circumstances of this case, Exim was fairly and reasonably apprised of Bariven's concerns regarding melamine contamination and, more importantly, suffered no prejudice based on the timing of sampling and testing or the a lack of earlier more formal notice.  To deny Bariven relief based on Exim's notice arguments would be particularly unjust under these circumstances because, as the trial evidence shows, Exim withheld from Bariven information that it learned from its Chinese suppliers that cast serious doubt on the quality and safety of the milk even as Bariven attempted in good faith to work out a resolution of the difficulties posed by the Chinese melamine scandal.

150.     The Court concludes that, where an installment contract is involved, a buyer claiming substantial impairment of the whole must provide the seller with general notice of breach, like the notice of breach required under an implied warranty claim—not the more particularized notice of rejection and/or revocation of each nonconforming installment, as Exim urges.  The "substantial impairment" provision of Fla. Stat. §672.612(3) does not include an

explicit notification requirement.  This is in contrast to the sections governing rejection and revocation of acceptance.  *See* Fla. Stat. § 672.602 (rejection) and Fla. Stat. § 672.608 (revocation).  Bariven argues—and the Court agrees—that the absence of a notification provision in §672.612(3) makes sense because the underlying purpose of requiring notification (*i.e.*, providing sellers an opportunity to cure) is not normally relevant in the substantial impairment context.  Section 672.612 makes clear that nonconformities that substantially impair the value of a contract are not subject to an automatic right to cure.  *See* Fla. Stat. § 672.612(2) (limiting seller's right to prevent a buyer's rejection of a nonconforming installment by providing assurances of cure only to those nonconformities that "do[] not fall within subsection (3)").

151.    Like the notice standard governing the implied warranty claim (*see* ¶¶ 122-137), in the substantial impairment context, notice of breach must be both timely and sufficient under the circumstances and is governed by the buyer's obligation to act in good faith.  *See Royal Typewriter Co. v. Xerographics Supplies Corp.*, 719 F.2d 1092, 1102 (11th Cir. 1983) (citing Fla. Stat. §§ 671.203, 672.103).

152.    Applying these provisions to the facts and circumstances of the case, for the same reasons as set forth in ¶¶ 122-137, the Court concludes that Bariven sufficiently notified Exim of breach within a reasonable time after it discovered or should have discovered the contamination of the milk.

153.    As soon as Bariven had reason to question whether the milk delivered by Exim might contain melamine, Bariven notified Exim of its concerns and continued to communicate with Exim regarding the troubling nature of the transaction right up to the point at which Exim filed the instant action.  *See* ¶¶ 26, 56-58, 73-74.  This course of conduct between Bariven and

Exim from the time that the Chinese melamine scandal came to light provided Exim with the notice required by Fla. Stat. § 672.607.

154.   Exim's argument that Bariven's "delayed" notification somehow prevented it from being able to "cure" is not grounded in the evidence.  There was no way to remove the melamine, nor could anyone in good conscience have sold the contaminated milk to a third party.  The only possible cure for such widespread melamine contamination would have been complete replacement or refund, something Exim would not do.  Moreover, Exim's other argument, that its suppliers would have accepted a return of the milk had they been notified of a problem, is nothing more than a red herring.  *See* ¶ 66.

155.   Having found that Bariven sufficiently and timely notified Exim of breach, the Court next addresses Exim's argument that Bariven's substantial impairment claim must fail because Bariven did not cancel the Milk Contract prior to commencement of this lawsuit.  Even assuming that cancellation is a formal prerequisite to asserting a claim under Fla. Stat. §672.612(3), the UCC gives a buyer a "reasonable" amount of time to provide notice of cancellation and provides that certain conduct extends the time period by which notice of cancellation must be given.  Specifically, the UCC provides "[a] reasonable time for notifying cancellation … extends of course to include the time covered by any reasonable negotiations in good faith" and that "a buyer who accepts a non-conforming installment which substantially impairs the value of the entire contract should properly be permitted to withhold his decision as to whether or not to cancel pending a response from the seller as to his claim for cure or adjustment."  Fla. Stat. § 672.612, n.7.  Both of these conditions are present here.  First, the evidence shows that Bariven engaged in good faith with Exim from the moment it learned of the melamine scandal to the date Exim filed suit and that this conduct was reasonable in light of

Exim's apparent cooperation.  *See* ¶¶ 130-137.  Second, the evidence shows that Bariven's

president, Mr. Kabboul, made a specific request for cure or adjustment (*i.e.*, return of goods

shown to be contaminated in exchange for a credit on the Milk Contract or other contracts) at the

January 21 meeting and in subsequent discussions the following day, *see* ¶ 57, and that this

request was outstanding as of April 7, 2009, the date on which Exim filed suit.

156.     Exim's lawsuit had the effect of cancelling the Milk Contract.  *See* Fla. Stat.

§672.106 (cancellation occurs "when either party puts an end to the contract for breach by the

other").  Thus, any notification requirement on Bariven's part thus became a moot point.  *See*

*Validsa, Inc. v. PDVSA Services, Inc.*, Nos. 10-11209; 10-11251, Slip Op. at n. 12 (11th Cir.,

Apr. 21, 2011); *Advanced Bodycare Solutions*, 615 F.3d at 1363 n.24 (noting that date of

defendant's termination letter was not relevant because plaintiff had already filed suit); *Surgical*

*Sales Corp. v. Heyer-Schulte Neurocare, L.P.*, Civ. A. 98-5813, 1999 U.S. Dist. LEXIS 10549,

at *11 (E.D. Pa. July 15, 1999) (noting that plaintiff's suit for breach of contract constituted a

cancellation as defined by the UCC); *Bellsouth Telesensor v. Information Sys. & Network Corp.*,

Civ. No. 92-9355, 92-2437, 1995 U.S. App. LEXIS 24802, at *15 (4th Cir. 1995) (unpublished

table decision reported at 65 F.3d 165) (noting that seller's lawsuit for breach obviated the need

for immediate notification of revocation).  In any event, Bariven notified Exim of cancellation at

the latest by way of its counterclaim, in which it alleged delivery of melamine-adulterated milk

and sought repayment of all sums paid to Exim under the Milk Contract.  Such notification was

seasonable in light of Bariven's good faith negotiation and outstanding request for adjustment.

157.     As the Court finds for Bariven on the basis of substantial impairment, it need not

address other theories of recovery, including whether Bariven rightfully revoked or rejected

acceptance of the contaminated milk installments.  However, were the Court to address

Bariven's alternative arguments, it would find that Bariven properly revoked its acceptance of Shipments 1-16 and rejected Shipments 17-22.  Accordingly, Bariven is entitled to damages under §§672.711(1), 672.713, and 672.715.

        *iii.*    *Revocation of Acceptance (Shipments 1-16)*

158.    Bariven's claim that it revoked acceptance of Shipments 1-16 is based on Fla. Stat. §672.608, which provides that a buyer may revoke acceptance of a lot or commercial unit whose nonconformity substantially impairs its value to the buyer "if her or his acceptance was reasonably induced either by the difficulty of discovery before acceptance or by the seller's assurances."  Fla. Stat. §672.608(1)(b)

159.    Bariven contends that after accepting the first sixteen shipments of milk, it learned that at least fifteen of those shipments were contaminated with melamine and cyanuric acid and that the presence of those substances substantially impaired the value of each of the first sixteen shipments.  Bariven contends that its acceptance of those shipments was reasonably induced by the difficulty of discovery because, prior to the Chinese government's announcement regarding melamine adulteration of powdered milk products, it had no reason to suspect that the milk contained melamine or cyanuric acid and that the presence of those substances is not readily apparent upon inspection and were not routinely tested for prior to the alert.

160.    Exim defends Bariven's claim for revocation of acceptance by raising the following defenses: (1) that Bariven's tests were unreliable and, therefore, Bariven has failed to prove nonconformity and (2) that Bariven failed to give Exim seasonable notice of revocation.

161.    Having carefully reviewed the evidence and the law, the Court concludes that Bariven has carried its burden of proving that it properly revoked acceptance of Shipments 1-16. The Court previously found, as a factual matter, that the test results are reliable and demonstrated

that the milk was contaminated and unfit for human consumption (*see* ¶¶ 82-84), and so Exim's first argument is rejected.

162.    The Court concludes that the presence of melamine and cyanuric acid in at least fifteen of the first sixteen shipments (all of which were sent prior to the Chinese government's announcement regarding widespread melamine contamination) substantially impaired the value of those shipments.  Knowing that melamine-contaminated milk products had caused death and serious injury to children in China, Bariven could not use the milk for its intended purpose.

163.    The Court is not persuaded by Exim's argument that Bariven failed to provide seasonable notice of revocation.  The UCC provides that revocation must occur "within a reasonable time after the buyer discovers or should have discovered the ground for it and before any substantial change in condition of the goods which is not caused by their own defects."  Fla. Stat. §672.608(2).  This notice standard is more particularized than the general notice standard required under Fla. Stat. § 672.607 for breach of warranty and substantial impairment claims.  In particular, "[t]he content of the notice under subsection (2) is to be determined in this case as in others by considerations of good faith, prevention of surprise, and reasonable adjustment. More will generally be necessary than the mere notification of breach required under the preceding section."  Fla. Stat. § 672.608, n.5.  Additionally, the seller's assurances act to extend the reasonable time in which the buyer may revoke acceptance pursuant to Fla. Stat. § 672.608.  *See GNP Commodities, Inc. v. Walsh Heffernan Co.*, 95 Ill. App. 3d 966, 973-74 (1981) (relying on seller's false assurances in finding that two month delay was reasonable to revoke acceptance of frozen pork bellies).

164.    Applying these provisions to the facts and circumstances of the case, for the same reasons as set forth in ¶¶ 132-137, the Court concludes that Exim's filing of this lawsuit after

being asked to meet with Bariven regarding melamine test results obviated the need for formal notice and, in any event, Bariven provided formal, seasonable notice no later than July 6, 2009, when it filed its counterclaim.

165.     Further, the Court is not persuaded by Exim's argument that Bariven's revocation was untimely because the milk itself was perishable.  Exim and its dairies represented to Bariven that the milk contained in these and subsequent shipments had an expiration date of one year. The 25kg bags of milk delivered by Exim were stamped with an expiration date one year after the production date and stated that the milk should be stored in a cool, dry place.  Pursuant to these instructions, Bariven stored the milk in warehouses that were cool and dry.  *See* DTX D at EX-VS00020; Rodriguez Testimony, March 29, 130:14-131:25; Bello Testimony, March 29, 20:17-21.[20]  Under the UCC, "the buyer may not revoke his acceptance if the goods have materially deteriorated except by reason of their own defects. *Worthless goods, however, need not be offered back. . . .*"  Fla. Stat. § 672.608, n.6.  In this case, given the extensive melamine and cyanuric acid contamination in at least fifteen of Exim's shipments, the goods were worthless and any passage of time was irrelevant.

166.     Accordingly, the Court finds that Bariven properly and seasonably revoked acceptance of milk Shipments 1-16 under Fla. Stat. § 672.608.

---

[20] The Court does not credit Mr. Salges' testimony that he observed the milk containers at Puerto La Guaira "in an open area in the port" in light of statements elicited during his cross-examination, in which he admitted that at least the first seven shipments of Exim's milk were discharged to Puerto Cabello and not Puerto La Guaira.  A review of the bills of lading for all sixteen shipments reveals that all were discharged to Puerto Cabello.  PTX 14-29 (containing bills of lading).  Mr. Salges testified that he never viewed milk containers at Puerto Cabello. Salges Testimony, March 15, 118:10-124:1.  Judith Bello, Bariven's Customs Leader, provided the only credible testimony regarding the storage conditions for the milk, indicating that it was stored in large, cool warehouses at the port.  Bello Testimony, March 29, 20:17-21.

### E.   Milk Contract Claims: Shipments 17-22

#### i.   Rejection (Shipments 17-22)

167.   Bariven's claim that it rejected Shipments 17-22 is based on Fla. Stat. §672.612(2), which provides that a buyer may reject an installment if (1) the installment does not conform to the requirements of the contract and the nonconformity substantially impairs the value of the installment; (2) rejection occurs within a reasonable time after delivery; and (3) the seller does not give adequate assurances that it will cure the nonconformity.  *See* Fla. Stat. §672.612(2).

168.   The Court finds that the Milk Contract's provision requiring Exim to send the delivery schedule and plant locations to PSI in order for PSI "to know the logistics and coordinate the inspections" and the related provisions requiring an inspection release issued by PSI's designated inspector before the goods could be loaded to leave China were intended to assure the buyer of the safety of the products it was purchasing and thus permitted the buyer—not the seller—to control and coordinate the inspections.  After the melamine alert, and given the large volume of goods, the cost, burden, time and risk involved in transportation from China to Venezuela, and the time, burden and expense in inspection, sampling and testing, allowing these inspections to take place in China was reasonably a matter of great significance to Bariven.  *See* ¶ 48 above.

169.   The Court further finds that Exim's failure to permit PSI to conduct inspections pursuant to the Milk Contract constituted a substantial impairment of the Milk Contract as a whole under §672.612 because, without control over pre-shipment inspections as provided in the Milk Contract, Bariven could not be confident in the milk's safety for distribution, and because Exim's unilateral decision imposed substantial burden, cost and risk on Bariven.  *See* ¶ 48.

170.     Despite Bariven's unequivocal insistence that Exim comply with the Milk Contract's inspection provision on November 17, 2008, Exim dispatched Shipments 17-22 starting on December 11, 2008 without PSI-supervised inspections.  That Exim ignored PSI's November 17, 2008 email (*see* ¶¶ 50-51) and sent the shipments without PSI-coordinated inspections would have created suspicion in the mind of any reasonable person regarding whether the milk contained melamine.

171.     As to the notice required for rejection, the UCC states that rejection of goods "must be within a reasonable time after their delivery or tender. It is ineffective unless the buyer seasonably notifies the seller."  Fla. Stat. § 672.602(1).

172.     In this case, Bariven provided Exim proper notice of rejection on January 20, 2009, stating that "[a]ny recent sending of this product without PSI's supervision is rejected because it is [in] violation to what is established in the purchase order under the inspection terms supervised/coordinated by PSI."  JTX 114 (emphasis added).

173.     There is no dispute that Shipment 17 was rejected along with Shipments 18-22. Stip. of counsel, March 31, 67:15-21.

174.     And, although Exim argues that Bariven had waived the inspection requirement by its course of performance during the summer of 2008, the Court finds that argument beside the point.  The Court finds that, even if such prior conduct amounted to a waiver, Bariven subsequently retracted such a waiver pursuant to Fla. Stat. § 672.209(5) by providing reasonable notification through the November 17th email communication that strict performance of the inspection requirement would thereafter be required.

175.     The UCC permits a buyer to retract a waiver "by reasonable notification received by the other party that strict performance will be required of any term waived, unless the

- 61 -

retraction would be unjust in view of a material change of position in reliance on the waiver." Fla. Stat § 672.209(5).  The UCC definitions of "notice" and "notification" demonstrate that there are no magic words required of a party to retract a waiver and that, as a matter of policy, the UCC does not impose a heavy burden on a party wishing to retract a prior waiver.  Instead, the UCC requires such a party to take *reasonable* steps to communicate that strict compliance with a contractual provision previously waived will thereafter be required.  Under the UCC, a person "notifies" or "gives notification" to another person by "taking such steps as may be reasonably required to inform the other person in ordinary course, whether or not the other person actually comes to know of it."   Fla. Stat § 671.201(26).  A person "receives notification" when it "comes to that person's attention" or "is duly delivered in a form reasonable under the circumstances at the place of business through which the contract was made or at another location held out by that person as the place for receipt of such communications."  *Id.*

176.    At trial, Exim argued that the November 17 email did not constitute a retraction because it was a form email apparently sent to multiple vendors, not just Exim.  In light of the UCC provision defining the means by which parties appropriately give and receive notification, Fla. Stat § 671.201(26),  the Court is not persuaded by Exim's argument.  The touchstone of Section 201 is reasonableness.  To the extent that Bariven waived a common contractual provision with multiple vendors and wanted to retract those waivers across-the-board, it was reasonable for Bariven to notify its vendors using the same language, provided that such language reasonably put the sellers on notice of the waiver being retracted.  Accordingly, the fact that the November 17 email was a "form letter" does not foreclose Bariven's reliance on it here as a valid retraction of waiver.  The sufficiency of the notice stands or falls based on whether the

content reasonably put Exim on notice that strict compliance with the inspection requirement would thereafter be required—not on whether the email was sent solely to Exim.

177.    The Court finds that the November 17 email was sufficient to put Exim on reasonable notice of the retraction.  It is undisputed that Exim received the November 17th email indicating that future milk shipments would not be accepted unless there was "an inspection release document issued by the inspector or the inspection agency assigned by PSI and under its supervision."  JTX 72.  As discussed above, the Court does not credit Mr. Salges' testimony that PSI personnel informed him orally that this reinstated requirement did not apply to Exim.  *See* ¶ 47 above.  Moreover, Exim presented no evidence at trial that it materially changed its position with regard to future shipments as a result of Bariven's waiver of the inspection requirement in the summer of 2008.  Exim resumed milk shipments on or about December 11th; therefore, Bariven's November 17th email allowed Exim sufficient time to at least provide Bariven with dairy locations or a schedule of future loadings such that PSI could arrange to have inspections done in China.  *See Cassidy Podel Lynch, Inc. v. SnyderGeneral Corp.*, 944 F.2d 1131, 1147 (3d Cir. 1991) (under UCC § 2-209, seller could retract its waiver of 30-day payment term with respect to future shipments in installment contract).

178.    The Court finds that Exim never offered any cure of its breach with respect to Shipments 17-22.  *See Midwest Mobile Diagnostic Imaging, L.L.C. v. Dynamics Corp. of Am.*, 965 F. Supp. 1003, 1015 (W.D. Mich. 1997) (holding that buyer's rejection of an installment was rightful where seller failed to offer cure and rejecting seller's contention that buyer was required to request assurances).  In fact, by the time of Exim's mid-January communications regarding inspections, Shipments 17-22 had already been loaded and dispatched from China.  JTX 194.

179. Further, although Exim faults Bariven for failing to test Shipments 17-22, the Court finds that having properly rejected these shipments, the powdered milk was not Bariven's to sample or test – the milk belonged to Exim. If Bariven were to have opened these containers, removed bags and sampled their contents, Exim would likely now claim that Bariven exercised ownership over the shipments. *See* Fla. Stat. § 672.602(2)(a) ("[a]fter rejection any exercise of ownership by the buyer with respect to any commercial unit is wrongful as against the seller)". In fact, a buyer who has rejected goods who "takes any action which is inconsistent with the claim that the goods have been rejected risks accepting the goods." *Ford v. Starr Fireworks*, 874 P.2d 230 (Wyo. 1994); *see* Fla. Stat. § 672.602(2)(c) ("The buyer has no further obligations with regard to goods rightfully rejected").

### F. Exim's Claim for Anticipatory Repudiation of the Milk Contract

180. Exim previously based its claim for anticipatory repudiation under Fla. Stat. §672.609, arguing throughout its pre-trial submissions that Bariven's failure to provide adequate assurances in response to its March 19 demand letter constituted anticipatory repudiation of the Milk Contract. Now, Exim seeks to argue its anticipatory claim under the common law standard set forth under Fla. Stat. §672.610. Fla. Stat. § 672.610 provides that "[w]hen either party repudiates the contract with respect to a performance not yet due . . . the aggrieved party may" take certain steps that include treating the contract as breached. Section 610, however, does not itself define repudiation. *See* Fla. Stat. § 672.610. Instead, it incorporates the common law definition of repudiation, which is "an overt communication of intention or an action which renders performance impossible or demonstrates a clear determination not to continue with performance." *See* Fla. Stat. § 672-610, n.1; *see also Mori v. Matsushita Elec. Corp. of Am.*, 380 So. 2d 461, 463 (Fla. Dist. Ct. App. 1980) (explaining that under Florida common law,

"repudiation may be evidenced by words or voluntary acts but the refusal must be distinct, unequivocal, and absolute"); Restatement (Second) of Contracts, § 250.

181.     Exim now contends that Bariven's refusal to pay for milk Shipments 18-22, its failure to permit Exim to provide milk from other non-Chinese suppliers, and failure to send inspectors to China to inspect the remainder of Exim's milk demonstrated an intent not to perform under the Milk Contract and therefore constituted an anticipatory repudiation of the Milk Contract under § 672.610.

182.     In response, Bariven argues that it never demonstrated through its communications or actions that it would not perform under the Milk Contract.  To the contrary, Bariven contends that its actions demonstrated its ongoing, good-faith commitment to the Milk Contract.

183.     Based on the evidence, the Court agrees with Bariven that it did not communicate (overtly or otherwise) any intention or demonstrate by action that it would not perform under the Milk Contract.

184.     The Court first finds Exim's argument that Bariven's refusal to pay for milk Shipments 18-22 constituted an anticipatory breach of the Milk Contract to be without merit. First, the parties had previously agreed at the January 21 meeting to a 30 day period in which to sort out various issues related to the Milk Contract.  The fact that Exim made a claim to Girobank for payment for Shipments 18-22 immediately following the January 21 meeting despite this 30-day agreement should not be held against Bariven and does not indicate an unwillingness to perform under the Milk Contract on the part of Bariven.  *See* JTX 118.  Second, Exim was fully secure under the Milk Contract up to $12.4 million.  As Exim's claim to Girobank amounted to $9,570,000 for milk Shipments 18-22, Exim was secured by the letter of

credit. Finally, and for the reasons stated above, the Court finds that Bariven properly rejected Shipments 17-22 such that its non-payment for Shipments 18-22 (Bariven had already paid for Shipment 17) was reasonable. S*ee* ¶¶ 172-174 above.

185. Exim also contends that Bariven's refusal to permit Exim from using non-Chinese milk suppliers to fulfill the Milk Contract constituted an anticipatory repudiation of the Milk Contract. However, the state of the evidence confirms that 1) Exim offered to supply milk from countries including Argentina, New Zealand, Brazil, and Uruguay in its October 27 letter; 2) Bariven responded to this offer by requesting further information on October 29; 3) Bariven separately inquired whether it would be possible for Exim to substitute milk from India, the other country of origin specifically referenced in the Milk Contract; 4) On November 13, Exim subsequently informed Bariven that it would begin shipping milk from India within a few weeks; 5) Exim learned that the Chinese milk embargo would be lifted shortly thereafter, and began resuming milk shipments from China, thereby mooting its earlier request to source milk from alternate suppliers. *See* ¶¶ 35-37, 39-40. Exim's argument is therefore without merit.

186. Finally, Exim argues that Bariven's failure to send inspectors to China to inspect the remainder of Exim's milk demonstrated an intent not to perform under the Milk Contract and therefore constituted an anticipatory repudiation under § 672.610. As an initial matter, Shipments 17-22 were dispatched from China before Exim alerted Bariven that milk was available for inspection. There is no evidence that any other milk was ready for inspection beyond Shipment 23, and the supplier withdrew Shipment 23 from the port, as Exim's counsel conceded during closing argument. Closing Argument, March 31, 150:5-13. Therefore, Exim's argument is based solely on the communications in February 2009 regarding this shipment.

187.     When a party unambiguously states that it will not perform, it will be found to have anticipatorily repudiated the contract.  Although a clear statement of intent not to perform, or not to perform without receiving additional un-bargained for consideration will repudiate a contract, mere expression of a desire not to perform or a statement that performance will be difficult, will not.  *See, e.g.*, *Lantec, Inc. v. Novell, Inc.*, 306 F.3d 1003, 1014 (10th Cir. 2002) (voicemail message stating that executives wanted to terminate relationship was not sufficiently definite); In re *S.N.A. Nut Co.*, 247 B.R. 7, 18 (Bankr. N.D. Ill. 2000) (statement of concern about obtaining supply of almonds for one shipment did not repudiate entire contract).

188.     A party's actions can also form the basis for a claim of anticipatory repudiation. In order for an act to repudiate a contract, it must unambiguously demonstrate an intent not to perform, or must render performance impossible.  A seller who sells the goods to another buyer prior to the time for delivery repudiates the contract because it is no longer possible to deliver the goods promised.  *See* 1 White & Summers, *supra* § 6-2, at 382, n.37 (citing *Allen v. Wolf River Lumber Co.*, 169 Wis. 253 (Wis. 1919)).

189.     The Court finds that: (1) Bariven never overtly stated or communicated an unwillingness to perform; rather, Bariven's communications with Exim were in fact consistent with its desire to continue performance; (2) Bariven's actions did not demonstrate an unambiguous intention not to perform and did not in any case render Exim's performance impossible; and (3) Bariven did in fact make efforts to continue performance under the Milk Contract.

190.     Exim's February 13, 2009 email to PSI in which Ms. Guevara requested that PSI order the appropriate inspections occurred during the 30-day hiatus period that the parties had agreed to at the January 21 meeting.  JTX 140.  PSI nevertheless responded to this email on

February 17, 2009, indicating that it was awaiting instructions from Venezuela regarding how to proceed.  JTX 142.  There is no evidence indicating that Bariven or PSI communicated any refusal to arrange for inspections in China.

191.    To the contrary, the evidence indicates that Bariven was making efforts to continue performance under the Milk Contract and specifically, to begin inspections of Exim's milk in China.  After the January 21 meeting, Bariven began making arrangements to conduct inspections on Exim's milk in China, a fact which Mr. Salges acknowledged during his testimony.  Azocar Testimony, March 17, 34:20-35:8 ("I understand that Eusebio requested the inspections."); Salges Testimony, March 15, 36:1-3 ("They were trying but never occur").  Bariven's efforts to arrange inspections cannot reasonably be interpreted as an unambiguous expression of an intention not to perform.

192.    Leaving aside Bariven's efforts to arrange for inspections, Bariven made a number of other efforts to continue its performance under the Milk Contract.  Bariven repeatedly requested to meet with Exim to discuss the Milk Contract and resolve the issues in an amicable manner.  For example, in his letter dated March 27, 2009, Bariven's president, Georges Kabboul, requested an urgent meeting at Bariven's offices to discuss the status of the Milk Contract in light of the melamine alert.  Mr. Kabboul wrote that "[w]e are sure that in this meeting we will be able to establish the mechanisms that will make the nationalization possible, as well as the subsequent payment of all shipments that are fit for human consumption."  JTX 157.  Mr. Kabboul's statement reflects an ongoing commitment to the Milk Contract and, in light of the facts and circumstances existing at the time, constituted an overt communication or intent to perform.

193. The fact that Bariven agreed to a second extension of the Girobank letter of credit on or around the date of Mr. Kabboul's letter only further highlights Bariven's commitment to the Milk Contract. (Bariven previously extended the letter of credit following the parties' meeting of January 21, 2009). JTX 122, 126; Salges Testimony, March 15, 2011 at 103:18-104:21; Azocar Testimony, March 17, 2011 at 13:9-13:13.

194. Against this factual backdrop, there is no indication that Exim expressed dissatisfaction with Bariven's response. To the contrary, when Bariven followed up its March 27 letter with another letter requesting a meeting at Bariven's offices (in a letter from Mr. Kabboul dated April 2, 2009), Mr. Salges, responded promptly on April 3 that he intended to travel to Caracas for the meeting, although he indicated that due to a shortage of flights the meeting would have to take place after April 16. Exim then filed this lawsuit on April 7. Under these circumstances, to decide that Bariven's actions were somehow insufficient to demonstrate Bariven's commitment to perform under the Milk Contract would subvert the concept of good faith at the heart of the UCC.

195. Finally, because § 672.610 incorporates the common law contract rules governing repudiation, it will not be available to a party that has already breached the contract. A party cannot sue for anticipatory breach unless that party could perform as promised under the contract. *See, e.g.*, *Hosp. Mortg. Group v. First Prudential Dev. Corp.*, 411 So.2d 181, 183 (Fla., 1982) ("The holder of the duty based upon a condition precedent cannot profit from an anticipatory repudiation of a contract that he would have breached himself."); *Porkolab v. Smithbay Homes, Inc.*, 640 So.2d 195, 196 (Fla. App. Dist., 1994) (holding that where seller could not perform condition precedent, buyer's cancellation of a contract to purchase real estate did not constitute anticipatory repudiation).

196.     As discussed in detail above, ¶¶ 117-120, Exim was already in breach of the Milk Contract in September and October 2008, when it completed delivery of at least 15 shipments of powdered milk contaminated with melamine and cyanuric acid, and again in December 2008 and January 2009, when it ignored Bariven's written reinstatement of the contractual provision requiring pre-shipment inspection under PSI's supervision.  Since Exim was in breach of the Milk Contract, it cannot rely on Fla. Stat. § 672.610 to prove that Bariven anticipatorily repudiated the Milk Contract.

197.     Based on the Court's conclusion that Exim had already breached the Milk Contract, Exim's anticipatory repudiation claim must fail.

198.     Although Exim appears now to have abandoned its anticipatory repudiation claim under Section 672.609, the Court will briefly address this issue.  Fla. Stat. § 672.609 provides that  "[w]hen reasonable grounds for insecurity arise with respect to the performance of either party the other party may in writing demand adequate assurances of due performance and until he or she receives such assurance may if commercially reasonable suspend any performance for which he or she has not already received the agreed return."  Fla. Stat. §672.609(1).  Upon receipt of a justified demand, failure by the receiving party to "provide within a reasonable time not exceeding 30 days such assurance of due performance as is adequate under the circumstances of the particular case is a repudiation of the contract."  Fla. Stat. §672.609(4).

199.     Exim previously argued that it had reasonable grounds for insecurity as of March 19, 2009; that its letter to PSI dated March 19, 2009 constituted a justified demand for adequate assurances of performance with respect to the Milk Contract; that Bariven did not provide adequate assurances of performance within a reasonable time after receiving the letter; and that Bariven therefore repudiated the Milk Contract.

200.     Bariven raised two defenses to Exim's claim that Bariven anticipatorily repudiated the Milk Contract.  First, Bariven argued that Exim was in breach of the Milk Contract when it sent its demand letter of March 19, 2009 and, accordingly, was not entitled to invoke Fla. Stat. §672.609 to construct an anticipatory repudiation claim against Bariven. Second, Bariven argued that, even if Exim were entitled to invoke Fla. Stat. §672.609, Bariven's response to the letter provided assurances of performance that were adequate under the circumstances.

201.     Based on the evidence, the Court agrees with Bariven and concludes that Exim was already in breach of the Milk Contract when it sent its March 19, 2009 demand letter. Consequently, this case is governed by *Advanced Bodycare Solutions*, in which the Eleventh Circuit held that a party already in breach is not entitled to invoke section 2-609 of the UCC by demanding assurances.  *Advanced Bodycare Solutions,* 615 F.3d at 1361 (noting that to allow a breaching party to invoke Section 2-609 would "allow a party to avoid liability for breaching its contracts").

202.     The Court's conclusion that *Advanced Bodycare Solutions* precludes Exim's reliance on Fla. Stat. §672.609 is not affected by the fact that, as of the date of Exim's letter, the presence of melamine had not yet been confirmed.  The nonconformity of Exim's milk was present when Exim shipped the product, when Exim failed to make Bariven aware of red flags suggesting contamination, when Exim repeatedly assured Bariven of the quality of the milk, and when Bariven sampled and tested the product in January 2009.  Exim was aware as of March 19 that Bariven and the Venezuelan Health Ministry had concerns about the product and, as a result, were conducting melamine tests.  Moreover, the evidence shows that Bariven had received test results from Silliker on February 24—prior to the date of Exim's letter—showing high levels of

contamination but refrained from communicating those results to Exim while it engaged two additional labs to confirm the results.  Under these circumstances, the Court is satisfied not only that Exim was in breach of the Milk Contract as of March 19, but that Exim was fairly on notice of breach and, therefore, that Exim ought not to escape liability for its breach by invoking Fla. Stat. §672.609 to demand assurances of Bariven.

203.    The Court is not persuaded by Exim's arguments that the principle espoused in *Advanced Bodycare Solutions* does not apply to the facts of this case.  Exim seeks to distinguish the cases upon which the *Advanced Bodycare Solutions* court relied because those cases dealt with situations in which the demanding parties were motivated to get out of contracts in order to enter into potentially more lucrative contracts.  However, there is no indication that the demanding party in *Advanced Bodycare Solutions* sought to get out of its contract to enter into a more lucrative one; to the contrary the party there sought to renegotiate the contract.  *Advanced Bodycare Solutions*, 615 F.3d at 1357.  Exim also contends that the principle that a party in breach may not invoke §672.609 "is unworkable in the installment contract context, unless the non-breaching party cancels the contract after the breach."  However, the contract at issue in *Advanced Bodycare Solutions* was an installment contract, and the party receiving the demand for assurances did not seek to terminate the contract until *after* the demanding party filed suit. *Advanced Bodycare Solutions*, 615 F.3d at 1363, n. 24.

204.    Based on the Court's conclusion that Exim was in breach of the Milk Contract at the time of its March 19 demand letter, Exim's anticipatory repudiation claim under §672.609 must also fail.

205.    Even assuming that Exim's breach did not preclude its reliance on Fla. Stat. §672.609, Exim still has failed to carry its burden of proving anticipatory repudiation.  Having

carefully reviewed the evidence, the Court finds that Bariven's response to Exim's March 19th letter provided assurances of Bariven's performance that were adequate under the circumstances.

206.    Exim's letter of March 19, 2009 demanded that Bariven pay for past shipments and that Bariven "receive and pay for the remaining 13,220 metric tons of powdered milk."[21]

207.    The payment of sums associated with shipments made in December 2008 and January 2009 is not relevant to this Court's analysis of Exim's anticipatory repudiation claim on the Milk Contract.  As discussed below, Exim breached the Milk Contract by dispatching these shipments without inspection by an agency under PSI's supervision.  Upon learning that Exim had ignored its instruction in November 2008 not to send additional shipments without PSI-supervised inspections, Bariven properly rejected the shipments associated with the allegedly past-due sums cited in Exim's demand letter.  Accordingly, these sums were not yet owed, and unless and until Exim cured the nonconformity, Bariven was not obligated to make payment.

208.    As for Exim's demand that Bariven "receive and pay for the remaining 13,220 metric tons of powdered milk," Florida law provides a party such as Bariven "a reasonable time not exceeding 30 days" to provide adequate assurances of performance.  Fla. Stat. §672.609(4). This does not mean that Bariven had thirty days to "receive and pay for" all of the outstanding shipments; it means merely that Bariven had to assure Exim of its commitment to the Milk Contract within a reasonable time after its receipt of the letter.  *See Scott v. Crown*, 765 P.2d 1043, 1047 (Colo. Ct. App. 1988) (rejecting demand for immediate payment because "demand for performance assurances cannot be used as a means of forcing a modification of the contract").  The statute "authorizes a demand for assurance of performance when grounds for

--------------------------------------------------------

[21] Exim's demand that Bariven withdraw certain statements allegedly made to Girobank is a side issue that does not go to contract performance and, therefore, is irrelevant to its claim for anticipatory repudiation.  In addition, the Girobank matter relates entirely to payment for the

insecurity arise" and only where "*adequate* assurance is not forthcoming" can an action be brought for breach.  *See Ford Motor Credit Co. v. Alachua Trading Co.*, 531 So. 2d 982, 984 (Fla. Dist. Ct. App. 1988) (emphasis added).

209.    For the reasons discussed above, *see* ¶ 71, the Court finds that Bariven's letter dated March 27, 2009 provided adequate assurances of performance.  Mr. Kabboul's statement reflects an ongoing commitment to the Milk Contract and, in light of the facts and circumstances existing at the time, constituted adequate assurances of performance.

210.    Finally, even assuming that Bariven's March 27 letter and other actions (including the extension of the Girobank letter of credit) were somehow insufficient to demonstrate Bariven's commitment to perform, Exim filed suit without giving Bariven 30 days to adequately assure (or further assure) Exim of its commitment to the Milk Contract.  Accordingly, Exim's claim on the Milk Contract fails.  *See* Fla. Stat. § 672.609(4), cmt. 5 ("[t]he thirty day limit on the time to provide assurance is laid down to free the question of reasonable time from uncertainty in later litigation").

### G.    Bariven's Claim for Breach of the Milk Contract's Implied Covenant of Good Faith and Fair Dealing

211.    In Florida, every contract contains an implied covenant of good faith and fair dealings.  *Burger King Corp. v. C.R. Weaver*, 169 F.3d 1310, 1315 (11th Cir. 1999).  A cause of action under the implied covenant may only be maintained where an express term of the underlying contract has been breached.  *Shibata v. Lim*, 2000 U.S. Dist. Lexis 20053, *14–19 (M.D. Fla. 2000) (citing *Burger King Corp.,* 169 F.3d at 1316–17) (requiring contract breach to sustain action for breach of covenant)).  In order to prove a breach of the implied covenant a party "must demonstrate a failure or refusal to discharge contractual responsibilities, prompted

---

properly-rejected Shipments 18-22.

not by an honest mistake, bad judgment or negligence; but, rather by a conscious and deliberate act, which unfairly frustrates the agreed common purpose and disappoints the reasonable expectations of the other party thereby depriving that party of the benefits of the agreement." *Id.* at *18 (internal citation omitted).

212.    Where there is a breach of the implied covenant, the aggrieved party may obtain damages resulting from the contract breach caused by the other party's deliberate and unfair actions. *Bookworld Trade, Inc. v. Daughters of St. Paul, Inc.*, 532 F. Supp. 2d 1350, 1359-60 (M.D. Fla. 2007) (indicating breach of contract provision as source of damages) (internal citation omitted).

213.    The Court has found that Exim breached the Milk Contract by supplying melamine-contaminated milk to Bariven, and by refusing to abide by the contractual inspection provisions with regard to Shipments 17-22.

214.    The Court further finds that by concealing or denying Bariven access to material information regarding the quality of its milk, Exim frustrated the common purpose of the Contract, which was to complete the purchase and sale of powdered milk free of toxic substances and fit for human consumption.  Deprived of critical information regarding the suspect quality of Exim's milk, Bariven was deceived into accepting the milk and continuing to work in good faith with Exim for months.

215.    In addition to the facts discussed above, the Court finds that, in light of the September 2008 melamine announcement, certain information that Exim learned early in its relationship with its milk supplier Dairygold raised red flags that Exim should have disclosed to Bariven in the wake of that announcement.  Exim's failure to bring these red flags to the

attention of Bariven constituted a departure from reasonable standards of commercial good faith and honesty in fact.

216.     Accordingly, the Court finds that Exim, through its course of conduct, breached the implied covenant of good faith and fair dealing contained in the Milk Contract such that Bariven is entitled to damages resulting from such a breach (including the amounts Bariven paid for shipments of powdered milk and subsequent storage and demurrage charges).

### H.     Bariven's Claim for Violation of FDUTPA

217.     The Florida Deceptive and Unfair Trade Practices Act ("FDUTPA"), Fla. Stat. §501.201, *et seq*., protects consumers and business enterprises from unfair or deceptive practices in the conduct of trade or commerce.  FDUTPA provides a party aggrieved of unfair or deceptive business practices actual damages caused thereby as well as reasonable attorney's fees.  Fla. Stat. §§501.2105, 501.211.

218.     To prove its claim for a violation of FDUTPA, Bariven must prove "(1) a deceptive or unfair practice; (2) causation; and (3) actual damages." *Siever v. BWGaskets Inc.*, 669 F.Supp.2d 1286, 1292–93 (M.D. Fla. 2009) (internal citations omitted).  "An unfair practice is 'one that offends established public policy' and one that is 'immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers.'" *PNR, Inc. v. Beacon Property Mgmt., Inc.*, 842 So.2d 773, 777 (Fla. 2003).  A deceptive practice is one that is likely to mislead consumers.  *Davis v. Powertel Inc.*, 776 So.2d 971, 974 (Fla. Dist. Ct. App. 2000).

219.     The Court finds that Bariven has carried its burden of proof on each of the required elements.  First, Bariven has shown by a preponderance of the evidence that Exim misled and deceived it by concealing material information from Bariven regarding the suspect quality of Exim's milk, and by continuing to affirm that its milk was melamine-free.  *See* ¶¶ 22-

- 76 -

24, 27-34.  As Bariven attempted to work in good faith to resolve any issues with the milk, it

remained unaware of an array of material information because of Exim's omissions.

220.    Second, Bariven has proven that Exim's concealment of material information

caused Bariven to suffer damages.   Specifically, Bariven has proven that, had it been made

aware of the information that Exim failed to disclose, it would not have been deceived into

accepting the milk and continuing to work in good faith with Exim for months.

221.    Accordingly, the Court finds that Exim, through its course of conduct in regard to

the Milk Contract, violated the provisions of FDUTPA such that Bariven is entitled to damages

resulting from such a violation (including the amounts Bariven paid for shipments of powdered

milk and subsequent storage and demurrage charges) in addition to reasonable attorney's fees

and costs and other expenses incurred.

### I.       Bariven's Claim for Breach of the Rice Contract

222.    Bariven's claim for breach of Rice Contract is based on two sections of the UCC:

Fla. Stat. §372.320(2) and Fla. Stat. §672.607.

223.    Section 372.320(2) provides that "[u]nless otherwise agreed…, the term C.I.F.

destination or its equivalent requires the seller at his or her own expense and risk to … [p]repare

an invoice of the goods and procure any other documents required to effect shipment or to

comply with the contract; and [f]orward and tender with commercial promptness all the

documents in due for and with any indorsement necessary to perfect the buyer's rights."

224.    Section 672.607 provides that "acceptance does not by itself impair any other

remedy provided by this chapter for nonconformity" and that, where a tender has been accepted,

a buyer may nevertheless sue for breach so long as it notifies the seller of breach within a

reasonable time after it discovers or should have discovered the breach.  Fla. Stat. §672.607(2)-

(3).

225.     Bariven contends that Exim breached the Rice Contract and failed to fulfill its obligations under Fla. Stat. §372.320(2) when, in January 2009, it delivered three shipments of rice to Venezuela without original export documents and thereafter consistently failed to provide those documents despite numerous requests for the original documents from PSI.  Bariven points out that the Rice Contract contained the delivery term "CIF Puerto Cabello / La Guaira, VE" and required that Exim provide Bariven "[o]riginal export documentation … seven (07) working days prior to the arrival of the freight at the first Venezuelan port of unlading."  JTX 24.

226.     Exim does not dispute that it failed to supply original export documents for these three shipments of rice for a period of approximately ten months, despite the fact that Bariven had already paid for the shipments and in spite of numerous requests through PSI for the documents.  Instead, Exim seeks to avoid liability by relying on two affirmative defenses: (1) waiver and (2) failure to mitigate damages.

227.     Before addressing Exim's defenses, the Court concludes that Bariven notified Exim of breach within a reasonable time after it discovered or should have discovered the breach.  Beginning in January 2009, PSI sent numerous emails to Exim notifying it that Bariven had not received original export documents, and that this was preventing it from obtaining the rice and causing it to incur storage costs.  *See* ¶ 94.

228.     Exim argued at trial that Bariven waived the contractual provision requiring original export documentation because, on certain occasions, Bariven accepted goods even though Exim provided the original export documents days or even weeks late.  Waiver is an affirmative defense and, as such, Exim has the burden of proof.  *See* Fed. R. Civ. P. 8(c) (including waiver as affirmative defense); *Legrande v. Emmanuel*, 889 So. 2d 991, 996 (Fla.

Dist. Ct. App. 2004) (noting that the burden on defendant to prove his affirmative defenses).  The Court concludes based on the evidence that Exim has failed to carry its burden.

229.     Waiver is the intentional or voluntary relinquishment of a known right, or conduct which infers the relinquishment of a known right.  *The Woodlands Civic Assoc., Inc. v. Darrow*, 765 So. 2d, 874, 877 (Fla. Dist. Ct. App. 2000) (internal citation omitted).  The essential elements of waiver are (1) the existence at the time of the waiver of a right, privilege, advantage, or benefit which may be waived; (2) the actual or constructive knowledge of the right; and (3) the intention to relinquish the right.  *Id.*  Waiver may be express, or implied from conduct or acts that lead a party to believe a right has been waived.  *Id.*  However, when waiver is to be implied from conduct, the acts, conduct, or circumstances relied upon to show waiver must make out a clear case.  *Id.*

230.     Exim has failed to prove that Bariven intentionally relinquished its contractual right to receive original export documents.  The trial record is replete with emails from PSI to Exim requesting original export documents in connection with rice shipments at issue.  *See* ¶ 94.  Exim does not dispute that Bariven asked Exim numerous times for the original export documentation and that, despite these requests, Exim failed to provide original export documentation to Bariven.  While Bariven may have waited for originals for a few days or weeks in some instances, Exim has offered no evidence that Bariven ever accepted rice from Exim with no original documents.  Bariven's previous willingness to wait for a short time for Exim to provide original documents does not support Exim's position; to the contrary it indicates that Bariven acted in good faith, was willing to work around minor delays without calling a halt to the entire contract, and was reasonable in waiting while storage charges mounted because Exim had always been able to provide originals previously.

231.    Exim argues that Bariven could have taken possession of the rice more quickly than it did, and thereby reduced the storage and demurrage costs, by utilizing a procedure called "*carta de compromiso*" or a letter of commitment.  This is a mitigation of damages argument for which Exim bears the burden of proof.  *See HGI Assocs. v. Wetmore Printing Co.,* 427 F.3d 867, 880–81 (11th Cir. 2005) (citing *Simeone v. First Bank Nat'l Assoc.*, 73 F.3d 184, 189 (8th Cir. 1996) ("The burden of proof rests with the seller to establish that the buyer acted unreasonably in failing to prevent his own loss").

232.    A *carta de compromiso* is a provision of Venezuelan law that permits nationalization in extraordinary circumstances without original export documents.  *See* Bello Deposition, 43:20-44:12.  The party seeking nationalization must provide an explicit commitment (*carta de compromiso*), in writing, to Venezuelan customs authorities that it will provide original export documents within a matter of days, or at most, within two to three weeks. *See id.*; Bello Testimony, March 29, 31:4-32:16.

233.    In light of the facts that Bariven repeatedly sought the original documents from Exim beginning in January 2009, that Exim was unable to provide them because it had not paid its supplier for the rice, and that Exim did not give Bariven any reasonable expectation that receipt of the original documents was imminent, it is manifestly unreasonable to expect Bariven to have made the representations required to utilize the "*carta de compromiso*" process to Venezuelan customs authorities in January 2009, February 2009, or at any time up until Bariven was actually in possession of the documents in October 2009.

234.    Bariven incurred storage and demurrage charges associated with these three shipments of rice.  Accordingly, the Court finds that Bariven has carried its burden of proof as to liability and is entitled to damages pursuant to Fla. Stat. §§ 762.714 and 672.715.

### J.      Exim's Claim for Anticipatory Repudiation of the Rice Contract

235.     Exim's claim for anticipatory repudiation is governed by Fla. Stat. §672.609, which is described above at ¶ 198.

236.     Exim contends that it had reasonable grounds for insecurity with respect to the Rice Contract as of April 8, 2009 because, as of that date, Bariven had not paid for several shipments of *milk* made in December 2008 and January 2009 (*i.e.*, Shipments 18-22). Exim does not contend that its grounds for insecurity were based on Bariven's performance under the Rice Contract, and in fact it concedes that, as of April 8, 2009, Bariven had paid in full for all shipments made (including the three without original export documents) under the Rice Contract. Although Exim filed suit against Bariven the previous day, April 7, 2009, it did not assert any claims related to the Rice Contract. It added a claim for anticipatory repudiation of the Rice Contract only after Bariven filed its counterclaim against Exim for its failure to provide original export documents.

237.     Exim contends that Mr. Salges' letter dated April 8, 2009 constituted a justified demand for adequate assurances of performance with respect to the Rice Contract; that Bariven did not provide adequate assurances of performance within a reasonable time after receiving the letter; and that Bariven therefore repudiated the Rice Contract. *See* JTX 163.

238.     Bariven raises three defenses to Exim's claim that it anticipatorily repudiated the Rice Contract. First, Bariven argues that Exim was in breach of the Rice Contract when it sent its demand letter of April 8, 2009 and, accordingly, was not entitled to invoke Fla. Stat. §672.609 to construct an anticipatory repudiation claim against Bariven. Second, Bariven argues that, even if Exim were entitled to invoke Fla. Stat. §672.609, Exim was not reasonably insecure with respect to Bariven's performance under the Rice Contract. Third, Bariven argues that Exim's letter dated April 8, 2009 was not a demand for adequate assurances.

239.    Based on the evidence, the Court agrees with Bariven and concludes that Exim was in breach of the Rice Contract when Mr. Salges sent his letter dated April 8, 2009. Consequently, this case is governed by *Advanced Bodycare Solutions*, in which the Eleventh Circuit held that a party already in breach is not entitled to invoke section 2-609 of the UCC by demanding assurances. *Advanced Bodycare Solutions*, 615 F.3d at 1361 (applying an identical provision of the Georgia UCC).

240.    Even assuming that Exim's breach did not preclude its reliance on Fla. Stat. §672.609, Exim still has failed to carry its burden of proving anticipatory repudiation. Having carefully reviewed the evidence, the Court finds that Exim was not reasonably insecure with respect to Bariven's performance under the Rice Contract. Exim concedes that Bariven had paid in full for all shipments of rice made pursuant to the Rice Contract. In addition, the evidence reflects that, as of April 8, 2009, only 3,000 metric tons of rice remained to be shipped under the Rice Contract and that Bariven had attempted to inspect those 3,000 metric tons of rice in Brazil, only to be turned away by the rice producer, Zaeli, because Exim had failed to pay Zaeli for shipments for which Bariven had already paid Exim. On these facts, the Court concludes that any insecurity felt by Exim was not reasonably related to Bariven's performance.

241.    Moreover, the Court finds that Exim's letter dated April 8, 2009 is not a valid demand for adequate assurances for performance on the Rice Contract. Florida law requires a written demand for adequate assurances. *See* Fla. Stat. § 672.609(4); *National Ropes, Inc. v. National Diving Serv., Inc.*, 513 F.2d 53, 61 (5th Cir. 1975) (holding that Florida law requires a written demand for assurances). Not all letters are sufficient to be deemed a request for assurances. *See, e.g. Scott v. Crown*, 765 P.2d 1043, 1046 (Colo. Ct. App. 1988) ("A mere demand for meeting to discuss the contracts, even if it had been in writing, would not be

sufficient to constitute a proper demand for assurances."); *SPS Indus. v. Atl. Steel Co.*, 336

S.E.2d 410, 414 (Ga. Ct. App. 1988) ("[I]t cannot be said that the letter constituted a demand for

adequate assurance as a matter of law.").  Other courts have held that in order to satisfy the

requirement, the written demand must be a "clear demand so that all parties are aware that,

absent assurances, the demanding party will withhold performance. An ambiguous

communication is not sufficient." *See Alaska Pacific Trading Co. v. Eagon Forest Prods., Inc.*,

933 P.2d 417, 421–22 (Wash Ct. App. 1997) (quoting 1 White & Summers, *supra* § 6-2 at 288)

(citing *Penberthy Electromelt  Int'l v. United States Gypsum*, 38 Wn. App. 514, 686 P.2d 1138)).

242.    Notably, the April 8 letter does not even mention the Rice Contract.  Instead, it

originally requests "payment for invoices past over due."  JTX 163.  The evidence adduced at

trial shows that Bariven had already paid Exim in full for all the rice shipped to Venezuela as of

April 8, 2009 and, therefore, no reasonable person could interpret this letter as relating in any

way to the Rice Contract.

243.    Because Exim has failed to show that it was reasonably insecure with respect to

Bariven's performance under the Rice Contract and has likewise failed to show that it sent

Bariven a request for adequate assurances, its claim for repudiation fails.

**K.    Damages**

*Bariven's Damages: Milk Contract*

244.    Based on the evidence, the Court concludes that Bariven is entitled to damages in

the amount of $72,202,133 in connection with the Milk Contract.  The amounts Bariven is

entitled to for specific counts are set forth below.

245.    Bariven is entitled to general and incidental damages under Count A (Implied

Warranty of Merchantability).  *See Eastern Cement v. Halliburton Co.*, 600 So.2d 469, 472

(stating that incidental damages may be recovered for breach of implied warranty).  Under the

Florida UCC, "[t]he measure of damages for breach of warranty is the difference at the time and place of acceptance between the value of the goods accepted and the value they would have had if they had been as warranted."  Fla. Stat. § 672.714(2).  The Court recognizes that, under Section 672.714(2), the measure of damages for breach of warranty is usually less than the amounts paid, as the goods accepted usually have some value.  Here, however, due to the melamine contamination of the powdered milk in Shipments 1-16, the Court finds that those shipments have no value, and Bariven is therefore entitled to recover the amounts it paid.  *See Carpetland U.S.A. v. Payne*, 536 N.E.2d 306 (Ind. Ct. App. 1989) (affirming award of purchase price to buyer where carpet purchased was found to have no value as tendered).

246.     Bariven is entitled to $45,361,800 in general damages for Exim's breach of the implied warranty of merchantability, which equals the amounts Bariven paid to Exim for Shipments 1-16.  JTX 194; Stip. of Counsel, March 29, 61:22-23; 62:16-21 (adopting amounts from Herce demonstrative).  As noted in the preceding paragraph, Bariven is also entitled to incidental damages for Exim's breach of the implied warranty.  Incidental damages include "expenses reasonably incurred in inspection, receipt, transportation and care and custody of goods rightfully rejected … and any other reasonable expense incident to the delay or breach." *See* Fla. Stat. §672.715.  Here, Bariven incurred $13,154,261 in storage and demurrage costs in connection with the powdered milk contained in Shipments 2-16.  Stip. of Counsel, March 29, 61:22-23; 62:16-21 (adopting amounts from Herce demonstrative).  Pursuant to Fla. Stat. § 672.715, Bariven is entitled to recover these amounts as incidental damages.

247.     Bariven is also entitled to damages under Count I (Breach of the Milk Contract). Fla. Stat. §  672.711 provides that "[w]here the seller fails to make delivery or repudiates or the buyer rightfully rejects or justifiably revokes acceptance then with respect to any goods involved,

and with respect to the whole if the breach goes to the whole contract (s. 672.612), the buyer may cancel and whether or not he or she has done so may *in addition to recovering so much of the price as has been paid . . . (b) [r]ecover damages for nondelivery as provided in this chapter (s. 672.713)*." Fla. Stat. §672.711(1) (emphasis added).  Fla. Stat. § 672.713 provides, in turn, that "the measure of damages for nondelivery or repudiation by the seller is the difference between the market price at the time when the buyer learned of the breach and the contract price *together with any incidental and consequential damages* provided in this chapter (s. 672.715), but less expenses saved in consequence of the seller's breach."  Fla. Stat. §672.713(1) (emphasis added).

248.    Bariven properly revoked acceptance of Shipments 1-16, and is therefore entitled to recover amounts it paid for Exim for those shipments: $45,361,800.  *See* Fla. Stat. § 672.711; JTX 194; Stip. of Counsel, March 29, 61:22-23; 62:16-21 (adopting amounts from Herce demonstrative).  It is further entitled to recover $13,166,625 in storage and demurrage costs incurred in connection with the powdered milk contained in Shipments 1-16 as incidental damages.  *See* Fla. Stat. § 672.713; Stip. of Counsel, March 29, 61:22-23; 62:16-21 (adopting amounts from Herce demonstrative).  The Court notes that both of these amounts are duplicative of Bariven's damages for Exim's breach of the implied warranty of merchantability.

249.    Bariven also properly rejected Shipments 17-22, and is therefore entitled to recover amounts it paid for Exim for those shipments:  $11,005,500.  *See* Fla. Stat. § 672.711; JTX 194; Stip. of Counsel, March 29, 61:22-23; 62:16-21 (adopting amounts from Herce demonstrative).  It is further entitled to recover $2,668,208 in storage and demurrage costs incurred in connection with the powdered milk contained in Shipments 17-22 as incidental

damages.  *See* Fla. Stat. § 672.713; Stip. of Counsel, March 29, 61:22-23; 62:16-21 (adopting

amounts from Herce demonstrative).

250.    The UCC also provides that when a buyer, under the provisions of Fla. Stat. §

672.612, properly cancels a contract due to breach of the whole resulting from nonconformity of

one or more installments which substantially impairs the value of the whole contract, the buyer is

entitled to damages under Fla. Stat. § 672.711.  *Midwest Mobile Diagnostic Imaging, L.L.C. v.*

*Dynamics Corp. of Am.*, 965 F. Supp. 1003, 1016 (W.D. MI 1997).   Under Fla. Stat. § 672.711,

a buyer who has rightfully cancelled a contract may recover the amount that has already been

paid.  *Id.*  Having found that Bariven properly cancelled the Milk Contract pursuant to Fla. Stat.

§ 672.612, the Court holds that Bariven in entitled to damages in the full amount that it had paid

under the Milk Contract at the time of cancellation.  Accordingly, Bariven is entitled to

$56,367,300 for amounts it paid to Exim for Shipments 1-22 of the Milk Contract.  JTX 194;

Stip. of Counsel, March 29, 61:22-23; 62:16-21 (adopting amounts from Herce demonstrative).

Bariven is also entitled to incidental damages of $15,834,833 for storage and other costs for the

Milk Contract.  *See* Fla. Stat. § 672.715; Stip. of Counsel, March 29, 61:22-23; 62:16-21

(adopting amounts from Herce demonstrative).  The Court notes that these damages are

duplicative of the amounts Bariven is entitled to recover Exim's breach of the implied warranty

of merchantability and for Bariven's revocation of acceptance of Shipments 1-16 and rejection of

Shipments 17-22.

251.    Bariven is also entitled to damages on Counts V (Breach of the Implied Covenant

of Good Faith, Fair Dealing and Commercial Reasonableness) in the amount of $72,202,133.

This figure consists of amounts paid by Bariven for Shipments 1-22 ($56,367,300)  as well as

incidental damages incurred in connection with those shipments ($15,834,833), and is

duplicative of the amounts Bariven may recover under Counts I and A.  JTX 194; Stip. of Counsel, March 29, 61:22-23; 62:16-21 (adopting amounts from Herce demonstrative).

252.    Finally, Bariven is entitled to damages under Count VII (FDUTPA) for Exim's unfair and deceptive acts in the amount of $72,202,133.  This figure consists of amounts paid by Bariven for Shipments 1-22 as well as incidental damages incurred in connection with those shipments.  JTX 194; Stip. of Counsel, March 29, 61:22-23; 62:16-21 (adopting amounts from Herce demonstrative).  While FDUTPA provides that "[t]he remedies of this part are in addition to remedies otherwise available for the same conduct under state or local law," Fla. Stat. § 501.213, and thus may arguably entitle Bariven to double damages, Bariven is not seeking double damages.  Bariven is seeking, and is entitled to, reasonable attorneys' fees, in an amount to be determined after trial.  Fla. Stat. § 501.2105.

*Bariven's Damages: Rice Contract*

253.    The Court finds that Bariven is entitled to the following damages for Exim's breach of the Rice Contract (Count II): $515,149 (demurrage costs for the Rice Contract) and (5) $1,441,536 (storage and other costs for the Rice Contract).  *See* Fla. Stat. § 672.715; Stip. of Counsel, March 29, 61:22-23; 62:16-21 (adopting amounts from Herce demonstrative).

*Exim's Damages*

254.    Having found against Exim on liability, the Court does not reach Exim's claim for damages.  However, the Court nonetheless makes the following observations about Exim's flawed damages theory.

255.    The ordinary measure of a seller's damages for a buyer's repudiation is the difference between the market price of goods, and the contract price at the time and place for tender.  *See* Fla. Stat. § 672.708(1).  However, Exim seeks damages under Fla. Stat. §

672.708(2): "If the measure of damages provided in subsection (1) is inadequate to put the seller in as good a position as performance would have done then the measure of damages is the profit (including reasonable overhead) which the seller would have made from full performance by the buyer, together with any incidental damages provided in this chapter (Section 672.710), due allowance for costs reasonably incurred and due credit for payments or proceeds of resale."

256.    With respect to Exim's claim for lost profits under the Rice and Milk Contracts (totaling approximately $14 million), Exim bears the burden of proving those amounts to a reasonable degree of certainty. *See HGI Assocs., Inc.*, 427 F.3d at 879 (11th Cir. 2005) ("Lost Profits must be established with a reasonable degree of certainty and must be the natural consequence of the wrong."); *Tech Corp. v. Permutit Co.*, 321 So.2d 562, 563 (Fla. Ct. App. 1975).

257.    Exim calculated its lost profits by subtracting from expected revenues the following categories of costs: (1) cost of goods sold (*i.e.*, amounts that would have been paid to suppliers but for the alleged breach); (2) operating expenses; and (3) commissions owed to third parties.  Despite deducting these three categories of expenses from its lost profits calculations, Exim nevertheless seeks to add back each category to recover it as a separate item of damages.

258.    While Exim has asserted a claim for approximately $14 million in alleged lost profits on the Milk and Rice Contracts, it seeks more than three-and-half times that amount, or approximately $50 million, in what it calls "liabilities with suppliers."  Based on the trial evidence, it is clear that these so-called "liabilities" are nothing more than amounts that Exim would have paid to its suppliers for future shipments under the Milk and Rice Contracts but for Bariven's alleged repudiation.  By attempting to add back in expenses deducted from its lost profits calculation, Exim is left with a damages amount that is no different than the remaining

contract price.  Under Fla. Stat. §672.709, however, a seller is entitled to recover the contract price in limited circumstances that do not apply here—either where (1) goods are accepted but not paid for, or (2) goods are identified to the contract and the seller is unable after reasonable effort to resell them at a reasonable price or the circumstances reasonably indicate that such effort will be unavailing.  Fla. Stat. §672.709(1).  Moreover, even assuming that Exim has a remaining contractual obligation to purchase additional quantities of milk and rice from its suppliers, those suppliers would have a corresponding obligation to provide Exim with milk or rice of similar value.  *See* Pérez Testimony, March 16, 48:20-50:20; 51:19-52:3.  Thus, Exim's "liability" would not be the amount it allegedly owes its suppliers but the difference, if any, between the amount owed and the value of milk or rice owed by the suppliers to Exim.  Exim offered no evidence that there is any difference between these two amounts.  For all of these reasons, Exim may not recover damages for alleged "liabilities" to its suppliers under the UCC.

259.    Sales commissions which would have been paid to a third party in connection with a given contract must be deducted from the contract revenue which would have been received in order to calculate gross profits because they are direct costs—that is, they are specifically tied to the volume of output under a particular contract. *See Automated Med. Labs., Inc. v. Armour Pharm. Co.*, 629 F.2d 1118, 1125 (11th Cir. 1980).  Moreover, sales commissions are recoverable as incidental damages only when the commissions were owed as a result of the buyer's breach, for example in the case where the seller pays a sales commission to a broker to find a replacement buyer after the breach.  *See* Fla. Stat. §672.710.  Therefore, Exim is not entitled to add back in the commissions it seeks incurred and due credit for payments or proceeds of resale."

III.    **CONCLUSION**

260.    Accordingly, this Court enters judgment in favor of Bariven on Exim's claims (Counts I & VII), and on Bariven's counterclaims in the amount of $74,158,818, together with interests, costs and attorneys fees, as follows:

(a)  As to Count A (breach of the implied warrant of merchantability), Bariven is entitled to $45,361,800 in general damages for amounts paid for Shipments 1-16, and $13,166,625 for incidental damages for storage and demurrage costs, together with interest and costs;

(b)  As to Count I (breach of Milk Contract), Bariven is entitled to:

(i) On its theory of substantial impairment of the whole under Fla. Stat. § 672.612, $56,367,300 as general damages for amounts paid by Bariven to Exim for Shipments 1-22 of the Milk Contract and $15,834,833 as incidental damages for storage, demurrage and other costs associated with Shipments 1-22, together with interest and costs;

(ii) On its theory of revocation of acceptance of Shipments 1-16 under Fla. Stat § 672.608, $45,361,800 as general damages for amounts paid by Bariven to Exim for Shipments 2-16 and $13,166,625 as incidental damages for storage, demurrage and other costs associated with Shipments 2-16, which would be partially duplicative of damages awarded under (b)(i) above, together with interest and costs;

(iii) On its theory of rejection of Shipments 17-22 under Fla. Stat. § 672.602, $11,005,500 as general damages for amounts paid by Bariven to Exim for Shipments 17-22 and $2,668,208 as incidental damages for storage, demurrage and other costs associated with Shipments 17-22, which would be partially duplicative of damages awarded under (b)(i) above, together with interest and costs;

(c)  As to Count V (implied covenant of good faith), Bariven is entitled to $56,367,300 as general damages for amounts paid by Bariven to Exim for Shipments 1-22 of the Milk Contract

and $15,834,833 as incidental damages for storage, demurrage and other costs associated with Shipments 1-22, which would be duplicative of damages awarded under (b)(i), together with interest and costs;

(d) As to Count VII (FDUTPA), Bariven is entitled to $56,367,300 as general damages for amounts paid by Bariven to Exim for Shipments 1-22 of the Milk Contract and $15,834,833 as incidental damages for storage, demurrage and other costs associated with Shipments 1-22, which would be duplicative of damages awarded under (b)(i), together with interest and costs and reasonable attorneys' fees, in an amount to be determined after trial.

(e) As to Count II (breach of Rice Contract), Bariven is entitled to $1,956,685 as incidental damages for storage, demurrage and other costs resulting from Exim's breach of the Rice Contract, together with interest and costs.

DONE AND ORDERED in chambers at the Miami, Florida, this ___ day of May, 2011.

Respectfully submitted,

BARIVEN, S.A.
By its attorneys,

 /s/ Brian Silverio
Brian Silverio, *Florida Bar No. 0183301*
SILVERIO & HALL, P.A.
150 West Flagler St., PH 2850
Miami, FL 33130
phone: (305) 371-2756
fax:     (305) 371-2744

Ronald E.M. Goodman, *pro hac vice*
FOLEY HOAG LLP
1875 K Street, N.W., Suite 800
Washington, D.C. 20006-1238
Telephone:  (202) 223-1200
Facsimile:  (202) 785-6687

Anthony Mirenda, *pro hac vice*
K. Neil Austin, *pro hac vice*
Jeff Bone, *pro hac vice*
Thomas Ayres, *pro hac vice*
FOLEY HOAG LLP
155 Seaport Blvd., Boston, MA 02210
Telephone:  (617) 832-1000
Facsimile:  (617) 832-7000

Dated:  May 6, 2011

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on May 6, 2011, I electronically filed the foregoing documents with the Clerk of Court using CM/ECF.  I also certify that the foregoing document is being served this day on all counsel of record, either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.


  /s/ Brian Silverio
Brian Silverio