**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**Miami Division**

CASE NO.: 09-20915-CIV-GOLD/McALILEY

EXIM BRICKELL, LLC,

      Plaintiff,

vs.

BARIVEN, S.A.,

      Defendant.

_____/

**EXIM'S POST TRIAL BRIEF**

George Volsky
Luis M. O'Naghten
Michael A. Sayre
Attorneys for Exim Brickell, LLC
One Southeast Third Avenue, 25th Floor
Miami, Florida  33131-1714
Phone:  (305) 374-5600
Fax:  (305) 374-5095
Email: george.volsky@akerman.com
      luis.onaghten@akerman.com
      michael.sayre@akerman.com

May 6, 2011

## TABLE OF CONTENTS

I.     INTRODUCTION ..................................................................................... 1

II.    PROCEDURAL POSTURE ..................................................................... 7

III.   FACTUAL BACKGROUND .................................................................... 7

    A.    The Parties ................................................................................ 7

    B.    The Milk Contract..................................................................... 8

        (i)    Milk Shipments 1-16 are sent by Exim and accepted by Bariven .................................................................... 10

        (ii)   The Chinese Powdered Milk Melamine Alert.......................... 11

        (iii)  Bariven Inexcusably Delays Sampling and Testing Exim Provided Milk ................................................................ 12

        (iv)  Milk Shipments 17-22 are sent by Exim ............................. 16

        (v)   Bariven's Attempted Rejection/Revocation of Milk Shipments ...................................................................... 18

        (vi)  January 21 meeting between Exim and Bariven.................... 20

        (vi)  Bariven Anticipatorily Breaches the Milk Contract ................. 21

    C.    The Rice Contract ................................................................... 22

IV.   ARGUMENT ....................................................................................... 24

    A.    In Order to Defeat Exim's Claims and Obtain Reimbursement of the Amounts Paid to Exim, Bariven Must Have Properly Rejected or Revoked Acceptance of Shipments 1-22 ................................... 24

    B.    Bariven's failure to timely test Milk Shipments 1-16 precludes Bariven from claiming these shipments were revoked ................... 26

        (i)    Revocation of Acceptance After 10 Months is Untimely .......... 26

        (ii)   Bariven's failure to timely revoke acceptance was not caused by any inducement by Exim ..................................... 31

(iii)   Bariven's revocation was untimely because the milk was perishable and it had changed conditions by the time Bariven revoked its acceptance ............................................. 33

(iv)   Bariven is Barred From Relying on Melamine Contamination to Establish Breach. ................................... 38

C.   Bariven failed to properly reject Milk Shipments 17-22 ................... 39

(i)   The lack of PSI supervised inspections was not the reason for rejecting Shipments 17-22, but was only a pretext .......... 41

(ii)   SGS-China is an affiliate of SGS and provided inspection reports that satisfied the Milk Contract requirements ............ 43

(iii)   The PSI supervised inspections called for ........................... 45

(iv)   Bariven could have cured the alleged lack of PSI supervised inspection ....................................................... 46

D.   Bariven's Breach of Warranty Claim Related to the Milk Contract fails due to its failure to provide timely notice of breach ................ 47

(i)   Bariven did not provide timely notice of breach ................... 48

(ii)   Bariven did not prove that a breach of warranty occurred ...... 51

E.   There Exists No Evidence to Sustain Bariven's FDUPTA and Breach of Implied Covenant of Good Faith Claim ........................... 52

F.   Exim is Entitled to Damages for Bariven's Anticipatory Repudiation of the Milk Contract ................................................. 55

(i)   Exim is entitled to damages even if Bariven can prove the existence of a prior breach by Exim ................................... 56

(ii)   Bariven never cancelled the Milk Contract ........................... 58

(iii)   Bariven anticipatorily repudiated the Milk Contract for which Exim is entitled to damages..................................... 61

G.   Exim, Not Bariven, is Entitled To Damages On The Rice Contract ..... 66

(i)   Last three shipments of rice delivered to Bariven could have been nationalized under the doctrine of legal abandonment................................................................. 66

(ii)   Bariven's Actions Constitute an Anticipatory Repudiation of Remainder of the Rice Contract ...................................... 69

H.    Damages ................................................................... 70

     (i)    Lost Profits ..................................................... 70

     (ii)   Exim's Incidental Damages .............................. 73

     (iii)  Bariven's claimed damages are speculative......................... 74

V.    CONCLUSION ..................................................................... 77

## EXIM'S POST TRIAL BRIEF

Plaintiff, Exim Brickell, LLC, pursuant to the Court's order dated April 19, 2011 (ECF 171), submits its post-trial brief.

## I.    INTRODUCTION

1.    The instant suit involves reciprocal allegations of breach of contract regarding two purchase orders in which Plaintiff Exim Brickell, LLC ("Exim"), a Florida based commodities broker, contracted to sell to Bariven SA ("Bariven"), a state owned entity of the Bolivarian Republic of Venezuela (Venezuela), powdered milk from China (the "Milk Contract") and rice from Brazil (the "Rice Contract"). The suit is governed, and ultimately resolved, by Florida's version of the UCC, § 672.201 *et seq.*[1]

2.    A "principal purpose of the UCC is to lower transaction costs by permitting covered parties to rely on certain **objective standards** of fair and reasonable dealing." (emphasis added.) *Crouch v. Johnson & Johnson Consumer Companies, Inc.*, 2010 WL 1530152 *10 (D. N.J. 2010) *quoting A & A Mech. v. Thermal Equip. Sales*, 998 SW 2d 505, 510 (Ky. Ct. App. 1999). There are no provisions specific to sovereign nations in the UCC; consequently, Bariven - an agency or instrumentality of Venezuela[2] - is no different than any other buyer and

---

[1]    Closing Argument, March 31, 2011 Trial Tr. p. 8 (*THE COURT: Well, is there agreement that the UCC applies to both parties here regardless? MR. MIRENDA: Yes, Your Honor.  There is agreement that the UCC applies to both parties here regardless.*"

[2]    Bariven's Answer to Second Amended Complaint, ¶3 (D.E. #33); Closing Argument, March 31, 2011 Trial Tr. p. 72 (*THE COURT: I don't remember my jurisdiction so you have to help me.  Is this not diversity? MR. MIRENDA: I believe actually that both were pled and both are accepted.   But the parties are diverse and Bariven is an agency or instrumentality.*")

is subject to the Code's provisions.[3] *Northern Indiana Public Service Co. v. Carbon County Coal Co.,* 799 F.2d 265 (7th Cir. 1986) ("act of government" does not excuse compliance with contract under the UCC).

3.      The evidence adduced at trial shows that Bariven repeatedly ignored its obligations under the UCC to the detriment of Exim.  Venezuela was in the midst of a national emergency that required the urgent purchase of foodstuffs – including the milk from Exim.[4]  However, after the announcement of the melamine alert and China placed an embargo on the export of powdered milk in mid-September, Bariven did absolutely nothing of consequence for over four (4) months to determine whether the milk it received from Exim was nonconforming. It waited ten (10) months before informing Exim for the first time that it was revoking certain

---

[3]      Further, when a sovereign nation (or its agency and instrumentality) enters commerce as a merchant, it is stripped of its sovereign immunity. 28 U.S.C.A. § 1605(a)(2) ("A foreign state shall not be immune from the jurisdiction of courts of the United States or of the States, in any case ... in which the action is based upon commercial activity carried on in the United States by the foreign state ...".)

[4]      Ms. Azocar, March 16, 2011 Trial Tr. p. 159 (*Q.   Okay.  So your company decided not to give just one supplier all the business of providing powdered milk from China? A. That is correct and basically also because between the years 2007 and 2008, there was a food crisis.*);

Mr. Salges, March 14, 2011 Trial Tr. p. 120. *(Q. I want to bring your attention to the food crisis that was occurring in Venezuela and that ultimately gave rise to the milk contract as well as the rice contract, and I want to get your understanding of what that food crisis was. A.   The food crisis started mainly as a political issue because President Chavez started closing all the private sector in Venezuela.  So we were producing rice.  We were producing milk powder.  We were producing industrial sugar. 80 percent of that crisis started because nobody was producing in the country.  He was getting ready for elections and there was no rice.  There was no milk.  There was no nothing on the supermarket shelves. So he had to put billions to start to import it, and that's how they started all into this.  And he put under hands of Bariven to do all of that because it was one of the international companies that they had that they can generate dollars. And doing that, then they purchase like $2 to $3 billion, and then the ports got all, how you say, the ports got all full capacity to receive more products.*

*And then the products started getting rotten and the crisis go to an extreme that they changed the president of Bariven.  And after changing the president of Bariven, the next...)*

shipments because of melamine contamination. Given that milk is a perishable product, Bariven's actions are inexcusable and greatly prejudiced Exim.

4.  Bariven's actions – or, more accurately, its failure to act – constitute a violation of the UCC strictures and bar its defenses to this action:

> (i) because it did not test Shipments 1-16 for over 4 months and did not revoke its acceptance for over 10 months, Bariven violated § 672.608's "reasonable time" requirement;
>
> (ii) because it *never* tested Shipments 17-22, Bariven could not reject those shipments as it could not prove § 672.612's requirement that the alleged nonconformity "substantially impair" any installments;
>
> (iii) because it never notified Exim that it cancelled the Milk Contract (and, maintins through this very date, that it did not cancel the Milk Contract) Bariven can not comply with § 672.612(3) requirement of "seasonably notifying of cancellation"; and
>
> (iv) because it did not any provide notice of breach regarding Shipments 1-16, Bariven can not asset its warranty claim (§ 672.605(1)).

5.  A direct consequence of Bariven never canceling the Milk Contract, is that its remaining obligations under the Milk Contract were not excused. Nonetheless, it refused to pay Exim over $9 million dollars due for Shipments 18-22, refused to send field inspectors to China despite Exim's repeated requests, and refused to allow Exim to provide milk from countries other than China. Simply put, Bariven breached the milk contract and Exim is entitled to receive its lost profits on the Milk Contract. As argued below, the case law and commentary interpreting § 672.612(3) uniformly support the proposition that by virtue of Bariven failing to cancel the Milk contract (an installment contract) Bariven waived any right to claim a prior breach in order to avoid a claim of anticipatory repudiation. (*See* Section IV F (i), ¶¶ 143-147, *infra.*)

6.      The arguments mentioned above are not simply "technical" arguments which support Exim's position in this case.   Bariven's actions both harmed and prejudiced Exim in a very tangible way and entitle Exim to recover damages. Although the facts as brought out at trial are discussed in greater detail below, certain facts that have overriding impact on the outcome of this case are highlighted here.  Both the Milk Contract and the Rice Contract were the result of the food crisis that affected Venezuela in early 2008.  The Milk Contract alone, first entered into in February 2008, was for 26,000 tons of powdered milk which was to come from China.[5]  Bariven signed a similar contract for powdered milk from China with another supplier - Absolute Trading.[6]  However, in September of 2008 China suspended all exports of powdered milk for four months due to a melamine alert resulting from certain infant formula having been found to be contaminated with melamine.[7]  When China finally allowed exports to resume in December 2008, Exim promptly began shipping powdered milk to Venezuela.[8]

---

[5]      *See* Milk Contract, JTX 5.

[6]      Mr. Salges, March 14, 2011 Trial Tr. p. 122 (*Q. Mr. Salges, can you testify as to how the milk contract came about? A. First, we got a request for quotation to supply 52,000 tons of milk powder.  We won the contract.  And then I received a call that it was 25,000 tons and the other 25,000 tons was given to Absolute Trading.*)

[7]      Ms. Azocar, March 16, 2011 Trial Tr. p. 165 (*Q. And you did come to learn at some point that the Chinese Government stopped allowing exports of milk from China? A. Yes. We had that information from the supplier, Exim Brickell, and also from the Ministry of Health in Venezuela.*);

Mr. Salges, March 14, 2011 Trial Tr. p. 180 (*Q. And when you read, what did you read? What was the news that you first heard about the melamine alert? A. That there were two infants that died because the baby or the infant milk produced by the Chinese domestic market had been contaminated by melamine. Q. And what did you do?  What did you do? A. Right away we talked to June Yao, our manager in China, and we told her to get in contact with Suncare and Dairygold to explain how that affects us and how, I mean, if the crowd is following...).*;

Mr. Salges, March 14, 2011 Trial Tr. p. 182 (*Q. Now, the news accounts related to infant milk.  What about industrial milk? What was the Chinese Government's response with respect to industrial milk? A. No. They stopped all production, I mean, from the dairy*

4

7.      Exim stopped shipping milk when Bariven refused to pay Exim over $9 million dollars for Shipments 18-22 and when it refused to send its own inspectors to China to inspect the milk.  Bariven's actions constitute anticipatory repudiation of the Milk Contract.   A court in Curacao has already ruled on Bariven's breach (its wrongful refusal to pay Exim for Shipments 18-22) when it ordered that Exim be paid the amounts owed pursuant to a Letter of Credit in October 2009.[9]

8.      The testimony adduced at trial showed one thing conclusively: Bariven did not timely test  Shipments 1-16 for melamine. Despite the fact that by October 2, 2008 Bariven was instructed to test all milk received that emanated from China for melamine, Bariven did not begin to *sample*, much less test, Exim's milk for over 4 months, until January 29, 2009.[10]   Moreover, these tests were only of two (2)

---

*producers to the packer produces to everything, and they put 5,000 inspectors to review each of the companies and to check all of the companies and audit all of the companies. They closed a few hundred of these small producers and then they reopened in December.)*

[8]      Mr. Salges, March 14, 2011 Trial Tr. p. 211 (*Q. Mr. Salges, before we took that break, we were directing our attention now to shipments 17 through 22.  And do you remember when the Government, the Chinese Government, suspension of exports was lifted? A. Around December 10th, December 9th, 2008. Q. Did you have advance notice of this at all? A. We got the notice from our suppliers because Suncare was the...*);

Mr. Salges, March 14, 2011 Trial Tr. p. 212 (*Q. Did you have advance notice of this at all? A. ...first one that was approved to do exportation of any – to do exportation of milk powder. Q. But did they give you advance notice?  Did they tell you, "We're going to be able to start this next week," or was it just a couple of days before? A. No, the situation was, yeah, like a week in advance. Q. And I can represent to you that shipment 17 left China on December 11, just for your time frame reference. A. Yes.*).

[9]      Curacao Final Judgment, JTX 172

[10]      March 17, 2011 Trial Tr. p. 21 (*Q. Now, staying on here right around the melamine alert, once the melamine alert, the Ministry of Healthy required that all milk coming from China was to be tested, is that not correct, for melamine? A. That is correct. Q. And this was as of at least as early as October 2008? A. Yes. Q.  Did this include Absolute Trading's milk? A. Yes. Q. Absolute Trading's milk was inspected by SGS and supervised by PSI in China; is that not correct? A. Correct.*);

March 17, 2011 Trial Tr. p. 22 (*Q. No samples were taken of Exim's milk until January 29; is that not correct? A. Yes. ....*)

shipments.[11]   Bariven **never** tested Shipments 17-22.[12]   Finally, by the time Bariven decided to sample the milk on January 29, 2009, already as much as 20% of the milk had spoiled. (JTX 130, notes taken while sampling).

9.     Bariven's inaction had a concrete impact on Exim.  Simply put, by delaying to conduct tests in a timely manner, Exim lost its ability and opportunity to cure any defect by supplying new milk to replace any damaged milk.[13]  At this late date, any action that could be brought against the Chinese suppliers is a hollow option as no judgment against a Chinese party has ever been enforced against that party in China.[14]  As a consequence, Bariven's anticipatory repudiation of the Milk Contract gives rise to Exim's claim for damages.

---

[11]     Ms. Azocar, March 30, 2011 Trial Tr. p. 5-6 (*Q. And in this email Mrs. Azocar is instructing that no shipments can be released until tests requested by Bariven are completed and the results are obtained; is that correct? A. Yes. It was telling us that it could not be released, that it was under observation.)*

[12]     March 17, 2011 Trial Tr. p. 25-26. (*Q. And my questions were really dealing with shipments 17 through 22, which were never tested and my question is: Since those came after China allowed the export of milk in December 2008, and Bariven wanted to find out whether or not – to verify whether or not the Chinese actions were, in fact, appropriate,...why was it never tested? A. I do not have an answer to that.  I don't know)*

[13]     Chen Gang Dep. 11:3-17 ("*Normally during our product testing time, which is about seven days, we can give the customer a longer time, which would be within a month.  If our customer thinks that this batch of product has a problem and it gets confirmed by us, then we can return the goods.  Yeah.*"); Zhao Jianli Dep. 18 (*"if after the customer has received the product and has some doubts about the quality of the product, then after -- within 10 to 20 days of receiving the product and definitely not more than a month after receiving it, they should mention the quality problem.*")

[14]     Dan Harris, "*Chinese Drywall Litigation And Why Seizing Assets Is Very Different From Seizing Ships.  With Apologies to Scott Weinstein fro Something I Never Said*" onChina Law   Blog,   http://www.chinalawblog.com/2010/02/chinese_drywall_and_the_halfas.html (posted February 28, 2010)( "US judgments are not enforced in Chinese courts")

## II.     PROCEDURAL POSTURE

10.     Exim brought a claim for damages alleging that Bariven breached both contracts when it failed to complete both purchase orders.[15]

11.     Bariven responds that it was excused from completing the purchases mandated under both contracts because (i) Exim breached the Milk Contract by providing powdered milk contaminated with melamine and failing to allow Bariven to conduct field inspections provided under the contract and (ii) Exim breached the Rice Contract by failing to provide Bariven original documents as required under the Rice Contract.  Bariven has counterclaimed against Exim.[16]

## III.     FACTUAL BACKGROUND[17]

### A.     The Parties

12.     Bariven, located in Caracas, Venezuela, is a wholly-owned subsidiary of Petroleos de Venezuela, S.A ("PDVSA"), the state-owned oil company.   (SJ Order, p.2).  Bariven typically purchases products for the Venezuelan oil industry.[18]

---

[15]     Only two of Exim's causes of action contained in the Second Amended Complaint remain pending: Count 1 for anticipatory breach of the Milk Contract resulting from Bariven's refusal to proceed with the purchase of the remaining 14,220 tons of milk and Count 7 for anticipatory breach of the Rice Contract resulting from Bariven's refusal to proceed with purchase of the remaining 3,000 tons in the amount of $3,063,000.

[16]     There remain five causes of action alleged by Bariven against Exim [ECF No. 33]: (i) breach of contract with respect to the Milk Contract resulting from Exim's failure to provide powdered milk that was free from toxic substances; (ii) breach of contract with respect to the Rice Contract resulting from Exim's failure to provide export documents seven days before delivery of the last three shipments of rice; (iii) breach of implied warranty of merchantability for providing contaminated milk; (iv) breach of implied covenant of good faith, fair dealing and commercial reasonableness with respect to the Milk Contract; and (v) violation of Florida Deceptive and Unfair Trade Practices Act ("FDUTPA").

[17]     The facts set forth in this section are derived from the trial transcript, the deposition designations, and pleadings.  "JTX" refers to Joint Trial Exhibits, "ETX" refers to Exim's Trial exhibits, "BVN" refers to documents produced by Bariven, and "EX" to documents produced by Exim.

[18]     Ms. Azocar, March 16, 2011 Trial Tr. p. 150; Mr. Salges, March 14, 2011 Trial Tr. p. 64.

However, at the end of 2007, Bariven began to purchase food commodities in international markets for importation into Venezuela and distribution by Productora y Distribuidora Venezolana de Alimentos, S.A.'s ("PDVAL"), another PDVSA subsidiary.[19]   Bariven carries out the purchases through PDVSA Services, Inc. ("PSI"), a Bariven subsidiary and its agent in the United States that assisted Bariven with its international purchases.   (SJ Order, p.2).   Prior to 2007, Bariven and PSI had no experience in the purchasing, transportation, importation or storage of food products.[20]

13.   Exim is a Florida corporation engaged in the business of buying and selling commodities, including food products.[21]

**B.     The Milk Contract**

14.   On March 26, 2008, PSI issued to Exim a purchase order for 26,000 metric tons of industrial powdered milk for a total price of $124,410,000.   (Milk Contract, JTX 5).   The Milk Contract provided for the milk to sold in installments. The industrial milk being supplied under the contract was perishable, with a 6 month-1 year expiration period depending on the conditions in which the milk was kept.[22]   The  Milk Contract contained specific requirements as to the content of the milk as required by the Venezuelan COVENIN standards.   (JTX 5).

15.   The Milk Contract provided that the "[p]roduct  . . . must not leave your facilities until the inspector or designated inspection agency has issued a

---

[19]     Ms. Azocar, March 16, 2011 Trial Tr. p. 151-152; Mr. Salges, March 14, 2011 Trial Tr. p. 64.

[20]     Mr. Salges, March 14, 2011 Trial Tr. p. 113-114; Bello Dep. p. 8; Zavatti Dep. p. 10.

[21]     Mr. Salges, March 14, 2011 Trial Tr. p. 113; Bariven Counterclaim, ¶¶53 and 80.

[22]     Prof. Bradley, March 16, 2011 Trial Tr. p. 60; Mr. Mitchell, March 30, 2011 Trial Tr. p. 113.

release authorizing shipping of the product." (JTX 5).   The Milk Contract also required that Exim provide information on the location where the inspection can be performed and the contact information for the project manager. (JTX 5).

16.     Both parties entered into agreements with other business entities to help them carry out their obligations under the Milk Contract.  Exim contracted with three Chinese manufacturers to produce the milk—Qingdao Dairygold Industry Co., Ltd. ("Dairygold") (JTX 11); Qingdao Suncare Nutritional Technology Co, Ltd. ("Suncare") (JTX 10); and Beijing Reward International Trade Co., Ltd. ("Reward").

17.     Although it had no obligation to do so, Exim hired SGS-China (an affiliate of SGS-NA) to prepare loading and packing reports (a "document inspection") as well as laboratory tests regarding the quality of the powdered milk (a "lab test"). (JTX 29).[23] Exim retained SGS-China to conduct the lab tests to assure itself of the quality of the product it was delivering.[24]   The SGS reports generated on Exim's behalf contained all the material information required by PSI of SGS-NA and more.[25]

18.     PSI contracted with SGS North America, Inc. ("SGS-NA") to perform the field inspections. (JTX 8).

19.     Under the terms of its engagement to conduct field inspection, SGS-NA was not required to perform any laboratory tests of the powdered milk to determine that it met the COVENIN standards set forth in the Milk Contract.[26]   Instead, PSI

---

[23]     Exim deliberately selected SGS-China to conduct these inspections because it was aware that SGS was the company Bariven retained to conduct its field inspections. (Mr. Salges, March 14, 2011 Trial Tr. 163; JTX 124).

[24]     Mr. Salges, March 14, 2011 Trial Tr. p. 162.

[25]     Cisneros Dep. p. 83.

[26]     Cisneros Dep. p. 21; Minutes of PSI-SGS-NA meeting, JTX 134.

required only that SGS-NA review the documentation related to loading and packing reports.[27]

### (i)     Milk Shipments 1-16 are sent by Exim and accepted by Bariven

20.     Complying with the contract requirements, Exim sent an email to PSI on May 20, 2008, informing PSI that the first shipment of milk was ready for the field inspection and providing the contact information for Exim's project manager in China, June Yao.  (JTX 17).  Neither Bariven, nor PSI, nor SGS-NA contacted June Yao, and SGS-NA did not conduct a field inspection of the milk. (SJ Order, p.4).   In fact,  neither Bariven, nor PSI, nor SGS-NA ever conducted the field inspections as was their right under the Milk Contract.[28]

21.     On June 22, 2008, Exim shipped its first milk installment, which arrived in Venezuela in August 2008. (JTX 194).  Thereafter, Exim shipped fifteen additional installments leaving China between July 3 and September 10, 2008, and arriving in Venezuela between September 7 and November 10, 2008. (JTX 194). The documentation provided by Exim to Bariven in relation to the milk shipments included reports detailing both SGS-China's document inspections and lab tests. Indeed, on September 10, 2008, in response to a request by PDVSA to audit documents of the Milk Contract, Exim's President sent a letter advising Bariven that Exim itself had contracted SGS to conduct inspections and tests and provided the requested documentation of shipments.   (ETX 8). Bariven accepted these first 16 shipments of milk.[29]

---

[27]     Id.

[28]     JTX 148; Ms. Guevara, March 15, 2011 Trial Tr. 162-163.

[29]     Summary Judgment Order at 16 (ECF 136).

### (ii)     The Chinese Powdered Milk Melamine Alert

22.     In mid-September 2008, after the first 16 Milk Shipments had left China, news outlets reported that infant formula milk emanating from certain Chinese manufacturers was contaminated with melamine, a chemical that in certain doses can be harmful to humans.[30]   The Chinese government initiated an investigation and suspended all exports of powdered milk until the investigation was completed.[31]

23.     On September 19, 2008, Jorge Parra (a Bariven employee) sent an email to Exim, requesting that Exim provide information about the melamine situation. (JTX 36).  In response, on September 23, 2008, Exim informed Mr. Parra that Exim had not used Mengniu Dairy, the manufacturer accused of distributing infant formula milk contaminated with melamine. Exim also stated it would test all future shipments for melamine.   (JTX 36). Mr. Parra forwarded Exim's email to other Bariven personnel, including Sulfani Azocar, who was in charge of Bariven's food acquisition program. (JTX 42).

24.     Bariven did not rely on the information provided by Exim in its September 23, 2008 email.[32]   To the contrary, Bariven's witnesses have testified that, despite the information provided by Exim, they were going to sample and test the Exim milk to confirm that it did not contain melamine.[33]   Indeed, on October 2, 2008, just one week after Exim provided information regarding the milk's quality,

---

[30]     Mr. Salges, March 14, 2011 Trial Tr. p. 180.

[31]     Ms. Azocar, March 16, 2011 Trial Tr. p. 165; Mr. Salges, March 14, 2011 Trial Tr. p. 180-182.

[32]     J. Parra Dep. p. 10 ("Bariven did not . . . rely or did not consider adequate [Exim's] comments . . . assuring that the milk was fine.")

[33]     Ms. Azocar, March 17, Trial Tr. p. 21-22.

Bariven directed that, notwithstanding this information, the Exim milk be sampled and tested. (JTX 48).   Moreover, Bariven's Procurement Superintendent in Food Products (Jorge Parra), explicitly testified that "Bariven did not . . . rely or did not consider adequate [Exim's] comments . . . assuring that the milk was fine."   (J. Parra Dep. 10:10-13).

**(iii)   Bariven Inexcusably Delays Sampling and Testing Exim Provided Milk**

25.   Despite acknowledging on October 2, 2008 that it had to test the Exim milk, Bariven did not begin sampling (much less testing) Exim's milk until four months later, on January 29, 2009.[34]

26.   The Bariven representatives knew that the milk was a perishable food product with a determined shelf-life, yet Bariven had no justifiable explanation for the 4-month delay (October 2008-January 29, 2009) in sampling Exim's milk other than: (i) Exim's milk was located 3 hours away from Caracas in Puerto Cabello, (ii) the containers of Exim milk were too difficult to find, (iii) Bariven was only interested in testing milk from Absolute Trading, and (iv) that half of the month of December is "dead" because of vacations.[35]   However, when it did sent its first samples for testing, it received test results within 2 weeks.[36]   Evidence at trial proved that if Bariven had wanted to, it could have brought an entire laboratory to test for melamine to Venezuela and had its results within 11 weeks.[37]

---

[34]   Ms. Azocar, March 17, 2011 Trial Tr. p. 21-22.

[35]   Ms. Azocar, March 17, 2011 Trial Tr. p. 22; Ms. Rodriguez, March 30, 2011 Trial Tr. 9.

[36]   Ms. Rodriguez, March 30, 2011 Trial Tr. p. 10-11.

[37]   Mr. Mitchell, March 30, 2011 Trial Tr. p. 93.

27.    Moreover, when it began sampling Exim's milk, Bariven only took samples of Shipments 7 and 8.  (Bariven Counterclaim ¶66).  By the time this initial and incomplete sampling occurred, the powdered milk for Shipments 1-16 was either expired or was nearing its expiration date, meaning it would no longer be fit for human consumption (even if there had been no melamine detected).[38]  Bariven did not receive the test results from these samples until a month after they were sent to the laboratories—4.9 months after the shipments had arrived. (JTX 192, Ex. A to Bariven's 2nd Supp. Answers).

28.    In May 2009, eight (8) months after Bariven decided in October 2008 that it needed to test Exim supplied milk,  Bariven decided to sample milk from Shipments 3, 5 and 16.[39]  Thus, as of May 2009, out of the 16 shipments made by Exim before the melamine alert, Bariven had only sampled milk from 5 shipments. Test results from these three samples were not received by Bariven until June 2009. (JTX 192, Ex. A to Bariven's 2nd Supp. Answers).

29.    Shipment 1 was never sampled or tested. (JTX 191, Ans. to Interrogs. 6, 7); (JTX 192).

30.    Other sampling from Shipments 2-16 (Shipments 2, 4, 6, 9, 10, 11, 12, 13, 14 and 15), did not occur until February 2010, long after the commencement of the instant litigation.  (JTX 192).  Test results for these samples were not obtained by Bariven until March/April 2010. (JTX 192). Clearly, the sampling and testing of these shipments played no part in Bariven's decision to revoke its prior acceptance of these shipments.

---

[38]    Prof. Bradley, March 16, 2011 Trial Tr. p. 60.

[39]    Ms. Rodriguez, March 30, 2011 Trial Tr. p. 25-27.

31.     Bariven's sampling method produced an unrepresentative sample resulting in wildly inconsistent results.[40] As Exim's expert testified, Bariven used an improper sampling device.[41]   Bariven should have used a coring device or "thief" which would have provided a sample of the entire bag of powdered milk.  Instead, when taking samples for the testing of powdered milk, Bariven used a scoop, which simply took samples from the surface of 25kg bags.[42]   Such improper sampling leads to unreliable test results.  (Prof. Bradley, March 16, Trial Tr. p. 67-71.)  This is in fact what happened in this case.

32.     For the 5 shipments that Bariven tested before it decided to revoke its acceptance of Shipments 2-16, the samples yielded significantly variant test results for melamine:[43]

| Shipment | Lowest detected amt. of melamine level | Highest detected amt. of melamine level |
|---|---|---|
| 3 | 0 | 16.1 |
| 5 | 0 | 39.2 |
| 7 | 0 | 88 |
| 8 | 0 | 1274 |
| 16 | 0 | 352 |

33.     Bariven attempts to explain that such divergence in each shipment could be attributed to the fact that each shipment had different "batches" of milk.

---

[40]     Prof. Bradley, March 16, 2011 Trial Tr. p. 70

[41]     Prof. Bradley, March 16, 2011 Trial Tr. p. 70-71.

[42]     Prof. Bradley, March 16, 2011 Trial Tr. p. 77.

[43]     Prof. Bradley, March 16, 2011 Trial Tr. p. 70-71.

However, even among some of the discrete "batches" there were great divergences in test results.[44]

| Shipment | Batch | Lowest detected melamine level | Highest detected melamine level |
|----------|-------|-------------------------------|--------------------------------|
| 4 | 2008.06.00 | < .25 | 117 |
| 5 | 12.07.2008 | < .25 | 39.2 |
| 7 | 25.07.2008 | .497 | 88 |
| 8 | 20.06.2008 | .905 | 725 |
| 9 | 07.08.2008 | < .25 | 239 |

34.     In addition to the inconsistent results of certain tests, the initial results of the tests of Exim milk sampled on January 29, 2009 were mixed.   Some laboratories contracted by Bariven found that there was no melamine contamination of the milk. (JTX 192, Ex. A to Bariven's 2nd Supp. Answers).   Other laboratories found that there was presence of melamine, but below toxic levels (2.5 ppm). (JTX 192).   Yet other laboratories showed some batches contained toxic amounts of melamine. (JTX 192).   Relying on the test results from the laboratories that showed no melamine contamination, including laboratories in Chile and Venezuela, Mr. Luis Pulido (Bariven's former President) proclaimed on several Venezuelan media outlets that Exim milk was melamine free.[45]

35.     Given the deficiencies in sampling technique, no test should have been conducted on these samples.   Certainly, the wide divergence in these test results

---

[44]     Prof. Bradley, March 16, 2011 Trial Tr. 67.

[45]     JTX 154 ; Pulido Dep. p. 24-25, 28

did not provide Bariven sufficient basis to subsequently revoke its acceptance of Shipments 2-16.

### (iv)    Milk Shipments 17-22 are sent by Exim

36.    On October 27, 2008, which was during the period in which China had imposed an export ban on all Chinese produced powdered milk, Exim sent to Bariven a letter in which it offered to use non-Chinese milk suppliers to fulfill the Milk Contract. (JTX 59).  Bariven held internal discussions regarding this offer but never responded to Exim.[46]  At trial, Bariven representatives simply stated that Bariven could not consider such an option because it would have been *unfair* to other suppliers.[47]  No consideration was given to the fact that the country faced an food emergency in which, presumably, it needed the milk that Exim had contracted to provide.

37.    Prior to lifting the ban on exporting powdered milk, the Chinese government investigated each and every Chinese manufacturer of powdered milk, inspecting each factory.  Only after a manufacturer was cleared, did the Chinese government permit that exporter to export powdered milk. Using the procedures described above, the Chinese government cleared Exim's manufacturers to export, Suncare, Dairygold and Reward.[48]  In fact, Suncare was the first factory that the government cleared to export milk.[49]

---

[46]      Parra Dep. p. 11

[47]      Ms. Azocar, March 16, 2011 Trial Tr. p. 168

[48]      Chen Gang Dep. p. 12-13 ("*After going through checking, they confirmed that our production was in conformance, in conformity with requirements and they permitted us to continue exporting.  And so our company became the first company which was allowed to export.*"); Zhao Jianli Dep. p.18 ("*Beijing Rewards' powdered milk [never] test[ed] positive for melamine*".)

[49]      Chen Gang Dep. p. 13.

38.     In addition to the tests conducted by the Chinese government and the clearance for export provided by the Chinese government, Exim directed SGS-China to add a test for melamine to its lab tests for the milk being delivered to Bariven so as to ensure that all the milk was melamine free. (JTX 40).

39.     On November 17, 2008 Bariven sent an email to Exim requesting that all field inspections required under the contract be conducted before any shipment was sent to Venezuela.  (JTX 72).  This email appears to have been a form email directed to all of Bariven's suppliers and not directed solely to Exim. (EXT 50).  Indeed, Bariven ignored this very email soon after it was sent as it relates to Exim.

40.     Exim recommenced its powdered milk shipments to Bariven, sending a shipment to Bariven on or about December 11, 2008. ("Shipment 17"). (JTX 194).  On or about December 15, 2008, Exim sent to Bariven the invoice for this shipment which invoice was paid by Bariven.  (JTX 77). No field inspection was conducted by Bariven or its agents on this shipment prior to its being paid.[50]

41.     On or about December 12, 2008, Ms. Marycarmen Alvarez (a treasurer with Bariven), at a PSI meeting, was directed by Bariven to suspend all payments to Exim.[51] After receiving the invoice for Shipment 17, Ms. Alvarez confirmed the suspension with her supervisor, Mr. Alfonso Gravina.[52]   Notwithstanding this suspension, Bariven did not object to the invoice sent on December 15th or otherwise advise Exim to halt shipments.  To the contrary, on December 17, 2008, a Bariven employee, Ms. Zorayma Freitez, asked Exim to continue making the milk

---

[50]     Ms. Guevara, March 15, 2011 Trial Tr. p. 153.

[51]     Alvarez Dep. p. 56; Mr. Salges, March 14, 2011 Trial Tr. p. 218.

[52]     Alvarez Dep. p. 53-56 ("*I was ordered] to suspend payment until further notice.*") Mr. Salges, March 14, 2011 Trial Tr. p. 218.

shipments.   (JTX 82).   As a result, Exim continued sending shipments 18-22 to Bariven, for which Bariven refused to pay.[53]

**(v)     Bariven's Attempted Rejection/Revocation of Milk Shipments**

42.     On January 8, 2009 Bariven sent an internal email, instructing employees that Exim shipments should be rejected in transit and returned to the port of origin because the field inspections in China had not been conducted under PSI supervision, but Bariven did not notify its customs broker Clover of the same.[54]

43.     On January 9, Mr. Herrera, PSI's Inspection Coordinator, wrote to Exim that "the product has been rejected for not having been inspected under PSI supervision."  (JTX 99).  Prior to this e-mail, Exim was unaware that Bariven would insist on having "PSI supervised" inspections.[55]   On January 15 (and again on February 13 and 20), Exim notified PSI that it had milk that was ready to be shipped and instructed PSI to communicate with June Yao about inspections. (JTX 108, JTX 141).  However, Bariven never sent inspectors to China to inspect Exim's next shipment.[56]

44.     Unbeknownst to Exim, however, the actual reason for suspending payments to Exim had nothing to do with PSI supervised inspection, but was simply the result of the fact that Bariven could not nationalize the milk.[57]

---

[53]     Alvarez Dep. p. 53-56 ; Mr. Salges, March 15, 2011 Trial Tr. 7-8.

[54]     JTX 94; Ms. Rodriguez Dep. p. 50. ("*[The rejection] ws based on the lack of coordination [with PSI].*")

[55]     Mr. Salges, March 15, 2011 Trial Tr. p. 14; Ms. Guevara, March 15, 2011 Trial Tr. p. 160-161.

[56]     Ms. Guevara, March 15, 2011 Trial Tr. p. 152.

[57]     Ms. Azocar, March 17, 2011 Trial Tr. p. 31.

45.     On January 20, Mr. Herrera sent Exim a formal claim notice purporting to reject Exim's milk shipments based on the lack of PSI supervised inspections. (JTX 114). The Claim Form did not specify which milk shipments were being rejected (whether all Shipments or only Shipments 17-22). The Claim Form simply provided that there was a "Technical Non-Conformity," specifically, "Rejection of product sent to Venezuela due to lack of inspection under PSI Supervision as requested and described in the PO." (JTX 114). Prior to sending the Claim Form, Mr. Gravina, PSI's International Purchasing Manager, cautioned others in Bariven that such a Claim Form was dubious because Bariven had waived the field inspection requirement up to that point in time.[58]

46.     Further, as it relates to Shipments 17-22, Bariven can not explain why the field inspections that were supposed to occur in China could not have been conducted in Venezuela the moment the shipments arrived. As discussed in greater detail below, Bariven's field inspections were nothing more than document inspections, which inspections would not have included any lab tests for melamine (or any other component). The document inspections submitted by Exim from SGS-China contained every material information than what SGS-NA would have provided Bariven, in addition to the lab test for melamine which Bariven never required nor contracted for. (JTX 134, BVN 1922).

47.     Nowhere did the Claim Form refer to melamine. (JTX 114). Indeed, at the time of the Bariven's official rejection, Bariven had not even begun to sample Exim's milk for possible melamine contamination and, consequently, Bariven had no

---

[58]     JTX 115. ("we must be careful with this case, as the first shipments for this same order have already been accepted without PSI inspection.")

evidence that any milk supplied by Exim was contaminated with melamine.[59]   To the contrary, for quite some time Bariven believed the powdered milk was melamine free, as Mr. Luis Pulido publicly declared that the powdered milk supplied to Venezuela from China was melamine free.[60]   Further, until the filing of its counterclaim on July 6, 2009, at no time did Bariven ever give formal notice that the powdered milk supplied was either rejected or revoked by based on melamine.

### (vi)   January 21 meeting between Exim and Bariven

48.   The day after the Claim Form was sent to Exim a meeting was held in Bariven's offices in which both the President of Exim, Mr. Salges, and the President of Bariven, Mr. George Kabboul, were present.   Although there exists a dispute as to certain aspects of that meeting, other aspects are not in dispute.

49.   Significant for purposes of this case, Bariven did not cancel the Milk Contract.   To the contrary, the parties agreed that the Letter of Credit would be extended, the purpose of which was to guarantee that Exim would be paid.[61] Moreover, it was discussed that Exim would hold back from making its next shipment for 30 days.[62]   Thus, far from canceling the Milk Contract, the parties agreed to the continuation of the contract.

---

[59]   Ms. Azocar, March 17, 2011 Trial Tr. p. 25.

[60]   Pulido Dep. p. 24-25, 28 ("[I made the statement that] 'There is no risk, absolutely no risk in the fact that the milk distributed by Productora y Distribuidora Venezolana de Alimentos, PDVAL, for it to be contaminated with melamine or any other bacteria.'").

[61]   Ms. Azocar, March 17, 2011 Trial Tr. p. 33

[62]   Mr. Salges, March 15, 2011 Trial Tr. p. 103

50.     After the debt to its Chinese suppliers became to great, Exim made a claim to Girobank in Curacao for payment of $9,570,000 for shipments 18-22.[63] (JTX 118).  Bariven defended the action in Curacao, alleging, in part, that the milk was contaminated with melamine.[64]   A Curacao court entered Judgment on September 16, 2009 that Exim was entitled to recover under the letter of credit for those shipments. (Final Judgment, JTX 172).

### (vii)   Bariven Anticipatorily Breaches the Milk Contract

51.     Bariven breached the Milk Contract in three specific manners: (i) it refused to pay for Shipments 18-22,[65] (ii) it refused to send field inspectors to inspect Bariven's next shipment,[66] and (iii) it refused to give Exim adequate assurance that it was going to comply with the Milk Contract.[67]

52.     On March 19, 2009, Exim's attorney sent a letter to PSI, in which Exim raised its concerns with Bariven's failure to pay for milk shipments made in January and December and Bariven's refusal to inspect the remaining amounts of milk waiting to be shipped.  (JTX 155).  Exim concluded the letter by asking Bariven to pay for the milk shipments already delivered and to accept and pay for the remainder of the milk to be delivered under the contract.  (JTX 155).  Bariven did

---

[63]     The Milk Contract provided that Bariven was required to post a letter of credit for 10% of the value of the contract.  Bariven posted the letter of credit with Girobank in Curacao.

[64]     Bariven has, to this date, never tested Shipments 17-22 for the presence of melamine.

[65]     Mr. Salges, March 15, 2011 Trial Tr. p. 36.

[66]     Ms. Guevara, March 15, 2011 Trial Tr. p. 162-163.

[67]     Kabboul Dep. p. 76 (when asked whether, in response to the letter, Bariven assured Exim that it would honor it obligations as to the remainder of the milk contract, Mr. Kabboul responded sarcastically, stating: "[t]o send product with melamine.")

not provide Exim assurances that it would pay for the milk or receive any more milk.[68]

53.    Despite Exim's request for assurance, Bariven contended that it had not cancelled the Milk Contract.  Answer to Second Set of Interrogatories, No. 3 (JTX 189).  It was only in the context of summary judgment motions in this litigation that Bariven changed its position in this regard and stated that the Milk Contract had been canceled.[69]

## C.    The Rice Contract

54.    Pursuant to the Rice Contract, Exim agreed to supply 19,200 metric tons of rice to Bariven in installments for a total price of $19,603,200.   (Rice Contract, JTX 24).   The Rice Contract required Exim to send original copies of shipping documents so that Bariven would receive them at least seven days before the shipment.   In particular, the Rice Contract provided that "[d]ocuments for all ocean shipments are required to be in possession of Bariven-Aduanas seven (07) working days prior to the arrival of the freight at the first Venezuelan Port." (JTX 24)

55.    Pursuant to the Rice Contract, from August 2008 through December 2008, Exim made twenty-three separate shipments of rice from Brazil to Venezuela,

---

[68]    Id.

[69]    Likewise, although the counterclaim referred to a possible rejection or revocation of the milk, Bariven never stated exactly which shipments it was rejecting and which were being revoked until August 2, 2010, when it filed its opposition to Exim's motion for summary judgment. (ECF 111, p. 15.)  Until that moment, Bariven refused to identify what shipments were rejected or revoked.  See Bariven Counterclaim ¶94 (Bariven is "entitled to revoke acceptance of any milk accepted, and to reject any other shipments of milk."); JTX 189 -Bariven's Answers to 2nd Set of Interrogatories at pg.5 ("Bariven rejected or revoked its acceptance of shipments 1 through 22").  It was only in the context of defending against summary judgment that Bariven identified that it was revoking its acceptance of Shipments 2-16 and rejecting Shipments 17-22.

totaling 16,200 metric tons, for a total price of $16,540,200. (JTX 195). PSI authorized payment for all of these shipments upon receiving invoices from Exim. Bariven routinely accepted the original shipping documents after the shipment had arrived.[70] Bariven never objected to this late delivery of documents.[71]

56. Similar to the prior 23 shipments of rice, Exim sent three shipments of rice, which arrived in Venezuela in January 2009 without original export documents. After 15 days in the port, Bariven had the ability to nationalize the rice shipments without the original export documents through a process called legal abandonment.[72] Despite this, Bariven failed to nationalize the rice shipments. (Bariven Counterclaim, ¶84).

57. Based on its unilateral decision not to nationalize these last 3 rice shipments and keep these shipments in port for several months, Bariven claims that charges related to the storage of these rice shipments were incurred. (Bariven Counterclaim, ¶87).[73] PDVSA Petroleos, S.A., not Bariven, was invoiced and paid for these charges.[74]

58. In light of Bariven's non-payment under the powdered milk contract, Exim had insecurity that Bariven would also not pay under the rice contract. (ECF 110, p.16]. Based on this insecurity, Exim requested assurances from Bariven that

---

[70]   Bello Dep. p. 38-40.

[71]   Id.

[72]   Ms. Bello, March 29, 2011 Trial Tr. p. 51.

[73]   Mr. Pulido, Mr. Kabboul and Mr. Gravina testified about severe congestion with food containers at Venezuelan ports at the end of 2008 and early 2009. (Pulido Dep. p. 66); (Kabboull dep. p. 70-74). Indeed, this later became a scandal in Venezuela well covered in international media (*see Economist* article, ETX 38) and resulting in the imprisonment of Bariven's President, Mr. Luis Pulido.

[74]   Ms. Bello, March 29, 2011 Trial Tr. p. 51 ("*Bariven's sister company [PDVSA Petroleos SA] is the one in charge or the one responsible for paying those in Venezuela.*")

it would perform on the rice contract. (JTX 163).   Bariven never provided the requested assurance.  [ECF 109 ¶55).

## IV.   ARGUMENT

**A.   In Order to Defeat Exim's Claims and Obtain Reimbursement of the Amounts Paid to Exim, Bariven Must Have Properly Rejected or Revoked Acceptance of Shipments 1-22**

59.   Bariven seeks to avoid the strictures of the UCC by simply arguing that the Milk Contract was cancelled, either by Exim when it filed its complaint in this case or by Bariven when it filed its counterclaim. (ECF 111 at 13-24)[75] Bariven claims that it is entitled to judgment on its breach of Milk Contract claim (Count I) because it cancelled the Milk Contract because of melamine contamination. Specifically, Bariven has argued that, because one or more installments contained melamine, pursuant to § 672.612(3) it is entitled to cancel the entire powdered milk contract and does not need to follow the procedures to reject or revoke the 22 shipments delivered before cancellation.   Bariven asserts that the Court "need not address . . . whether Bariven rightfully rejected or revoked acceptance of non-conforming installments."  (ECF 111 at 13).

60.   Bariven's claims in this regard are specious. In this litigation, Bariven has repeatedly admitted, even in closing arguments, that it did not cancel the Milk

---

[75]   Bariven's position on this issue has varied throughout these proceedings.   As discussed below, Bariven initially argued that it did not cancel the Milk Contract. (*See* JTX 189, Bariven Interr. Response #3); at the summary judgment stage Bariven argued that the Milk Contract was cancelled when it filed its counterclaim (*see* Bariven's Opposition to Exim Motion for Summary Judgment at 14 (ECF 111); and finally at trial, Bariven changed its position again and argued a hybrid: that Exim's filing of its complaint acted as a cancellation (*see* Bariven's Proposed Findings of Fact and Conclusions of Law, ¶130 (ECF145)) and that Bariven never cancelled the Milk Contract.  Closing Argument, March 31 Trial Tr. p. 140 ("*Mr. Mirenda: The interrogatories were asking whether Bariven canceled the contract.  And the answer is Bariven didn't cancel the contract.*")  Bariven's evolving legal position is a tacit admission that it cannot avoid the UCC by simply arguing that the Milk Contract was "cancelled."

Contract. (JTX 189, Bariven Interr. Response #3)("Bariven . . . states that Bariven did not cancel Purchase Order 5100062310 [the powdered milk contract]"; Closing Argument, March 31 Trial Tr. p. 140 ("*Mr. Mirenda: The interrogatories were asking whether Bariven canceled the contract. And the answer is Bariven didn't cancel the contract.*")). Nonetheless, even if Bariven had met its burden to establish cancellation, Bariven's argument still fails as it relates to Shipments 1-22.

61. Bariven misconstrues § 672.612(3). While § 672.612(3) permits a buyer to cancel a contract upon establishing substantial impairment of the whole contract, such cancellation merely discharges the buyer's obligations as to shipments delivered after, not before, the cancellation. *L&M Enterprises v. BEI Sensors & Systems*, 231 F.3d 1284, 1288 (10th Cir. 2000) ("substantial impairment justif[ies] cancellation as to the future undelivered balance of a contract."); § 672.612, comment 6 ("cancellation [is] as to the future [shipments]."). As to shipments delivered before cancellation, the buyer must establish proper revocation or rejection. This means that the buyer must establish that, as to each shipment, the non-conformity substantially impaired the shipment. Notwithstanding its admissions that it did not cancel the Milk Contract, Bariven now argues that the powdered milk contract was cancelled in either April 2009 or July 2009. (ECF #111 at 13-24). All 22 shipments at issue in this matter were received before those dates. Accordingly, Bariven's purported cancellation does not relieve it of its obligation to properly reject or revoke the 22 shipments delivered, including establishing that each of the shipments were substantially impaired.

**B.      The failure to timely test Milk Shipments 1-16 precludes Bariven from being able to revoke these shipments**

62.      Bariven asserts that it revoked acceptance of Shipments 1-16. Bariven is wrong.  Pursuant to Fla. Stat. § 672.608, in order to properly revoke goods, Bariven must prove (i) a nonconformity substantially impaired the value of the milk; (ii) it was induced to accept the goods because it would have been difficult to discover the nonconformity before acceptance or because of assurances from the seller; and (iii) revocation occurred within a reasonable time after the buyer discovered or should have discovered the non-conformity and before any substantial change in the condition of the goods.  While Exim argues that Bariven has failed to carry its burden as to each prong, Exim's analysis concentrates on the second and third prongs.[76]

63.      Specifically, Exim argues that

(i)      Bariven 10 month delay in its purported revocation is untimely;

(ii)      Bariven's failure to timely revoke acceptance was not caused by any inducement by Exim;

(iii)      Bariven's revocation was untimely because the milk was perishable and

(iv)      Bariven is barred from revoking the shipments based on melamine for failure to list it as a grounds for rejection.

64.      Exim addresses each argument in turn.

**(i)      Revocation of Acceptance After 10 Months is Untimely**

65.      Section 672.608, dealing with "Revocation of acceptance in whole or in part" provides that:

---

[76]      Exim asserts that Bariven has failed to establish that the shipments were substantially impaired.  However, the Court need not address this prong, because, as explained below, Bariven failed to carry its burden as to prongs two and three.

(2) Revocation of acceptance must occur **within a reasonable time after the buyer discovers or should have discovered the ground for it** and before any substantial change in condition of the goods which is not caused by their own defects. It is not effective until the buyer notifies the seller of it.

Similarly, *Gulfwind South, Inc. v. Jones*, 775 So. 2d 311, 312 (Fla. 2nd DCA 2000) the court held that buyer must establish that she "revoked her acceptance within a 'reasonable time.'"

66.    It is undisputed that Bariven accepted shipments 1-16.[77]  Shipment 16 was accepted no later than September 18, 2008 when Bariven paid for this shipment.[78]  Bariven allegedly "revoked"[79] its acceptance on July 6, 2009 with the filing of its counterclaim.[80]  This **10 month delay** in revoking Shipments 1-16 renders Bariven's revocation untimely.

67.    In this regard, the circumstances which gave rise to the Milk Contract – the Venezuelan food crisis - must be highlighted.   At trial, Bariven's officer in charge of the food acquisition program "on a high level", Ms. Azocar, testified that the Venezuelan food emergency made time "*of the essence*" in the Milk Contract

---

[77]    SJ Hr'g Tr. p. 33, Dec 10, 2010; ECF No. 111, p. 9.

[78]    JTX 194

[79]    It is undisputed that Bariven's revocation of acceptance was based on the melamine contamination, not lack of PSI inspection; SJ Order, p. 17 (ECF 136 )

[80]    Bariven's Opposition to Exim Motion for Summary Judgment at 15 (ECF 111))

It also bears mentioning that Bariven did not expressly "revoke" Shipments 1-16 when it filed its counterclaim.  The Counterclaim merely states that Bariven either rejected or revoked these shipments *See* Bariven Counterclaim, ¶95 (Bariven is "entitled to revoke acceptance of any milk accepted, and to reject any other shipments of milk."). In responses to interrogatories Bariven refused to identify exactly which shipments it was alleging that it had rejected and which it had revoked. JTX 189 -Bariven's Answers to 2nd Set of Interrogatories at pg.5 ("Bariven rejected or revoked its acceptance of shipments 1 through 22"). It wan only when it filed its Response in Opposition to Exim's Summary Judgment motion did Bariven expressly state that it had revoked Shipments 1-16. *See* Bariven's Counterclaim at 14 (ECF 111).

*The Court: Because of the food crisis in Venezuela, was it made known to Exim that **time was of the essence** or important in meeting the purchase order requirements?*

*A: Yes.  It was made known and the answer was that the timeline was on schedule, on time.*

Ms. Azocar, March 16, Trial Tr. p. 151; 156.

68.    As noted before, by October 2, 2008, Bariven was under explicit instructions to test all milk that emanated from China, including the milk provided by Exim.[81]   Nonetheless, Bariven did not even begin to sample Exim's milk until January 29, 2009.  Results from these two samples were received on February 20, 2009.[82]   At trial, Bariven offered three principal excuses for not testing Exim supplied milk in a more timely manner and some minor excuses.   None excuse Bariven's delay.  Indeed, a recitation of these excuses simply reinforce the cavalier attitude that Bariven took with respect to its obligations under the UCC and the disregard it had for Exim's rights.

69.    <u>First Excuse</u>: incredibly, despite there existing a food emergency in Venezuela, the principal reason adduced at trial for Bariven's delay in testing Exim milk was that the milk was located at Puerto Cabello, which results in a three (3) hour drive from Caracas to Puerto Cabello.

*Q: No samples were taken of Exim's milk until January 29; is that not correct?*

---

[81]    Ms. Azocar, March 17, 2011 Trial Tr. p. 21-22 (*Q. Now, staying on here right around the melamine alert, once the melamine alert, the Ministry of Healthy required that all milk coming from China was to be tested, is that not correct, for melamine? A. That is correct. Q. And this was as of at least as early as October 2008? A. Yes. Q.  Did this include Absolute Trading's milk? A. Yes. Q. Absolute Trading's milk was inspected by SGS and supervised by PSI in China; is that not correct? A. Correct Q. No samples were taken of Exim's milk until January 29; is that not correct? A. Yes. ….*); : JTX 48 (e-mail from Ms. Azocar)

[82]    *See* Plt. Ex. 52 (analysis of test provided by SGS).

*A:   Yes.  **This is mainly because of the logistical problems** we had.  Exim milk came through Puerto Cabello, which is three hours away from Caracas by car, an logistically it was more efficient to do the testing of the product that was in Caracas, Maiquetia, which is 30 minutes away by car.*

Ms. Azocar, March 17, Trial Tr. p. 22 (emphasis added).

70.   <u>Second Excuse</u>: Despite the national food emergency, it was simply too difficult for Bariven to find containers with Exim's milk.  Bariven simply blamed port congestion.

*Q: Can you describe ... when the ports began getting congested.*

*A: Between November and December 2008.*

*Q: And what caused this congestion?*

*A: The number of containers that were coming into port, also because it was Christmas season.*

*Q: And you say the congestion at the ports prevented Bariven from taking samples from Puerto Cabello.  Did I understand your response earlier correctly?*

*A: Yes.  This made logistics very complicated because the containers were stacked one on top of the other.*

Ms. Azocar, March 17, Trial Tr. p. 26 (emphasis added)

71.   <u>Third Excuse</u>: Despite having been instructed to test all milk from China, including Exim supplied milk, Bariven was only interested in testing milk supplied by Absolute Trading.

*The Court: You're saying that samples were taken in September and October 2008 of milk powder that was shipped in January 2008.  Did I understand that right?*

*A:  Of those shipments that were closer to that January date.*

*The Court: So this was the milk supplied by Absolute [Trading]?*

*A:  Yes.*

Ms. Azocar, March 16, Trial Tr. p. 165-166

72.   <u>Fourth (miscellaneous) excuses</u>: According to Bariven, December is a "dead month" because of holidays (Ms. Rodriguez, March 30, Trial Tr. p.9) and Ms. Rodriguez doesn't speak English which hindered her ability to contact foreign laboratories. (Ms. Rodriguez, March 30, Trial Tr. p.17).

73.   As the above cited evidence shows, there was absolutely no urgency shown by Bariven regarding Exim's milk.  Bariven did not even call the inspection agency it had under contract to inspect Exim's milk, SGS, until January (Ms. Rodriguez, March 30, Trial Tr. p.9). Indeed, even if Bariven's protestations as to the difficulty of having the milk tested in Venezuela are accepted, nothing explains that Bariven did not even considered bringing SGS or any other lab to Venezuela (Ms. Rodriguez, March 30, Trial Tr. p. 15)[83] or the fact that it never contacted labs in other countries (Ms. Rodriguez, March 30, Trial Tr. p.16).  In fact, even if it had ordered tests, as of January 2009 Bariven did not have an idea of what the proper melamine standard was (Ms. Rodriguez, March 30, Trial Tr. p.19).

74.   Although discussed in greater detail below, it must be noted that  the above actions (or, more specifically, inaction) by Bariven involved a product that it was aware was perishable.  (Ms. Azocar, March 17, Trial Tr. p. 25).

75.   Had Bariven acted promptly, Exim could have replaced any melamine tainted milk from its own suppliers.[84]   However, Bariven's unnecessary delay precluded Exim from being able to cure the delivery of any non-conforming milk.[85]

---

[83]      Bariven could have bought a machine to test melamine, had it installed, and obtained sample within 11 weeks. (*See* Mr. Mitchell, March 30, 2011 Trial Tr. p. 93.)

[84]      Chen Gang Dep. p. 11; Zhao Jianli Dep. p. 18.

[85]      Mr. Salges, March 14, 2011 Trial Tr. p. 197.

> **(ii)     Bariven's failure to timely revoke acceptance was not caused by any inducement by Exim**

76.     Regarding timeliness, pursuant to § 672.608(1)(b) Bariven argues that it was induced to accept the milk because Exim interfered with Bariven's discovery of the milk's alleged nonconformity.[86]   Bariven contends that it was induced to accept the milk because of assurances from seller.[87]   In particular, Bariven cites to correspondence from Exim CEO, Rogelio Salges, in which Mr. Salges stated that Exim's milk was "fine" and that melamine contamination was limited to infant formula produced by one company in one month.   (JTX 42).   However, Bariven's actual trial testimony on this issue was negligible.

77.     Initially, it must be noted that Mr. Salges' letter can not be construed to be an "assurance" as alleged by Bariven.  Mr. Salges' email was in response to a request for information from Bariven, not a request for assurance.  Bariven's simple email inquiry regarding Exim's performance to date does not constitute a request for assurance and Mr. Salges' letter does not constitutes such an assurance. *Advanced Bodycare Solutions LLC v. Thone International*, 615 F.3d 1352, 1361 (11th Cir. 2010).

78.     Further, the evidence proves conclusively that Bariven's delay in testing had nothing to do with Mr. Salge's letter.   The commentary to §

---

[86]    Summary Judgment Order at 17 (ECF 136)

§ 672.608(1)(b). (Revocation of acceptance in whole or in part) provides that:

(1) The buyer may revoke her or his acceptance of a lot or commercial unit whose nonconformity substantially impairs its value to her or him if she or he has accepted it:

(b) **Without discovery of such nonconformity if her or his acceptance was reasonably induced** either by the difficulty of discovery before acceptance or **by the seller's assurances**. (emphasis added.)

[87]    Summary Judgment Order at 17 (ECF 136).

672.608(1)(b) provides that "the reason for recognizing . . . assurances [as a ground for inducing acceptance] **is that they induce the buyer to delay discovery**." § 672.608, comment 3. (emphasis added).   In other words, the assurance must have delayed the buyer's inspection, which if done timely would have permitted the buyer to reject the product.   The buyer is not entitled to such an extension if it did not rely on the assurance.   *Smith v. Penbridge Associates, Inc.*, 655 A.2d 1015, 1021 (Pa. Super. 1995) (finding that seller's assurance only induce acceptance if the "assurances had the effect of inducing [the buyer] to delay . . . inspection of [the goods].");   *Highway Sales, Inc. v. Blue Bird Corp.*, 559 F.3d 782, 790 (8th Cir. 2009)(seller's assurances did not justify the delay because buyer "manifested no reliance on [seller's] assurances."); § 672.608, comment 3.

79.   The evidence establishes that Bariven did not rely on Exim's purported "assurances."   To the contrary, Bariven's witnesses testified that, despite Exim's purported "assurances," by October 2, 2008, Bariven was going to sample and test the Exim milk to confirm that it did not contain melamine.[88]  Because the milk issue was considered a matter of state in Venezuela, on October 2, 2008, just one week after Exim provided an e-mail regarding the milk's quality, Bariven directed that, notwithstanding this e-mail, the milk be sampled and tested.

> *"First week in October... the Venezuelan Government considered the shipments that we had in our ports... as a matter of state."*
>
> (*Azocar*, March 16, p. 162)
>
> **"Q: ... once the melamine alert, the Ministry of Health required that all milk coming from China was to be tested, is that not correct?**

---

[88]     JTX 48; Ms. Azocar March 17, 2011 Trial Tr. p. 21 ("as of at least as early as October 2008 [the ministry of required that all milk coming from China was to be tested]").

32

**"A:  That is correct.**

**"Q:  And this was as of at least October 2008?**

**"A:  Yes."**

Ms. Azocar, March 17, Trial Tr. p. 21 (emphasis added.)[89]

80.    This testimony makes clear that Exim's assurances did not cause Bariven to delay its inspection of the milk.

**(iii)      Bariven's revocation was untimely because the milk was perishable and it had changed conditions by the time Bariven revoked its acceptance**

81.    Similarly, Bariven did not establish that the revocation of acceptance occurred before any substantial change in the condition of the goods.[90]   As previously mentioned, between the time when Bariven should have discovered the alleged melamine breach (October 2008) and when it notified Exim through a counterclaim of the revocation based on melamine (July 6, 2009), close to nine months had elapsed.  This nine month delay is not reasonable under UCC standards given the perishable nature of powdered milk.

82.    "Under the U.C.C., a reasonable time for any action 'depends on the nature, purpose and circumstances' of that action."  *Arnold, Matheny and Eagan, P.A. v. First American Holdings, Inc.*, 982 So.2d 628, 635 n.3 (Fla. 2008).  "'What is a reasonable opportunity varies, depending upon the type of goods involved.'"

---

[89]      In addition to Ms. Azocar's live testimony at trial, a Bariven employee (Jorge Parra, Bariven's Procurement Superintendent in Food Products), testified in his deposition "Bariven did not . . . rely or did not consider adequate [Exim's] comments . . . assuring that the milk was fine."  (J. Parra Dep. p. 10).

[90]      Bariven also argues that the timing of its revocation is irrelevant because the goods were contaminated anyway and, thus "substantially impaired."  In essence, Bariven is attempting to remove the requirement that a revocation must be done in a timely manner as required by Fla. Stat. § 672.608. There is no basis for removing the timeliness requirement imposed by § 672.608.

*Rafter Seven Ranches L.P. v. C.H. Brown Company*, 546 F.3d 1194, 1207 (10 Cir. 2008)(citations omitted). If the goods are perishable, the notification period is shorter. *Levin v. Gallery 63 Antiques Corp.*, Case No. 04-CV-1504; 2006 WL 2802008 *19 (S.D.N.Y. Sept. 28, 2006) (recognizing that timeliness of notification is an issue as to "'perishable goods [or] goods which fluctuated rapidly in price.'").

83. Delay of revocation until after the product expired (such as is the case with the initial shipments) is clearly unreasonable and the UCC drafters recognized as much, providing that the revocation must occur "before any substantial change in condition of the goods." § 672.608(2); *see also* White & Summers, *Uniform Commercial Code* § 11-10 at 772-3 (5d ed. 1996) (citing *A.C. Carpenter, Inc. v. Boyer Potato Chips,* 7 UCCRS 493 (1969) (twelve day delay after delivery of potatoes is unreasonable), and citing *Mazur Brothers v. Jaffe Fish Co., Inc.,* 3 UCCRS 419 (1965) (five day delay after delivery of shrimp is unreasonable)).

84. The powdered milk was perishable and Bariven at all times recognized this fact.[91] Bariven's argues that shelf-life of the milk was twelve months, though expert testimony showed otherwise.[92] Shipments 1-16 were shipped between June 22, 2008 and September 10, 2008. (JTX 194). As such, even assuming that the milk was produced the day it was shipped (which of course it was not), the shelf life of Shipment 1 expired on June 22, 2009 (two weeks *before* revocation) while the

---

[91]    *See* testimony of Ms. Sulfani Azocar:

   *Q: Are you aware or were you aware at that time that powdered milk is a perishable good?*

   *A:  **Yes, it is perishable**, but it also has a like a shelf life that is pretty long, like a year, perhaps a little bit more than a year.*

   (Ms. Azocar, March 17, Trial Tr. p. 19) (emphasis added.)

[92]    Prof. Bradley, March 16, Trial Tr. p. 60; Mr. Mitchell, March 30 Trial Tr. p. 110.

last shipment of powdered milk expired on  September 10, 2009 (2 months after revocation).  Bariven's revocation was not timely as a matter of law.

85.    As to the remaining shipments, the milk would have expired within a month or two of the date of revocation, making the shipments unmarketable. As such, Bariven's delay in revocation of acceptance until July 6. 2009, was unreasonable and ineffective.

86.    The issue of the exact date of when Exim's milk expired was rendered, in large part, irrelevant by the testimony of Ms. Dubraska Rodriguez, Bariven's technical services analyst.  Ms. Rodriguez' testimony revealed that milk from each of the five shipments sampled prior to Bariven's "revocation" on July 6, 2009 (Bariven only tested 5 shipments prior to revoking Shipments 1-16) was already compromised. [93]   Indeed, the notes taken on January 29, 2009 of the first two shipments (for Shipments 7 and 8) sampled by Bariven show that up to 20% of the milk had already spoiled.   The following chart demonstrates the evidence in this regard:

---

[93]    Ms. Rodriguez, March 30, 2011 Trial Tr. p. 27-29.

Exim asserts that, given the conditions in which Bariven stored the milk, the shelf life of the milk was even less than six months.  Although substantiated by the evidence cited immediately below, this concept is easily understood.  If one purchases a gallon of milk at a store which states that the milk has a shelf life of one month, this shelf life presumes that the milk is properly stored in a refrigerator.  If the milk is simply left on a counter top of a non-air conditioned room instead of a refrigerator, the self life of the milk is reduced dramatically.  Clearly is exactly what occurred in this instance as Bariven did not store Exim's milk in a refrigerated warehouse.

| Shipment # (Ship Date) | Sample Date | Field Notes of Inspectors | Time Lapse between Shipping & Sample Dates |
|---|---|---|---|
| 7 (8/6/08) | 1/29/09 | **7 out of 50** bags present a Texture and Odor Not Characteristic (BVN000122) (JTX 130) | 176 days |
| 8 (8/7/08) | 1/29/09 | **10 out of 50** bags sampled presented Texture not Characteristic (BVN000120) (JTX 130) | 175 days |
| 3 (7/14/08) | 5/5/09 | Characteristics not desired (Texture and Odor) (BVN000158) (JTX 164) | 295 days |
| 5 (7/19/08) | 5/5/09 | Color and Texture Not Characteristic (BVN000152-153) (JTX 164) | 290 days |
| 16 (9/10/08) | 5/5/09 | Characteristics Not Desired (Texture & Odor) (BVN000166) (JTX 164) | 237 days |

87.     The evidence shows that whether the milk had a shelf life of only six months or Bariven simply failed to properly store the Exim supplied milk, this milk would spoil in less than six (6) months.  The chart below demonstrates that in this regard, Bariven's revocation on July 6, 2009 was simply untimely as the revocation occurred well after the six month time frame by when the milk would spoil:

| Shipment | Delay in Revocation |
|---|---|
| 1   (6/22/08) | 379 days |
| 2   (7/3/08) | 368 days |
| 3   (7/14/08) | 357 days |
| 4   (7/17/08) | 354 days |
| 5   (7/19/08) | 352 days |
| 6   (7/25/08) | 346 days |

| 7   (8/6/08) | 334 days |
|---|---|
| 8   (8/7/08) | 333 days |
| 9   (8/15/08) | 325 days |
| 10  (8/22/08) | 318 days |
| 11  (8/29/08) | 311 days |
| 12  (8/22/08) | 318 days |
| 13  (8/29/08) | 311 days |
| 14  (8/29/08) | 311 days |
| 15  (9/10/08) | 299 days |
| 16  (9/10/08) | 299 days |

88.     At trial Bariven attempted to avoid the issue of the perishable nature of the milk by citing to Comment 6 to § 672.608(2) which states that "[w]orthless goods, however, need not be offered back ... ." However, this comment is not relevant in this instance in that no evidence was introduced showing that Exim's milk was worthless, even if it had some amount of melamine.  To the contrary, Bariven's own witness, Ms. Azocar, testified that Bariven was looking into alternative uses of the milk, e.g. for use with animals, in the event the milk had melamine. *See* Ms. Azocar, March 17, 2011 Trial Tr. 22.  Consequently, Bariven can not prove Exim's milk was "worthless," except by virtue of its own negligence of allowing the milk to spoil.

89.     Simply put, Bariven's revocation of Shipments 1-16 was untimely. Although Venezuela's need for powdered milk was a "matter of State," Bariven

demonstrated no urgency when dealing with Exim's milk. The milk was perishable and was already becoming rancid within 6 months.  Despite knowledge of these facts, Bariven delayed in taking the first samples of Exim's milk for no less than four (4) months after China's melamine alert.  This delay was not caused by virtue of any statements on Exim's part as by October 2, 2008 the Ministry of Health required Bariven to test milk before nationalization.  Instead, Bariven's untimely revocation was caused by its own delay in sampling and testing the milk.

### (iv)      Bariven is Barred From Relying on Melamine Contamination to Establish Breach.

90.     In addition to the reasons stated above, Bariven cannot revoke acceptance of Shipments 1-16 because, before its revocation of acceptance on July 6, 2009, it attempted to improperly reject all shipments, including Shipments 1-16. (JTX 99, BVN003038).[94]  This failed rejection bars Bariven from now relying on melamine as a ground for breach.

91.     If a buyer fails to state a particular reason for rejection, it will have been deemed to have waived such an objection. Fla. Stat. § 672.605;[95] *In Re Mystic Tank Lines, Corp.*, 354 B.R. 694, 699 -700 (Bkrtcy.D.N.J. 2006) (construing

---

[94]     At trial, Bariven clarified that it was no longer asserting that the January 20 Claim Form addressed Shipments 1-16. (Closing Argument, A. Mirenda, March 31, 2011 Trial Tr. p. 59-60)   However, as with much of Bariven's legal arguments, this was a late development.  Reading the e-mail to which the Claim Form was attached, it is apparent that Bariven initially claimed that this Claim Form included Shipments 1-16. JTX 114 ("any recent shipment of this product without PSI supervision is rejected.")  It was only on August 2, 2010, that Bariven disclosed that it had revoked – not rejected - Shipments 1-16 on July 6, 2009 with the filing of its counterclaim. (ECF 111.) Before that disclosure, the only evidence contemporaneous with the actual events shows Bariven attempting to *reject* all shipments (1-22) through the Claim Form.  Certainly, the Claim Form itself does not limit its effect to only Shipments 17-22.

[95]     The statute provides that: "(1) the buyer's failure to state in connection with rejection a particular defect which is ascertainable by reasonable inspection precludes the buyer from relying on the unstated defect to justify rejection or to establish breach:  (a) where the seller could have cured it if stated seasonably ... ." Fla. Stat. § 672.605(1)(a).

UCC provision identical to Fla. Stat. §672.605) ("Where a buyer rejects the goods delivered by the seller, the buyer must identify the particular defect. If the buyer fails to identify the defect, it is precluded from relying on the unstated defect to justify rejection or breach where the seller could have seasonably cured the defect."); *see also Pennfield Precision, Inc. v. Atlantic Castings and Engineering Corp.*, 1990 WL 158193, *9 (E.D.Pa. 1990) (same).

92.    On January 20, 2009, Bariven submitted to Exim the Claim Form purporting to reject all shipments of milk delivered to that point. (JTX 114).   The Claim Form was explicit with respect the basis of rejection: "Rejection of product sent to Venezuela due to lack of inspection under PSI Supervision as requested and described in the PO."   Nowhere did the Claim Form mention melamine.   As such, pursuant to  § 672.605, Bariven forever waived that objection and cannot rely on it to establish a breach justifying revocation of acceptance.

**C.    Bariven failed to properly reject Milk Shipments 17-22**

93.    The pertinent standards for rejection of a sale of goods in an installment contract under Florida Law are provided in Fla. Stat. § 672.612:

> (2) The buyer may reject any installment which is nonconforming *if the nonconformity substantially impairs the value of that installment and cannot be cured* or if the nonconformity is a defect in the required documents; but if the nonconformity does not fall within subsection (3) and the seller gives adequate assurance of its cure the buyer must accept that installment.  (emphasis added.)

*See also*, *Midwest Mobile Diagnostic Imaging, L.L.C. v. Dynamics Corp. of America*, 965 F.Supp. 1003, 1011 (W.D.Mich. 1997) ("Under subsection (2), a buyer may not reject nonconforming tender unless the defect substantially impairs the value of the installment."), *Design Plus Store Fixtures, Inc. v. Citro Corp.*, 508 S.E.2d 825, 827 (N.C. Ct. App. 1998) ("Rejection of an installment   is appropriate only if "the

nonconformity substantially impairs the value of that installment ….") As such, in order to properly reject, the buyer must establish that the alleged nonconformity substantially impaired the installments (here, Shipments 17-22).

94.    However, Bariven *never* tested Shipments 17-22 for the presence of melamine.  Despite the fact that this issue was a "matter of State," Bariven decided not to test these shipments which all came after China lifted the embargo on milk exports.[96]  The testimony at trial on this issue was nothing less than astounding. Bariven's representative could give no reason for the decision not to test Shipments 17-22:

> *A: And my questions* were *really dealing with shipments 17 through 22, which were never tested and my question is: Since those came after China allowed the export of milk in December 2008, and Bariven wanted to find out whether or not – to verify whether or not the Chinese actions were, in fact appropriate, why it was never tested?*
>
> *Q: I do not have an answer to that; I do not know.*

Ms. Azocar, March 17, p. 25-26

95.    Because there is absolutely no evidence that any of the Shipments 17-22 actually contained non-conforming goods or were otherwise "substantially impaired," Bariven is forced to use a pretextual argument for its purported rejection of these shipments.  It claims that the lack of pre-shipment inspection "substantially impaired the value of each of these shipments because, in light of the

---

[96]    Shipments 17-22 were delivered only after extensive and newly mandated melamine tests conducted by the Chinese government as well as SGS-China melamine tests ordered by Exim (a precaution never undertaken by Bariven).

*"And only after passing CIQ inspection would the goods be permitted to be exported from China."*  (Gang Dep. p. 25)

*"First they went through our testing and secondly went through testing by CIQ. Because all dairy products exported from China have to go through CIQ testing and only if they pass the CIQ testing will they be allowed to be exported."*  (Jianli Dep. p. 16)

melamine scandal, Bariven could not distribute powdered milk from China unless it was confident that the milk did not contain melamine.   Bariven could not be confident that the milk was safe if it had no control over pre-shipment inspections." [ECF 111, p.20].   Exim asserts that lack of PSI supervised inspections did not substantially impair the shipments for four reasons:

i.   The trial testimony and internal Bariven documents reveal that "document inspections" were not the actual reason for the rejection.  Moreover, Bariven representatives testified that, regardless of whether there had been PSI inspection, it would not distribute the milk until it had been re-tested in Venezuela.   Thus, as to all Chinese milk, regardless of whether PSI inspection requirement has been satisfied, it had to be tested again in Venezuela.

ii.   SGS-China was an affiliate of SGS - the inspection agency retained by Bariven to conduct the inspections.

iii.   The PSI inspection mandated by the powdered milk contract called for nothing more than a review of the documents generated by SGS-China.  <u>PSI did not actually sample and run laboratory tests on the milk</u>.   As such, compliance with the powdered milk's inspection requirement had no bearing on whether Bariven was "confident that the milk was safe."  The inspection reports from SGS-China included all material information that was to be included in the PSI supervised inspections.

iv.   Finally, the inspection requirement could easily be cured when the milk arrived in Venezuela.  There can be no substantial impairment when nothing prevented Bariven from conducting the identical field inspection in Venezuela as China (indeed, it would appear that such an inspection would have been easier for Bariven to conduct in its own country than across the world in China.

96.   Exim addresses each of these arguments below.

**(i)   The lack of PSI supervised inspections was not the reason for rejecting Shipments 17-22, but was only a pretext**.

97.   Bariven seeks to convince the Court that it rejected Shipments 17-22 because they did not have "PSI supervised inspections" as required by the Milk Contract.  The trial testimony and documentary evidence proves the contrary.

98.     The pretextual nature of Bariven's argument is revealed when it is recognized that Bariven issued the Claim Form rejecting all shipments on January 20, 2009. (JTX 114),  but Bariven did not reject nor return Shipments 17-22 when they arrived in port after that date.  The testimony on this issue in unequivocal:

> *Q. So we have a claim form rejecting milk shipments and then we got milk shipments arriving after that date. Were you ever given instructions to turn it away as we discussed before using the procedure to turn away that we had discussed earlier in your cross-examination?*
>
> *A. No, I had no knowledge.*
>
> Ms. Bello, March 29, Trial Tr. p. 49

99.     Internal Bariven e-mails reveal that the true reason for rejecting Shipments 17-22 had to do with the fact that  Bariven could not nationalize Exim's milk.   A January 12, 2009 e-mail from Ms. Azocar states the real reason for rejection:

> Good afternoon, María. It is true what you say. We invited [Exim] to a meeting on several occasions and finally it was agreed for 12/17/2008, but [Exim] canceled it because of health reasons.  We are waiting for a new meeting this month which can no longer be delayed. ***The milk from China that is being sent by [Exim] is a product that is not in conformity because the Health Ministry did not grant the permission for its nationalization, therefore, the reason why we should not pay for it.***  Tomorrow we will call him and ask him again to come to a meeting. I suggest that from now on before making any food payments, you check with me and we will avoid any misunderstanding. The rice is in conformity;  therefore, we can pay for it.
>
> E-mail from S. Azocar to M. Alvarez, Jan. 12, 2009 (JTX 101)

100.   Ms. Azocar's trial testimony leaves no doubt as the meaning of this e-mail:

> *Q: So if I understand this email correctly, you are instructing Maria Carmen Alvarez not to pay Exim Brickell because the nationalization certificate had not been obtained; is that correct?*

*A: Yes, that's correct.*

Ms. Azocar, March 17, Trial Tr. p. 31

101.   Further evidence of the pretextual nature of Bariven's "rejection" of Shipments 17-22 is revealed by virtue of the fact that the Letter of Credit backing the Milk Contract was extended after January 21, 2009 meeting between Mr. Salges of Exim and Mr. Kabboul of Bariven. (JTX 126)  Again, trial testimony proves that the reason why the Letter of Credit was extended was to **guarantee** that Exim would be paid for Shipments 18-22.[97]

> *Q: With respect to that, you also expected to talk about suspending any payments to Exim Brickell* **but you were going to extend the letter of credit because you wanted to guarantee that Exim got paid** *and you wanted to show that you had trust in Exim, is that not correct?*
>
> *A: Yes, that is correct.*

Ms. Azocar, March 17, Trial Tr.p. 33 (emphasis added.)

102.   The fact that Bariven wanted to guarantee Exim's payment for Shipments 18-22 conclusively disproves that Bariven was rejecting these shipments.

### (ii)    SGS-China is an affiliate of SGS and provided inspection reports that satisfied the Milk Contract requirements

103.   Bariven argues that the SGS-China reports provided by Exim did not comply with the Milk Contract because the inspections had to be conducted by SGS-NA, not SGS-China.[98]  This argument was rejected by the court in Curacao which

---

[97]    As previously mentioned, Bariven had paid for Shipment 17.

[98]    "*The Court: But why did you tell me that earlier once the emergency was occurring in China that your main concern was whether the supplier was doing tests on the product, if you were so worried about the specifics of your contract?*

*A:  Because any test that the supplier might do had to be certified by SGS.*

ruled that the SGS-China documents provided by Exim were sufficient and ruled that Exim was entitled to be paid under the Letter of Credit. (Curacao judgment, JTX 172)  Based on comity, this Court should respect the Curacao judgment. *Belize Telecom v. Government of Belize*, 528 F.3d 1298, 1306 n. 10 (11th Cir. 2008) ("any foreign decree should be recognized as a valid judgment, and thus be entitled to comity [where certain conditions are met]")

104.   In addition to the Curacao judgment, documentary evidence presented at trial proves that SGS-China satisfied the Milk Contract requirements. First, in the Letter of Credit itself, Bariven identified the inspection company as the "SGS Group," not SGS-NA. (Letter of Credit, JTX 13) ("Certificate of inspection issued and signed by an authorized officer of SGS Group at the port of loading ...")

105.   Further, an e-mail exchange between PSI and Bariven again identifies only "SGS" as the inspection company.  (JTX 4) ("Please be advised that SGS will need to issue a Release Notice for every shipment ... .")

106.   Finally, the SGS-NA representative testified that SGS-NA would not have conducted the "PSI supervised" inspections, but that the inspections would have been outsourced to a SGS affiliate in China.

---

*The Court: So you had SGS-China.  Your earlier documents didn't specify – well your early documents that I read only said SGS certified.  So if SGS was doing the tests, then why wasn't that sufficient?*

*A:  Because we had the contract, it was with SGS North America and if I wrote SGS, it is implicit that it means SGS North America because it was with them that we had the inspection contract.*

*The Court: Well, you mean implicit in your mind?*

*A:  Yes, because we make our payments to SGS North America. ...*

(Ms. Azocar, March 16, Trial Tr. p. 179)

> "In this case, because the order is in China, we send it to SGS
> Industrial Services Division in China, my counterpart--office in
> Shanghai, our primary link-- to review the order, and coordinate as
> per the details therein."

Mr. Cisneros Dep. p. 23

107.   This testimony provides further proof of the pretextual nature of
Bariven's argument that SGS-China was not the inspection agency authorized by
Bariven to conduct the "PSI supervised" inspections.   Certainly, it is conclusive
proof that the inspections conducted by SGS-China did not "substantially impair"
Shipments 17-22.

### (iii)       The PSI supervised inspections called for "document inspections" and not laboratory tests

108.   Contrary to Bariven's arguments, the PSI inspection contracted by
Bariven with SGS-NA did not involve sampling and testing which would have
allowed Bariven to "be confident that the milk was safe." Specifically, the
inspections contracted for by PSI did not entail laboratory tests, but only a review
of the documents at the port of loading that would reveal whether the *documents*
conformed to the Milk Contract.  This fact is conclusively proved by the minutes of
an internal meeting between SGS-NA and PSI, which state:

> The personnel at SGS Houston explained that there are two types of
> inspection performed by SGS China based on the information provided
> by Exim Brickell.
> - Supervision of the loading and review of documents: to
>   ascertain whether the containers were clean, the packs, pallets
>   and loaded containers are examined and the closing of the
>   containers with a seal are certified.
> - Laboratory tests of a milk sample showing its chemical
>   composition.  This sample of milk can be taken to the SGS
>   laboratory o it can be taken as part of the lot that is loaded in
>   the containers.

**Similarly it was noted that if SGS Houston had performed the inspection ordered by PSI, the laboratory tests would not have been done because they do not fall within the scope of work contracted with SGS.**

Minutes of 2/5/09 PSI/SGS-NA meeting (JTX 134) (emphasis added) *see also* (Cisneros Dep. p. 21, 17, 86); (JTX 134, BVN 1922-23).

109. Because the PSI did not contract with SGS-NA to conduct "laboratory tests," compliance with this inspection requirement would have had no bearing on whether Bariven was "confident that the milk was safe."[99]

110. Finally, Mr. Cisneros, the SGS-NA representative testified at his deposition that the SGS-China reports provided by Exim contained all the material information that would have been provided by SGS-NA under its contract with PSI. *See* Cisneros Dep. p. 83.

**(iv)    Bariven could have cured the alleged lack of PSI supervised inspection**

111. As set forth above, § 672.612(2) provides that

The buyer may reject any installment which is nonconforming if the nonconformity substantially impairs the value of that installment **and cannot be cured** or if the nonconformity is a defect in the required documents; but if the nonconformity does not fall within subsection. (emphasis added).

112. Bariven has been unable to explain why it could not cure the inspection requirement upon the milk's arrival in Venezuela.   The inspection requirement was at all times solely in Bariven's capacity to conduct.   Indeed,

---

[99]    Bariven's substantial impairment argument is further undermined by Bariven's testimony that, if it had been able to nationalize the milk, Bariven would have distributed the milk notwithstanding the lack of inspection. (Mr. Parra Dep. p. 23-26).

Bariven's trial testimony regarding the alleged substantial impairment —Bariven's inability to distribute the milk— also disproves its arguments because of the Venezuelan Health Ministry's requirement that all milk be retested in Venezuela before distribution. Thus, regardless of whether the PSI inspection had occurred in China, Bariven was required by the Venezuelan Ministry of Health to retest the milk in China.

Bariven is making the document inspection argument because it is explicitly rejecting the reports prepared by SGS-China (an affiliate of SGS-NA) which contained all the information its own inspection would have produced.

113. Lack of PSI supervised inspections did not substantially impair Shipments 17-22.  PSI inspections did not include laboratory tests. Regardless of whether PSI inspections had been conducted, Ministry of Health still required tests to be performed (tests which were <u>never</u> conducted).

114. But, as shown above, PSI inspections are but a pretext: real reason was that Bariven wanted to delay payment until Ministry of Health allowed nationalization.

**D.     Bariven's Breach of Warranty Claim Related to the Milk Contract fails due to its failure to provide timely notice of breach**

115.   In addition to seeking to recover the purchase price of Shipments 1-16 on grounds of revocation and cancellation, Bariven also pursues a claim for breach of implied warranty of merchantability.  Bariven asserts that the powdered milk was not merchantable because it contained melamine.  This assertion is a non-starter because Bariven failed to provide a notice of breach regarding Shipments 1-16, whether based on melamine or any other basis.

116.   "In order to properly plead a cause of action for breach of warranties under the Florida Uniform Commercial Code a complaint should contain at least the following allegations: (1) facts in respect to the sale of the goods; (2) identification of the types of warranties created, *i.e.* express warranty Section 672.313 . . .; (3) facts in respect to the creation of the particular warranty . . .; (4) facts in respect to the breach of the warranty; (5) notice to seller of breach; (6) the injuries sustained by the buyer as a result of the breach of warranty." Section 672.607(3)(a), Florida

Statutes (1975); *James v. Ashley Adams Antiques, Inc.*, No. 2:05-cv-515-FtM-29DNF; 2006 WL 4990908 *5 (M.D. Fla. June 15, 2006). Exim centers its analysis on the fourth and fifth elements, which require that the buyer establish breach and timely notification of breach to the seller. Bariven has failed to carry its burden to establish either of these requirements.

### (i)    Bariven did not provide timely notice of breach

117.  Regarding timely notice of breach, § 672.607(3)(a) states that "buyer must [timely] notify the seller of breach **or be barred from any remedy**." (emphasis added). In *Federal Ins. Co. v. Lazzara Yachts of N. America*, 8:09-CV-607-T-27MAP; 2010 WL 1223126 *5 (M.D. Fla. Mar. 24, 2010), the court recognized, specifically in the context of a warranty claim, that "'[t]he buyer must within a reasonable time after he or she discovers or should have discovered any breach notify the seller of breach or be barred from any remedy.'" Hence, Bariven must establish that it timely notified Exim of the breach of the powdered milk contract.

118.  Bariven asserts that, under the UCC, a proper notice of breach merely requires that the notice let the seller know "that the transaction is still troublesome and must be watched." (ECF #111 at 22). However, "mere notice that a transaction is 'troublesome' is not enough." *K&M Joint Venture v. Smith International, Inc.*, 669 F.2d 1106, 1113 (6th Cir. 1982). Rather, "[t]he critical issue . . . was whether the seller 'had notice it was considered to be in breach.'" *Id.* (citations omitted).

119.   In describing what constitutes a proper notice of breach under the UCC, the Fifth Circuit, in a precedent that remains binding in this Circuit, has stated:

> However, the fact that the Code has eliminated the technical rigors of the notice requirement under the Uniform Sales Act does not require the conclusion that any expression of discontent by a buyer always satisfies section 2-607. As Comment 4 indicates, a buyer's conduct under section 2-607 must satisfy the Code's standard of commercial good faith. **Thus, while the buyer must inform the seller that the transaction is "still troublesome," Comment 4 also requires that the notification "be such as informs the seller that the transaction is claimed to involve a breach, and thus opens the way for normal settlement through negotiation."** (emphasis added.)

*Eastern Air Lines, Inc. v. McDonnell Douglas Corp.,* 53 F.2d 957, 976 (5th Cir. 1976).

120.   Simply put, prior to the filing of its counterclaim on July 6, 2009, Bariven <u>never</u> gave notice to Exim of a breach regarding Shipments 1-16.[100]   Notice of breach at that time is not timely.  *See* Section IV (B)(i) ¶¶ 65-75 above.  Without such notice, the breach of warranty claim fails.

---

[100]   Bariven has admitted that the January 20, 2009 Claim Form applies only to Shipments 17-22 and does not apply to Shipments 1-16. *See* Closing Argument, A. Mirenda, March 31, 2011 Trial Tr. p. 59-60.

Moreover, even if at this late date Bariven's legal position changes again, the failure to list melamine contamination in the Claim Form as grounds for breach precludes its being the basis for a warranty claim.  "The buyer's failure to state in connection with rejection a particular defect which is ascertainable by reasonable inspection precludes the buyer from relying on the unstated defect to justify rejection **or to establish breach** . . . ."  *See* Fla. Stat. § 672.605 (1) (emphasis added).  *See also In Re Mystic Tank Lines, Corp.*, 354 B.R. 694, 699 -700 (Bkrtcy.D.N.J. 2006) (construing UCC provision identical to Fla. Stat. §672.605) ("Where a buyer rejects the goods delivered by the seller, the buyer must identify the particular defect. If the buyer fails to identify the defect, it is precluded from relying on the unstated defect to justify rejection or breach where the seller could have seasonably cured the defect.") As noted, the Claim Form did not mention melamine contamination.  Thus, Bariven is barred from "establish[ing] breach" of the implied warranty of merchantability based on purported melamine contamination.

121.   Bariven has previously argued that notice of breach was given to Exim by virtue of Jorge Parra's September 19, 2008 email to Exim.  In that email, Mr. Parra stated:

> In light of international news concerning possible problems with milk from China, I would like to get your comments concerning the plants that are used for our deliveries and additional measures that are being taken to preserve the quality and reliability of the shipments being received, considering that our greatest priority is consumer health.

(JTX 42).

122.   Mr. Parra's email does not claim that Exim is in breach, but rather just asked Exim for information about the melamine alert related to Chinese milk.  In no manner can it be considered a notice of breach under the standard enunciated in *Eastern Air Lines, supra.*

123.   Bariven now asserts that at the January 21 meeting held between Mr. Salges (Exim's President) and Mr. George Kabboul (Bariven's President) a notice of breach with respect to Shipments 1-16 was given.  However, this revisionist history is not credible for two reasons. First, Bariven sent the Claim Form to Exim the day immediately before the January 21 meeting which Bariven admits does not refer to Shipments 1-16.   Thus, despite having sent a formal, written notice of breach (rejection) the prior day, Bariven seeks to convince the Court that some type of oral notice of breach was given the very next day regarding Shipments 1-16. Second, notice of breach regarding Shipments 1-16 could not possibly have been given on January 21 as at that time Bariven had absolutely no evidence that any of Exim's milk was contaminated by melamine as it had not yet even taken its first sample to conduct a test for the presence of melamine (the first sample was taken over a week later on January 29, 2009).

124.   Because Bariven did not provide timely notice of breach regarding Shipments 1-16, its breach of warranty claim fails.

**(ii)        Bariven did not prove that a breach of warranty occurred**

125.   Bariven asserts that a breach of warranty occurred by virtue of the fact that Shipments 1-16 were contaminated with melamine.  Bariven did not prove this element.

126.   As an initial matter, it must be noted that by the time Bariven filed its claim for breach of warranty, it had only tested 5 of the 16 shipments. *See* Ms. Rodriguez, March 30, 2011 Trial Tr. p. 25-26.   This was insufficient to establish a breach of warranty as to the totality of Shipments 1-16.

127.   Further, the tests performed by Bariven were designed to detect the *presence* of melamine. *See* Cusak, March 30, 2011 Trial Tr. p. 49-50.  However, in order to detect the exact amount of melamine, Bariven was required to take a representative sample of the milk, which would have required the use of a coring device or "thief." (Prof. Bradley, March 16, 2011 Trial Tr. p. 71.)  As a consequence, the test results obtained by Bariven are wildly divergent.  For example, the chart below shows results obtained by Bariven's expert laboratory (Certified Labs) for the same lots:

| Shipment # | Batch # | Lowest detected melamine level | Highest detected melamine level |
|---|---|---|---|
| 4 | 2008.06.00 | <.25 | 117 |
| 5 | 12.07.2008 | <.25 | 39.2 |
| 6 | 22.07.2008 | <.25 | 652 |
| 9 | 07.08.2008 | <.25 | 239 |
| 10 | 15.08.2008 | <.25 | 2800 |
| 16 | 02.09.2008 | 1.1 | 352 |
| | 29.08.2008 | <.25 | 84 |

128.   Such inconsistent results simply can not support Bariven's claim of breach regarding Shipments 1-16.

**E.   There Exists No Evidence to Sustain Bariven's FDUPTA and Breach of Implied Covenant of Good Faith Claim**

129.   "A consumer claim for damages under the FDUTPA has three elements: (1) a deceptive act or unfair practice; (2) causation; and (3) actual damages." *Rollins, Inc. v. Butland*, 951 So. 2d 860, 869 (Fla. 2d DCA 2006), *review denied*, 962 So. 2d 335 (Fla. 2007).   A practice is unfair when it "`offends established public policy and when the practice is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers' (or competitors or other businessmen)." *See Day v. Le-Jo Enters., Inc.*, 521 So. 2d 175, 178 (Fla. 3d DCA 1988).   Absent "significant allegations of unfair or deceptive conduct," a complaint that merely alleges intentional breach of contract is insufficient to state a claim

under FDUTPA. *See Hache v. Damon Corp.,* 2008 WL 912434 at *2 (M.D.Fla.

2008).

130.   Bariven claims that Exim's following conduct was deceptive or unfair:

- Exim failed to disclose that the milk manufacturer reformulated the milk formula to bring it into compliance with Bariven's requirements.

- Exim failed to inform Bariven then Suncare had informed it that it had been forced to stop production and was recalling its product due to melamine contamination.

- Exim represented that renewed testing was done on retained samples, knowing that the samples tested were not retained samples.

- Exim failed to inform Bariven of an email indicating that to resume shipment the CIQ officers "would need some bribery, I would negotiate to reduce your cost."

(ECF 141, p. 11-12).

131.   Bariven alleges that, in the aggregate, this conduct evidences Exim's

efforts to conceal material information regarding the questionable quality of the

milk.  In short, Bariven attempts to frame Exim as knowing that the milk contained

melamine and concealing this fact.  However, the evidence does not bear this out.

To the contrary, the evidence reveals that Exim exceeded its contractual

requirements in responding to the melamine alert and attempting to ensure that

the milk that was provided and would be provided in the future was melamine free.

132.   Bariven has provided absolutely no proof with respect to any of the

three elements required to state a claim under FDUPTA.  The issues of causation

have been discussed above (Bariven would not have suffered any of its alleged

damages relating to the Milk Contract if it had timely performed tests for melamine

starting in October 2008).

133.   Significantly, there absolutely no evidence of a deceptive act or unfair trade practice by Exim.  In fact, the evidence proves the contrary.

134.   The evidence at trial showed Exim's proactive and good faith efforts to comply with Milk Contract:

- Exim hired SGS (Bariven's inspection company of choice) to assist it.  *See* Mr. Salges, March 14, 2011 Trial Tr. p. 163.
- Exim had SGS conduct audits of suppliers *See* Mr. Salges, March 14, 2011 Trial Tr. p. 133.
- Upon learning of the melamine alert, Exim gave instructions to "make arrangements with SGS to perform additional[] melamine test in our lab test by batch . . . We need to know if the milk . . . produced for us faced any kind of exposure."  (JTX 40) (*compare,* Bariven waited 5 months before sampling) *See* Mr. Salges, March 14, 2011 Trial Tr. p. 188.
- Upon Melamine Alert, Exim contracted SGS to conduct melamine tests on all new shipments (*compare,* Bariven <u>never</u> tested Shipments 17-22). *See* Mr. Salges,March 14, 2011 Trial Tr. p. 212-213.[101]
- Exim offered to go out of its way to find alternate, non-Chinese milk suppliers to supply milk to Bariven.  (JTX 59) Bariven refused this request.

135.   To support its FDUPTA claim, Bariven attempts to use Exim's proactive and good faith efforts against it.  However, it must be noted that:

- Exim had no contractual requirement to have SGS conduct audits of suppliers. *See* Mr. Salges, March 14, 2011 Trial Tr. p. 162.
- Exim immediately sent to Bariven the results of the SGS tests on prior shipments of Suncare. *See* Mr. Salges,  March 14, 2011 Trial Tr. p. 195.

136.   According to Bariven's theory, Exim would have been better off not conducting audits or requesting immediate tests (similar to Bariven's actions in this case)

---

[101]   In stark contrast, Bariven did not amend its inspection requirements with SGS-NA to include tests for melamine; moreover, it even failed to test the milk shipments it had in its possession for months.

137.   Bariven's FDUPTA claim fails due to a complete absence of evidence to support the claim and evidence proving the contrary – Exim at all times acted in good faith.

138.   Moreover, a cause of action under the implied covenant of good faith may only be maintained where an express term of the underlying contract has been breached. *Shibata v. Lim*, 2000 U.S. Dist. Lexis 20053, *15-*19 (M.D. Fla. 2000) (citing *Burger King Corp.*, 169 F.3d at 1316-17 (11th Cir. 1999) (requiring contract breach to sustain action for breach of covenant)).   The § 672.605 and untimely notification analysis related to Bariven's implied warranty of merchantability claim applies equally to Bariven's implied covenant of good faith claim.

**F.   Exim is Entitled to Damages for Bariven's Anticipatory Repudiation of the Milk Contract**

139.   Pursuant to § 672.610(2) Exim is entitled to bring suit for anticipatory repudiation.  That section reads:

> When either party repudiates the contract with respect to a performance not yet due the loss of which will substantially impair the value of the contract to the other, the aggrieved party may: …
>
> Resort  to any remedy for breach … even though the aggrieved party has notified the repudiating party that she or he would await the latter's performance and has urged retraction

140.   The Eleventh Circuit has found that an anticipatory repudiation of a contract gives rise to damages.  *Dunkin' Donuts of America, Inc. V. Minerva*, 956 F.2d 1566 (11th Cir. 1992):

> "[U]nless the repudiation is withdrawn it operates as a `continuing offer' of a breach which may be taken advantage of at any time." This court has held, all that is required to close the door to repentance is definite action indicating that the anticipatory breach has been accepted as final, and this requisite can be supplied either by the filing of a suit or firm declaration, as here, that unless within a fixed time the breach is repudiated, it will be accepted.

55

141.   In order to determine whether Exim is entitled to damages for anticipatory repudiation of the Milk Contract, the Court must analyze three issues:

(i) whether Exim is entitled to recover damages based on anticipatory repudiation even if Bariven can establish a prior breach by Exim;

(ii) whether Bariven ever cancelled the Milk Contract; and

(iii) whether Bariven anticipatorily repudiated the Milk Contract

142.   The three issues are discussed in turn below.

### (i)       Exim is entitled to damages even if Bariven can prove the existence of a prior breach by Exim

143.   At closing argument the Court posed the question whether a prior breach by Exim would preclude it from obtaining damages based on anticipatory repudiation.  *See* Closing Argument, March 31, 2011 Trial Tr. 133-134. The answer to the Court's question is unequivocally no; Exim is entitled to damages for anticipatory repudiation even if there existed some prior breach on its part.

144.   The issue is governed principally by § 672.612(3) which provides that

Whenever nonconformity or default with respect to one or more installments substantially impairs the value of the whole contract there is a breach of the whole. **But the aggrieved party reinstates the contract if she or he accepts a nonconforming installment without seasonably notifying of cancellation** or if she or he brings an action with respect only to past installments or demands performance as to future installments.

145.   Although this section discusses the issue in terms of "reinstating" the contract, commentators refer to a buyer waiving its right to cancel the contract as to future shipments based on the non-conformity in the retained goods.[102]   The cases discussing this section are in accord.

---

[102]      Elizabeth Patterson, *UCC Section 2-612(3): Breach of an Installment Contract and a Hobson's Choice for the Aggrieved Party*, 48 Ohio St. L.J. 177, n.61 (1987) ("Actually the use of word 'reinstates' in § 5-612(3) is infelicitous.  The reinstatement provision governs situations here an aggrieved party has failed to make an overt cancellation.  Therefore, the

146.   It has been specifically held that a buyer's failure to cancel a contract upon the occurrence of a breach by seller, effectively constitutes a waiver by the buyer to assert the prior breach as a defense to a claim for breach of contract.  The case that addresses this issue most directly is *Holford USA Ltd., Inc. v. Cherokee, Inc.*, where the buyer argued that seller's prior breach excused buyer's non-performance notwithstanding the fact that the buyer had not cancelled the contract. 864 F. Supp. 364 (S.D.N.Y. 1994).  In rejecting buyer's argument, the court stated:

> I assume *arguendo* that there came a point when [seller] was in breach as to some perhaps many, of the goods. But that conclusion does not sweep the boards for [buyer].  This contract contemplated many shipments over a five year period. If, as I assume, there were breaches .  . . as to some shipments, [buyer] had the right to treat those breaches as a breach of the entire contract if those defaults "substantially impair[ed] the value of the whole contract . . ."  . . . But [seller] did [not cancel the contract]. Indeed, [buyer]'s counsel specifically asserted during argument that the contract remains in effect.   Accordingly, [buyer] cannot excuse any future failure to comply with [its contractual obligations] on the basis of any prior [breach] by seller.

*Id.* at 372.  *See also BOC Group, Inc. v. Chevron Chemical Co.*, LLC, 819 A.2d 431, 440 (NJ Super. Ct. App. Div. 2003) (seller sued buyer for breach of requirement contract, and buyer argued as a defense that it had the right to cancel based on seller's late deliveries of product.  Court rejected this defense reasoning that buyer

---

provision should more accurately refer to a waiver of the right of cancellation, as does comment 6 to § 2-612(3) … In other words, how can the aggrieved party 'reinstate' a contract which the Code assumes that party has not effectively cancelled?"; *see also* Am. Jur. 2d *Sales s 622, Waiver or estoppel* (2011) ("Thus, when the buyer accepts a nonconforming installment he cannot reject a later conforming installment because of the nonconformity of the earlier installment."); Hawkland Uniform Commercial Codes Series s 2-612:6, Seasonable notice of cancellation (2010) ("Under subsection 2-612(3), even if the contract may be cancelled because a default with respect to one or more installments has impaired the value of the whole contract, the aggrieved party loses his right to cancel "if he accepts a nonconforming installment without seasonably notifying of cancellation or if he brings an action with respect only to past installments or demands performance as to future installments." In these cases the contract is reinstated.")

accepted late deliveries "without 'seasonably' notifying plaintiff of its decision to cancel the contract. In fact, it was not until well after the twenty-one allegedly late deliveries that defendant told plaintiff of its intention to cancel the contract."); *Merwin v. Siebarth*, 252 N.W.2d 193, 199 (N.D. 1977) ("By accepting the non-conforming installment without notification of cancellation due to the defects in that installment, the whole contract is deemed reinstated ... **It would be incongruous to allow the defendants to retain an installment, yet reject future installments because of an alleged defect in the retained installment.**") (emphasis added); *Mextel, Inc. v. Air-Shields, Inc.*, 2005 WL 226112 (E.D.Pa. Jan. 31, 2005) (regardless of whether the earlier deliveries of controllers were non-conforming and regardless of whether they impaired the value of the Agreement as a whole, thereby giving [buyer] the right to treat the earlier non-conforming deliveries as complete breach, [buyer's] post delivery conduct consistently reinstated the terms of the Agreement ... For example, there is no dispute that [buyer] accepted controllers in previous installments without notifying [seller] of its intent to cancel the Agreement ... ").

147. Thus, in order to be able to preclude Exim from claiming damages for anticipatory repudiation, Bariven must show that it cancelled the contract based on Exim's alleged prior breaches. We now turn to that issue.

### (ii)     Bariven never cancelled the Milk Contract

148. Bariven never cancelled the Milk Contract.

149. Section 672.612(3) requires that the buyer "seasonably notify[] [the seller] of cancellation." The official comments to 672.612(3) expand on the cancellation requirement, providing that "[s]ubsection (3) is designed to further the

continuance of the contract in the absence of an **overt cancellation.**"   §
672.612(3), Comment 6 (emphasis added).   Additionally, comment 7 specifically
recognizes that § 672.612(3) contains a notice of cancellation requirement, stating
that under 672.612(3) there is a "**requirement of seasonable notification of
cancellation.**"   § 672.612(3), Comment 7 (emphasis added).

150.   Even if one party breaches the agreement, in the absence of an overt
cancellation, the contract is still executory and the parties must continue to perform
their contractual obligations.   *Service Helex, Inc. v. United States*, 543 F.2d 1306,
1317 (Ct.Cl. 1976) (the UCC favors "continuation of a contract in the absence of
clear and prompt cancellation.").

151.   There was never an overt cancellation of the Milk Contract.   To the
contrary, Bariven repeatedly and explicitly admitted on the record that it had not
cancelled the Milk Contract:

| SOURCE | STATEMENT |
|---|---|
| Answer to Second Set of Interrogatories, No. 3  (JTX 189)[103] | "Bariven . . . states that Bariven did not cancel Purchase Order 5100062310 [the powdered milk contract]" |
| J.   Camacho   (PSI's international buyer). (Camacho Dep. p. 44) | "[the powdered milk contract is] not cancelled." |
| A. Gravina  (PSI's international purchasing manager). (Gravina Dep. p. 97) | indicating that the powdered milk contract was not cancelled because it was his understanding that Bariven's "instruct[ion] to suspend the shipments from . . . Exim Brickell . . . was not a permanent thing, but that it would be possible in the future for shipments to be re-started." |

---

[103]   The answers to interrogatories is especially damning in this instance due to the involvement of counsel that typically occurs with respect to interrogatory answers.

152.   Even at trial, Bariven's witnesses stated that as late as the January 21, 2009, meeting between Exim and Bariven, Bariven had not cancelled the contract. To the contrary, Ms. Azocar testified that:

> *"Up to that moment we had discussed in the meeting that we had received up to 11,000 tons.  And at that moment, on January 21st, the melamine issue was at its highest level of alert or emergency, and we asked the provider to help in solving the problem with the 11,500 tons* **so that we could later discuss about the rest of the shipments."**

Ms. Azocar, March 17, Trial Tr. p 32-33 (emphasis added)

Consequently, as late as January 21 Bariven was discussing the "rest of the shipments."  Bariven produced absolutely no evidence demonstrating that in the interval between January 21 and the filing of Exim's complaint in this action Bariven cancelled the Milk Contract.

153.   Although quoted previously, counsel for Bariven admitted in closing argument that Bariven had never cancelled the Milk Contract.  (Closing Argument, March 31, p. 140 "*Mr. Mirenda: The interrogatories were asking whether Bariven canceled the contract.  And the answer is Bariven didn't cancel the contract*")

154.   When faced with the repercussions of its admissions, Bariven has attempted to change its legal argument to include the assertion that the Milk Contract had been cancelled.  Bariven's change in legal tactics does not erase Bariven's admissions on the record which conclusively prove that Bariven did not cancel the Milk Contract.

155.   Nor is Bariven's argument that by virtue of Exim filing this suit, *Exim* cancelled the contract allegedly precluding it from recovering for anticipatory repudiation.  Bariven's argument is without any merit whatsoever.  According to Bariven's circular argument, Exim's complaint results in a cancellation of the

contract, which then precludes the claim for anticipatory breach.   Bariven's argument is contrary to § 672.610(2) which gives Exim the right to file suit in the event Bariven anticipatorily breached the Milk Contract.   As shown immediately below, Bariven did anticipatorily breach the Milk Contract and Exim is entitled to damages for such breach.

### (iii)   Bariven anticipatorily repudiated the Milk Contract for which Exim is entitled to damages

156.   Bariven anticipatorily repudiated the Milk Contract in four (4) specific manners:

(i) it improperly failed to pay Exim for Shipments 18-22;

(ii) it improperly failed to send field inspectors to inspect Shipment 23 despite repeated demands by Exim;

(iii) it refused to allow Exim to supply powdered milk from countries other than China; and

(iv) it refused to provide Exim adequate assurance that it would perform the Milk Contract in the future

157.   Failure to pay. It is undisputed that Bariven did not pay for final five shipments of milk that Exim supplied.   Bariven refused to pay Exim despite the fact that it never had any evidence that Shipments 17-22 were contaminated with melamine.

Q: Well, prior to January 29, Bariven had no confirmation that any Exim milk had been contaminated with melamine; is that not correct?

A: Before the 29th, yes.

Azocar, March 17, p. 25

158.   Exim was forced to obtain payment for these shipments by suing on the letter of credit issued by Bariven in Curacao.[104]   Indeed, representatives at

---

[104]   Mr. Salges, March 15, 2011 Trial Tr. p. 37-38.

Girobank specifically requested that Exim file suit against the bank because the bank did not want to offend Bariven.  Mr. Salges, March 15, 2011 Trial Tr. p. 37.

159.   The court in Curacao ultimately ruled that Exim was entitled to payment under the Letter of Credit, conclusively proving Bariven's breach of the Milk Contract, which decision is entitled to be recognized under the principles of comity. *Belize Telecom v. Government of Belize*, 528 F.3d 1298, 1306 n. 10 (11th Cir. 2008) ("any foreign decree should be recognized as a valid judgment, and thus be entitled to comity [where certain conditions are met]")

160.   Bariven's improper refusal to pay for Shipments 18-22 constituted a breach of the Milk Contract.

161.   <u>Failure to send field inspectors to inspect Shipment 23</u>.  "When a party stipulates that another shall do a certain thing, he thereby impliedly promises that he will himself do nothing which will hinder or obstruct that other in doing that thing . . . ." *Sharp v. Williams* 141 Fla. 1, 192 So. 476, 480 (1940)(citations omitted).  Indeed, "'If [a party] prevents or makes impossible the performance or happening of a condition precedent, the condition is excused.'" *Jacobs v. Tenneco West, Inc.*, 186 Cal.App.3d 1413, 1418 (1986)(citations omitted); *United States v. Peck*, 102 U.S. 64, 65 (1880) ("the conduct of one party to a contract which prevents the other from performing his part is an excuse for non-performance").

162.   In this instance, Bariven prevented Exim from fulfilling the Milk Contract in two different manners: (i) refusing to send its field inspectors for Shipment 23 despite Exim's repeated requests and (ii) refusing to allow Exim to supply milk from countries other than China.  We discuss each circumstance in turn.

163.   Despite claiming that Exim breached the Milk Contract due to the lack of field inspection on earlier shipments, Bariven repeatedly refused Exim's request that Bariven inspect milk so that it could be shipped (JTX 108,109,141) and implemented a "strategy" not to respond to Exim. (JTX 148) (Email from J. Herrera to G. Perez of PSI explaining that, in dealing with Exim, do not provide responses to their requests for inspection, but instead indicate that PSI is waiting on instructions from Bariven in Venezuela.)

164.   Prior to receiving an e-mail on January 9, 2009 (JTX 99), Exim was unaware that Bariven wanted to change the manner of doing business with Exim by sending its own SGS inspectors instead of relying on the SGS-China reports that Exim had been providing.[105]   However, upon learning of Bariven's request, on January 15, 2009 Exim sent Bariven an e-mail requesting that it send its field inspectors to inspect the next shipment.   (JTX 108).   Bariven did not send an inspector.  (JTX 148).  A month later, on February 13, 2009 Exim sent a second e-mail asking that Bariven send an inspector to inspect the next shipment.   (JTX 141).  Again, Bariven refused. (JTX 148).

165.  By not sending its "PSI supervised" field inspectors to inspect Shipment 23, Exim never had the opportunity to continue to ship milk because Bariven would have rejected any such shipment not previously inspected under PSI supervision.

166.   Here, Bariven was the sole cause for any failure to comply with the Milk Contract's field inspection requirement.

---

[105]   Mr. Salges, March 15, 2011 Trial Tr. p. 14; Ms. Guevara, March 15, 2011 Trial Tr. p. 160-161.

167.  <u>Failure to allow Exim to fulfill contract from other countries</u>.  On October 27, 2008, Exim offered Bariven powdered milk from countries other than China, specifically from Argentina, New Zealand, Brazil and Uruguay. (JTX 59) Bariven refused this offer. [106]

168.  Thus, despite the fact that a food emergency exists in Venezuela, Bariven impeded Exim's ability to perform the Milk Contract.  This fact was brought out at trial:

> *The Court:  I don't understand this.  You're talking about a food crisis in Venezuela and a crisis in China which you're very worried about in terms of the milk product being delivered and you're telling me the relationship that you have with the Government of Venezuela.  I mean, why can't you – why couldn't you have bent the rules to allow the supplier to give you the product from other countries?*
>
> *When you talk about norms and all, you know, all bets were off because you were in a crisis.  Why couldn't you have accommodated?  Wasn't that a reasonable request?  You were worried more about legalities than his ability to live up to his purchase order?*
>
> *A: Precisely because that is the foundation for good management.  And the other thing is that strategically regarding the milk case, we had sufficient providers, suppliers, and the crisis would end but Bariven's reputation would have to always prevail.*
>
> Ms. Azocar, March 16, Trial Tr. p. 169.

169.  A possible financial explanation for Bariven's refusal to allow Exim to supply milk from other countries was discovered at trial.

> *Q: If we go to the [newly entered milk] contracts that were entered in February 2009 – and this is on Exhibit U – the price is dramatically less [than Exim's contract price]; is that not correct?*
>
> *A: Yes.*
>
> *Q: However, if you had allowed Exim to continue providing milk under its contract from another country, it would have remained under the Exim contract price, correct?*
>
> *A: True.*
>
> Ms. Azocar, March 17, Trial Tr. p. *27*-28

---

[106]   Mr. Salges, March 14, 2011 Trial Tr. p. 205.

170.    Thus, had Bariven allowed Exim to supply milk from other countries it would have had to pay a higher than market price - Exim's contract price.

171.    <u>Bariven refuses to provide Exim with adequate assurance</u>.  Under the UCC, it is clear that if a party has reasonable grounds for insecurity, it can (1) ask the other party to provide adequate assurances that it will perform and (2) halt performance until the other party provides the requested assurance.  § 672.609 (1) ("When reasonable grounds for insecurity arise with respect to the performance of either party the other may in writing demand adequate assurance of due performance and until he or she receives such assurance may if commercially reasonable suspend any performance for which he or she has not already received the agreed return.").   Moreover, failure to provide adequate assurance "is a repudiation of the contract."   § 672.609 (1).

172. On March 19, 2009, counsel for Exim sent a letter to Bariven requesting adequate assurance that it would accept the remaining 14,220 metric tons of milk remaining to be delivered pursuant to the Milk Contract. (JTX 155) Bariven has never provided such adequate assurance.

173.    As a consequence, Bariven anticipatorily repudiated the Milk Contract.

174.    Bariven's failure to pay for Shipments 18-22, failure to send field inspectors to inspect Shipment 23 after requests by Exim, failure to accept delivery of the remainder of the milk shipments, and failure to provide reasonable assurance in response to Exim's March 19, 2009 request for assurances, all constitute an anticipatory breach of the Milk Contract and, as such, Bariven is liable to Exim for its damages related to this breach.

**G.    Exim, Not Bariven, is Entitled To Damages On The Rice Contract**

**(i)    Last three shipments of rice delivered to Bariven could have been nationalized under the doctrine of legal abandonment**

175.    Bariven asserts that Exim failed to timely deliver original shipping documents related to three shipments of rice.  As a consequence, Bariven asserts that it was unable to nationalize the rice shipments and alleges that it incurred storage and demurrage costs related to these shipments.  Exim asserts that it is not liable, because Bariven waived the requirement that it provide original shipping documents.  Exim also argues that Bariven failed to mitigate its damages, as it had the ability to nationalize the rice shipments without the original export documentation and did not do so.

176.    Fla. Stat. § 672.208 provides that "course of performance shall be relevant to show a waiver or modification of any term inconsistent with such course of performance."  See also *T.J. Stevenson & Co., Inc. v. 81,193 Bags of Flour*, 629 F.2d 338 (5th Cir. 1980) (express notice provisions waived by course of performance); *In re McClamrock*, 2003 WL 21730519 (Bankr. M.D.N.C. July 21, 2003) (high car payment waived by course of performance).  Bariven routinely permitted Exim to provide the original shipping documentation after that shipment had arrived without objection:

> *Q. Now, during your time as Customs leader for the Bariven food program, did Exim Brickell ever deliver original documents a week or two weeks after the arrival of the actual food itself?*
>
> *A. Yes. We had some cases of that.*
>
> *Q. But did that cause any problems with respect to nationalization?*
>
> *A. No, because we applied the procedure that I have just explained.*
>
> Ms. Bello, March 29, Trial Tr. p. 29

177.   This course of performance resulted in a waiver or modification of the requirement that Exim provide the original documentation seven days in advance. Accordingly, as the provision has been waived, Bariven is precluded from claiming a breach of the provision. *T. J. Stevenson & Co., Inc.,* 629 F.2d at 365 (applying UCC waiver provision to hold that notice requirement  in parties' agreement was waived by the parties' course of performance); *Midwest Builder Distributing, Inc. v. Lord and Essex, Inc.*, 891 N.E.2d 1, 28, 322  (Ill. Ct. App. 2007)("under the UCC, the course of performance is more than an interpretive tool; it may also give rise to waiver of express contractual terms if those terms are not strictly adhered to.").

178.   Further, even if the original export documentation provision had not been waived, Bariven still cannot recover, as it failed to mitigate its damages. *Sharick v. Nova S.E. Univ. Health Sci.*, 780 So. 2d 136, 141 (Fla. 3d DCA 2000) (recognizing "the potential for mitigation of damages if [student who was improperly expelled from medical school] fails to establish that it would be impossible for him to obtain a DO degree at another institution."); *see also* 17 Fla. Jur. 2d Damages § 104 ("If by reasonable exertion or care the injured party could have prevented damages resulting from the defendant's breach, the injured party cannot recover for breach.").

179.   During the course of this litigation, Bariven has changed its position regarding its ability to nationalize the rice shipments without the original export documents.   In its motion for summary judgment it stated that "[o]riginal export documents were required in order to permit food imported into Venezuela to make it through the customs process and be delivered to end user."  (ECF 84 at pg. 17). In Exim's opposition, Exim identified that Bariven could nationalize the product

using, at a minimum, the "carta de compromiso".  After this revelation, Bariven admitted that it could nationalize the rice without original documentation using the carta de compromiso, however, Bariven argued that it could not, in good conscience, have utilized this procedure because it could not guarantee that it would have the original documents within a few days of executing the carta de compromiso.  In reply, Exim identified that Bariven's statement was inaccurate, as it did in fact nationalize at least two of the rice shipments at issue without the original documentation.

180.   Finally, Bariven responded to this allegation by identifying yet another method of nationalizing the rice shipments without original documentation—legal abandonment. (ECF 123 at 7) Thus, during the course of this litigation, Bariven's positions changed in the following order: (1) Bariven cannot nationalize without original documentation, (2) Bariven can only nationalize without original documentation using a carta de compromiso and (3) Bariven can nationalize the product using not only a carta de compromiso but also through a procedure call legal abandonment.  These facts weigh against Bariven's credibility.

181.   However, the court does not rely alone on the credibility issue, as there is trial testimony establishing that Bariven could nationalized food shipments under the concept of legal abandonment.  According to Ms. Bello's trial testimony, the rice shipments were capable of being nationalized pursuant to the concept of legal abandonment once 15 days had elapsed from the arrival at the port:

> *Q. Now, you had mentioned a week or two weeks.  Why was that acceptable?*
>
> *A. Because in the case of food from the time of arrival to the 15th of the month, this was a legal allowance of time for nationalization. And starting at that time, it fell into the condition of legal abandonment. That is the process in order to release that shipment and it becomes much more complicated and complex.*

*Q. If a cargo was left for more than 15 days was it immediately declared in legal abandonment?*

*A. It is in the condition of legal abandonment even though the Government has not executed that legal abandonment*

Ms. Bello, March *29*, Trial Tr. p. 28-29

182. Despite being in the legal status that allowed the rice to be nationalized pursuant to the doctrine of legal abandonment, Bariven simply decided to leave the rice at the port.  Of course, the rice was ultimately nationalized using the concept of legal abandonment prior to the receipt of the original bill of ladings by Bariven, which excuse was always but a pretext to pressure Exim.

183.   Thus, the Court should rule against Bariven on this point because it did not suffer damages, as Bariven was not ultimately responsible for payment of the demurrage and storage costs.  Indeed, PDVSA Petroleo, not Bariven, was billed for and paid the storage and demurrage costs.  (Ms. Bello Dep. p. 96) ("The payer is PDVSA Petroleo, we have seen that on the papers.").

### (ii)      Bariven's Actions Constitute an Anticipatory Repudiation of Remainder of the Rice Contract

184.   Bariven argues that Exim's failure to provide it with original export documents excused its failure to purchase the remainder of the rice under the contract.  However, even assuming this failure to provide documents constituted a substantial impairment of the entire contract that would justify Bariven's cancellation of the rice contract, for the same reason that it is entitled to damages under the Milk contract, Exim is still entitled to damages based on anticipatory repudiation *because Bariven never cancelled the Rice Contract*.   Indeed, Bariven provided the following response to interrogatory inquiring whether Bariven had cancelled the rice contract: "Bariven . . . states that Bariven did not cancel

Purchase Order 5100065038[the rice contract]." (JTX 189, Bariven's Response to Exim's Second Set of Interrogatories, #5). Accordingly, the Rice Contract remained executory. As the contract remained executory, both Exim and Bariven were required to continue to perform their respective obligations under the Rice Contract.

185. Bariven repudiated the Rice Contract by failing to provide Exim with assurances that it would continue to perform under the contract. *See* discussion above, IV F. (iii) ¶¶ 171-172.

186. In light of Bariven's non-payment under the powdered milk contract, Exim had reasonable grounds for insecurity that Bariven would also not pay under the rice contract. Commentary to § 672.609, ¶3 ("a ground for insecurity need not arise from or be directly related to the contract in question."). Based on this insecurity, Exim requested assurances from Bariven that it would perform on the rice contract. (JTX 163). Bariven never provided the requested assurance. As that assurance was never given, Bariven was deemed to have repudiated the contract. As such, Bariven is liable to Exim for its damages related to this breach.

## H. Damages

187. Exim is entitled to its lost profits related to the Milk and Rice Contracts pursuant to § 672.708(2) and its incidental damages pursuant to § 672.710.

### (i) Exim's Lost Profits

188. Section 672.708(2), which provides, "[i]f the measure of damages in subsection (1) is inadequate to put the seller in as good a position as performance would have done then the measure of damages is the profit (including reasonable overhead) which the Seller would have made from full performance by the Buyer, together with any incidental damages provided in this chapter (s. 672.710), due

70

allowance for costs reasonably incurred and due credit for payment or proceeds of resale."

189.   This subsection of 672.708 applies because Exim is a jobber or middleman that does not take possession of the goods it sells. *See TCP Indus., Inc. v. Uniroyal, Inc.*, 661 F.2d 542, 552 (6th Cir. 1981) (holding that Section 2708(2) provides for recovery of lost profits for a "middleman" because recovery under Section 2708(1), the difference between the contract price and the market price, "does not adequately compensate a middleman upon . . . repudiation."); *Nobs Chemical U.S.A., Inc. v. Koppers Co., Inc.*, 616 F.2d 212, 215 (5th Cir. 1980) (holding that Section 2-7C8(2) applies to parties, such as "jobbers", who never acquire the contract goods and whose decision not to acquire those goods, after learning of the breach, was commercially reasonable).

190.   To determine lost profits, Section 672.708(2) tells the Court to calculate "the profit (including reasonable overhead) which the Seller would have made from full performance by the Buyer."   The official comment to Section 672.708 explains that the measure of "profit" discussed in subsection 2 "would be the list price less cost to the dealer . . ."   Fla. Stat. § 672.708 cmt. n.2   *See also Automated Medical Laboratories., Inc. v. Armour Pharmaceutical Co.*, 629 F.2d 1118, 1125 (5th Cir. 1980) (finding that Section 672.708(2) entitled the Plaintiff seller to recover gross profits, which includes the net profit, "the contract price per liter minus direct costs" and overhead costs.); 1 James J. White & Robert S. Summers, *Uniform Commercial Code* § 7-13, n. 7 (5th ed. 2006) (noting the "jobber's measure of damages under 2-708(2) when it has no responsibility for delivery costs to buyer is gross profits with no reduction for overhead"); 67 Am,

Jur. 2d Sales § 1007 (2009) ("The phrase 'profit (including reasonable overhead)' in [Section 2-708(2)] is intended to mean the equivalent of gross profit, which includes fixed costs, but not costs saved as a result of the breach."). The reasoning behind Section 672,708(2) is explained in *Mid-South Materials Co. v. Ellis*, No, 87-314-II, 1988 WL 23914, at *3 (Tenn. Ct. App. Mar, 16, 1988). The court in Mid-South stated, "[i]n the case of a middleman or jobber where there is no cost of delivery [the measure of damages] usually equals what we call gross profit: the jobber's markup, or, in the case of the middleman, the contract price less the middleman's costs of acquiring the goods." The Court agrees with the sound reasoning of these decisions.

191.   Accordingly, pursuant to Section 672.708(2), Exim is entitled to recover its gross profits: the contract price per metric ton of milk and rice less Exim's direct costs, and by definition this calculation includes any overhead expenses.

192.   Exim's lost profit calculations were explained by Exim's expert witness on damages, Raymond Perez ("Mr. Perez"), whose testimony on in this area was completely un-rebutted. Mr. Perez calculated Exim's profit under the Milk and Rice Contracts as the difference between the amount Bariven would have paid Exim for the Milk and Rice under the contracts and the cost of the milk and rice to Exim from its suppliers and arrived at the following lost profit figures:

| Milk Contract Lost Profits | Rice Contracts Lost Profits |
|---|---|
| $11,894,830[107] | $245,971[108] |

193.    Accordingly, in total, Exim is entitled to $12,140,801 in lost profit damages.

**(ii)        Exim's Incidental Damages**

194.    Exim also seeks direct and incidental damages under Fla. Stat. § 672.710, which provides: "[i]ncidental damages to an aggrieved seller include any commercially reasonable charges, expenses or commissions incurred in stopping delivery … after the buyer's breach , or otherwise resulting from the breach."  Such incidental damages include the seller's liability to its suppliers.  *Validsa Inc. v. PDVSA Services, Inc.*, 1:08-cv-21682-JLK.  Mr. Perez's calculated Exim's incidental

|  | Milk | Rice |
|---|---|---|
| Pending Liability to Supplier | $50,442,300 | $2,796,000 |
| Operating Expenses and Costs | $467,136 | $21,029 |
| Liabilities on Commissions | $2,372,552 | |
| transportation of rice that had been prepared for Bariven back to warehouse and repackaging of the Inventory | | $554,814 |
| **TOTAL** | **$53,281,988** | **$3,371,843** |

damages as follows:

---

[107]     Mr. Perez, March 16, 2011 Trial Tr. p. 24.

[108]     Mr. Perez, March 16, 2011 Trial Tr. p. 37.

195.   Accordingly,   Exim   is   entitled   to   a   total   of   $56,653,831.00 ($53,281,988 + $3,371,843)  in incidental damages.

**(iii)      Bariven's claimed damages are speculative**

196.   Bariven claims two broad areas of damages: (i) the amounts received by Exim for Shipments 1-22 (approximately $56.4 million)[109] and (ii) damages related to the storage and demurrage costs allegedly incurred by Bariven with respect to both the Milk and Rice Contracts.

197.   The amount received by Exim for Shipments 1-22 is not in dispute and Exim does not address that amount (other than to reiterate that Bariven is not entitled to receive the return of these amounts because, for the reasons set forth above, Bariven did not properly revoke are reject the acceptance of Shipments 1-22).

198.   However, with respect to the storage and demurrage costs, Exim argues three points:

(i) Bariven did not incur any storage or demurrage costs on the Milk and Rice Contracts, did not pay and will not pay any such costs in the future

(ii) a large percentage of the demurrage costs are completely speculative as no invoice was ever rendered for such costs; and

(iii) Bariven failed to mitigate its damages as was its responsibility.

199.   Bariven did not incur storage and demurrage costs.  Bariven's damage expert, Dr. Herce, testified that each and every invoice for both demurrage and storage costs that he reviewed in calculating Bariven's damages was not directed to Bariven.[110]  Instead, the invoices were rendered to a PDVSA Petroleos.[111]

---

[109]      Dr. Herce, March 29, 2011 Trial Tr. p. 56.

[110]      Dr. Herce, March 29, 2011 Trial Tr. p. 79.

[111]      Dr. Herce, March 29, 2011 Trial Tr. p. 79.

200.   Significantly, Dr. Herce testified that he was unaware of any contractual arrangement that made Bariven liable for these amounts.[112] Corroborating this fact was Ms. Bello, who also testified that Bariven was not liable for these amounts.[113]

201.   <u>Demurrage costs are speculative</u>.   Dr. Herce testified that approximately $7 million of the demurrage costs were not based on invoices, but instead on his calculation of what the expected costs would be.[114] Given the many years that have transpired it is entirely speculative that any such invoice will ever be rendered.   This entire category of damages is inappropriate as unduly speculative.   *Himes v. Brown & Co. Securities Corp.*, 518 So. 2d 937 (Fla. 3d DCA 1988) ("speculative lost profits damages … [are] not recoverable"); *see also Kane v. Shearson Lehman Hutton, Inc.*, 916 F.2d 643 (11th Cir. 1990) (same).

202.   <u>Bariven's failure to mitigate</u>.   Bariven failed to comply with its obligation to mitigate its damages. *Sharick v. Nova S.E. Univ. Health Sci.*, 780 So. 2d 136, 141 (Fla. 3d DCA 2000) (recognizing "the potential for mitigation of damages if [student who was improperly expelled from medical school] fails to establish that it would be impossible for him to obtain a DO degree at another institution."); *see also* 17 Fla. Jur. 2d Damages § 104 ("If by reasonable exertion or care the injured party could have prevented damages resulting from the defendant's breach, the injured party cannot recover for breach.")   Indeed, Dr.

---

[112]   Dr. Herce, March 29, 2011 Trial Tr. p. 79.

[113]   PDVSA has not invoiced Bariven for the amounts it paid for demurrage and storage, and *"they are not going to charge them either because PDVSA Petroleos is the one in charge of the payments in Venezuela."* (Ms. Bello, March 29,Trial Tr.  p. 37)

[114]   Dr. Herce, March 29, 2011 Trial Tr. p. 73, 80.

Herce testified that he did not even consider Bariven's obligation to mitigate damages in making his calculations.[115]

203.   In the current instance, Bariven could have dramatically reduced its alleged damages in the following manner:

(i)  Bariven could have thrown away all milk that was contaminated with melamine;

(ii)  Bariven could have *actually* rejected Shipments 17-22 and not allowed them into Puerto Cabello and required that Exim take possession of those Shipments; and

(iii) Bariven could have sought to have the rice shipments nationalized after 15 days in port.

204.   The failure to mitigate precludes Bariven from recovering any damages related to the storage and demurrage costs.  *Sharick v. Nova S.E. Univ. Health Sci.*, 780 So. 2d 136, 141 (Fla. 3d DCA 2000); *see also* 17 Fla. Jur. 2d Damages § 104 ("If by reasonable exertion or care the injured party could have prevented damages resulting from the defendant's breach, the injured party cannot recover for breach.")

---

[115]     Dr. Herce, March 29, 2011 Trial Tr. p. 81.

**V. CONCLUSION**

205.   Based on the foregoing argument and authority, the Court should find

in favor of Exim and award it the damages suffered.

Respectfully submitted,

Attorneys for Plaintiff
One Southeast Third Avenue, 25th Floor
Miami, Florida  33131-1714
Phone:  (305) 374-5600
Fax:  (305) 374-5095
Email:  george.volsky@akerman.com
        luis.onaghten@akerman.com
        michael.sayre@akerman.com


By: s/Luis M. O'Naghten
        George Volsky, Esq.
        Fla. Bar No. 203092
        email: george.volsky@akerman.com
        Luis M. O'Naghten, Esq.
        Fla. Bar No. 622435
        email: luis.onaghten@akerman.com
        Michael A. Sayre, Esq.
        Fla. Bar No. 17607
        email: michael.sayre@akerman.com

## CERTIFICATE OF SERVICE

*I hereby certify* that on May 6, 2011, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF.  I also certify that the foregoing document is being served this day on all counsel of record or pro se parties identified on the attached Service List in the manner specified, either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

By:  /s/Michael A. Sayre

## SERVICE LIST

**Exim Brickell, LLC v. PDVSA Services, Inc. and Bariven S.A.**
**CASE NO.: 09-20915-CIV-GOLD/McALILEY**
**United States District Court, Southern District of Florida**

Anthony D. Mirenda, Esq.
K. Neil Austin, Esq.
Thomas J. Bone, Esq.
Thomas R. Ayres, Esq.
Foley Hoag LLP
155 Seaport Boulevard
World Trade Center West
Boston, MA  02210-2170
Tel:  (617) 832-1000
Email: amirenda@foleyhoag.com
Email: naustin@foleyhoag.com
Email: jbone@foleyhoag.com
Email: tayres@foleyhoag.com

Ronald E.M. Goodman, Esq.
Foley Hoag LLP
1875 K. Street, N.W., Suite 800
Washington, DC  20006
Tel:  (202) 223-1200
Email: rgoodman@foleyhoag.com

Brian Silverio, Esq.
Silverio & Hall, P.A.
150 West Flagler Street, PH. 2850
Miami, FL  33130-1557
Tel:  (305) 371-2756
Email: bsilverio@silveriohall.com