

Filed by D.C.
ELECTRONIC
**JUN 13, 2013**
STEVEN M. LARIMORE
CLERK U.S. DIST. CT.
S.D. OF FLA. - MIAMI

# UNITED STATES COURT OF APPEALS
# FOR THE ELEVENTH CIRCUIT

ELBERT PARR TUTTLE COURT OF APPEALS BUILDING
56 Forsyth Street, N.W.
Atlanta, Georgia 30303

John Ley
Clerk of Court

June 13, 2013

For rules and forms visit
www.ca11.uscourts.gov

Steven M. Larimore
U.S. District Court
400 N MIAMI AVE
MIAMI, FL 33128-1810

Appeal Number: 11-15162-AA
Case Style: Exim Brickell LLC v. Bariven S. A.
District Court Docket No: 1:09-cv-20915-ASG

A copy of this letter, and the judgment form if noted above, but not a copy of the court's decision, is also being mailed to counsel and pro se parties. A copy of the court's decision was previously mailed to counsel and pro se parties on the date it was issued.

The enclosed copy of the judgment is hereby issued as mandate of the court. The court's opinion was previously provided on the date of issuance.

Sincerely,

JOHN LEY, Clerk of Court

Reply to: Regina A. Veals-Gillis
Phone #: (404) 335-6163

Enclosure(s)

MDT-1 Letter Issuing Mandate

**UNITED STATES COURT OF APPEALS**
**For the Eleventh Circuit**

_____

No. 11-15162

_____

District Court Docket No.
1:09-cv-20915-ASG

EXIM BRICKELL LLC,
a Florida limited liablity company,

                       Plaintiff - Counter
                       Defendant - Appellant
                       Cross Appellee,

versus

PDVSA SERVICES INC.,
a Delaware corporation,

                       Defendant,

BARIVEN S. A.,
a Venezuelan business entity,

                       Defendant - Counter
                       Claimant - Appellee
                       Cross Appellant.

_____

Appeals from the United States District Court for the
Southern District of Florida

_____

JUDGMENT

It is hereby ordered, adjudged, and decreed that the opinion issued on this date in this appeal is
entered as the judgment of this Court.

Entered: April 08, 2013
For the Court: John Ley, Clerk of Court
By: Jeff R. Patch

Issued as Mandate:
June 13, 2013

[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

––––––––––––––

No. 11-15162

––––––––––––––

D.C. Docket No.   1:09-cv-20915-ASG

EXIM BRICKELL LLC,
a Florida limited liability company,

                                    Plaintiff - Counter
                                    Defendant - Appellant
                                    Cross Appellee,

versus

PDVSA SERVICES INC.,
a Delaware corporation,

                                    Defendant,

BARIVEN S.A.,
a Venezuelan business entity,

                                    Defendant - Counter
                                    Claimant - Appellee
                                    Cross Appellant.

––––––––––––––

Appeals from the United States District Court
for the Southern District of Florida

––––––––––––––

(April 8, 2013)

Before CARNES and BLACK, Circuit Judges, and RESTANI,[*] Judge.

RESTANI, Judge:

Bariven S.A. ("Bariven"), a Venezuelan state-owned purchasing company, contracted with Exim Brickell LLC ("Exim"), a Florida-based export/import company, through its agent, PDVSA Services Inc. ("PSI"), for the purchase of large quantities of powdered milk from China, which ultimately proved to be toxic. Both parties appeal from the decision of the district court which awarded partial damages to Bariven for two of the shipments under the installment contract.   The parties contest the extent of Bariven's purported revocation of shipments as well as the measure of Bariven's storage costs associated with Exim's breach of the milk contract and a separate contract for rice.

## **BACKGROUND**[1]

*Milk Contract*

Due to a food shortage in Venezuela, Bariven contracted with Exim for the purchase of 26,000 metric tons of enriched powdered milk valued at $124.41

---

[*] Honorable Jane A. Restani, United States Court of International Trade Judge, sitting by designation.

[1] Following a two-week bench trial, the district court provided very detailed findings of fact and conclusions of law in its 152-page opinion.   On appeal, the parties do not directly challenge any of the determinations of historical fact made by the trial court and summarized below.   Instead, any factual challenges go to determinations of reasonable periods of time discussed infra.

million.   The powdered milk was to be sourced from either China or India and shipped to a port in Venezuela in monthly shipments.   Under the contract, the milk was required to be "free of preservatives, neutralizers, toxic substances or any strange matter."   Payment was guaranteed by a letter of credit issued in Curacao by a Bariven affiliate.   Exim began shipping the powdered milk in late June 2008, with shipments typically arriving in Venezuela six to eight weeks after leaving China. Although Bariven contracted for a right to inspect the goods prior to shipment, it failed to do so for the first 16 shipments despite being notified, at least initially, of the contact information for the Exim representative in China.   At any rate, Bariven's inspections would not have discovered the toxins contained in these initial shipments as no one in the industry expected to find melamine in milk and would not have tested for it.[2]   Bariven paid for each shipment en route, typically within a few days of being invoiced, sending a confirmation each time that the shipment was "received, reviewed, confirmed and accepted."   Payment was made directly by Bariven to Exim, although the letter of credit remained intact to guarantee payment.

---

[2] Melamine and its analog cyanuric acid are synthetic substances not naturally found in milk. Both are toxic, primarily damaging the kidneys, and can cause health effects ranging from kidney stones to death, depending on the dose and the size and age of the consumer.   Both chemicals were added to milk products in China because they can cause the milk to test for higher levels of protein without the need to undertake costly reformulation.

3

Beginning in mid-September 2008, news alerts began reporting melamine contamination in Chinese milk products.   Bariven first contacted Exim on September 19, 2008, to ask if the milk it had purchased was impacted by the alert and what steps Exim was taking to guarantee the quality of its supply.   Exim replied that its Chinese producers and the particular type of powdered milk purchased by Bariven (industrial as opposed to infant powdered milk) were not implicated in the news alerts.   Both pieces of information later proved to be incorrect, although Exim never passed these revelations on to Bariven.   Exim also provided Bariven with test results purporting to demonstrate that samples taken from earlier shipments were free of melamine.   This information also turned out to be inaccurate, as the samples did not correspond to the shipments actually sent to Bariven and instead were samples provided by the Chinese manufacturer.[3]   On October 2, 2008, Bariven internally decided to test all milk shipments, despite Exim's assurances that Bariven's milk was not contaminated.   Bariven did not implement this system immediately, but it began by testing shipments 7 and 8 in January 2009.

_____

[3] The district court concluded that Exim probably should have been more forthcoming in correcting these inaccurate statements, but it did not find that Exim acted in bad faith to intentionally misrepresent the situation.   This conclusion was despite internal communications indicating that Exim knew its email to Bariven was false at the time of or shortly after the emails were sent.   The parties have not appealed this decision dismissing Bariven's Florida Deceptive and Unfair Trade Practices Act ("FDUTPA") claim, and so we need not address it here.

4

After discovery of the melamine contamination, the Chinese government intervened in the industry, prohibiting the sale of any powdered milk until each manufacturer had been cleared by the government's inspection agency.   This included halting production by Exim's main supplier under the contract, Suncare, whose products contained detectable levels of melamine.   Exim was able to restart its milk shipments on December 11, 2008, after its suppliers received government approval to restart operations.

Possibly in light of the alert, Bariven sent a letter to Exim on November 17, 2008, insisting on pre-shipment inspections as set out in the contract but never invoked previously by Bariven.   Exim's CEO claimed at trial that he was told that the email, possibly sent to all of Bariven's suppliers, did not cover the milk contract, a position the district court credited in light of Bariven's subsequent payment for shipment 17 and allegedly contrary representations by Bariven to Exim.   Bariven then changed course by stopping payment for all shipments, although it did not notify Exim or Bariven's customs broker of this decision.   As a result, shipments 18–22 entered the Venezuelan ports but were not paid for.   Bariven, through its agent PSI, explicitly rejected "recent" shipments on January 9, claiming Exim breached the contract by failing to provide Bariven with pre-shipment inspections. Bariven also sought to block payment for future shipments under the letter of credit,

5

resulting in litigation in Curacao, in which Exim ultimately prevailed in September 2009.[4]

Following the melamine alert, Bariven had proposed a meeting in December 2008.   The parties met, however, only on January 21, 2009, after the previously requested meetings were postponed due to illness and holidays.   The content of the meeting is disputed except to the extent that there was discussion about nationalizing the powdered milk that had accumulated at the port because the milk shipments lacked the necessary health permits from the Venezuelan Health Ministry.   The Venezuela government feared that the goods could be contaminated with melamine in light of the news alerts and began requiring the goods be tested prior to entry. Exim agreed to help with this process by providing test results to the government and making its producers available, even though it was not responsible for product nationalization under the terms of the contract.

Bariven finally sent samples from shipments 7 and 8 of Exim's milk for testing in January 2009,[5] but it received inconclusive test results in late February

---

[4] Although Bariven raised the issue of melamine contamination in the proceedings in Curacao, where it intervened in the litigation between Exim and the bank issuing the letter of credit, the judgment in favor of Exim in that case is not relevant to the issues presented here.   The judgment expressly declined to draw any conclusions regarding the contamination of the goods, because the Curacao court was concerned only with whether Exim had presented proper documentation to the bank as required under the terms of the documentary letter of credit.   Furthermore, this litigation related to shipments 18–22, which are not at issue here.   See also note 7 infra.

2009.[6]   In response, Bariven had the same shipments retested by different labs, the results of which showed widespread contamination.

At the same time, Bariven continued to ignore requests by Exim to send inspectors to China to inspect shipment 23, as required under the contract and insisted upon by Bariven in its purported rejection of shipments 17–22.   Exim sent information regarding the availability of shipment 23 for inspection on January 15 and February 13, but Bariven did not reply.   After Bariven continued to refuse to send inspectors, Exim sent a formal demand letter on March 19, 2009, ordering Bariven to perform under the contract by inspecting/accepting future shipments and paying for those already received.   Bariven responded on March 27, 2009, by requesting a meeting to discuss nationalization of the milk.   Following this email, but before Exim replied, Bariven finally received the second set of test results for shipments 7 and 8, conclusively showing melamine contamination.   Bariven followed up on its March 27 letter by calling Exim to an urgent meeting to discuss

---

(...continued)
[5] Bariven first tested older milk from a different supplier, Absolute.   In undertaking its testing protocol, Bariven encountered a variety of problems with finding a lab capable of performing the relatively complex analysis for small levels of melamine as well as sending samples to the labs once identified.

[6] The initial test results came to different conclusions regarding contamination.   Testimony by Bariven's expert at trial indicated that this divergence may have been due to the labs employing different analytical methodologies, at least one of which had not been approved by any recognized body.   In setting a threshold for what level of melamine was sufficient to conclude that the milk was toxic, the trial court adopted the level of 0.324 ppm proposed by Bariven's expert.

the results of its melamine testing.   Bariven also asserted that if Exim did not timely

respond, it reserved the right to resort to legal proceedings to protect its rights.   The

parties never met, however, and Exim instead filed this suit five days later; Bariven

counterclaimed.   After litigation began, Bariven continued testing the milk.   It sent

samples of shipments 3, 5, and 16 for testing in late April/early May, receiving

confirmation of contamination in June 2009.   It later tested the remaining

shipments, apart from shipment 1, in February 2010, as part of a joint

sampling/testing protocol agreed to by Exim.

   *Rice Contract*

   In a separate agreement also at issue in this litigation, Bariven contracted with

Exim for the purchase of 19,200 metric tons of rice worth $19,603,200.   The goods

were supplied by a single manufacturer in Brazil, Zaeli Alimentos, Ltda. ("Zaeli").

The contract required Exim to provide original documents needed for the rice to

clear customs at least seven days before arrival.   Exim, however, typically sent the

documents about a week or two after delivery, without objection by Bariven.

Venezuelan customs, in its discretion, released some of the earlier shipments that

had been "abandoned" after Bariven produced a carta de compromiso, promising the

original documents would be later produced within a reasonable period of time and

providing evidence through copies of the documents that were in transit.

8

Beginning in January 2009, Exim failed to produce documents on three shipments because it did not have the funds to pay its supplier, which in turn refused to supply the required documentation.   This is despite the fact that Bariven had continued to pay all that was owed under the rice contract.   The rice shipments remained at the port until October 2009 when the documents were finally produced.   Additionally, the remaining shipments due under the rice contract were never shipped because Bariven was unable to inspect them, as the rice supplier would not allow Bariven access until Exim had resolved its payment issues with the supplier.

## JURISDICTION

Neither party raised jurisdictional issues below, agreeing that jurisdiction existed under either 28 U.S.C. § 1332 or 28 U.S.C. § 1330.   In its response and reply brief to this court, however, Exim questioned the subject matter jurisdiction of this court and the trial court after we raised a jurisdictional question in a related case. See Absolute Trading Corp. v. Bariven S.A., No. 12-12234, 2013 U.S. App. LEXIS 240, at *4–5 (11th Cir. Jan. 4, 2013) (unpublished per curiam).   The question in that case, involving another supplier to Bariven, asked whether the district court and this court lacked jurisdiction to hear a similar claim against Bariven because, as a state-owned entity, Bariven might be protected by foreign sovereign immunity. The Foreign Sovereign Immunities Act bars jurisdiction over a foreign state in any

U.S. court unless, in relevant part, "the foreign state has waived its immunity either explicitly or by implication, notwithstanding any withdrawal of the waiver . . ." or "the action is based . . . upon an act outside of the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States."   28 U.S.C. § 1605(a)(1)–(2).

Exim never briefed the merits of this issue, but we still address it in passing because it is a question of jurisdiction.   Exim's hinted-at argument fails on its face because Bariven, the only party possibly in a position to assert sovereign immunity, did not do so.   Even if Bariven had not waived immunity, the commercial exception under 28 U.S.C. § 1605(a)(2) likely applies.   See Republic of Argentina v. Weltover, Inc., 504 U.S. 607, 618–20 (1992) (deciding the commercial exception applied where New York banks were involved in the transaction).

## STANDARD OF REVIEW

In reviewing the decision of the district court following a bench trial, we decide issues of law de novo while we defer to the trial court's findings of fact unless they are clearly erroneous.   See A.I.G. Uru. Compania de Seguros, S.A. v. AAA Cooper Transp., 334 F.3d 997, 1003 (11th Cir. 2003).   In applying the Uniform Commercial Code ("UCC"), questions as to the reasonableness of a delay in inspection and the timeliness and sufficiency of notice are typically questions of

10

fact.   Royal Typewriter Co. v. Xerographic Supplies Corp., 719 F.2d 1092, 1102

(11th Cir. 1983); T.J. Stevenson & Co. v. 81,193 Bags of Flour, 629 F.2d 338, 361

(5th Cir. 1980) ("[T]he factfinder's determination of the mixed law-fact issue of

notice, if based on a correct understanding of the law, is to be given great weight.").

Some Florida courts, however, have recognized the outer limits of these standards as

matters of law.   See Cent. Fla. Antenna Serv., Inc. v. Crabtree, 503 So. 2d 1351,

1353 (Fla. Dist. Ct. App. 1987) (revocation not possible where buyer was aware of

defects for one and a half years prior to seeking rescission of the contract).   Both

parties argue that the court misinterpreted the relevant law or misapplied that law to

the facts found.   In such instances, our review is de novo.

## **DISCUSSION**

The parties have divided their arguments on appeal into two distinct groups of

shipments under the milk contract, and the district court generally adhered to this

approach in its opinion.   We adopt the same rubric as the parties, beginning with a

discussion of revocation with respect to shipments 1–16, which were contaminated

with melamine, before turning to questions of anticipatory repudiation of shipments

23 onward.[7]   We then address issues of damages under both the milk and rice

---

[7] Neither party appealed the decisions of the district court related to shipments 17–22.   Exim
recovered for these shipments, which were made when China again permitted shipment, following
a period of no shipments of milk from China.

contracts.   Because this case is brought as a diversity action to which Florida law

applies, specifically its version of the UCC, we will resolve the parties' claims in the

way that we predict the Florida Supreme Court would decide them.   See Bravo v.

United States, 577 F.3d 1324, 1325–26 (11th Cir. 2009) (explaining that we look to

state intermediate court of appeals where the state supreme court has not addressed

an issue).   At the outset, we note that there is surprisingly little case law from our

court or the Florida courts addressing the circumstances similar to those of this case,

and therefore, where relevant, we will look to jurisprudence from other courts

interpreting similar provisions of the UCC.   See State Farm Fire & Cas. Co. v.

Steinberg, 393 F.3d 1226, 1231 (11th Cir. 2004).

### I. Shipments 1–16

The district court concluded that Bariven successfully proved that shipments

1–16 were contaminated,[8] satisfying the element of breach.   The court also

concluded that Bariven provided proper notice of revocation to Exim in its April 2,

2009 email.   The court, however, limited the scope of this notice to only the

shipments for which Bariven had test results in hand, namely shipments 7 and 8.

Accordingly, the court determined that Bariven unreasonably delayed its inspection

---

[8]   Although Exim contested at trial whether the shipments were correctly sampled and tested, as
well as whether the results of those tests proved contamination, the district court rejected these
arguments, and they were not raised on appeal.

12

and notice for all other shipments, barring Bariven's attempted revocation.   Bariven

argues that it successfully revoked its acceptance of shipments 1–16 of the milk

contract after it discovered that they were substantially contaminated with

melamine.   Exim responds that even though the milk from those shipments was

contaminated, Bariven is barred from recovering for any shipments because it did

not inspect the goods within a reasonable time or provide timely and sufficient

notice of the breach to Exim.

A buyer accepts goods when: "(a) After a reasonable opportunity to inspect

the goods [it] signifies to the seller that the goods are conforming or that the buyer

will take or retain them in spite of their nonconformity; or (b) Fails to make an

effective rejection, but such acceptance does not occur until the buyer has had a

reasonable opportunity to inspect them . . . ."   Fla. Stat. § 672.606 (internal citation

omitted).   Florida's version of the UCC allows revocation of acceptance due to

substantial nonconformity where the buyer "has accepted . . . [w]ithout discovery of

such nonconformity if her or his acceptance was reasonably induced either by the

difficulty of discovery before acceptance or by the seller's assurances."

§ 672.608(1).   "Revocation of acceptance must occur within a reasonable time after

the buyer discovers or should have discovered the ground for it and before any

13

substantial change in condition of the goods which is not caused by their own

defects.   It is not effective until the buyer notifies the seller of it."   § 672.608(2).

Notice of revocation need not take a particular form, including use of the word

breach, but "[t]he buyer must within a reasonable time after he or she discovers or

should have discovered any breach notify the seller of breach or be barred from any

remedy . . . ."   § 672.607(3)(a); see T.J. Stevenson, 629 F.2d at 359 (applying the

UCC as adopted in Illinois).   As Judge Learned Hand explained:

> The notice "of the breach" required is not of the facts, which the seller
> presumably knows quite as well as, if not better than, the buyer, but of
> buyer's claim that they constitute a breach.   The purpose of the notice
> is to advise the seller that he must meet a claim for damages, as to
> which, rightly or wrongly, the law requires that he shall have early
> warning.

E. Air Lines, Inc. v. McDonnell Douglas Corp., 532 F.2d 957, 972 (5th Cir. 1976)

(quoting Am. Mfg. Co. v. U.S. Shipping Bd. E. F. Corp., 7 F.2d 565, 566 (2d Cir.

1925)).   Notice is intended to "open the way for settlement through negotiation

between the parties."   Id.

*Acceptance*

As a preliminary matter, we examine the timing of Bariven's acceptance of

shipments 1–16 because it impacts the determination of whether Bariven accepted

the goods prior to the melamine alert.   The trial court determined that Bariven

accepted shipments only when they arrived in port in Venezuela.   The court based

14

its decision in part on Bariven's waiver of its right to inspect the goods in China and its decision to hire SGS-North America ("SGS-NA"), its inspection agent, for the limited purpose of overseeing only the loading of the goods, a task that it never actually performed.   Accordingly, the trial court determined that Bariven had an opportunity to inspect the goods only upon their arrival in Venezuela, and, therefore, despite its decision to pay Exim while the goods remained at sea, acceptance was delayed.

In this case, Bariven bargained for a contractual right to inspect the milk before its shipment from China.   Bariven waived this right, relying instead on the reports provided by Exim's inspector, SGS-China.[9]   Bariven paid for the goods from all initial 16 shipments while they were in transit to Venezuela.   Upon each payment, it also transmitted a message to Exim, notifying Exim that the shipment was "received, reviewed, confirmed and accepted."   Based on these uncontested facts, the trial court erred as a matter of law in deciding the time at which acceptance occurred.   Bariven had a contractually-mandated reasonable opportunity to inspect the goods before they left China, and it communicated its acceptance at the time of payment while the goods were en route.   The last of the shipments in this group,

---

[9] This decision was reasonable in light of the fact that SGS-NA, Bariven's inspection company was an affiliate of SGS-China.   In fact, evidence at trial suggested that SGS-NA likely would have used SGS-China as its agent in conducting any inspections under the contract.

15

shipment 16, left China on September 10, 2008, and was paid for on September 18, 2008.   Although possibly not dispositive individually, when taken together, Bariven's prompt payment and acceptance message as well as its opportunity to inspect the goods pre-shipment lead to the conclusion that Bariven accepted the last of these shipments at the latest by September 18, 2008, before the melamine alert became public.

Applying its faulty acceptance analysis, the trial court then determined Bariven accepted the goods in shipments 1–5 because it had no reason to inspect for melamine, and shipments 6–8 were accepted based on assurances from Exim that the powdered milk was unaffected by the melamine alert.   The court decided, however, that shipments 9–16 were accepted upon arrival in Venezuela only after an October 2, 2008, internal email in which Bariven decided to test all of Exim's powdered milk going forward, a policy it did not put into practice.   Accordingly, the court determined that Bariven failed to satisfy the second prong of the revocation statute because it knew of the melamine alert and could have discovered the defect before accepting the goods.[10]

---

[10] In finding that Bariven did not rely on Exim's assurances that the milk was free of contamination, the district court apparently failed to understand how Bariven's internal policy could be squared at all with reliance.   It is possible that Bariven considered Exim's test results and assurances in delaying the implementation of its internal policy, at least with respect to Exim. Because we have decided that these shipments were accepted prior to the melamine alert, the district court's findings with respect to reliance are not relevant to our analysis on revocation, (continued...)

16

Because these 16 shipments were accepted prior to the melamine alert, Bariven accepted them without discovery of the nonconformity.   Both parties concede that the product would not have been tested for melamine contamination by a reasonable buyer prior to the alert.   Thus, Bariven cannot be charged with failure to discover the defect prior to acceptance.   Accordingly, Bariven has satisfied the second prong of the revocation analysis.   The only question that remains is whether Bariven undertook a reasonable inspection in order to provide sufficient and timely notice of the breach to Exim.

*Inspection*

Bariven's inspection efforts were far from ideal and in the absence of the relevant context may seem entirely unreasonable.   The district court, while clearly unimpressed with Bariven's efforts to test its milk in light of the ongoing food crisis, as well as with the company's internal decision of October 2008 to test all milk, still decided that Bariven's initial testing was factually reasonable both in terms of scope and time.   Where the district court took issue with Bariven's testing program was with Bariven's decision to delay testing three more shipments for one month after receiving positive test results for shipments 7 and 8 in March 2009 and with delaying the testing of the remaining shipments until February 2010.

_____

(...continued)
which depends on the difficulty of discovery of the contamination.

*Notice*

This failure to make what the court determined to be a reasonable inspection, however, only directly affected Bariven's rights to the extent that it precluded Bariven from being able to give timely notice of a breach to Exim.   This time period for notice begins to run from the time at which the buyer discovered or should have discovered the defect.   See Fla. Stat. § 672.608(2).

The court analyzed the notice of breach at issue here under two prongs: timeliness and sufficiency.   Although Bariven argued below that it provided notice of revocation at several points in time, the court ultimately settled on the communication of April 2 as a revocation notice, at least for some shipments.   That email called for an "urgent meeting . . . in light of the results obtained on the melamine test performed on [Exim's milk]."   It further demanded that Exim reply within 48 hours or Bariven "reserve[d] the right to take legal action in order to defend our legitimate interests."   Because the parties have not directed us elsewhere on appeal, we will look only to the sufficiency and timeliness of the April 2 notice, taking into consideration the relevant circumstances and course of conduct of the parties.   Ultimately, we agree that any reasonable seller in Exim's position would have understood the April 2 notice to amount to a revocation in light of the ongoing discussions and uncertainty regarding the possible contamination of the pre-alert

18

shipments.   And, in fact, Exim confirmed this understanding by filing suit. Although the notice could have been clearer and better supported at the time it was given, the policy concerns relating to clarity of notice are not of particular importance here given the impossibility of cure, and because any ambiguity may have been resolved easily had Exim not responded by filing suit, terminating the contract, and bringing an end to any amicable negotiations between the parties.

<u>Timeliness</u>

Beginning with the question of timely notice, the district court appropriately decided that the notice was timely given the difficulties in testing the milk shipments and the previous lack of awareness in the industry of the possibility of melamine contamination.   This is neither a clearly erroneous finding of fact nor an erroneous application of law to fact.[11]

<u>Sufficiency</u>

Turning to sufficiency, we agree with the district court's conclusion that the April 2 email put Exim on notice that the goods were non-conforming in a specific way, especially in light of the prolonged discussions between the parties regarding

---

[11]  In its brief, Exim emphasizes the perishability of the goods at issue in this case, an issue also debated extensively at trial.   We agree with Bariven, however, that this concern is a red herring in the present case because the goods were completely unusable upon delivery given their contamination upon delivery.   Thus, the spoiling of the milk, prior to some of the inspections, did not change their already worthless condition or the level of contamination, a possible preclusion to revocation under Fla. Stat. section 672.608(2).

19

possible melamine contamination and the problems involving the Venezuelan

Health Ministry.   Furthermore, had Exim not initiated this suit instead of attending

the meeting proposed by Bariven, the email would have opened the way to

negotiations between the parties aimed at resolving the defect, possibly through the

provision of replacement goods as nothing in the record indicates any other curative

option existed.[12]   The trial court, however, decided that in its April 2 email, Bariven

only revoked its acceptance of shipments 7 and 8.   In doing so, the court relied on

its interpretation of the UCC that in an installment contract, a buyer may not revoke

acceptance for non-conformity when it does not have proof on hand that each

shipment for which it seeks revocation is substantially non-conforming.   The court

cites no precedent for this statement but rather relies on its textual reading of Fla.

Stat. section 672.608, requiring revocation to occur within a reasonable time "after"

the buyer discovers or should have discovered the defects.   The trial court

combined this analysis with the UCC's approach to installment contracts that treats

each shipment as a separate contract.

Although a plain reading of the statute could support the trial court's

interpretation, we have recognized that the UCC is to be interpreted generally in

terms of commercial reasonableness and principles of good faith.   See Fla. Stat.

---

[12] Comment six to Fla. Stat. section 672.608 makes it clear that worthless goods need not be offered back to the seller to permit a cure.

§§ 671.203, 672.103(1)(b); see, e.g., T.J. Stevenson, 629 F.2d at 364 (analyzing notice of breach in the context of "commercial good faith"); see also Absolute, 2013 U.S. App. LEXIS 240, at *9–11.[13]   The leading treatise describes the purpose of timely notification as providing opportunity for adjustment or settlement.   J. White & R. Summers, Uniform Commercial Code § 9-4, at 431 (6th ed. 2010) [hereinafter "White & Summers"]; see Nobs Chem., U.S.A., Inc. v. Koppers Co., 616 F.2d 212, 215 (5th Cir. 1980) (looking to White & Summers where the UCC article was unclear).   The treatise also recognizes a distinction between the concepts of "wrongful" rejection and "ineffective" rejection, indicating that a rejection may occur even if the rejecting party is factually incorrect or unsupported in its grounds for rejection, although the party then may be liable for any resulting damages. White & Summers at 423.   This recognizes that a buyer can reject without having absolute support for his alleged breach, although the buyer in turn bears the risk of damages for wrongful rejection as a result.

Based on the evidence presented at trial, Bariven had a good faith reason to believe that other shipments from the same supplier during the same time period likely were tainted.   This conclusion is underscored by Exim's own decision to

---

[13] Although we ordinarily do not cite to unpublished opinions of this court for principles of law, see 11th Cir. R. 36-2, IOP 7, we do so here because of the very similar facts involved in Absolute in which Bariven was litigating another melamine contamination claim against another milk supplier under an identical contract.

"test" four previous shipments to satisfy itself that all of the pre-alert shipments were free of contamination.   Moreover, it is supported by the trial court's own conclusion with respect to shipment 1, which it found to be contaminated despite the lack of any testing, because it was produced at the same time as the other contaminated shipments and by the same supplier.   The purposes of notification were achieved here, and the district court erred in judicially restricting Bariven's notice of revocation to shipments 7 and 8 based on its application of its faulty rule of proof. Additionally, any imprecision in the notice and lack of firm evidence by Bariven at the time of notice did not prejudice Exim, as the defect in the goods could not be cured, and they could not be resold on the market because they were toxic.   Instead of taking an objective approach to Bariven's notice of breach, which it correctly adopted in other parts of its UCC analysis, the trial court construed the notice based only on what Bariven subjectively knew at the time.   This is not consistent with the focus of the UCC on external communications.   Had the meeting scheduled for early April actually taken place, it is likely that the parties would have discussed the current and outstanding test results and established a mutual agreement for sampling and testing the remaining shipments.   Instead, these contentious negotiations occurred over several months in the context of discovery during the protracted litigation of this case.   Accordingly, because we accept the district court's factual

22

determination that the notice of breach of April 2 was timely in light of the

difficulties of inspection but reject its limitations on the scope of that notice, we find

that Bariven properly revoked its acceptance of shipments 1–16.[14]

## II.   Repudiation of Shipment 23

The district court found that Bariven anticipatorily repudiated the contract

with respect to shipment 23.   It decided, however, that Bariven did not repudiate

shipments 24 onward because Exim did not allow Bariven sufficient time to provide

adequate assurances of performance, and Exim failed to demonstrate its capacity

and readiness to continue performing the contract.   Exim argues that the court erred

because Bariven repudiated the contract for shipments 23 onward.   Bariven claims

that it did not repudiate the contract with respect to any shipments.

Florida law has two provisions governing anticipatory repudiation.   Fla. Stat.

section 672.609 provides:

> When reasonable grounds for insecurity arise with respect to the
> performance of either party the other may in writing demand adequate
> assurance of due performance and until he or she receives such

---

[14]   Because the standards for providing notice of revocation are at least as high if not higher than
those for claims of a breach of warranty, Bariven also provided sufficient and timely notice for its
breach of warranty claim.   We need not repeat that analysis again in assessing Bariven's warranty
claims except to note that the decision of the trial court is reversed as to that determination for the
same reasons.

  This conclusion may have also been relevant to the analysis of Bariven's cancellation claim
raised below but not on appeal.   Because Bariven decided to abandon that claim before this court,
we will not address it.

23

assurance may if commercially reasonable suspend any performance
for which he or she has not already received the agreed return . . . . After
receipt of a justified demand failure to provide within a reasonable time
not exceeding 30 days such assurance of due performance as is
adequate under the circumstances of the particular case is a repudiation
of the contract.

Fla. Stat. section 672.610 states:

When either party repudiates the contract with respect to a
performance not yet due the loss of which will substantially impair the
value of the contract to the other, the aggrieved party may:
(1) For a commercially reasonable time await performance by the
repudiating party; or
(2) Resort to any remedy for breach . . . .

*Right to Demand Adequate Assurances*

A threshold issue of the availability of anticipatory repudiation has been

briefed and argued by both Exim and Bariven to support their claims.   Bariven

takes the position that Exim lost the right to demand adequate assurances under

section 672.609 because Exim was already in breach at the time that it sent the

demand letter.   Exim argues and the district court concluded that because only

Bariven was known to be in breach at the time of the demand for assurances, Exim

retained its rights to invoke section 672.609.

In Advanced Bodycare Solutions, LLC v. Thione Int'l, Inc., 615 F.3d 1352,

1361 (11th Cir. 2010),[15] we decided that a breaching party loses the right to demand

---

[15] In Advanced Bodycare, we interpreted an identical Georgia statute codifying the UCC.

adequate assurances.   While not fully explained in our analysis there, the rule is

based on the principle that a breaching party cannot use anticipatory repudiation as

an attempt to avoid liability.   It may not seek adequate assurances with the sole

intent to suspend or terminate the agreement by manufacturing grounds for a breach

or to coerce the other party to waive its claim for damages.   See id. at 1361 (citing

Hope's Architectural Prods., Inc. v. Lundy's Constr., Inc., 781 F. Supp. 711, 715 (D.

Kan. 1991)).   As explained further in the cases relied upon in Advanced Body,

courts should not permit a breaching party to avoid liability by extracting assurances

that no damages will be sought for its breach or use the manufactured breach as a

subterfuge to escape its own obligations under the contract; such actions would

violate the UCC's overriding principle of good faith and fair dealing.   See United

States v. Great Plains Gasification Assocs., 819 F.2d 831, 834 n.5, 835 (8th Cir.

1987); Hope's, 781 F. Supp. at 715.   Accordingly, a party will only be barred from

invoking section 672.609 where it knew or reasonably should have known at the

time of the demand for assurances that it was in breach.

Here, at the time Exim sent its demand letter, Bariven had not complained to

Exim about its previous shipments based on the later-found contamination; in fact

Bariven could not have done so because it did not yet know the shipments were

contaminated.   Instead, Bariven had breached the contract by refusing to pay for

shipments 18–22 and insisted on inspecting future milk shipments in China while simultaneously refusing to fulfill its role in that process.   Because neither party knew of Exim's breach at the time of the demand letter, Exim's demands were far from the bad faith demands barred by <u>Advanced Bodycare</u>.   Accordingly, Exim's situation does not fall within the scope of the judicially-created exception to the application of section 672.609, and it was permitted to demand assurances.

*Anticipatory Repudiation Under 672.609*

Turning to the merits of the district court's determination that Bariven anticipatorily repudiated the contract, we find that the district court properly applied the law and established a reasonable waiting period for Bariven to reply with assurances.   After a party demands assurances, the other party will be in breach if no response is received within the reasonable waiting period, up to thirty days.   <u>See</u> Fla. Stat. § 672.609.   To recover, the party claiming repudiation must prove that it also was ready and willing to perform.   <u>Mori v. Matsushita Elec. Corp. of Am.</u>, 380 So. 2d 461, 465 (Fla. Dist. Ct. App. 1980).

Exim clearly demanded adequate assurances in its letter of March 19, 2009, when it ordered Bariven's agent to "honor its contractual obligations to receive and pay for the 13,220 metric tons of powdered milk that remain to be shipped under the [Milk] Agreement," including paying the outstanding balance and accepting future

26

shipments by sending inspectors to China.   This demand came after repeated

requests for Bariven to inspect the goods, which Bariven never acted upon, and the

demand clearly covered all shipments from 23 onward.   Bariven's only previous

reply was a February 2009 email indicating that it was awaiting instructions from the

government before it could complete the inspections.   Bariven first responded to

the demand letter on March 27, 2009, calling for a meeting to discuss nationalization

of the milk powder, which was being held pending Venezuelan health permits.

Bariven argues that this response to Exim's demand letter provided the requested

assurances to Exim as to shipment 23.   Bariven primarily relies for support on an

unpublished case from the Sixth Circuit, By-Lo Oil Co. v. ParTech, Inc., 11 F.

App'x 538 (6th Cir. May 30, 2001).   In that case, the court found a company's

response to a demand for assurances was adequate as a matter of law because the

company said it would look into a product issue that could not have harmed the other

party for at least two years.   Id. at 545.   Bariven's reliance is misplaced, because

here, Bariven had refused to pay for several shipments and blocked payment under

the letter of credit, causing immediate harm to Exim.   Without a promise to actually

remedy the payment issue, this response was reasonably seen as inadequate by the

district court.

27

Bariven again responded on April 2, 2009, calling for an urgent meeting to discuss positive melamine results.   Bariven further demanded that Exim respond within forty-eight hours, or Bariven reserved the right to take legal action. Although Bariven may be correct that a proposal for meetings to discuss conflicts between the parties may sometimes operate as adequate assurances, the proposal here did not in light of the clarity of Bariven's insistence on inspections and its own recognition of its non-performance.   The trial court correctly found that none of Bariven's communications provided Exim with adequate assurances as to future performance in light of the repeated demands by Exim to perform.   Although Exim waited only until April 7, 2009, less than the statutory maximum time of thirty days after its demand for assurances, to initiate this lawsuit, the trial court found this period of time sufficient to trigger repudiation for shipment 23, in part because the requests for inspections and payment had begun in January and Bariven had communicated its inability to perform the inspections.   In light of the record evidence, we cannot say that the district court's findings of fact or conclusions of law as to shipment 23 were erroneous.[16]

---

[16] Exim argues that the trial court used the thirty-day maximum period of time for adequate assurances as an automatic standard to apply in this case.   The trial court, however, specifically noted that the thirty-day period was not required in every case, and instead, it selected thirty days for shipments 24 forward based on an analysis of what was a reasonable period under the circumstances.   Based on this explanation, it is clear that the district court did not misconstrue the law as constraining its role as a fact finder to determine independently a reasonable period of time. (continued...)

The district court, however, did not allow Exim to recover for scheduled shipments 24 and beyond because it found that Exim did not wait long enough for Bariven to provide adequate assurances before initiating suit (waiting only eighteen days).   The court's analysis focused on the fact that the demand letter was the first mention of performance beyond shipment 23.   The trial court decided that Bariven in fact may have responded favorably to the demand letter had Exim not initiated suit within the thirty-day waiting period found reasonable by the court.[17]   Although the evidence shows that Bariven's performance was rather unlikely as Bariven never provided any indication that it would have inspected the future shipments and instead threatened possible legal action as of April 4, 2009, we cannot say that the district court erred in interpreting the law or applying it to the facts it found.   The court correctly found that Fla. Stat. section 672.609 looks only to objective, external communications and not internal plans.   As noted supra, because we find that the thirty-day waiting period was not an unreasonable one for these future shipments, for which performance had not been requested previously, we agree with the district

_____

(...continued)

[17] Exim's filing suit operated as a cancellation of the contract, ending any need for future performance or assurances of performance by Bariven.   See Fla. Stat. §§ 672.106(4), 672.612(3).

29

court's limitation in restricting Exim's anticipatory repudiation claim to shipment 23.[18]

Exim argues further that even if the full thirty-day waiting period was reasonable, Bariven's reply on April 2 was inadequate and gave rise to an immediate repudiation because it threatened litigation and claimed breach. The case upon which Exim relies, however, does not involve a response similar to Bariven's reply. See Land O'Lakes, Inc. v. Hanig, 610 N.W.2d 518, 523–24 (Iowa 2000). In Land O'Lakes, the breaching party provided "assurances" in the form of agreeing to perform only if the other party first obtained an order demonstrating that the contract was enforceable. Id. This amounted to the breaching party's "promise plus the right to win a lawsuit." Id. at 523 (internal quotation marks omitted). Unlike in that case where the repudiating party expressly promised not to perform in the future because he believed the contract to be unenforceable, Bariven never made any representations that its contract with Exim was no longer enforceable or valid. It simply asserted that Exim might be liable for beach and damages based on past

---

[18] The district court alternatively rejected Exim's claims for anticipatory repudiation for shipments 24 onward because Exim failed to present sufficient proof that it was ready and able to continue performance. Although we note our concern with the trial court's apparent requirement that an aggrieved party must prove that it already has incurred expenses for future shipments in order to prove its ability to continue performance, a position that seems at odds with other case law, we need not reach that question as we have decided on different grounds that the district court reasonably found that Exim cut off its anticipatory repudiation claim by prematurely initiating this suit with respect to shipments 24 onward.

30

shipments.   <u>Land O'Lakes</u> is therefore distinguishable in the present case as to

shipments 24 forward.

*Repudiation Under 672.610*

Exim also claims that the district court failed to consider the application of

Fla. Stat. section 672.610.   In its order denying Exim's motion for reconsideration,

the trial court clarified that it had considered and again rejected Exim's repudiation

argument because the evidence did not support a finding that Bariven had

communicated its clear intent to repudiate the contract with respect to all remaining

shipments.

Although the interrelation between repudiation under Fla. Stat. sections

672.609 and 672.610 is not made clear in the statutes, both parties conceded in

their arguments before the district court that the standards are distinct, such that a

party could succeed based on one but not the other.   The comments to section

672.610 explain, "[A]nticipatory repudiation centers upon an overt communication

of intention or an action which renders performance impossible or demonstrates a

clear determination not to continue with performance."   Fla. Stat. § 672.610 cmt.

1.   Additionally, "[i]t is not necessary for repudiation that performance be made

31

literally and utterly impossible.    Repudiation can result from action which reasonably indicates a rejection of the continuing obligation." Id. cmt 2.    In evaluating whether a party has repudiated the contract in response to demands for adequate assurance, we must look for distinct, unequivocal, and absolute words or acts that communicate refusal to perform.    Mori, 380 So. 2d at 463; see also Am. Cyanamid Co. v. Miss. Chem. Corp., 817 F.2d 91, 93 (11th Cir. 1987) (applying UCC as adopted in New Jersey).

Exim has failed to point to any "overt communication" by Bariven that it intended to no longer perform under the contract.    See Fla Stat. § 672.610 cmt. 1. At best, Bariven's email of February 17, 2009, that communicated Bariven was unable at the time to send inspectors for shipment 23 gave rise to reasonable grounds for Exim's insecurity.    Nowhere in that email or in Bariven's later requests for meetings, however, did Bariven tell Exim that it had no intention to perform with respect to future shipments.    Bariven's failure to pay for shipments 18–22 does not alter this conclusion as that breach related only to those shipments and did not clearly communicate Barvien's intentions with regards to future shipments.    In fact, the parties' interactions demonstrate a belief that both parties would continue under the contract.    Bariven's email of November 17 demanded that no shipments be sent prior to PSI's inspection but envisioned future shipments

32

subject to the satisfaction of this condition; Exim responded by providing information to permit such inspections, indicating that Exim interpreted this communication to not be a repudiation with respect to future shipments.    Any internal communications within Bariven to the contrary are not relevant for analysis under Fla. Stat. section 672.610.    Absent such a showing of clear repudiation, Exim was constrained to the anticipatory repudiation procedures laid out in Fla. Stat. section 672.609 and addressed supra.    We conclude, therefore, that Bariven did not repudiate the contract under section 672.610.

### III.    Mitigation and Proof of Damages

The district court concluded that Bariven was not entitled to recover for its entire storage costs for rice and milk.   The court reduced Bariven's recovery for storage costs under the milk contract because Bariven continued to store the milk long after it had spoiled, which was an unreasonable effort to mitigate damages. With respect to the rice storage costs, the court found that as of the initiation of the present litigation in April 2009, Bariven should have realized that it could not expect continued cooperation from Exim.   Accordingly, Bariven should have attempted to nationalize the goods using an alternative legal mechanism or returned the goods to Brazil instead of waiting for Exim to supply original documents while storage costs escalated.

33

Exim agrees with the trial court's reduction of Bariven's storage costs, but it claims that the costs for both milk and rice storage are unrecoverable in their entirety as a matter of law.   Exim contends that the alleged damages were incurred only by PDVSA Petróleos, an affiliate of Bariven, which is not a party to the contract or this litigation.   Bariven contends that Exim's arguments based on Bariven's ability to recover for costs invoiced to its affiliate lack legal and factual support.   Bariven also claims it could not have mitigated the rice storage costs further because it could not nationalize the goods and had no reason to doubt Exim's continued performance under the separate rice contract, despite its suit on the milk contract.

Fla. Stat. section 672.714(1) allows that: "Where the buyer has accepted goods and given notification . . . he or she may recover as damages for any nonconformity of tender the loss resulting in the ordinary course of events from the seller's breach as determined in any manner which is reasonable."   Additionally, under Fla. Stat. section 672.715(1), a buyer is entitled to recover incidental and consequential damages including "expenses reasonably incurred in inspection, receipt, transportation and care and custody of goods rightfully rejected, any commercially reasonable charges, expenses or commissions in connection with effecting cover and any other reasonable expense incident to the delay or other breach."   In order to recover damages, however, the buyer must have made

34

reasonable effort to mitigate those damages.   Nyquist v. Randall, 819 F.2d 1014,

1019 (11th Cir. 1987) (interpreting Florida's UCC).   Questions regarding the

reasonableness and quantification of damages are generally issues of fact for which

we will defer to the trial court, provided the findings are not clearly erroneous.

Orange Beach Water, Sewer & Fire Protection Auth. v. M/V Alva, 680 F.2d 1374,

1383 (11th Cir. 1982).

*Direct Costs*

Exim argues that all storage costs claimed by Bariven as damages were not

recoverable because only PDVSA Petróleos incurred the costs, and the costs were

never invoiced to Bariven.   The district court dismissed this challenge both in its

initial order and in its denial of Exim's motion for reconsideration.

Exim relies on two cases to argue that these damages are not recoverable as a

matter of law.[19]   Both cases, however, are not from this circuit, do not apply the

UCC, and do not relate to a state-owned conglomerate.   Instead, one addresses an

actual loss requirement imposed by the Pennsylvania courts in cases of attorney

malpractice; the other addresses the ability of a third party to seek a constructive

---

[19]  Bariven argues that we may reverse the district court's determination on this issue only if it is
clear error, citing to Orange Beach Water, Sewer & Fire Protection Auth. V. M/V Alva, 680 F.2d
1374, 1383 (11th Cir. 1982).   This standard of review, however, applies only to factual
determinations made in calculating damages.   Id.   Exim seems to frame its challenge as
addressing both legal and factual conclusions, specifically, 1) whether a company may recover for
losses paid by a sister company, and 2) whether Bariven directly incurred a loss for the storage
fees.   Ultimately, in this case, the answer to question two renders question one irrelevant.

trust of the assets of independent LLCs.   See Gen. Nutrition Corp. v. Gardere

Wynne Sewell, LLP, 727 F. Supp. 2d 377 (W.D. Pa. 2010); Mitchell Co. v. Campus,

2009 WL 1758835 (S.D. Ala. June 17, 2009).   These cases do not involve laws that

are directly analogous to any provision of the UCC.

Upon review of the case law, we have not located a Florida or Eleventh

Circuit case addressing this issue in the context of the UCC.   It is true that we

normally will not disregard corporate formalities to allow one company to recover

damages incurred by a non-contracting party, absent a finding of consequential

damages.   See Martens v. Barrett, 245 F.2d 844, 846–48 (5th Cir. 1957).   Of

course, here, a contracting party makes the claim and the facts of this case represent

a somewhat unique situation in part due to the non-traditional operation of the

various business entities operating within the PDVSA umbrella.

The district court noted that the testimony on the invoices for the storage costs

was somewhat contradictory and unclear.   Bariven's employee testified that

PDVSA Petróleos was the entity responsible for making all payments in Venezuelan

Bolivares, and it would not invoice Bariven for these payments.[20]   On the other

---

[20]   According to trial testimony, within the overall state-owned PDVSA system, PDVSA Petróleos
was solely responsible for paying storage costs.   This reflects, in part, the unique organization of
the state owned enterprise, which gave little consideration to profits and losses of its separate
corporate entities, and instead employed the companies as operational arms on behalf of the
parent, PDVSA.   For example, the letter of credit used to guarantee payment under the contract
and ultimately drawn on for shipments 18–22 was funded by yet another entity within the PDVSA
(continued...)

36

hand, Bariven was responsible for receiving the invoices, inputting them into the PDVSA payment system, and following up on payments.   As a result, the district court found that the testimony regarding the name on the invoices and the lack of proof of an intra-company reconciliation was not significant enough to overcome Bariven's proof of storage costs that are concededly tied to the milk and rice shipments at issue in this case.   The district court properly recognized the lack of clarity involved in the internal operations and accounting of the state-owned companies involved in this case and found that the testimony on which Exim relied is not factually sufficient to overcome Bariven's proof of damages that clearly stemmed from the contract and would have been borne solely by Bariven in the normal course of business.   We do not find this interpretation of conflicting evidence to be clearly erroneous.

> *Nationalization of the Rice*

The district court denied the full extent of Bariven's requested recovery for the rice storage costs while the goods were detained by customs until October 2009. The court based its conclusion on a belief that Bariven should have known Exim would no longer send original importation documents as of the filing of the lawsuit

---

(...continued)
corporate umbrella.

covering the milk contract in early April 2009.   The court further reduced the award

because it found that Bariven's alleged damages exceeded the contract value and

would therefore be a "windfall."   The court incorrectly imposed a numerical

limitation on the damages recoverable by Bariven under the UCC.   The cases

primarily relied upon by the trial court, <u>Nobs</u>, 616 F.2d at 215, and <u>Sharick v. Se.

Univ. of the Health Sci.</u>, 780 So. 2d 136, 140 (Fla. Dist. Ct. App. 2000), do not

support the court's approach, and there is no independent rule that damages may not

exceed the contract price provided they are actually incurred and proven with

certainty.   It often may be the case that direct contract damages when combined

with incidental and consequential damages may exceed the entire contract price.

Here, Bariven produced uncontested invoices for all of its storage costs, and Exim

has not claimed that the rates were unreasonable, objecting only that they were

unnecessary.   Accordingly, Bariven was entitled to all reasonable damages required

to make it whole in accordance with the UCC's principles of complete remedy,

provided an opportunity to mitigate was not available.

 Additionally, the district court faulted Bariven for not attempting to

nationalize the goods by means of a "letter of commitment" or a <u>carta de

compromiso</u>.   Under this legal procedure within the Venezuelan customs system,

Bariven had been able to secure the release of other rice shipments by providing

38

assurances to customs that the necessary importation documents would be provided in the near future, typically within a few weeks, and providing copies of the documents.   This process allows the release of the goods while the original documents are en route.   The court's conclusion that Bariven could have used such a process in this instance is belied by its earlier determination that Bariven should not have expected to ever receive the documentation from Exim and instead should have attempted to return the goods.   The uncontradicted trial testimony explained that re-exportation was not possible after about two weeks, and legal abandonment, the only other option, was entirely within the discretion of the customs authorities. Although a letter of commitment could be used to guide customs authorities in their discretion, such an option was admittedly not available here where the district court found that it would be unreasonable for Bariven to expect the original shipping documents from Exim.   Because the district court misinterpreted the law governing Bariven's duty to mitigate given the uncontradicted trial testimony, the decision reducing Bariven's incidental damages related to rice storage costs is reversed.

## **CONCLUSION**

Although the district court completed a formidable task well in resolving many of the difficult issues in this uncharted area and factually dense case, it erred in determining when acceptance of shipments 1–16 occurred and the scope of

Bariven's revocation notice of April 2.   Accordingly, Bariven properly revoked acceptance of shipments 1–16, and it is entitled to damages resulting from all of these shipments, not just shipments 7 and 8.   The district court correctly found that Bariven repudiated the contract with respect to shipment 23 but not to any other future shipments.   Finally, the district court erred in concluding that Bariven should have nationalized the rice shipments earlier than it did.   Consequently, the court should have awarded all storage costs under the rice contract required to make Bariven whole.   We remand to the district court so that it may recalculate the damages to which each party is entitled in a manner not inconsistent with this opinion.

**AFFIRMED IN PART; REVERSED IN PART; REMANDED**